# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION AT COLUMBUS

NAWAZ AHMED,

                    Petitioner,

         -vs.-

MARC C. HOUK, Warden,

                  Respondent

:

:

:

:

Case No. 2:07-cv-658

District Judge Michael H. Watson
Magistrate Judge Michael R. Merz

---

# REPORT AND RECOMMENDATIONS

---

Petitioner Nawaz Ahmed is before this Court on a Petition for a Writ of Habeas Corpus (Doc. No. 35), in which he advances twenty-seven grounds for relief challenging his convictions and sentences for the aggravated murders of his wife Lubaina Bhatti Ahmed, his father-in-law Abdul Bhatti, his sister-in-law Ruhie Ahmed, and his two-year-old niece Nasira Ahmed. Respondent has filed his Return of Writ (Doc. No. 61), Ahmed filed his Traverse (Doc. No. 71), and the matter is now ripe for decision.

## FACTS

The facts leading to Ahmed's convictions and death sentences were found by the Ohio Supreme Court to be as follows:

> In October 1998, Lubaina hired an attorney to end her marriage with [Ahmed] and to secure custody of their two children, Tariq and Ahsan. According to Lubaina's divorce attorney, [Ahmed] did not want a divorce, and consequently, it was a hostile divorce proceeding. In early February 1999, shortly after the complaint for

1

divorce had been filed, Lubaina was awarded temporary custody of the children and exclusive use of the marital residence. Later that month, the divorce court issued a restraining order to prevent [Ahmed] from coming near Lubaina or making harassing phone calls to her.

[Ahmed] had accused Lubaina, a physician, of having an affair with another physician, and claimed that their oldest son, Tariq, was not his. A subsequent paternity test showed that claim to be false. According to Lubaina's divorce attorney, Grace Hoffman, Lubaina had been afraid of [Ahmed] and she had called Hoffman three or four times a week, "scared [and] frustrated * * *. It just kept escalating." Lubaina had also confided to Hoffman that [Ahmed] had forced her to have sex with him during the marriage.

Tahira Kahn, one of Lubaina's sisters, corroborated that Lubaina had feared [Ahmed]. She also testified that Lubaina had told her that [Ahmed] had raped her repeatedly.

The owner of the rental home where Lubaina resided testified that Lubaina had called him in February 1999 and asked him to change the locks on the house. He stated that Lubaina had been very upset and had asked that he change them within the hour.

In March 1999, Lubaina complained to police that [Ahmed] was harassing her by telephone, but after the officer explained that the matter could be handled through criminal or civil proceedings, she decided to handle it through the ongoing divorce proceedings. The final divorce hearing was scheduled for Monday, September 13, 1999, and Lubaina had arranged for her sister Ruhie to fly in from California the Friday before to testify at the hearing.

On Friday, September 10, 1999, [Ahmed] called Lubaina's office several times. But Lubaina had instructed the medical assistants at her office to reject any phone calls from him. Then, at approximately 4:00 p.m. that day, Lubaina took [Ahmed's] call. [Ahmed] who worked and lived in Columbus, wanted Lubaina to bring the children to him for the weekend two hours earlier than planned. [Ahmed] claimed that he was planning a surprise birthday party for their youngest son. Lubaina, however, refused to change her plans and told [Ahmed] that he was using the birthday party as an excuse to inconvenience her.

Rafi Ahmed, husband of Ruhie and father of two-year-old Nasira, testified that Ruhie and Nasira had been scheduled to arrive in Columbus from California at 10:34 p.m. on Friday, September 10. Ruhie had planned to call Rafi that night when she arrived at Lubaina's home near St. Clairsville. However, since he had not heard from Ruhie, Rafi began calling Lubaina's home at 1:21 a.m., Saturday, September 11. Rafi called 20 to 25 times, but he got only Lubaina's answering machine. At approximately 3:00 a.m., he called the Belmont County Sheriff's Office.

A parking receipt found in Lubaina's van indicated that the van had entered a Columbus airport parking lot at 9:30 p.m. and exited at 11:14 p.m. on September 10, 1999.

Around 3:45 a.m. on September 11, in response to Rafi Ahmed's call, a sheriff's detective went to Lubaina's home and knocked on the doors and rang the doorbell. She got no answer. The detective also looked in the windows, but nothing at the home appeared to be disturbed.

Later that day, Belmont County Sheriff's Department Detective Steve Forro was assigned to investigate the missing persons. He recognized Lubaina's name because he was the officer who had talked to her regarding [Ahmed's] harassing phone calls. Forro called [Ahmed's] home to see if he had any information. [Ahmed] did not answer, so Forro called Columbus police to have them check [Ahmed's] apartment. They did and found that he was not home.

Forro went to Lubaina's home at 2:18 p.m. As he walked around the outside of the house, he noticed a flicker of a car taillight through a garage window. Using a flashlight, he looked through the window and saw a van with its hatch open and luggage inside. He then saw the body of a man on the floor covered with blood.

Forro called for backup. Deputy Dan Showalter responded and entered through a side door, which he had found unlocked. He searched the house and found three more bodies on the basement floor.

Detective Bart Giesey found [Ahmed's] MCI WorldCom employee badge on the basement floor near the bodies. Records from [Ahmed's] employer, MCI WorldCom in Hilliard, Ohio, revealed that [Ahmed's] badge was last used at 7:19 p.m. on September 10, 1999.

Through several inquiries, police learned that [Ahmed] was scheduled to depart from JFK [International Airport in New York] for Lahore, Pakistan, that evening. Earlier that day, [Ahmed], through a travel agent, had booked a flight leaving for Pakistan that same evening. [Ahmed] arrived at the agent's home with both of his sons and asked if he could leave them with the agent, saying that his wife would pick them up soon. [Ahmed] wrote on the back of his and Lubaina's marriage certificate, which he gave to the agent, that he was leaving his sons to be handed over to his wife. [Ahmed] also signed his car over to the agent. The agent then drove [Ahmed] to JFK to catch his flight to Pakistan.

At 8:10 p.m., Robert Nanni, a police officer stationed at JFK, learned that [Ahmed] was a murder suspect and that he had checked in for a flight scheduled to leave for Pakistan at 8:55 p.m. [Ahmed] was located and arrested. Nanni noticed a large laceration on [Ahmed's] right thumb. Nanni read [Ahmed] his rights and called airport paramedics to attend to [Ahmed's] thumb. Among the items confiscated from [Ahmed] was an attaché case containing 15 traveler's checks totaling $7,500, his will, and $6,954.34 in cash.

. . .

At trial, Dr. Manuel Villaverde, the Belmont County Coroner, testified that he had been called to the crime scene on September 11, 1999. All four victims appeared to have died from blood loss from slashes on their necks. Based on the condition of the bodies, he determined that the victims had been killed at approximately 3:00 a.m. that day, with two to four hours' variation either way.

A deputy coroner for Franklin County performed autopsies on all four victims and concluded that each victim had died from skull fractures and a large cut on the neck.

Diane Larson, a forensic scientist at the DNA-serology section of the Bureau of Criminal Identification and Investigation ("BCI"), concluded that the DNA of blood found in the kitchen of Lubaina's home matched [Ahmed's] DNA profile. The probability of someone else in the Caucasian population having that same DNA profile is 1 in 7.6 quadrillion, and in the African-American population, the probability is 1 in 65 quadrillion.

*State v. Ahmed*, 103 Ohio St. 3d 27, 27-30, 2004-Ohio-4190 at ¶¶ 2-20 (2004).

# PROCEDURAL HISTORY[1]

Ahmed was found guilty of the aggravated murders of Lubaina Bhatti Ahmed, Abdul Bhatti, Ruhie Ahmed, and Nasira Ahmed on January 25, 2001. (Appendix, Vol. 2 at 258-268.) Each count also carried a multiple-murder specification, and the count concerning Nasira's murder included the additional specification of murder of a child under the age of thirteen. *Id*. Ahmed was found guilty of those specifications as well. *Id*. Following a mitigation hearing, the jury recommended a sentence of death on each of the four aggravated murder counts, *id*. at 320-27, and after independently weighing the aggravating circumstances and mitigating factors, the trial court imposed a sentence of death. (Appendix, Vol. 2 at 359-371; Vol. 3 at 14-16.)

On April 29, 2002, Ahmed pursued a direct appeal to the Ohio Supreme Court, advancing nineteen propositions of law. (Appendix, Vol. 3 at 245-484.) The state supreme court denied each of Ahmed's propositions of law, *State v. Ahmed*, 103 Ohio St. 3d 27, 2004-Ohio-4190 (2004), and a subsequent motion to reconsider was also denied (Appendix, Vol. 3 at 429-446). The United States Supreme Court later denied Ahmed's petition for a writ of certiorari. (Appendix, Vol. 5 at 170.)

On December 2, 2004, Ahmed filed an application to reopen his direct appeal alleging his appellate counsel provided ineffective assistance when they failed to raise an additional ten propositions of law. (Appendix, Vol. 5 at 72-81.) That application, along with a motion to amend the application were denied by the Ohio Supreme Court on March 2, 2005, because Ahmed failed to

---

[1]Although he was at all times represented by counsel, Ahmed filed voluminous *pro se* motions, etc. throughout his state-court proceedings. Those motions will be discussed in the Court's analysis of Ahmed's grounds for relief if and when they are relevant to the issue at hand.

comply with the 90-day filing deadline for applications to reopen set forth in Ohio S. Ct. Prac. R. XI, Section 6(A). (Appendix, Vol. 5 at 113.)

At the same time, Ahmed was pursuing post-conviction relief in the state trial court alleging fifteen claims for relief. (Appendix, Vol. 6 at 189-233.) Ahmed later amended his petition to include a sixteenth claim for relief (Appendix, Vol. 8 at 68-71), and a seventeenth claim for relief, *id*. at 114-18). His petition for post-conviction relief was denied (Appendix, Vol. 8 at 319-46), and on March 24, 2006, Ahmed appealed that decision to the state court of appeals raising six assignments of error (Appendix, Vol. 9 at 85-130). The court of appeals, however, affirmed the trial court's denial of Ahmed's post-conviction petition. *State v. Ahmed*, No. 05-BE-15, 2006-Ohio-7069, 2006 WL 3849862 (Ohio App. 7ᵗʰ Dist. Dec. 28, 2006). The Supreme Court of Ohio declined to exercise jurisdiction over a further appeal to the Ohio Supreme Court (Appendix, Vol. 10 at 3-39) and dismissed the case as not involving any substantial constitutional question, *id*. at 121.[2]

## ANALYSIS

Since Ahmed filed his Petition for a Writ of Habeas Corpus well after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the amendments to 28 U.S.C. § 2254 embodied in that Act are applicable to his petition. (*See* Petition, Doc. No. 35.) The Sixth Circuit has summarized the standard of review under the AEDPA as follows:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) . . . , a federal court

---

[2]Although a document purporting to be an Entry dismissing Ahmed's appeal from the denial of his post-conviction petition does appear at the designated page, it has neither a signature of any Ohio Supreme Court justice or clerk, nor does it possess a file stamp indicating that it was actually filed. The docket in the state supreme court case, however, reveals that a "Copy of entry sent to clerk" occurred on June 6, 2007. (Appendix, Vol. 10 at 2.)

may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state court unless (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" . . . or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir.2002) (quoting 28 U.S.C. § 2254(d)).

This standard requires the federal courts to give considerable deference to state-court decisions. *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir.1998) ("[the AEDPA] tells federal courts: Hands off, unless the judgment in place is based on an error grave enough to be called unreasonable.") (citation and quotation marks omitted).

The first line of analysis under [the] AEDPA involves the consistency of the state-court decision with existing federal law. A state-court decision is considered "contrary to . . . clearly established Federal law" if it is "diametrically different, opposite in character or nature, or mutually opposed." *Williams v. Taylor*, 529 U.S. 362, 405 [sic] (2000) (emphasis and quotation marks omitted). Alternatively, to be found an "unreasonable application of . . . clearly established Federal law," the state-court decision must be "objectively unreasonable" and not simply erroneous or incorrect. *Id.* at 409-11.

The second line of analysis under [the] AEDPA concerns findings of fact made by the state courts. [The] AEDPA requires federal courts to accord a high degree of deference to such factual determinations. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. The [federal] court gives complete deference to the . . . state court's findings of fact supported by the evidence." *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir.2004) (citations omitted).

*Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007)(parallel citations omitted). Of course, the "clear and convincing evidence" being offered to rebut the presumption of correctness due a state court's factual findings refers to evidence found within the state court record. *Cullen v. Pinholster*,

556 U.S. ___, ___, 131 S.Ct. 1388, 1398 (2011); 28 U.S.C. § 2254(d)(2). The Sixth Circuit has agreed that pursuant to *Pinholster,* under 28 U.S.C. § 2254(d)(1), when addressing a claim that was adjudicated on the merits by the state court, the habeas court's review is limited to the record that was before the state court. *Bray v. Andrews,* 640 F.3d 731, 737 (6th Cir. 2011). In addition, federal courts are explicitly limited by the statutory language itself to evidence that was before the state court when 28 U.S.C. § 2254(d)(2) is applicable.

As the court of appeals has stated, "federal courts need not review every point of error raised by a *habeas* petitioner." *Hoffner v. Bradshaw*, 622 F.3d 487, 495 (6th Cir. 2010). The court explained:

> When a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice . . . or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In this circuit, to determine whether a federal claim has been procedurally defaulted, we apply the three-prong test initially laid out in *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986):
>
> > First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule . . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction . . . . Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim . . . .
>
> *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin*, 785 F.2d at 138). If the state procedural rule was not complied with and that rule was an "adequate and independent" ground for default, we may still excuse the default if the petitioner can demonstrate "that there was 'cause' for him not to follow the procedural rule and that he

was actually prejudiced by the alleged constitutional error." *Maupin*, 785 F.2d at 138.

*Hoffner*, 622 F.3d at 495 (parallel citations omitted). It is with these principles in mind that this Court considers Ahmed's twenty-seven grounds for relief.


**First Ground for Relief**

In his first ground for relief, Ahmed contends he was deprived of his "fundamental right to his own funds to employ counsel of choice, plan his defense and employ experts of his choosing." (Petition, Doc. No. 35 at PageID 173.) Respondent argues the claim is both procedurally defaulted and meritless. (Return of Writ, Doc. No. 61 at PageID 970-73.) Ahmed disputes that the claim is procedurally defaulted, and contends that the state court addressed the merits of his claim on six different occasions. (Traverse, Doc. No. 71 at PageID 1648-84.)

**Procedural Issues**

It is true, as Ahmed asserts, that Respondent filed a Motion to Dismiss Procedurally Defaulted Claims (Doc. No. 39) approximately three months after Ahmed filed his Petition, seeking dismissal of several of Ahmed's habeas claims, but not the instant ground for relief. Shortly after this case was transferred to the undersigned Magistrate Judge, this Court recommended that the Motion to Dismiss itself be denied and instructed that Respondent should instead include the procedural defense in his Return of Writ so that the case could be decided as a whole. (Doc. No. 57.) Neither party filed objections to the Report and Recommendations, and it was adopted by District Judge Michael H. Watson on September 14, 2010. (Doc. No. 58.) Thereafter, Respondent filed his Return of Writ which included his procedural defenses. (Doc. No. 61.)

**1.    Ahmed's Argument that Respondent Waived Procedural Default Defense**

Ahmed's argument that Respondent waived the procedural defense by excluding it from his Motion to Dismiss fails. The Rules Governing Habeas Corpus Cases Under 28 U.S.C. § 2254 specifically allow for procedural defenses to be raised in Respondent's Return of Writ (also called "the answer"). Habeas Rule 5(b). In addition, Fed. R. Civ. P. 12(b)(6), upon which Respondent relies in his Motion, states that a motion to dismiss on the basis that an opponent has failed to state a claim upon which relief can be granted may be raised in "any pleading allowed or ordered under Rule 7(a)." That rule includes pleadings such as complaints and answers, and nothing in the rules mandates that a motion to dismiss on a ground such as that relied upon by Respondent must be raised any earlier, although they certainly provide that avenue should a party wish to proceed in that direction before filing his or her answer. Ahmed's reliance on *Granberry v. Greer*, 481 U.S. 129, 134-35 (1987) is misplaced since in that case, the Supreme Court was discussing the State's failure to raise its procedural defense, the petitioner's failure to exhaust his claim, at the district court level and was attempting to do so in the appellate court, a set of circumstances not present here. Accordingly, Respondent did not waive a procedural defense by neglecting to include his argument that Ahmed's first ground for relief is procedurally defaulted in his ultimately unsuccessful Motion to Dismiss.

**2.      Ahmed's Argument that the Ohio Supreme Court Addressed the Merits of His Claim**

Ahmed also argues that his claim is preserved for habeas corpus review because the Ohio Supreme Court considered the merits of the claim on direct appeal. (Traverse, Doc. No. 71 at PageID 1649-50.) He refers this Court to his thirteenth proposition of law in his appellate brief, but that proposition relates Ahmed's contention that the trial court erroneously refused to allow Ahmed to represent himself as a *pro se* defendant, which is the subject of his third ground for relief, *infra*.

(Appendix, Vol. 3 at 426-28.)  Raising that claim on direct appeal does not preserve the instant claim for habeas corpus review.

### 3.    Ahmed's Argument that He Raised his Claim in a State Court Motion to Reconsider

Next, Ahmed argues he preserved his claim by raising it in a *pro se* motion to reconsider the Ohio Supreme Court's denial of his direct appeal.  (Traverse, Doc. No. 71 at PageID 1650-52.) Ignoring, for the time being, that the Ohio Supreme Court has "uniformly held that criminal defendants have no right to hybrid representation when they are already represented by counsel," as Ahmed has been every step of the way, *State v. Tenace*, 109 Ohio St. 3d 451, 452-53, 2006-Ohio-2987 at ¶ 10 (2006), this Court observes that in Ohio, a motion for reconsideration of a direct appeal in the supreme court is limited.  Under the applicable rule, such a motion may only be filed with respect to the following:  (1) the Supreme Court's refusal to grant jurisdiction to hear a discretionary appeal, (2) the *sua sponte* dismissal of a case, (3) the granting of a motion to dismiss, or (4) a decision on the merits of a case.  Ohio Sup. Ct. Prac. R. XI, Section 2(A).  A motion to reconsider, therefore, is not an appropriate vehicle through which to introduce new propositions of law that were not included in the initial appeal.  This interpretation of the rule governing state supreme court practice is consistent with the corresponding rule applicable to the courts of appeals in Ohio.  That rule expressly provides that an application for reconsideration is limited to "any cause or motion submitted on appeal," and has consistently been interpreted as providing an avenue through which an appellant may "call[] to the attention of the court an obvious error in its decision or raises an issue for consideration that either was not considered at all or was not fully considered by [the court] when it should have been."  *See*, *e.g.*, *Matthews v. Matthews*, 5 Ohio App. 3d 140 (Ohio App. 10th Dist. 1982) (paragraph two of the syllabus).  It does not allow the presentation of new claims of error.  In

other words, a motion for reconsideration is not a second bite at the apple, but rather is a second chance to chew on and digest the first bite.  Consequently, raising a new claim in a motion for reconsideration does not satisfy the requirement that a claim must be fairly presented in a timely manner to the state court before it can be raised in federal habeas corpus.

Ahmed argues that the state supreme court's summary denial of his *pro se* motion for reconsideration constituted a decision on the merits in this post-*Harrington v. Richter* world.  131 S.Ct. 770 (2011).  But while *Harrington* does not require written opinions from the state courts, it does hold that the presumption that state court summary dispositions are merits decisions may be overcome "when there is reason to think some other explanation for the state court's decision is more likely."  *Id*. at 785, *citing Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  As has been discussed above, there are at least two procedurally based explanations for the Ohio court's denial of Ahmed's motion for reconsideration that are more likely than a merits decision:  (1) it is unlikely the state court would have addressed the merits of Ahmed's *pro se* motion since he was at all times represented by counsel and therefore not entitled to hybrid representation, and (2) the state procedural rule allowing motions for reconsideration does not contemplate new claims being presented to the state court in such filings.  Therefore, this Court does not presume that the Ohio Supreme Court denied Ahmed's *pro se* motion for reconsideration on its merits, and instead concludesit was denied on both of the procedural grounds discussed.  It also appears that the rule against hybrid representation is firmly established and regularly followed in the Ohio courts.  *See State v. Martin*, 103 Ohio St. 3d 385, 2004-Ohio5471 (2004) (paragraph one of the syllabus); *State v. Ferguson*, 108 Ohio St. 3d 451, 466, 2006-Ohio-1502 at ¶ 97 (2006); *State v. Tenace*, 109 Ohio St. 3d 451, 452-53, 2006-Ohio-2987 at ¶ 10 (2006); *State v. Martin*, 103 Ohio St. 3d 385, 391, 2004-

Ohio-5471 at ¶ 32 (2004); *State v. Taylor*, 98 Ohio St. 3d 27, 34, 2002-Ohio-7017 at ¶ 43 (2002); *State v. Cassano*, 96 Ohio St. 3d 94, 100, 2002-Ohio-3751 at ¶ 37 (2002); *State v. Keenan*, 81 Ohio St. 3d 133, 138 (1998); *State v. Landrum*, 53 Ohio St. 3d 107, 119 (1990); *State v. Thompson*, 33 Ohio St. 3d 1, 6-7 (1987); *State v. Packer*, 188 Ohio App. 3d 162, 168-69, 2010-Ohio-2627 at ¶ 20 (Ohio App. 6th Dist. 2010); *State v. Pilgrim*, 184 Ohio App. 3d 675, 2009-Ohio-5357 (Ohio App. 10th Dist. 2009) (paragraph five of the syllabus); *State v. Litten*, 174 Ohio App. 3d 743, 747, 2008-Ohio-313 at ¶ 19 (Ohio App. 8th Dist. 2008); *State v. Beaver*, 119 Ohio App. 3d 385, 401-2 (Ohio App. 11th Dist. 1997); *State v. Day*, 72 Ohio App. 3d 82, 86 (Ohio App. 4th Dist. 1991); *State v. Carter*, 53 Ohio App. 2d 125, 129 (Ohio App. 4th Dist. 1977).

Although there exists no explicit enforcement of the Ohio Supreme Court rule specifically prohibiting the raising of new claims of error in motions for reconsideration in direct appeals in death penalty cases, the lineage of the first procedural ground suffices to establish Ahmed's procedural default. Ahmed has made no attempt to demonstrate cause and prejudice for the procedural default of his claim in this section of his argument, leaving it unexcused. Thus, Ahmed's first ground for relief has not been preserved for habeas corpus review by his having raised the issue in his *pro se* motion for reconsideration of his direct appeal in the Ohio Supreme Court.

**4.    Ahmed's Argument that he Preserved his Claim in a Motion to Disqualify the Ohio Public Defender's Office**

Ahmed also contends procedural default of his claim was prevented by his having raised it in his most unwieldily titled *pro se* "Motion to Disqualify and Remove the Ohio Public Defender's Office From All Representation of Defendant-Appellant and Stay All Proceedings Until Counsel Can Be Employed and Arranged by the Counsulate [sic] Officials of Pakistan Under the Provisions of Vienna Convention and Request for Court Order That All Funds of Defendant Presently Held By

Sheriff, Auditor and Courts of Common Pleas of Belmont County Be Released to Counsulate [sic] Officials." (Traverse, Doc. No. 71 at PageID 1652; Appendix, Vol. 3 at 223-36.) That motion suffered the same fate in the state supreme court as did Ahmed's motion for reconsideration just discussed above, *see id*. at 244, and stands in the same procedural stance as does that prior motion, which is to say that it did not preserve Ahmed's first ground for habeas corpus review.

**5.** **Ahmed's Argument that he Preserved his Claim in an Application to Reopen Direct Appeal**

Next, Ahmed argues that the Ohio Supreme Court addressed the merits of his first ground when the court denied his application to reopen his direct appeal based on the ineffectiveness of his appellate counsel, thereby preserving his claim for habeas review. (Traverse, Doc. No. 71 at PageID 1652-61.) Presumably, Ahmed means to say that including in his application to reopen the argument that his appellate counsel were ineffective for failing to include in his direct appeal a claim that "[t]he trial court . . . actively engaged in conduct to frustrate Mr. Ahmed's efforts to retain counsel of his choosing" was tantamount to raising the underlying claim itself. (App. to Reopen, Appendix, Vol. 5 at 74.) The application to reopen was summarily denied by the state court because Ahmed failed to comply with the 90-day filing deadline in Ohio Sup. Ct. Prac. R. XI, Section 6(A).[3] *Id*. at 113.

---

[3]Nevertheless, nearly three years later, Ahmed filed a *pro se* application to reopen his direct appeal in which he argued the ineffectiveness of his appellate counsel for their failure to raise the instant claim as error on direct appeal. (Appendix, Vol. 5 at 225-34.) Ahmed does not discuss that application in his Traverse, nor does he indicate what became of it in the state court. No entry disposing of the application is indicated in the index to the Appendix, and the Court has searched the remainder of the fifth volume of the Appendix, some 175 pages or so, without finding any ruling concerning Ahmed's *pro se* application. The court is reluctant to search the remaining volumes of the Appendix in search of the document, and since Ahmed ignores it in his Traverse, the Court will do so here.

Ahmed offers three explanations as to why the state court's denial on timeliness grounds was incorrect. First, he contends that running of the time for filing was tolled until counsel was appointed to represent him in litigating his application to reopen. (Traverse, Doc. No. 71 at PageID 1654.) Absence of counsel, however, has not been accepted by the Ohio Supreme Court as good cause for an untimely filing of an application, even in capital cases. *State v. Hoffner*, 112 Ohio St. 3d 467, 467-68, 2007-Ohio-376 at ¶¶ 3-6 (2007). The state court has also made it clear that an appellant's lack of legal knowledge does not establish good cause for failing to seek timely relief either. *Id*. at ¶ 7.

Second, Ahmed contends that the time for filing his application to reopen was tolled during the pendency of his motions to reconsider issues raised in his direct appeal and that the state court's denial on timeliness grounds was erroneous. (Traverse, Doc. No. 71 at PageID 1654-55.) He cites Ohio Sup. Ct. Prac. R. XI, Section 4(A)(1) for the proposition that a timely motion for reconsideration stays the mandate until the motion is decided. Since just before the Ohio Supreme Court entered judgment on Ahmed's direct appeal, that rule has read as follows:

> Section 4. Issuance of mandate
> (A) After the Supreme Court has decided an appeal on the merits, the Clerk shall issue the mandate. The mandate shall be issued 10 days after entry of the judgment, unless a motion for reconsideration is filed within that time in accordance with Section 2 of this rule.
> (1) If a motion for reconsideration is filed but denied, the mandate shall be issued when the Supreme Court reconsiders the case and when the entry on reconsideration is filed with the Clerk.

Pursuant to that rule, the mandate in Ahmed's case issued on October 27, 2004, and that is the date that Ahmed argues is the triggering event for the beginning of the 90-day time within which he had

to file his application to reopen his direct appeal. But the part of the rule that provides for applications to reopen explicitly states the triggering event is the Ohio Supreme Court's entry of judgment, not entry of the mandate. Ohio Sup. Ct. Prac. R. XI, Section 6(A). In Ahmed's case, that triggering event, the filing of the judgment entry, occurred on August 25, 2004. Ninety days from that date was November 23, 2004, but Ahmed did not file his application to reopen his direct appeal until December 21, making it out of time. Ahmed provides no authority for his contention that the filing of a motion for reconsideration tolls the 90-day period, and this court has found none in its own research.

In addition, it makes sense that the two processes are independent of one another since they exist to remedy distinctly different problems. As noted earlier, a motion for reconsideration basically provides a way for an appellate court to correct errors in a decision, whereas an application to reopen a direct appeal provides a process through which an appellant can assert an ineffective assistance of appellate counsel claim. Those two purposes do not overlap in any way, so it would be illogical to condition or link the allowable time for filing one on the other; both can be pursued simultaneously without compromising an appellant's position in either. Accordingly, Ahmed's argument that his motion for reconsideration tolled the time within which he had to have filed his application to reopen fails to rescue his first ground for relief from procedural default.

Even if his application to reopen had been timely, however, the underlying claim that Ahmed had been denied his right to retain counsel of his choice would not have been preserved for habeas review. Because claims of ineffective assistance of appellate counsel are based on an analytically distinct legal theory from the underlying claims, an application to reopen direct appeal does not save

the underlying claims from default. *Davie v. Mitchell,* 547 F.3d 297, 312 (6th Cir. 2008), *citing White v. Mitchell,* 431 F.3d 517, 526 (6th Cir. 2005).

Finally, Ahmed contends that the 90-day period for filing his application to reopen his direct appeal was tolled during the time he sought and was denied a writ of certiorari in the United States Supreme Court. (Traverse, Doc. No. 71 at PageID 1655.) He argues that as long as his petition was pending in the Supreme Court, his direct appeal was not final, and therefore the time for filing an application to reopen his direct appeal had not begun running, *id.*, *citing Morgan v. Eads*, 104 Ohio St. 3d 142, 145-46, 2004-Ohio-6110 at ¶ 18 (2004). The cited paragraph explains one reason why the Ohio Supreme Court has not treated applications to reopen as if they were part of the direct appeal in criminal cases, stating that proceedings to reopen a direct appeal move forward on a schedule different from that of the direct appeal, and identifying the journalization of the appellate judgment as the end of direct appeal as of right. How this reasoning supports Ahmed's argument is a mystery to the Court, especially because, in the very same case, the Ohio Supreme Court held applications to reopen to be a collateral post-conviction remedy, rather than part of the direct appeal process. *Id.* at ¶ 25-26. In spite of that holding, Ahmed maintains that an application to reopen is a part of direct appeal. Missing from his argument is any assertion that the time for filing collateral post-conviction proceedings is also tolled during the filing period for a petition for a writ of certiorari in the United States Supreme Court. That is for good reason: in discussing *Morgan v. Eads*, the Sixth Circuit Court of Appeals has observed that "[o]n direct review, the time for filing of petitions of certiorari and proceedings in the United States Supreme Court do not count towards the limitation period. On collateral review, they do." *Lopez v. Wilson*, 426 F.3d 339, 346 (6th Cir. 2005), *quoting Lambert v. Warden*, No. 01-3422, 2003 WL 22071466 at *3 (6th Cir. Sept. 2, 2003).

Accordingly, Ahmed's first ground for relief is not saved from procedural default by tolling of the 90-day filing period for a petition for a writ of certiorari in the Supreme Court.

### A. Ahmed's Argument that the 90-Day Filing Deadline for Applications to Reopen a Direct Appeal is not an Independent and Adequate State Procedural Ground Upon Which to Base a Procedural Default

The Court finds, below, that the timeliness requirement of Ohio's rule concerning applications to reopen direct appeals was not an independent and adequate state ground capable of precluding federal habeas corpus review at the time the rule was applied in Ahmed's case. *See* Fifth Ground for Relief. That does not salvage Ahmed's claim that he was deprived of his right to retain counsel of his choice from procedural default, however. The Sixth Circuit Court of Appeals has reaffirmed that that in the context of an application to reopen a direct appeal in the intermediate court of appeals, the application "preserves for *habeas* review only the ineffective assistance of appellate counsel arguments, not the underlying substantive arguments." *Wogenstahl v. Mitchell*, 668 F.3d 307, 338 (6th Cir. 2012), *citing Lott v. Coyle*, 261 F.3d 594, 612 (6th Cir. 2001). There is no reason to believe an application to reopen a direct appeal in the Ohio Supreme Court would or should be treated any differently. Consequently, Ahmed's claim that he was denied his right to hire counsel of his choice was not preserved by his having raised it as a claim underlying his ineffective assistance of appellate counsel proposed proposition of law in his application to reopen his direct appeal.

### B. Ahmed's Argument that He Can Establish Cause for Procedurally Defaulting his Claim

Ahmed employs circular logic in arguing that the reason his claim that he was denied his right to retain counsel of his choice was procedurally defaulted was because he was denied his right to retain counsel of his choice who could have timely filed his application to reopen his direct

appeal. (Traverse, Doc. No. 71 at PageID 1658.) As a collateral proceeding not part of direct appeal, however, Ahmed was not entitled to counsel to pursue his application to reopen. *Lopez v. Wilson*, 426 F.3d 339 (2005). Rather than wait until counsel were retained or appointed, Ahmed could have filed his application to reopen his direct appeal himself to avoid its dismissal by the state court on timeliness grounds, and subsequent procedural default in this Court. Although the Supreme Court has recognized a criminal defendant's right to effective assistance of counsel at trial, *Strickland v. Washington*, 466 U.S. 668 (1984), and on the first direct appeal of right, *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Douglas v. California*, 372 U.S. 353 (1963), it has not extended that right into the collateral application-to-reopen-a-direct-appeal context. In other words, the absence of counsel, whether retained or appointed, is no excuse for failing to file an application to reopen a direct appeal in a timely manner. Consequently, Ahmed has not demonstrated cause for the default.

6. **Ahmed's Argument that he Preserved his Claim by Raising it in *Pro Se* Post-Conviction Petitions**

Finally, Ahmed appears to argue that by raising "a number of post-conviction claims pro se," which the trial and appellate courts refused to consider because Ahmed was represented by counsel, and over which the Ohio Supreme Court declined jurisdiction, he preserved this specific claim for habeas review. (Traverse, Doc. No. 71 at PageID 1661-65.) The Court observes that the documents to which Ahmed directs its attention appear to be incomplete, as both terminate mid-sentence (Appendix, Vol 7 at 310-16; Vol. 8 at 6-9). The first of those documents was filed on October 3, 2002, *id.*, and a docket entry on that date indicates that the *pro se* petition submitted by Ahmed would be lodged in the official file but that the court would not act upon it because Ahmed was

represented by counsel and because the matter was before the Ohio Supreme Court. (Appendix, Vol. 8 at 1.) The second of the *pro se* post-conviction petitions was filed on October 11, 2002.

The *pro se* post-conviction documents themselves are a rambling inventory of statements apparently made during Ahmed's trial by witnesses and attorneys with which Ahmed takes issue. With no better guidance from Ahmed as to where in either petition the Court might find argument relevant to the instant claim, this Court is unable to conclude that Ahmed raised the claim in his *pro se* petition. Ahmed's argument that the Ohio Supreme Court addressed the claim by denying jurisdiction over his *pro-se* petition is simply nonsensical.

### A.     Ahmed's Argument that Ohio Has No Rule Prohibiting Hybrid Representation

In an attempt to salvage his claim from procedural default, Ahmed argues that Ohio has no procedural rule prohibiting hybrid representation, but that argument is disproved by this Court's discussion of that issue under Ahmed's third argument, *supra*, that he preserved the instant claim. The cases to which Ahmed cites to support his argument to the contrary are, for the most part, cases that came after his in the Ohio appellate courts. The United States Supreme Court has indicated that whether a state procedural rule is firmly established and regularly followed for procedural default purposes is determined by looking at the rule *as of the date it was applied to the petitioner's case* by the state court. *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). In addition, a "rule can be 'firmly established' and 'regularly followed' . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not in others." *Walker v. Martin*, ___ U.S. ___, ___, 131 S.Ct. 1120, 1128 (2011), *citing Beard v. Kindler*, 558 U.S. 53, 130 S.Ct. 612, 618 (2009). Ahmed concedes that if a rule against hybrid representation does exist in Ohio, it was actually

enforced against him by the trial court and the state court of appeals. (Traverse, Doc. No. 71 at PageID 1662.)

### B. Ahmed's Argument That the Rule Was Not an Independent and Adequate State Procedural Ground

Ahmed cites eight cases from the Ohio Seventh District Court of Appeals in which he claims the rule against hybrid representation was not enforced, contending that enforcement of the rule is, at best, inconsistent. (Traverse, Doc. No. 71 at PageID 1663.) Only four of those cases predate the state courts'[4] application of the rule to Ahmed's case; the rest are irrelevant to any determination as to whether the rule was regularly enforced at the time it was applied in Ahmed's case (Appendix, Vol.8 at 319, 323). *Ford*, 498 U.S. at 423-24.

The four Seventh District Court of Appeals cases cited by Ahmed that predate his own case are *State v. Patel*, No. 03-BE-41, 2004-Ohio-1553, 2004 WL 614986 (Ohio App. 7th Dist. March 24, 2004), *State v. Gist*, No. 03 CO 10, 2003-Ohio-7018, 2003 WL 22998486 (Ohio App. 7th Dist. Dec. 17, 2003), *State v. Taravella*, No. 02-HA-542, 2003-Ohio-4880, 2003 WL 22120272 (Ohio Ap. 7th Dist. Sept. 8, 2003), and *State v. Gist*, No. 99-CO-34, 2002-Ohio-5241, 2002 WL 31170255 (Ohio App. 7th Dist. Sept. 27, 2002). It is true that in those cases, the court of appeals addressed in some fashion the appellants' *pro se* assignments of error even though the appellants were represented by counsel. In many more cases, however, the rule against hybrid representation was enforced during the years prior to its application in Ahmed's case. *State v. Tenace*, 109 Ohio St. 3d 451, 452-53, 2006-Ohio-2626 at ¶ 10 (2006); *State v. Ferguson*, 108 Ohio St. 3d 451, 466, 2006-Ohio-1502 at ¶

---

[4]The trial court applied the rule in its March 8, 2005, Findings of Fact and Conclusions of Law (Appendix, Vol. 8 at 323), and the Seventh District Court of Appeals applied the rule to Ahmed's case the following year in its Opinion, *State v. Ahmed*, No. 05-BE-15, 2006-Ohio-7069, 2006 WL 3849862 (Ohio App. 7th Dist. Dec. 28, 2006).

97 (2006); *State v. Martin*, 103 Ohio St. 3d 385, 390, 2004-Ohio-5471 at ¶ 31 (2004); *State v. Taylor*, 98 Ohio St. 3d 27, 34, 2002-Ohio-7017 at ¶ 43 (2002); *State v. Cassano*, 96 Ohio St. 3d 94, 99-100, 2002-Ohio-3751 at ¶¶ 34-37 (2002); *State v. Keenan*, 81 Ohio St. 3d 133, 138 (1998); *State v. Landrum*, 53 Ohio St. 3d 107, 119 (1990); *State v. Thompson*, 33 Ohio St. 3d 1, 6-7 (1987); *State v. West*, No. 2-06-04, 2006-Ohio-5834 at ¶¶ 30-31, 2006 WL 3159354 (Ohio App. 3rd Dist. Nov. 6, 2006); *State v. Davis*, No. 05-AP-193, 2006-Ohio-193 at ¶¶ 10-12, 2006 WL 2780177 (Ohio App. 10th Dist. Sept. 28, 2006); *State v. Greenleaf*, No. 2005-P-0017, 2006-Ohio-4317 at ¶¶ 70-71, 2006 WL 2390253 (Ohio App. 11th Dist. Aug. 18, 2006); *State v. Haines*, No. 05-AP-55, 2005-Ohio-5707 at ¶¶ 34-35, 2005 WL 2789065 (Ohio App. 10th Dist. Oct. 27, 2005); *State v. Lemke*, No. 90-C-51, 1992 WL 150219 at *6 (Ohio App. 7th Dist. June 26, 1992); but cf. *State v. Martin*, No. 87339, 2006-Ohio-5012 at ¶ 3 n.1, 2006 WL 2776522 (Ohio App. 8th Dist. Sept. 28, 2006) (suggesting that *pro se* motions fall outside what is considered "hybrid representation"). At least one Ohio court has noted that where a *pro se* defendant's appointed standby counsel's assistance goes beyond mere consultation, such hybrid representation may constitute reversible error. *State v. Bumphus*, No. E-03-043, 2005-Ohio-536 at ¶¶ 14, 51, 2005-WL 327187 (Ohio App. 6th Dist. Feb. 11, 2005). Although somewhat different from Ahmed's situation, those cases illustrate the strength of the prohibition against hybrid representation. Perhaps most succinctly and unequivocally, the Ohio Supreme Court stated in *Martin*, "Today we reaffirm and hold that in Ohio, a criminal defendant has the right to representation by counsel or to proceed *pro se* with the assistance of standby counsel. However, these two rights are independent of each other and may not be asserted simultaneously." 103 Ohio St. 3d at 390, 2004-Ohio-5471 at ¶ 32.

That a particular trial court and court of appeals might have disregarded or, in their discretion

decided not to enforce the rule in a few cases does not negate its firm establishment or its regular

enforcement. A petitioner must show more than an occasional act of grace by a state court in

excusing or disregarding a state procedural rule for a federal court to conclude that the state

procedural rule is inadequate because it is inconsistently applied. *Hutchison v. Bell,* 303 F.3d 720,

737 (6th Cir. 2002), *citing Coleman v. Mitchell*, 268 F.3d 417, 429 (6th Cir. 2001). A procedural rule

need not be followed in every case; it is sufficient if it is applied in the vast majority of cases. *Byrd*

*v. Collins,* 209 F. 3d 486, 521 (6th Cir. 2000), *citing Dugger v. Adams*, 489 U.S. 401, 410 n. 6

(1989). Moreover, the Supreme Court has held that "a discretionary state procedural rule can serve

as an adequate ground to bar federal habeas review." *Beard v. Kindler*, 558 U.S. 53, 130 S.Ct. 612,

618 (2009). Thus, Ahmed's citation of four cases in which a state court of appeals did not enforce

the rule against hybrid representation fails to persuade this Court that the rule is neither firmly

established nor regularly followed.

## C. Ahmed's Argument That He Can Demonstrate Cause and Prejudice Excusing His Procedural Default

Finally, Ahmed contends that even if this Court determines that Ohio does have a procedural

rule against hybrid representation, and even if that rule was firmly established and regularly

followed at the time it was applied in his case, he can establish cause and prejudice excusing his

procedural default of his claim. (Traverse, Doc. No. 71 at PageID 1663-65.) He offers as cause his

appellate counsels's and post-conviction counsel's failures to include the instant claim in the

appellate brief and post-conviction petition, respectively. *Id.* Of course, Ahmed's claim that he was

denied the right to retain counsel of his choice could only properly be brought in one or the other,

the direct appeal or the post-conviction proceedings. Errors apparent on the trial record are properly brought on direct appeal, while errors that rely on evidence from outside the record, *Brady* claims, for instance, must be brought in a petition for post-conviction relief. Ahmed does not distinguish between the two in his argument, nor does he indicate what, if any, evidence from outside the record would have been necessary for his claim to be considered in a post-conviction proceeding.

Taking his claim that his appellate counsel's ineffectiveness provides cause for the default first, it is recalled that the Supreme Court has held that an ineffective assistance of counsel claim asserted as cause for the procedural default of another claim must itself have been preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Ahmed did present a claim of appellate counsel's ineffectiveness for not having raised the instant claim as error on direct appeal. (Application to Reopen Direct Appeal, Appendix, Vol. 5 at 74.) As noted above, however, that application was denied as untimely, which this Court has determined was, at the time it was applied in Ahmed's case, an independent and adequate state procedural ground sufficient to preclude habeas corpus review of the claims asserted in the application. Since Ahmed's ineffective assistance of appellate counsel claim is itself procedurally defaulted, it cannot constitute cause for his default of the underlying claim that he was denied his right to counsel of his choice at his trial.

Ahmed advances the alternative argument that his post-conviction counsel were ineffective for failing to raise the instant claim in his post-conviction proceedings. There is no constitutional right to an attorney in those proceedings. *Coleman v. Thompson*, 501 U.S. 722, 736 (1991). Therefore a habeas petitioner generally cannot claim ineffective assistance of counsel in such proceedings. *Gulertekin v. Tinnelman-Cooper,* 340 F.3d 415, 425 (6th Cir. 2003), *citing Coleman* 501 U.S. at 752-53 (1991). A narrow exception to the general statement in *Coleman* was recently

carved out by the Supreme Court. In *Martinez v. Ryan*, ___ U.S. ___, ___, 132 S.Ct. 1309, 1315 (2012), the Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." But here, Ahmed's argument is that his post-conviction (or initial-review) counsel should have raised the claim that Ahmed was denied his right to counsel of his choice, not that they should have raised a claim of trial counsel's ineffectiveness. Therefore, the exception announced in *Martinez* does not provide an avenue through which Ahmed might establish cause for the procedural default of his counsel-of-choice claim.

Aside from having failed to demonstrate cause for procedurally defaulting his claim, Ahmed makes no effort to show how he was prejudiced by the alleged ineffectiveness of his appellate and post-conviction counsel.

Ahmed has procedurally defaulted his first ground for relief and has not demonstrated cause or prejudice for the default. Accordingly, his first ground should be denied as procedurally defaulted.

Even if Ahmed had preserved the claim for habeas review, however, it would fail. In his petition, Ahmed alleges that "the criminal trial judge, domestic relations court judge and probate judge of Belmont County, Ohio[,] coordinated their actions with the prosecutor's office, sheriff's office, the Belmont County public defender and the appointed conservator . . . by intentionally engaging in conduct designed to frustrate petitioner's efforts to obtain counsel of choice." (Petition, Doc. No. 35 at PageID 173; Traverse, Doc. No.71 at PageID 1648.)

In *Wheat v. United States*, 486 U.S. 153 (1988), the Supreme Court of the United States expounded upon a defendant's right to retain counsel of his or her choice as follows:

The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of Counsel for his defence." In *United States v. Morrison,* 449 U.S. 361, 364 (1981), we observed that this right was designed to assure fairness in the adversary criminal process. Realizing that an unaided layman may have little skill in arguing the law or in coping with an intricate procedural system, *Powell v. Alabama*, 287 U.S. 45, 69 (1932); *United States v. Ash*, 413 U.S. 300, 307 (1973), we have held that the Sixth Amendment secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime. *Gideon v. Wainwright*, 372 U.S. 335 (1963). We have further recognized that the purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," *Strickland v. Washington*, 466 U.S. 668, 689 (1984), and that in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic*, 466 U.S. 648[, 657 n.21] (1984)[, *overruled on other grounds by Sawyer v. Smith*, 497 U.S. 227 (1990)]. Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. *See Morris v. Slappy*, 461 U.S. 1, 13-14 (1983); *Jones v. Barnes*, 463 U.S. 745 (1983).

The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects. Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court. Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government.

*Id*. at 158-59 (parallel citations omitted).

Later, the Supreme Court elaborated on the right of a criminal defendant who can afford to hire his own counsel to retain the attorney of his choice. In *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), the Court distinguished the right to hire one's attorney of choice from the right to a

fair trial by observing that while the latter requires a showing of prejudice to be "complete," the former does not. *Id*. at 146. Instead, the erroneous denial of a non-indigent defendant's right to hire the counsel of his choice was held to be "structural error" entitling the defendant to a reversal of his conviction without a showing of prejudice, and with no requirement that a reviewing court determine whether the error was harmless. *Id*. at 150-52; *United States v. Davila*, 131 S.Ct. 2139 (2013). Since *Gonzalez-Lopez*, however, several federal courts have concluded that the new rule announced therein is neither a "watershed" rule nor substantive, and that it consequently is not retroactively applicable. *Rodriguez v. Montgomery*, 594 F.3d 548 (7th Cir. 2010); *Rodriguez v. Chandler*, 492 F.3d 863 (7th Cir. 2007); *Hoffenberg v. United States*, No. 06-3208-pr, 2009 WL 1740050 at **3 n.1 (2nd Cir. June 19, 2009); *Gonzalez v. Wynder*, No. 2006-cv-04842, 2010 WL 962882 (E.D. Pa. Mar. 11, 2010) (adopting Report and Recommendations, *Gonzalez v. Wynder*, No. 06-4842, 2007 WL 7079557 at *3 n.4 (E.D. Pa. Nov. 15, 2007)); *King v. Tamez*, No. 3:09-cv-0564-D, 2009 WL 4884148 at *2 (N.D. Tex, Dec. 17, 2009); *Wright v. United States*, Nos. 3:98CV355-MU, 3:94CR95-5-V, 2008 WL 943371 at *2 n.2 (W.D.N.C. April 7, 2008); *Peters v. Bell*, No. 1:06-cv-880, 2007 WL 3348011 at *1 (W.D. Mich. Nov. 8, 2007) (Memorandum Order); *Harris v. Diguglielmo*, No. 07-213, 2007 WL 3120065 at *11 (W.D. Pa. Oct. 22, 2007). Ahmed's convictions became final in 2005, *see Ahmed v. Ohio*, 544 U.S. 952 (2005)(denying certiorari), and *Ahmed v. Ohio*, 545 U.S. 1124 (2005) (denying reconsideration of the denial of certiorari), so the rule announced in *Gonzalez-Lopez* the following year does not apply in his case. Thus, to succeed on his claim, Ahmed would to demonstrate both that he was denied the right to hire counsel of choice, and that the fairness of his trial was compromised as a result. *See Wheat*, *supra*.

Ahmed contends his claim is governed by *Faretta v. California*, 422 U.S. 806 (1975), and *Chandler v. Fretag*, 348 U.S. 3 (1954), but those cases are inapposite. In *Faretta*, a criminal defendant's right to represent himself was at issue, not his right to hire counsel of choice. In *Chandler*, a criminal defendant charged with breaking and entering a business and stealing items with a value of three dollars waived his right to counsel, was immediately charged with a substantially more serious offense, and was then denied a continuance to obtain counsel to represent him on the more serious charge. Thus, the issues and circumstances in *Faretta* and *Chandler* are distinguishable from those here.

Ahmed provides a lengthy chronology of his attempts to hire counsel, but fails to expose any collaboration, nefarious or otherwise, between the various courts he names, the prosecutor's office, the public defender, or conservator intended to deny him his right to counsel of his choice. On October 13, 1999, the trial court appointed two attorneys, James Nichelson and Eric Costine, to represent Ahmed at his arraignment. (October 13, 1999, Hearing, Trial Tr. Vol. 3 at 3.) At that time, Ahmed informed the court that he had talked to about three attorneys and was intending to retain private counsel. *Id.* at 4. Following that hearing, the court filed an entry indicating that Ahmed did not appear to have the means to hire private counsel, and that public defenders had been appointed. (Appendix, Vol. 1 at 99.) By November 24, 1999, Ahmed had neither retained counsel nor submitted a financial affidavit to the court from which the court could determine whether he was indigent and entitled to appointed counsel who had already been working on his behalf for over a month. The trial court filed an entry on that date ordering Ahmed to submit a financial affidavit to the court no later than December 1, 1999, and prohibiting Ahmed from using any of his assets before his indigency status was determined. (Appendix, Vol. 1 at 141.)

Under threat of being held in contempt of court (Appendix, Vol. 1 at 206), Ahmed filed a financial affidavit on February 14, 2000, that does not appear to be in the record, *id*. at 201. About three weeks later, the trial court ordered Ahmed to deposit $10,000 with the clerk of courts, money intended to be set aside to repay the Public Defender's Office for representing Ahmed for approximately five months. *Id*. at 222. The court also granted Ahmed twenty days to retain counsel and for counsel to file a notice of appearance. *Id*. Soon thereafter, Ahmed protested that depositing $10,000 with the clerk of courts as ordered would leave him with under $1,000 with which to retain counsel to represent him in his capital trial.[5] (Appendix, Vol. 1 at 249.) On March 28, the trial court again ordered that Ahmed deposit $10,000 with the clerk of courts, and encouraged him to use his remaining funds to retain private counsel. (Appendix, Vol. 1 at 254.)

Two weeks later, Ahmed complained in writing to the trial judge that her orders were prohibiting him from obtaining adequate defense counsel, and stressing that his private attorneys would not enter their notice of appearance until they received payment. *Id*. at 275-78. Ahmed also stated "[t]here is no money to Public Defender, who did not do any work and imposed on me due to your illegal orders and not my choice." *Id*. at 278. Ahmed informed the court that when it lifted the order that he deposit $10,000 with the clerk of courts, his attorneys would take over the case, "[o]therwise you can keep [it] the way it is. There is [sic] never going to be all funds deposited with

---

[5]On January 26, 2000, a voluntary and limited conservatorship over Ahmed's assets was created in the probate court in Belmont County, Ohio. *In the matter of the Conservatorship of Ahmed*, Nos. 01-BA-13, 01-BA-48, 2003-Ohio-3272 at ¶¶ 2-4, 2003 WL 21442314 at *1 (Ohio App. 7th Dist. June 16, 2003). In 2003, the court of appeals summarized the condition of the conservatorship as of April 2000 as follows:

On April 3, 2000, the conservator filed an inventory listing the eleven accounts originally included in the application and their values . . . . The total inventory of the potential conservatorship estate was $57,234.25. The conservator then filed a partial account listing receipts from various financial institutions for a total of $18,481.50. The conservator noted that Ahmed denied him access to four accounts that contain: $13,000; $4,000; $20,000; and $4-7,000.

*Id*. at ¶ 6.

the court . . . ." *Id*. The court responded with an entry informing Ahmed that it has placed no restrictions on Ahmed's use of the funds in the conservatorship for the purpose of hiring counsel to defend him in his capital trial. *Id*. at 280.

On August 22, 2000, the trial court clarified its orders respecting the conservatorship funds in response to Ahmed's request. The court stated that Ahmed was free to terminate the conservatorship as long as the probate court approved the termination, and that whatever funds were left after the fees of the conservator were paid should be deposited in an escrow account with the clerk of courts. (Appendix, Vol. 1 at 324.) Those funds would be held in the escrow account until Ahmed retained private counsel, but Ahmed would have also have to pay appointed counsel from those funds for the many months they had worked on his case. *Id*. at 325. Upon verification that counsel had been retained, the court would release the remaining funds directly to those counsel, not to Ahmed. *Id*. at 325-26. The following month, the trial court filed an entry indicating it had been advised that the current balance in the conservatorship was $18,491.50, but that there were three accounts totaling between $46,000 and $49,000 that Ahmed had never permitted the conservator to deposit into the conservatorship. (Appendix, Vol. 1 at 366.) The court surmised that the amount of money available to Ahmed was more than enough to hire private counsel to represent him at trial, and set down priorities for how the money should be disbursed. *Id*. The court stated that *after* Ahmed pays any private attorney or attorneys he might retain, appointed counsel or other court-appointed experts or assistants should be paid, and anything left would be Ahmed's exclusive property. *Id*. at 367. By November 9, 2000, however, no attorney had entered an appearance in Ahmed's case and the trial court reinstated the order prohibiting Ahmed from depleting his assets. *Id*. at 387-88. The court also informed Ahmed that the funds would remain under court supervision until an attorney entered his

appearance.  *Id.*  On January 2, 2001, the court stressed to Ahmed in court that his funds were reserved for Ahmed's use in hiring private counsel.  (Hearing of January 2, 2001, Trial Tr.,  Vol. 3 at 7.)

Even as voir dire in Ahmed's case began on January 16, 2001, he had not retained private counsel.  (Trial Tr., Vol. 5 at 219.)  The trial court stated in an entry that Ahmed could still hire private counsel, but that any motion for a continuance would not be decided until retained counsel made a motion requesting more time to prepare.  (Appendix, Vol. 2 at 250.)  Ahmed continued to argue that he had been denied his right to hire private counsel throughout his trial.  (Trial Tr., Vol. 9 at 34; Vol. 10 at 15, 24, 27-28; Appendix, Vol. 2 at 249.)  No attorney ever filed a notice of appearance in Ahmed's case and he was at all times represented by appointed counsel.

It is true, however, that Ahmed unsuccessfully attempted to retain private counsel.  On December 13, 1999, attorney Dennis McNamara informed Ahmed that he would not represent him at trial because release of the funds to pay him would be time consuming, and Ahmed refused to waive his right to a speedy trial.  (Appendix, Vol. 2 at 157.)  Noting that Ahmed's trial was scheduled for the next month, McNamara stated he was going to be out of the state for a week over the holidays and had a case he was working on in federal court, so would not have the time to prepare for Ahmed's January trial.  *Id.*

There is in the record an undated transcript of a telephone call between the trial court and attorney Sam Shamansky to discuss how much money was available to pay retained counsel should Shamansky agree to take the case.  (Trial Tr., Vol. 3 at 1-4 (located after the transcript of the hearing of December 6, 1999).)  There is some indication in the record that attorneys R. William Meeks, Samuel Shamansky, and Dave Thomas considered representing Ahmed in the first half of 2000

31

(Appendix, Vol. 2 at 154-55), but they never entered their appearances which was a prerequisite to the release of Ahmed's funds.

On April 27, 2000, attorney Harry Reinhart discussed with the trial court the possibility of his representing Ahmed at trial. Reinhart explained that from what Ahmed had told him, Ahmed did not have sufficient funds to pay for the defense in a capital trial. (Transcript of April 27, 2000, Hearing, Trial Tr., Vol. 3 at 3.) The trial judge stated that if there came a time when Ahmed's assets were exhausted and that was verified by the conservator, the county would pay for reasonably necessary defense services. *Id*. at 4. She further told Reinhart that if he took the case and needed the $10,000 she had earmarked to pay for appointed counsel, she would vacate her order respecting the $10,000 and Reinhart could use that money, as well. *Id*. at 5. The judge stated that Ahmed has sworn to the fact that he only had $15,000. *Id*. at 6. She indicated she would have no problem with funds being disbursed to Reinhart should he take the case. *Id*. Reinhart expressed concern over the fast-approaching trial date, but the judge told him she knew he could not try the case in July, and that if he decided to take the case, she, Reinhart, and the prosecutor would have to schedule it for a date everyone could honor. *Id*. at 7. Reinhart said he would let the court know the next week whether he was going to take the case. *Id*. at 8.

Apparently things did not work out with Reinhart, because on May 24, 2000, attorneys Brian Rigg and Donald Schumacher participated in a telephone conference with, among others, Judge Sargus, the trial judge in Ahmed's case. Judge Sargus explained that she had set aside $10,000 to pay appointed counsel, but that if Rigg and Schumacher entered their appearance, she would release that money to them. (Transcript of Telephone Conference of May 24, 2000, Trial Tr., Vol. 3 at 3.) Although the trial had been scheduled for July, that date was cancelled because Ahmed named his

appointed counsel as witnesses in his case, necessitating the appointment of new counsel. *Id*. at 12.

Schumacher stated that he had made it clear to Ahmed that if he and Rigg took his case, they would

need until the beginning of 2001 to prepare and that they expected Ahmed to waive his speedy trial

right. *Id*. at 13-14. In a June 2, 2000, hearing Judge Sargus told Ahmed and his appointed counsel

that Rigg and Schumacher had decided not to take Ahmed's case. (Transcript of June 2, 2000,

Hearing, Trial Tr., Vol. 3 at 6.) The reason given in their June 1, 2000, letter to Ahmed was "the

financial restrictions present at this time." (Appendix, Vol. 2 at 150.) Two months later,

Schumacher wrote Ahmed telling him that the financial circumstances of his situation were not an

issue he and Rigg wished to become involved with, and so they were declining to represent him.

(Appendix, Vol. 2 at 151.)

On October 23, 2000, however, Ahmed's appointed counsel notified the trial court that Rigg

was willing to undertake representation of Ahmed. (Transcript of October 23, 2000, Hearing, Trial

Tr., Vol. 3 at 3.) Judge Sargus stated all that was necessary for her to release the funds to Rigg was

for Rigg himself to appear in court and express his intention to enter an appearance in Ahmed's case.

*Id*. at 4. A couple of weeks later, in another hearing, appointed counsel Adrian Hershey responded

to Ahmed's complaint that Hershey and co-counsel Peter Olivito never allowed Ahmed to meet with

Rigg and Schumacher out of Hershey and Olivito's presence. (Transcript of November 9, 2000,

Hearing, Trial Tr., Vol. 3 at 46.) Hershey stated that Ahmed never requested to do so, and that in the

course of the meeting with the other attorneys and Ahmed, Rigg and Schumacher told Ahmed that if

they were to take his case, he would have to sign a waiver of his right to a speedy trial. *Id*. Ahmed

argued with Rigg and Schumacher about the law, stated he would not sign a waiver, and returned

their retainer agreement to them unsigned. *Id*. The next day, Hershey received a call from Rigg

informing him that Rigg and Schumacher were not interested in taking Ahmed's case. *Id*. at 47. In their letter to Judge Sargus informing her of their decision, Rigg and Schumacher merely stated that "after meeting with Mr. Ahmed and his counsel and reviewing all aspects of the situation, we feel we will not be able to undertake this representation." (Appendix, Vol. 1 at 389.)

There also appears in the record a retainer agreement dated June 8, 2000, from attorneys Terry Sherman and Debra Gorrell, which set out the scope of their representation of Ahmed. (Appendix, Vol. 2 at 152.) The agreement was not signed by Ahmed. *Id*.

Later in November 2000, yet another attorney, Robert Suhr, contacted the court about representing Ahmed. Ahmed had indicated to Suhr that he would pay the attorney his fee, but that the court would provide funding for the usual support services in capital cases. (Transcript of November 27, 2000, Hearing, Trial Tr., Vol. 3 at 3.) Judge Sargus reassured Suhr that Ahmed was not indigent, and that he probably had $50,000 to $60,000 in assets, but that Ahmed's appointed counsel would have to be paid something out of that money since they had been representing him for some time. *Id*. at 4. When Suhr realized that appointed counsel were still on the case, he stated it would be premature for him to talk to anybody, presumably Ahmed. The record of that hearing ends at that point. *Id*. at 5.

It appears from the record that attorneys Richard Cline and David Young also contemplated representing Ahmed in his criminal case. A single page of what might have been a multi-page agreement spells out the scope of the representation and the associated fees. (Appendix, Vol. 2 at 159.) The document is altered in handwriting that is strikingly similar to that observed in Ahmed's *pro se* submissions to the trial court. One such alteration is as follows: "Any legal fees incurred in connection with the work performed by such attorney or attorneys will be approved by and be the

responsibility of ~~Mr. Ahmed~~. *Attorneys*" *Id.* In addition, the agreement was further modified in the section entitled "Scope of Work" as follows:

> It ~~does not~~ include any appeal of the decisions of the trial court, the jury or the sentence, ~~nor does it~~ *and also* include any re~~trial~~ if a mistrial is declared during trial. Should an appeal become necessary ~~or a mistrial be declared~~, **Attorneys** and Mr. Ahmed will reach a new fee agreement at that time.

*Id.* The modifications to the agreement are probably not terms that would be acceptable to any attorney, but there is no other information in the record that sheds any light on how the proposed agreement came into being or what its ultimate fate was. In any case, Cline and Young never filed a notice of their appearance and did not represent Ahmed at any time during his trial.

Finally, in December 2000, attorney Joseph Carpino met with Judge Sargus in her chambers to discuss representing Ahmed. (Transcript of December 8, 2000. Hearing, Trial Tr., Vol. 3 at 1-6.) In a January 2, 2001, hearing, Ahmed informed the trial court that he had retained Carpino as of December 22. (Transcript of January 2, 2001, Hearing, Trial Tr., Vol. 3 at 9.) At that same hearing, appointed counsel Olivito revealed to the court that Carpino had come to his home uninvited on Christmas Day to request that Olivito ask Hershey to withdraw from Ahmed's case so Carpino could represent Ahmed with Olivito. *Id.* at 13. In a January 8, 2001, hearing, Deputy Sheriff Randall Alderman from the Belmont County Sheriff's Office testified that on January 4, Carpino visited Ahmed in the Belmont County Jail. (Trial Tr. Vol. 4 at 92.) From outside the interview room, he could hear voices being raised, although he could not understand what was being said. *Id.* at 93. Alderman stated that within a short period of time, Carpino was up against the door wanting out of the interview room with his hand on the doorknob, and Ahmed standing within one foot of Carpino. *Id.* at 93-94. Carpino was let out of the interview room and left the jail. *Id.*

Also during that hearing, the trial court found Carpino in contempt of court for the contemptuous language found in pleadings he had filed, as follows:

> You have filed numerous pleadings with me, and they constitute direct contempt.
>
> The pleading of December 12th talks about, "Stop the travesty of justice. The trial judge is doubtful or mistaken." You have demanded written decisions. You have stated that the court's rulings shepparding [sic] the defendant's funds for his defense are earmarked for wrongful payment. And you have repeated that the proceeding is a travesty of justice. You have accused the judge of prejudice. All of this is done as an officer of the court. And it fits the classic definition of contempt. It tends to demean the court in the eyes of the public, and it obstructs justice. And you are hereby found to be in contempt.

(Transcript of January 8, 2001, Motion Hearing, Trial Tr., Vol. 4 at 115; see also Appendix, Vol. 1 at 416, 440, 443-45, 457-73, 481-82.) In a letter to Judge Sargus dated December 18, 2000, Ahmed himself expressed concern about Carpino's mental stability, financial situation, and ethical purity. (Appendix, Vol. 2 at 29-30.) Ahmed's concern was not unfounded, and was apparently shared by the Belmont County Court of Appeals throughout the time that Carpino was seeking to represent Ahmed. *See In re Beck*, No. 00 BA 52, 2002-Ohio-3460 (7th Dist. Ct. App., June 27, 2002) (detailing flagrant violations of the Ohio Rules of Appellate Procedure and bizarre behavior on the part of Carpino in his representation of a client). In *Beck*, the court of appeals noted that it had recently discussed Carpino's similar disregard of the rules in *Carpino v. Wheeling Volkswagen-Subaru*, No. 00 JE 45, 2001-Ohio-3357 (7th Dist. Ct. App. Sept. 21, 2001), in which Carpino proceeded *pro se*. The court of appeals also observed that Carpino's defense of his client in *State v. Christian*, No. 96-JE-42, 2000 WL 126609 (7th Dist. Ct. App. Jan. 13, 2000) was so outrageously unintelligible and strange that it recommended Carpino not be appointed to any capital cases in the future. *Id*. at *7. These cases, particularly *Christian*, overlap the period Carpino was seeking to

36

represent Ahmed in his capital case, so it would appear that Ahmed's assessment of Carpino's competence was fairly accurate. Carpino was later suspended from the practice of law because he was found to be suffering from a serious mental illness. http://www.supremecourt.ohio.gov/Clerk/ ecms/resultsbycasenumber.asp?type=3&year=2005&number=0748&myPage=searchbycasenumber. asp; http://www.supremecourt.ohio.gov/AttySvcs/AttyReg/Public_AttorneyDetails.asp?ID=0019474 (both websites last visited April 30, 2013).

Ahmed has not demonstrated that any of these attorneys declined to represent him because the trial court refused to release his funds to them, and he has utterly failed to produce any evidence of a conspiracy between the trial judge, the domestic relations judge, the probate judge, the conservator, the Belmont County Sheriff's Office, appointed counsel, and the prosecutors to deny him his right to hire counsel of his choice.

Although attorney McNamara mentioned that it would take time for Ahmed's funds to be released, he also stated that he could not take Ahmed's case because he did not have time to prepare for Ahmed's trial, and Ahmed refused to waive his speedy trial right. Attorneys Shamansky, Meeks, and Thomas were apparently willing to take Ahmed's case and sent him forms to complete that would give them access to Ahmed's account with T. Rowe Price, apparently one of the accounts not in the control of the conservator. The record does not indicate what became of those forms, whether Ahmed executed them or not, but because Ahmed had not provided the court with a financial statement from which the court could determine his indigency status, Ahmed was prohibited by a court order from using any of his money for any purpose. Thus, it was Ahmed's failure to cooperate with the court's assessment of his ability to pay for his own counsel that prevented Shamansky, *et. al.* from receiving payment from Ahmed's funds. When attorney Reinhart discussed taking Ahmed's

case with Judge Sargus, she assured him there was no barrier to his receiving payment from Ahmed's funds, and this Court has not found within the record any explanation as to why Reinhart ultimately decided not to take Ahmed's case. Although attorneys Rigg and Schumacher initially declined to represent Ahmed in part because of the financial restrictions, they later expressed an interest in taking his case. When they informed Ahmed that he would need to waive his right to a speedy trial if they decided to represent him, he refused to sign either a waiver or the retainer agreement they had presented to him. Ahmed, then, was the one to reject representation by Rigg and Schumacher.

The only evidence that attorneys Sherman and Gorrell were interested in representing Ahmed is their retainer agreement, signed by both of them, but not by Ahmed. The Court cannot presume anything from that document other than that an agreement was not reached. The reasons for that outcome are unknown. Attorney Suhr was apparently under the impression that Ahmed did not have counsel at the time he expressed an interest in representing him, and when he found out otherwise, he determined that having a conversation with Ahmed, who was represented by appointed counsel, would be "premature." That does not establish that Suhr was worried about the availability of Ahmed's funds to pay him should he become Ahmed's lawyer. If this Court were to assume anything about the failure of attorneys Cline and Young to represent Ahmed, it would be that Ahmed altered the "Scope of Work" portion of the retainer agreement to terms that would be unacceptable to most, if not all, attorneys. There is nothing in the record suggesting that they were afraid they would not be paid if they took Ahmed's case. And as for Carpino, it is evident that Ahmed himself had doubts about Carpino's ability to competently represent him, and those doubts were warranted, as evidenced by Carpino's filings and conduct in Ahmed's case, by Carpino's conduct in other cases

around that same time, and by his mental illness suspension from the practice of law a couple of years later. None of these attorneys ever filed a notice of appearance in Ahmed's case, which the trial court had repeatedly stated was necessary before Ahmed's funds would be released. Under the circumstances present in Ahmed's case, it was not unreasonable for Judge Sargus to require such a filing before disbursing Ahmed's funds to any attorney.

As for Ahmed's argument that he was denied his right to counsel of his choice on appeal, there is nothing to that claim. (*See* Petition, Doc. No. 35 at PageID 197-98.) At his sentencing hearing on February 2, 2001, Judge Sargus appointed the Ohio Public Defender's office to represent Ahmed so that it would be assured that a timely motion for a new trial and a notice of appeal would be filed. (Trial Tr., Vol. 10 at 27.) Ahmed protested that he had the right to secure his own attorney before the court had any reason to appoint counsel for him. *Id*. at 27-28. The attorney he claimed represented him, none other than Carpino, was not present in the courtroom at the sentencing hearing. *Id*. at 28. Judge Sargus explained that the public defenders would help him secure counsel of his choice, and when said counsel entered a notice of appearance, the public defenders would "be delighted to withdraw" from Ahmed's case. *Id*. The court informed Ahmed that it was fine that he had chosen Carpino to represent him, but that Carpino had to enter a notice of appearance so that he could be made attorney of record. *Id*. Aside from that conversation, which does not implicate Ahmed's right to retain his counsel of choice for his appeal, he points to nothing in the record to support his claim of a denial of that right. Unless, that is, the argument that "Ahmed *claims* that the trial judge made a secret order with the prosecutor, appointing OPD for appeal, on January 8, 2001, constructively removing attorney Carpino from [the] appeal and never ruled on [the] motion to release funds to selected counsel for appeal" counts. (Petition, Doc. No. 35 at PageID 197

(emphasis added).)  What Ahmed thinks, or suspects, or claims is not evidence upon which this Court may rely in evaluating his counsel-of-choice ground for relief.  It is true, as Ahmed alleges, that Carpino filed a "Motion in Arrest of Judgment," a document entitled "Motion for New Trial, Motion for Judgment of acquittal, Motion for Discovery," all filed on February 2, 2001, and a "Motion for Judgment of Acquittal" which is also captioned "Motion for Mistrial" in Carpino's hand, filed on February 5, 2001.  (Appendix, Vol. 2 at 304, 305, and 331-33, respectively.)  But nowhere in the record is Carpino's notice of appearance as counsel for Ahmed in his direct appeal.

There are, however, indications that Ahmed had privately retained attorney Paul Mancino to represent him on direct appeal.  In the Ohio Public Defender's motion to withdraw from the case, it is noted that Ahmed had retained Mancino.  (Appendix, Vol. 2 at 464.)  Mancino filed a notice of appeal on Ahmed's behalf, *id*. at 467, and the trial court recognized Mancino as Ahmed's counsel when granting the public defender's motion to withdraw, *id*. at 471.  The court also acknowledged that Ahmed had secured private counsel in two docket entries disposing of *pro se* motions Ahmed had filed.  *Id*. at 474, 475.  Although it does appear that the Ohio Public Defender's Office was again appointed to represent Ahmed on appeal about six months after Mancino took the case, there is no explanation or indication as to what caused that reappointment.  *Id*. at 476.  Ahmed's complaint here, however, is that he was deprived of Carpino's representation, not Mancino's.

Neither the trial court nor the appellate court stood in the way of Ahmed's retaining the attorney of his choice for his direct appeal.  The trial court made it clear to Ahmed that Carpino would have to file a notice of appearance to represent Ahmed, but he never did so.  Ahmed ultimately retained Mancino, but for whatever reason that relationship did not endure and the Ohio Public Defender's Office was once again appointed to represent Ahmed.  Thus, even if Ahmed had

preserved the instant ground for relief insofar as he alleges he was deprived of counsel of his choice on direct appeal, the claim would be unavailing.

Ahmed's first ground for relief is procedurally defaulted without excuse, and should be denied on that ground. Even if he had properly preserved the claim for habeas corpus review, however, it would fail as he has not demonstrated that he was denied his right to hire counsel of his choice in his criminal trial.


**Second Ground for Relief**

In his second ground for relief, Ahmed contends he was forced to go to trial with counsel who labored under a conflict of interest. (Petition, Doc. No. 35 at PageID 199.) Respondent acknowledges that the claim is properly preserved for habeas review, but argues it is nevertheless meritless. (ROW, Doc. No. 61 at PageID 974-77.) In his traverse, Ahmed basically repeats the same arguments made in his petition with very little additional argument. (Traverse, Doc. No. 71 at PageID 1684-95.)

Although lengthy, it is necessary to include here the Ohio Supreme Court's decision on direct appeal on the claim Ahmed presented there and now presents here to facilitate this Court's analysis of the state court's decision under the AEDPA. It reads as follows:

> In his second proposition of law, appellant asserts that the trial court erred in failing to remove defense counsel, since a conflict of interest occurred when he filed a lawsuit against counsel in federal court. Alternatively, appellant contends that there was a total breakdown of the attorney-client relationship that required counsel's removal. Appellant submits that the trial court's inquiry into the difficulties between him and counsel was insufficient.
>
> Appellant complained about his counsel on numerous occasions. Appellant was first represented by appointed public defenders at his

arraignment. Appellant claimed that counsel had not met with him or answered his questions, but counsel disputed appellant's allegations. Due to conflicts with appellant, both attorneys later withdrew, and by June 2000, the trial court had appointed attorneys Peter Olivito and Adrian Hershey to represent appellant. Although appellant sought to hire attorneys of his own choosing, he was never able to do so.

Soon after Olivito and Hershey were appointed, appellant began complaining that their representation was ineffective. At a September 6, 2000 hearing, appellant claimed that counsel had neither met nor consulted with him prior to seeking a continuance. At a November 9, 2000 hearing, appellant complained that Hershey had laughed at and humiliated him in front of a detective, had made racial slurs, and had been hostile toward him. Hershey disputed appellant's complaints, and the court advised appellant to let his counsel help him.

At a January 2, 2001 hearing, appellant told the court that he had hired attorney Joseph Carpino to represent him and that he had filed a civil rights lawsuit against Olivito and Hershey in federal court and wanted to discharge them.

On January 8, 2001, the trial court held a hearing on appellant's motion to discharge counsel. Appellant indicated again that he was suing counsel in federal court. He also claimed that he had given his attorneys a list of witnesses, but that in 16 months, neither his first attorneys nor his new attorneys had contacted them and that his new attorneys had "refused to contact them." Olivito explained that many of the witnesses that appellant had named were in Pakistan and that appellant had not provided phone numbers to contact them. Both attorneys told the trial court of their efforts to obtain witnesses and comply with requests by appellant. The trial court concluded that counsel was [sic] representing appellant diligently and therefore overruled appellant's motion to discharge them.

Also at the January 8, 2001 hearing, the court found that Carpino could not serve as appellant's counsel because he was not certified to act as counsel in capital cases. The court overruled Carpino's motion to become appellant's trial counsel.

Appellant reiterated his dissatisfaction with counsel at a January 11, 2001 suppression hearing. He also complained about counsel at the outset of voir dire, as well as at the mitigation and sentencing hearings.

Appellant relies on *Smith v. Lockhart* (C.A. 8, 1991), 923 F.2d 1314, 1321, citing *Douglas v. United States* (D.C. App. 1985), 488 A.2d 121, 136, in claiming that his federal lawsuit against appointed counsel reflected a conflict between his interests and counsel's. Appellant contends that once he raised the issue of a conflict of interest, the trial court was required to allow him to demonstrate that the conflict "impermissibly imperil[ed] his right to a fair trial." See *Cuyler v. Sullivan* (1980), 446 U.S. 335, 348.

There are strong indications that appellant filed his federal lawsuit simply to get his court-appointed attorneys discharged. Prior to trial, the trial court held hearings regarding appellant's complaints about counsel on November 9, 2000, and January 8, 2001. Upon considering the statements of appellant and counsel, the trial court found no reason to replace counsel. At the conclusion of the November 9 hearing, the trial court urged appellant to let his counsel help him. At the conclusion of the January 8, hearing, the court stated: "The court is comfortable that counsel has represented Mr. Ahmed * * * diligently; that the difficulties which have arisen in this case stem from what Mr. Ahmed himself pinpointed when he said that he does not understand. And the allegations do not have firm footing in law or in fact. The motion to discharge is overruled." Nor did the trial court find any conflict of interest that adversely affected counsel's performance. See *Mickens v. Taylor* (2002), 535 U.S. 162, 171-172. Under these circumstances, we will defer to the trial judge, "who see[s] and hear[s] what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St. 3d 68, 84.

We further note that courts "must be wary of defendants who employ complaints about counsel as dilatory tactics or for another invidious motive." *Smith v. Lockhart*, 923 F.2d at 1321, fn.11, citing *United States v. Welty* (C.A. 3 1982), 674 F.2d 185, 193-194.

Appellant continually complained about counsel. The trial court took appellant's complaints seriously and listened to all sides before it determined that his complaints were not valid and that counsel should remain as appellant's attorneys. The federal lawsuit appears to have been filed in an attempt to create a conflict so that his counsel would be removed from the case, not a genuine grievance causing a true conflict of interest. Moreover, after the trial court conducted thorough inquiries into the difficulties between appellant and counsel, it found that appellant's complaints against counsel were not

substantiated.  Nothing offered by appellant compels us to disturb that ruling.  See *State v. Deal* (1969), 17 Ohio St. 2d 17.

Appellant argues alternatively that even if there was no conflict of interest, there was at least a total breakdown in the attorney-client relationship that necessitated counsel's removal.  The trial court, however, addressed appellant's complaints concerning counsel's representation of him at two hearings as stated above.  Upon considering appellant's motion for a new trial and his complaints about counsel and claims of counsel's ineffectiveness throughout trial, the trial court held that "[h]ours of testimony [concerning appellant's disagreements with counsel] established that the grounds alleged were not cogent or reliable."  In addition, the record reflects many instances where appellant continued to confer with counsel throughout the proceedings, thus belying his claim that there was a total breakdown in the attorney-client relationship.

Since appellant did not substantiate his claims of a conflict of interest and of a total breakdown of the attorney-client relationship, we overrule his second proposition.

*State v. Ahmed*, 103 Ohio St. 3d 27, 30-33, 2004-Ohio-4190 at ¶¶ 24-36 (2004).

Ahmed's task under the AEDPA is to demonstrate that the Ohio Supreme Court's decision above was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, or based on an unreasonable determination of the facts in light of the evidence before the court.  28 U.S.C. § 2254(d)(1) and (2).  Instead of attempting that in any serious manner, however, Ahmed has simply repeated nearly verbatim the arguments he presented in the state court.  That practice, disturbingly common in capital habeas corpus cases that come before this Court, reveals a fundamental misunderstanding of the statutory limitations on federal habeas corpus. The issue before the habeas court is not the same as the issue presented to the state court.  The question before the state court was whether there was a conflict of interest or a total breakdown of communication between Ahmed and his trial counsel requiring reversal of his convictions.  Here, the question is whether the state court's decision that there was not a conflict is either contrary to or an

unreasonable application of federal law as determined by the United States Supreme Court, or whether the state court's decision was based upon an unreasonable determination of the facts, given the evidence before that court at the time of Ahmed's trial, starkly different inquiries than the one before the state court in the first instance. Basically cutting and pasting the claim as it was presented to the state court into a habeas petition is consequently ill advised as it does not address the question this Court must consider in habeas review. *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 785 (2011). That is true even in cases where the argument in the state court fairly presents the federal constitutional claim. *See Lamar v. Ishee*, No. 1:04-cv-541, 2010 WL 5574467 at *23 (S.D. Ohio, July 30, 2010) (Report and Recommendations, adopted in its entirety in *Lamar v. Ishee*, No. 1:04-cv-541, 2011 WL 110561 (S.D. Ohio Jan. 13, 2011)).

As the Sixth Circuit Court of Appeals has recognized, a claim that counsel labored under a conflict of interest is at base a claim of ineffective assistance of counsel governed by *Strickland v. Washington*, 466 U.S. 668 (1984). *See Brooks v. Bobby*, 660 F.3d 959, 963-64 (6th Cir. 2011). There are some ineffective assistance of counsel contexts in which the United States Supreme Court has directed that prejudice be presumed, one of which is that the attorney labored under an actual conflict of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 487-91 (1978). As that Court has also observed, however, the *Holloway/Cuyler* exception is only clearly established in relation to a conflict of interest that arises from an attorney's representation of multiple concurrent or co-defendants in the same or separate proceedings. *Mickens v. Taylor*, 535 U.S. 162, 174-76 (2002); *Satterwhite v. Texas*, 486 U.S. 249, 256-58 (1988); *see also Jalowiec v. Bradshaw*, 657 F.3d 293, 314-15 (6th Cir. 2011), *McElrath v. Simpson*, 595 F.3d 624, 630-31 (6th Cir. 2010); *Stewart v. Wolfenbarger*, 468 F.3d 338, 350-54 (6th Cir. 2006); *Gillard v.*

*Mitchell*, 445 F.3d 883, 890-91 (6th Cir. 2006); *Whiting v. Burt*, 395 F.3d 602, 617-20 (6th Cir. 2005); *McFarland v. Yukins*, 356 F.3d 688, 705-09 (6th Cir. 2004); *Moss v. United States*, 323 F.3d 445, 460-61 (6th Cir. 2003); *Smith v. Hofbauer*, 312 F.3d 809, 814-16 (6th Cir. 2002); *but see Fautenberry v. Mitchell*, 515 F.3d 614, 627-28 (6th Cir. 2008) (applying *Cuyler* where petitioner claimed trial counsel labored under a conflict because he was a trustee for township where victim's body was found). Consequently, this Court must consider Ahmed's claim that his trial counsel were laboring under a conflict of interest, and that there was a total breakdown of the attorney-client relationship under the standard set forth in *Strickland*, *supra*. *Stewart*, 468 F.3d at 351.

Success on a claim of counsel's ineffectiveness depends upon the claimant's ability to show that counsel's performance was objectively unreasonable, and that absent counsel's deficient performance, there is a "reasonable probability that . . . the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). In the habeas context, the Supreme Court has elaborated on the fit between *Strickland* and the AEDPA as follows:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under [the] AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams* [*v.Taylor*, 529 U.S. 362,] . . . 410 [(2000)]. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 785 (2011) (parallel citations omitted).

In his traverse, Ahmed devotes only one original paragraph to the argument that is actually relevant to the question before *this* Court. It reads:

> In this case, the Ohio Supreme Court found that Ahmed "did not substantiate his claims of conflict of interest and of a total breakdown of the attorney-client relationship." Ahmed established that his counsel were subject to a conflict of interest due to: (1) the depth and breadth of the accusations lodged against them and (2) the filing of the lawsuit. Ahmed further established that the conflict adversely affected counsels' [sic] performance in that, Counsel refused to meet their client alone; Ahmed, to his detriment, refused to take the advice of counsel; both counsel and Ahmed failed to provide each other with much[-]needed information; and counsel failed to follow up on important investigative leads supplied by Ahmed that were relevant to putting on a case for mitigation.

(Traverse, Doc. No. 71 at PageID 1695.) That brief paragraph falls short of demonstrating that the state court's thorough decision was contrary to federal law or based upon an unreasonable determination of the facts. Ahmed's claim as it was presented in the state court and in this Court is filled with statements that begin with "Ahmed accused . . .," "Ahmed claimed . . .," "Ahmed asserted . . .," "Ahmed believed . . .," and the like (Appendix, Vol. 3 at 287-97; Petition, Doc. No. 35 at PageID 199-207), but the Court notes that Ahmed's belief or claim or assertion of something does not establish it as fact upon which the state court may act, or this Court rely.

That Ahmed lodged numerous and far-fetched accusations against his trial counsel reflects more on his own inability to cooperate with counsel than on counsel's ability to represent him adequately. Ahmed's filing of the lawsuit against his trial counsel in federal court was determined by the state court to likely have been for the very purpose of creating a conflict of interest in hopes of having them removed from his case, and Ahmed does not explain how that determination was unreasonable under federal law or based upon an unreasonable determination of the facts as they existed at the time of the state court's decision.

47

As for prejudice, Ahmed deceptively states that his "Counsel refused to meet their client alone," implying that he was, after that point, never alone with his two trial counsel. In reality, it was only attorney Hershey who refused to meet with Ahmed without co-counsel Olivito present. (Trial Tr., Vol. 3 at 42-54.) Hershey explained to the trial court that he had decided not to meet with Ahmed alone again because Ahmed took things he said out of context and made unfounded accusations against him. *Id.* at 54. There is nothing in the record indicating whether Hershey stuck by his decision to meet with Ahmed only if Olivito could also be present for the remainder of their representation of Ahmed. Even assuming Hershey did follow through, however, Ahmed does not address how Hershey's decision demonstrates a conflict of interest, a total breakdown of the attorney-client relationship, or, indeed, any error of a constitutional dimension. Nor can counsel be faulted for Ahmed's decision not to follow their advice.

Ahmed also claims he and his counsel failed to provide each other with information vital to the defense. Counsel had no control over what information Ahmed chose to share with them, and Ahmed does not identify with any specificity what other documents or information was withheld from him by his counsel. Ahmed directs the Court to the transcript of a January 8, 2001, hearing in which Ahmed appears to be arguing to the trial court that his counsel kept a search warrant from him and that "there were some other documents, also. It was not only the warrant which was given to them." (Transcript of January 8, 2001, Hearing, Trial Tr., Vol. 4 at 29.) The significance of the warrant is not explained, and the "other documents" are not even identified, nor is it indicated where in the record any of those documents might be found. Ahmed also claims that his trial counsel failed to contact individuals whose names he had provided to them as possible witnesses. After listening to trial counsel detail the steps they had taken to obtain witnesses and comply with Ahmed's requests,

the trial court concluded that counsel's performance was not deficient. *State v. Ahmed*, 103 Ohio St. 3d 27, 31, 2004-Ohio-4190 at ¶ 28 (2004). Ahmed merely repeats the arguments he made on direct appeal in the state court and makes the conclusory statement that counsel failed to "follow up on important investigative leads" he supplied, attempting to establish that the alleged conflict adversely affected counsel's performance. (Traverse, Doc. No. 71 at PageID 1695.) This he has failed to accomplish. He has not overcome the deference and latitude due the state court's decision in habeas corpus review, considerations that are not part of a straight application of the *Strickland* standard. *Harrington*, 131 S.Ct. at 785.

To sum up, Ahmed has not demonstrated that the Ohio Supreme Court's decision on his conflict-of-interest/breakdown-of-attorney-client-relationship claim was contrary to federal law as determined by the United States Supreme Court, or that the state court's decision was based upon an unreasonable determination of the facts in light of the evidence presented to the court. Accordingly, his claim that he was deprived of effective representation due to his trial counsel's conflict of interest and a total breakdown of the attorney-client relationship should be denied.

**Third Ground for Relief**

In his third ground for relief, Ahmed contends that he was denied his right to represent himself at trial.[6] (Petition, Doc. No. 35 at PageID 214-220.) Respondent acknowledges the claim has been properly preserved for habeas corpus review, but argues it is nevertheless meritless. (ROW, Doc. No. 61 at PageID 977-980.) In his traverse, Ahmed repeats the arguments made in his

petition, which to a large extent are the same arguments made in the state court on direct appeal (Appendix, Vol. 3 at 426-28), then asserts that the Ohio Supreme Court's decision rejecting the claim was contrary to federal law. (Traverse, Doc. No. 71 at PageID 1696-1701.)

Respondent is only partially correct in stating that Ahmed raised the instant claim on direct appeal in the state court. There, Ahmed's claim that he was denied his right to proceed *pro se* was explicitly limited to the mitigation phase of his trial (Appendix, Vol. 3 at 426-28), whereas here, the claim has expanded to include both phases of the trial (Petition, Doc. No. 35 at PageID 214-17). Although a colorable argument could be made that Ahmed procedurally defaulted the part of the instant claim relating to the guilt phase of his trial, Respondent has not suggested that any part of Ahmed's claim has been defaulted.

Generally, procedural default is an affirmative defense that must be asserted by a respondent at the earliest opportunity or it will be waived. *Trest v. Cain*, 522 U.S. 87, 89 (1997). While a federal court is not required to *sua sponte* invoke procedural default when a respondent has failed to do so, there is no prohibition against doing so, either. *Id.* at 89-90; *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000). This Court has been reluctant to raise the defense *sua sponte* except in cases where an expressly defederalized claim was presented to the state courts. *See Sheppard v. Bagley*, 604 F.Supp.2d 1003, 1008-1013 (S.D. Ohio 2009). That is not the situation here, and because of the seriousness of the penalty Ahmed faces, the Court will exercise its discretion not to raise the procedural defense *sua sponte*.

---

[6] Elsewhere in his Petition, Ahmed claims he was incompetent even to stand trial, an argument that seems particularly at odds with his claim here that he was capable of acting as his own attorney at his capital trial, especially since Ahmed argued his incompetence just eight days prior to the start of the mitigation phase of his trial. The significance of the timing of Ahmed's initial claim of incompetence will become apparent in the Court's discussion of the instant ground for relief.

Where a respondent does not advance a procedural default defense respecting a habeas claim never presented to the state court, a federal court has an opportunity to address the claim *de novo*. "If deference to the state court is inapplicable . . ., we 'exercise our independent judgment' and review the claim de novo." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *quoting Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir. 2002). Accordingly, to the extent Ahmed argues that he was denied his right to represent himself in the guilt phase of his capital trial, this Court will address his claim *de novo*. That part of his claim relating to the mitigation phase of his trial, of course, will be considered under the familiar standard set forth in the AEDPA.

Ahmed states that he repeatedly attempted to waive his right to counsel in the pre-trial stage of his trial, but that the trial court consistently denied his request. (Petition, Doc. No. 35 at PageID 214.) He cites to pages eight through eighteen of the transcript of a January 2, 2001, hearing as supporting his claim, but those pages reveal that what Ahmed was actually seeking is discharge of his appointed counsel, Hershey and Olivito, because he had retained private counsel, Carpino. (Trial Tr., Vol. 3 at 8-18.) Carpino incongruously stated he wanted to be appointed as a third counsel in addition to Hershey and Olivito and that he wanted to be appointed as a friend of the court. *Id*. at 8. Ahmed suggested that he could represent himself *pro se* as well as having Carpino retained as his counsel, in other words, he requested hybrid representation, which the court denied. *Id*. at 11-12. Requesting hybrid representation is not the same as requesting to represent one's self, and Ahmed's argument that he requested *pro se* status within the pages of the transcript he cited is disingenuous.

Next, Ahmed claims he asserted his right to proceed *pro se* in a September 6, 2000, hearing. (Petition, Doc. No. 35 at PageID 215.) The particular quotation Ahmed cites for support of his argument, however, was not in response to Ahmed's request to proceed *pro se*, but rather in response

to Ahmed's handing to his attorneys a "Motion to permit use of objections not timely filed under Criminal Rule 12(G)." (September 6, 2000, Hearing,Trial Tr., Vol. 3 at 18-20.) Other motions addressed in that hearing involved Ahmed's requests for individual voir dire, the exclusion of certain photographs, to view the crime scene prior to its being cleaned up, to obtain an investigator, to compel discovery, to use a particular interview room at the jail when meeting with his attorneys, and to have his handcuffs removed during meetings with his attorneys. *Id.* at 1-20. Conspicuously absent, given Ahmed's argument, is any motion to proceed *pro se*. Once again, the record reveals the falsity of Ahmed's assertions that he requested that he be permitted to represent himself in his capital trial.

Ahmed claims he also attempted to assert his right to self-representation in a January 8, 2001, hearing. (Petition, Doc. No. 35 at PageID 215.) The page of the hearing transcript cited by Ahmed instead shows that at that time Ahmed requested that his appointed counsel be discharged because he was unhappy with their representation for various reasons. (January 8, 2001, Hearing, Trial Tr., Vol. 4 at 4.) Ahmed states that when he "attempted to explain his situation to the court, the Judge refused to listen to his statements," citing page twenty-seven of the same hearing transcript. (Petition, Doc. No. 35 at PageID 215.) Again, Ahmed quotes the trial court completely out of context. The trial court did instruct Ahmed to "be quiet now," but it was in response to Ahmed's interruption after the court asked Ahmed's counsel a question about how many photographs had been turned over to the defense by the prosecutor in discovery, something that has nothing whatsoever to do with any desire Ahmed may have had to represent himself.

Ahmed also states that he filed a motion to proceed *pro se* on January 19, 2001, but provides this Court no citation to the record where the motion might be found. This Court is not required to search the record in order to find support for a habeas petitioner's claims.

Given that Ahmed has misrepresented the record to this Court as noted above, and has failed to indicate where in the record his January 19, 2001, motion to proceed *pro se* might be found, there is no support for his contention that he requested self representation prior to or during the guilt phase of his trial. The only pretrial or guilt-phase request this Court finds that even mentions *pro se* representation is Ahmed's misuse of the term "*pro se*" when he was really requesting hybrid representation. (January 2, 2001, Hearing, Trial Tr., Vol. 3 at 11.) Thus, Ahmed's claim that he was denied his right to represent himself during the guilt phase of his trial rests on facts that are not facts at all, and are instead figments at best, and outright untruths at worst. Consequently, he has not demonstrated entitlement to habeas corpus relief with regard to that part of his third ground for relief.

At the outset of the mitigation phase of Ahmed's trial, he repeatedly requested to waive his right to appointed counsel and to represent himself for the remainder of his trial. (Trial Tr., Vol. 9 at 10, 33, 34, 35.) The trial judge advised him that he would be required to follow the same procedural rules as attorneys, that she would not grant a continuance, and that he would not have a lot of time to talk with the mitigation witnesses. *Id*. at 11. She also warned Ahmed that he does not possess the same knowledge as do his attorneys respecting the available penalties, the mitigating factors, the aggravating circumstances, or the weighing process. *Id*. at 12. She reminded Ahmed that he had already been found in contempt of court several times during his trial, and she cautioned that if he engaged in disorderly or contemptuous conduct, she would remove him from his own case. *Id*. at

11. As the judge reviewed the proposed jury instructions with Ahmed, he rustled papers, and interrupted the judge to question whether the court composed the proposed instructions or if the prosecutor had done so. *Id*. at 23-25. The trial court advised him that he cannot question the court and that if it was his intent to represent himself and thwart the rules of procedure, she would not permit him to proceed *pro se*. *Id*. at 25. Ahmed then asked about the author of the jury instructions again, to which the court responded that if Ahmed were to ask another question contrary to the rules, she would hold him in contempt of court. *Id*. Ahmed continued to interrupt the judge and objected to Hershey and Olivito's continued presence in the courtroom since he had decided to represent himself. *Id*. at 29, 33. The judge asked Ahmed again if he wanted his appointed counsel discharged and to represent himself, to which Ahmed responded by repeating his persistent complaint of having been denied his right to hire counsel of his choice. *Id*. at 34. The court then overruled Ahmed's motion, stating it was false and that the issue of Ahmed's dissatisfaction with his appointed counsel had been dealt with previously. *Id*. at 35. The court continued to explain self-representation to Ahmed, however, and responded to his complaint about Hershey and Olivito remaining in the courtroom by saying that they would be there for Ahmed to consult should he wish to do so. *Id*. at 33, 36-37. Finally, the trial court indicated to Ahmed that if he wanted to proceed *pro se*, he had to sign a form acknowledging his rights by a time certain that day. *Id*. at 37. That time came and went without Ahmed's signing the form acknowledging his rights. *Id*. at 38. Instead, Ahmed composed a written addendum to the form contending he was denied his constitutional rights to a continuance and to self-representation without the presence of his previously appointed counsel. *Id*. at 38, 41. When the trial court questioned Ahmed as to whether he agreed that he was advised of his rights to self-representation, Ahmed argued that advisement means nothing when the rights are not given. *Id*.

The court found that Ahmed had not effectively signed the acknowledgement of rights form and overruled his motion to proceed *pro se*. *Id*. at 43.[7]

As acknowledged by Respondent, Ahmed did present this part of his claim to the state supreme court on direct appeal. (ROW, Doc. No. 61 at PageID 977-80; Appendix, Vol. 3 at 426-28.) The Ohio Supreme Court rejected the claim, reasoning as follows:

> [A]ppellant submits that the trial court deprived him of due process and the right to conduct his own defense when the court declined to accept his waiver of counsel at the beginning of the penalty phase. Appellant contends that <u>*Faretta v. California* (1975), 422 U.S. 806</u>, guarantees him the right to waive assistance of counsel and proceed pro se.
>
> If a trial court denies the right of self-representation, when properly invoked, the denial is per se reversible error. <u>*State v. Reed* (1996), 74 Ohio St.3d 534, 535, 660 N.E.2d 456</u>, citing <u>*McKaskle v. Wiggins* (1984), 465 U.S. 168, 177</u>. However, in this case, the right of self-representation was not properly invoked. See <u>*State v. Vrabel*, 99 Ohio St. 3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 49-53</u>.
>
> At the beginning of the penalty phase, appellant gave the trial court a pro se motion "to exercise his right to self representation under the circumstances and thus hereby discharge the appointed counsels." The court explained to appellant the right that he was waiving and what representing himself would entail. The court then gave appellant a docket entry to sign that stated: "Being fully advised of my rights, I hereby elect to represent myself." Appellant signed the form but also wrote on the docket entry: "I have not been allowed the rights under Constitution and as given in Constitution and Crim.R. 10 and 44 to continuance and representation by selection

---

[7] In his petition and traverse, Ahmed asserts that he signed the acknowledgment of rights form, contrary to the trial court's in-court findings, and he refers the Court to Volume 9, Page 38, of the trial transcript and to "Judge's Ex. 1." (Petition, Doc. No. 35 at PageID 217, 218; Traverse, Doc. No. 71 at PageID 1698, 1699.) The cited page of the transcript, however, indicates that Ahmed did *not* sign the form, and no additional information about the "Judge's Ex. 1," such as where it might be found in the record before this Court, is provided. Taking a guess, the Court has nevertheless reviewed that part of the Appendix that covers the time period from the rendering of the guilt-phase verdicts through judgment, imposition of the death sentence, and Ahmed's notice of appeal to the state court of appeals (Appendix, Vol. 9 at 254-478) and found no document marked as "Judge's Ex. 1," nor did it find any document purporting to be the acknowledgment of rights form at issue.

counsel and even to represent myself alone without the presence of court appointed counsels to whom I have sued in the civil case C2-001-0013 in Federal Court. There has been no defense, no defense witnesses and almost no investigation to jusify 16 months of delay or period before trial and --."

The trial court then addressed appellant and repeatedly asked him whether he understood his rights and wanted to waive them. Appellant did not give a clear answer. The court then held: "When I read the comments that you have written on the docket entry, I find that you have failed to effectively sign the entry that was prepared by the court; that the soliloquy [sic] has failed and that you have not, in fact, elected to undertake self representation. We will proceed. Counsel will represent you."

The trial court correctly found that appellant did not unequivocally and explicitly invoke his right to self-representation. See *State v. Cassano*, 96 Ohio St. 3d 94, 2002-Ohio-3751, 722 N.E.2d 81, ¶ 37-38. "The constitutional right of self-representation is waived if it is not timely and unequivocally asserted." *Jackson v. Ylst* (C.A.9, 1990), 921 F.2d 882, 888; see, also, *United States v. Frazier-El* (C.A.4, 2000), 204 F.3d 553, 558 (assertion of the right of self-representation "must be * * * clear and unequivocal").

Given these circumstances, appellant's . . . proposition of law is not well taken.

*State v. Ahmed*, 103 Ohio St. 3d 27, 44-45, 2004-Ohio-4190 ¶¶ 102-108 (2004) (some parallel citations omitted).

The United States Supreme Court has recognized a criminal defendant's right to represent himself in a state trial, so long as that election is made voluntarily and intelligently. *Faretta v. California*, 422 U.S. 806 (1975). The right to represent one's self is not absolute, however, Criminal defendants may not use the courtroom to engage in "deliberate disruption . . . [or] serious and obstructionist misconduct," *id.* at 834 n.46, and must be "able and willing abide by the rules of procedure and courtroom protocol," *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984). "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the

defendant's interest in acting as his own lawyer." *Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000), *see also Sell v. United States*, 539 U.S. 166, 180 (2003) (observing that "the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one"). Furthermore, any waiver of the right to counsel, for that is what the decision to represent one's self is, must be knowing, intelligent, and unequivocal. *Faretta*, 422 U.S. at 835. When the right to proceed *pro se* is properly invoked and a trial court denies the request, the denial is *per se* reversible error. *McKaskle*, 465 U.S. at 177 n.6.

Ahmed has once again merely cut and pasted the arguments made to the Ohio Supreme Court on direct appeal into his habeas petition and traverse, and devotes only two additional paragraphs to the question relevant to *this* Court's task. There, he argues that the Ohio Supreme Court's finding that Ahmed did not unequivocally and explicitly invoke his right to represent himself was an unreasonable application of *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979) (stating that an "explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right . . . to counsel"). In *Butler*, however, the issue was whether the defendant had waived his Fifth Amendment *Miranda* right to the presence of a lawyer during his interrogation, *id.* at 374, a situation distinguishable from Ahmed's, and Ahmed does not assert a violation of his Fifth Amendment right in the instant ground for relief. Ahmed also argues that the trial court improperly required his waiver to be in writing. (Traverse, Doc. No. 71 at PageID 1701.) But what the trial court did is not the primary focus of this Court. Instead, it is how the Ohio Supreme Court decided the constitutional propriety of the trial court's handling of the matter that is at issue. *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 785 (2011). That court merely concluded that that the

trial court correctly found Ahmed had not equivocally and explicitly[8] invoked his right to represent himself in the mitigation phase of his trial. *Ahmed*, 103 Ohio St. 3d at 45, 2004-Ohio-4190 at ¶ 107. Significantly, the state supreme court acknowledged that Ahmed actually signed the written request to proceed *pro se*, *Ahmed*, 103 Ohio St. 3d at 44, 2004-Ohio-4190 at ¶ 105, contrary to the trial court's statement on the record that he had not (Trial Tr., Vol. 9 at 38).

In habeas corpus, the petitioner's burden "must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 784 (2011). Both the trial court and the Ohio Supreme Court concluded that Ahmed had not effectively invoked his right to self representation, presumably because of his handwritten addendum to the form provided to Ahmed by the trial court. This Court need not agree with the state court on that question to deny Ahmed's claim for habeas corpus relief, however. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786, *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). This Court does not disagree with the state court's decision, but even if it were to do so, Ahmed has not demonstrated that only an unreasonable jurist would agree with the decision. In addition, another basis for denying Ahmed's request to proceed *pro se*, perhaps even stronger than the first, is apparent in the record.

As noted above, a defendant wishing to represent himself may not use the right for the purpose of disrupting the proceedings, and must be willing to follow courtroom procedure and

---

[8] An explicit waiver need not be in writing, although that is the form the trial court preferred in Ahmed's case.

protocol. *Faretta*, 422 U.S. at 834 n.46; *United States v. Lopez-Osuna*, 232 F.3d 657, 665 (9th Cir. 2000) (holding defendant's request to represent himself may be denied when he is unable or unwilling to adhere to rules of procedure and courtroom protocol); *United States v. Frazier-El*, 204 F.3d 553, 559 (4th Cir. 2000) (stating that "the *Faretta* right to self-representation is not absolute, and the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"); *United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998) (finding that "when a defendant's obstreperous behavior is so disruptive that the trial cannot move forward, it is within the trial judge's discretion to require the defendant to be represented by counsel"). Ahmed had already been cited for contempt of court before he requested to proceed *pro se* in the mitigation phase of his trial. In numerous hearings, Ahmed repeatedly interrupted the trial judge, answered questions directed to others, refused to move on in his argument when instructed to do so by the court, and used contemptuous language directed at his attorneys and the court (Hearing of January 2, 2001, Trial Tr., Vol. 3 at 18, 19; Hearing of January 8, 2001, Trial Tr., Vol. 4 at 11, 20, 27, 30-31, 33, 37, 42, 43, 45, 46, 48, 49, 52, 54, 57, 59, 73-74; Hearing of January 11, 2001, id. at 86, 87; Hearing of February 1, 2001, Trial Tr., Vol. 9 at 11), demonstrating a persistent inability or unwillingness to adhere to the rules of procedure and courtroom protocol. As the trial judge observed, she had been "heroically patient" with Ahmed and his numerous and repeated complaints about them, providing him with multiple opportunities at hearings to air his grievances about his appointed attorneys, his treatment at the jail, and the trial judge herself. (Hearing of January 11, 2001, Trial Tr., Vol. 4 at 85.) Still, she found it necessary to hold Ahmed in contempt of court. (Hearing of February 1, 2001, Trial Tr., Vol. 9 at 11.) In addition, in presenting his request to proceed *pro se*, Ahmed again breached protocol by arguing about the judge's decision

that appointed counsel would become stand-by counsel should Ahmed represent himself, challenging the judge on the origin of the proposed jury instructions to the point of being threatened with being held in contempt of court again, interrupting the judge, and arguing with the judge about the difference between being advised of his rights and being given his rights. (Hearing of February 1, 2001, Trial Tr., Vol. 9 at 12, 25, 33, 36, 38-39.) Thus, even if the state court's finding that Ahmed had not effectively invoked his right to self representation were objectively unreasonable, Ahmed's demonstrated unwillingness to adhere to the rules of court and to conduct himself within the parameters of courtroom protocol would provide a solid ground upon which to deny his right to represent himself in the mitigation phase of his trial.

Ahmed has not demonstrated that the Ohio Supreme Court's decision that he had not unequivocally invoked his right to self-representation was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Consequently, his third ground for relief should be denied.

**Fourth Ground for Relief**

In his fourth ground for relief, Ahmed contends he was denied the effective assistance of counsel in all phases of his capital trial. (Petition, Doc. No. 35 at PageID 220-46.) Respondent does not advance the procedural default defense, and instead argues that the Ohio Supreme Court's decision was neither unreasonable nor contrary to federal law. (ROW, Doc. No. 61 at PageID 980-93.) In his traverse, Ahmed reproduces twenty pages from his petition (which in turn is almost entirely cut and pasted from his appellate brief on direct appeal to the Ohio Supreme Court), and devotes slightly more than one page of argument to the issue before this Court. (Traverse, Doc. No.

71 at PageID 1702-24.)  There, he contends that the Ohio Supreme Court's decision is contrary to the federal law set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), because the court failed to consider the allegations of attorney ineffectiveness cumulatively in determining whether Ahmed had suffered prejudice due to his counsel's substandard performance.  (Traverse, Doc. No. 71 at PageID 1723.)

Ineffective assistance of counsel claims are governed by the law set forth in *Strickland v. Washington*, 466 U.S. 668, 693 (1984), which holds that to warrant reversal of a conviction or death sentence, a defendant must show deficient performance on the part of his counsel, and prejudice therefrom.  As previously noted in somewhat abbreviated fashion (*see* Second Ground for Relief, *supra*), the United States Supreme Court has recently summarized the interplay between *Strickland* and federal habeas corpus (and pointed out why cutting and pasting from a state court appellate brief is ill advised in habeas corpus) as follows:

> Federal habeas relief may not be granted for claims subject to [28 U.S.C.] § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of this Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 [(2000)]; or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).
>
> . . .
>
> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.  Under [the] AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect*

application of federal law." *Williams*, *supra*, at 410. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

. . .

> If this standard is difficult to meet, that is because it was meant to be. As amended by [the] AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Cf. *Felker v. Turpin*, 518 U.S. 651, 664 (1996) (discussing [the] AEDPA's "modified res judicata rule under § 2244). It preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.

*Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 785-87 (2011) (parallel citations omitted).

In his petition, Ahmed makes no mention of the Ohio Supreme Court's decision relating to his sixth proposition of law on direct appeal where he presented his ineffective assistance of trial counsel claim. (Doc. No. 35 at PageID 220-46.) He does not allege that the state court's application of federal law to his claim was unreasonable, or that the court's determination of the facts in rejecting his claim was unreasonable. Instead, Ahmed saved such allegations for his traverse. (Doc. No. 71 at PageID 1722-23.) Technically, then, Ahmed has not stated a claim upon which habeas corpus relief can be granted. *See* Rule 2(c)(1) of the Rules Governing Section 2254 Cases in the United States District Courts. Nevertheless, because the claim is readily decided, this Court will

consider the sparse but relevant arguments Ahmed makes in his traverse as if they were presented in his petition.

Ahmed alleges that the Ohio Supreme Court failed to consider the cumulative effect of the instances of his counsel's ineffectiveness as required by *Strickland*. (Traverse, Doc. No. 71 at PageID 1723.) After considering each allegation of ineffective assistance made by Ahmed, however, a discussion comprising some twenty-four paragraphs, the Ohio Supreme Court concluded with the following paragraph:

> Last, appellant asserts that the cumulative effect of errors and omissions by trial counsel infringed his Sixth Amendment right to effective assistance of counsel. However, appellant received a fair trial, and any error was nonprejudicial. "Such errors cannot become prejudicial by sheer weight of numbers." *State v. Hill*, 75 Ohio St. 3d [195,] . . . 212, 661 N.E.2d 1068 [(1996)]; *State v. Braden*, 98 Ohio St. 3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 123 [(2003)]. For all the foregoing reasons, we reject appellant's sixth proposition.

*Ahmed*, 103 Ohio St. 3d 27, 55, 2004-Ohio-4190 at ¶ 165. Ahmed contends that the court only cumulatively evaluated the performance prong of *Strickland* and ignored the prejudice prong in the quoted paragraph (Traverse, Doc. No. 71 at PageID 1723), but that claim is contradicted by court's specific language therein. What is the "effect of errors and omissions" referred to in the first sentence of the paragraph if not prejudice? Thus, when the court addressed the cumulative "effect of errors and omissions," it was determining whether the errors and omissions alleged by Ahmed prejudiced him. His claim that the state court failed to consider the cumulative prejudicial effect of the many alleged instances of ineffective assistance of his trial counsel is factually incorrect.

Ahmed also suggests that "[e]ven if the Ohio Supreme Court did consider the errors of counsel collectively," the court applied the wrong standard in assessing any prejudice from trial counsel's errors. (Traverse, Doc. No. 71 at PageID 1723.) Ahmed argues that "the test to be

employed is whether the result or outcome was worthy of confidence – not whether 'any error [singular][9] was prejudicial," citing the paragraph quoted above from the Ohio Supreme Court's decision. *Id*. Ahmed goes into no more detail than that.

*Strickland* held that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. While the Ohio Supreme Court did not use *Strickland*'s language verbatim when considering whether the cumulative effect of the alleged ineffectiveness warranted relief, it did conclude that Ahmed's trial was a fair one. Ahmed does not challenge that conclusion, nor does he explain how it conflicts with the standard set forth in *Strickland*, and this Court finds that it does not.

Ahmed has failed to show that his trial counsel provided him ineffective assistance at any time prior to or during his trial. Accordingly, his fourth ground for relief should be denied.


**Fifth Ground for Relief**

Next, Ahmed contends his appellate counsel provided ineffective assistance during his direct appeal to the Ohio Supreme Court. (Petition, Doc. No. 35 at PageID 246-55.) Respondent argues the claim is both procedurally defaulted and meritless. (ROW, Doc. No. 61 at PageID 993-95.)

Ahmed's reply to Respondent's procedural default defense is perplexing. First, he states that prior to his trial he had asked the trial court to allow him to appeal his appointed counsel's waiver of his speedy trial right. (Traverse, Doc. No. 71 at PageID 1724.) The connection between that pretrial

---

[9] The Court notes that Ahmed inappropriately inserted the bracketed word into the state court's statement, substantially changing the meaning of the court's words.

request and Ahmed's claim here that his appellate counsel were ineffective is a complete mystery to this Court.

Next, he contends he twice raised "this claim" *pro se* in post-conviction, and again references a violation of his right to a speedy trial. *Id.* There are a couple of problems with that argument. First, "this claim" concerns a claim of ineffective assistance of appellate counsel, not speedy trial rights, and second, ineffective assistance of appellate counsel claims can only be brought in Ohio by filing an application to reopen a direct appeal, and cannot be brought in a post-conviction petition. *State v. Murnahan*, 63 Ohio St. 3d 60 (1992).

Ahmed also contends he sought removal of his appellate counsel for failing to raise valid arguments on direct appeal, but that his request was denied by the Ohio Supreme Court. (Traverse, Doc. No. 71 at PageID 1725.) He directs the Court's attention to a procedural default argument made in his first ground for relief in these proceedings, but the argument to which he refers, in its entirety, reads as follows:

> (1)(B)(4)      The Ohio Supreme Court addressed this claim on its merits when it denied the 'motion to disqualify and remove public defender's office representation of Appellant."
>
>                  Ahmed filed a motion in the Ohio Supreme Court to remove the public defender. (Apx. Vol. 3, pp. 223-243). Throughout that motion Ahmed detailed the efforts of Belmont County Courts to deny him his right to counsel of choice. The motion was denied on its merits. (Apx. Vol. 3, pp. 244). As a consequence, this claim is exhausted and not procedurally defaulted.

(Traverse, Doc. No. 71 at PageID 1652.) Again, this argument is unrelated to the procedural posture of the instant ground for relief in which he argues the ineffectiveness of his appellate counsel.

Equally confounding is Ahmed's assertion that he raised "this ground" in his application to reopen his direct appeal as his second proposed proposition of law. *Id.* at PageID 1725. Turning to that document, the Court finds that it, too, concerns the alleged deprivation of Ahmed's right to a speedy trial. (Appendix, Vol. 5 at 74-75.)

Ahmed acknowledges that his application to reopen his direct appeal was denied by the state court on timeliness grounds, and directs the Court to another section of his procedural argument in his first ground for relief. (Traverse, Doc. No. 71 at PageID 1725.) There, Ahmed argues that the state court's denial of his application on timeliness grounds was not a procedural default of the claims contained in the application. *Id.* at PageID 1652-65. In disputing Respondent's assertion of the procedural default defense, Ahmed argues that because the Ohio Supreme Court dismissed his application to reopen his direct appeal on a procedural ground, specifically timeliness, it did not adjudicate the merits of his ineffective assistance of appellate counsel claim, hence the claim is amenable to *de novo* review by this Court. (Traverse, Doc, No. 71 at 1730.) Ahmed's ultimate conclusion, that the claim is subject to *de novo* review, is correct, but the path he takes to arrive at it is impossible to follow. Perhaps the Court can clarify the course.

The procedural default defense in habeas corpus is described by the United States Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise in federal habeas a federal constitutional claim he could not raise in state court because of procedural default. *Engle v. Isaac*, 456 U.S. 107, 110 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 80 (1977). "[A]bsent a showing of cause and prejudice, 'a federal habeas corpus petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review.'" *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000) *quoting Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright,* 433 U.S. at 87.

Most of Ahmed's argument, then, appears to support rather than defeat Respondent's assertion of the procedural default defense. He acknowledges that there is a procedural rule applicable to his application to reopen his direct appeal and that the state court enforced the rule against him, conceding the first and second prongs of *Maupin*, respectively. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If the rule is an "independent and adequate" state ground it meets the requirement of *Maupin*'s third prong, and if Ahmed has failed to demonstrate cause and prejudice the fourth *Maupin* prong is satisfied, which will result in foreclosure of federal habeas corpus review on the instant ground for relief. *Id.*

The Supreme Court has observed that if the state court decision indicates clearly and expressly that it is based upon a ground that is separate and independent of federal law, a federal habeas court is not to address the merits of the claim. *Florida v. Powell*, 559 U.S. 50, ___, 130 S.Ct. 1195, ___ (2009), *quoting Michigan v. Long*, 463 U.S. 1032, 1041 (1983). To be adequate, the state procedural rule must be "firmly established and regularly followed" by the state court at the time it

was applied. *Beard v. Kindler*, 558 U.S. 53, ___, 130 S.Ct. 612, 617-18 (2009), *quoting Lee v. Kemna*, 534 U.S. 362, 376 (2002).

This Court finds only two capital cases in which the Ohio Supreme Court enforced the timeliness requirement contained in the rule governing applications to reopen direct appeals prior to the state court's enforcement of the provision in Ahmed's case. *See State v. Bryan*, 103 Ohio St. 3d 1490, 2004-Ohio-5605 (Oct. 27, 2004)(table); *State v. Cassano*, 103 Ohio St. 3d 1475, 2004-Ohio-5405 (Oct. 13, 2004)(table). Although the applications in both of those cases were denied expressly on timeliness grounds, they were denied just two months before Ahmed filed his application to reopen his direct appeal, and the state court applied the rule in Ahmed's case less than five months after *Bryan* and *Cassano*. (Appendix, Vol. 5 at 72, Application to Reopen filed December 20, 2004; 344, Entry Denying Application to Reopen filed March 2, 2005.) Two cases so close in time to Ahmed's application to reopen do not suffice to establish the state rule on timeliness as one that was firmly established and regularly followed in capital cases at the time the rule was applied in Ahmed's case. That is not to say that two or three cases might not signal a "reversal of practice" with regard to the timeliness requirement, *Franklin v. Anderson*, 434 F.3d 412, 421 (6th Cir. 2006), but the critical period of time to consider when determining whether a state has a firmly established and regularly followed procedural rule is at the time it was applied. So even if the state supreme court consistently enforced the timeliness rule ever after Ahmed's case, it would not establish that the rule was firmly established and regularly followed when it was applied to Ahmed's application to reopen. In answering that question, this Court has only *Bryan* and *Cassano* to consider. Accordingly, the rule relied upon by the state court in dismissing Ahmed's application to reopen his direct appeal was not independent and adequate as required to effect a procedural default in federal

habeas corpus proceedings. That conclusion means this Court must address the merits of Ahmed's ineffective assistance of appellate counsel claim *de novo*.[10] *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. (2003).

Ohio law provides that an individual convicted of a capital offense has an appeal as a matter of right to the Ohio Supreme Court. Ohio Rev. Code § 2929.05(A); *see also* Ohio Const. Art. IV, § 2. "A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney." *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Ineffective assistance of appellate counsel claims are governed by the same *Strickland* standard as claims of ineffective assistance of trial counsel. *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010), *citing Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Ahmed identifies thirteen propositions of law that he contends his appellate counsel should have presented to the Ohio Supreme Court on direct appeal, but did not. (Petition, Doc, No. 35 at PageID 247-55; Traverse, Doc. No. 71 at PageID 1725-29.) Summarized, Ahmed alleges his attorneys failed to raise the following issues on direct appeal:

    1.    He was denied his right to counsel of his choice;

    2.    He was denied his right to a speedy trial;

    3.    He was denied his right to self representation;

    4.    The trial judge was biased against Ahmed;

    5.    He was denied his right to a public trial;

---

[10] Ahmed correctly argues that the rule was not firmly established and regularly followed, but his circuitous and unsupported assertions making up his argument leave gaps large enough to risk a contrary outcome. Also, having concluded the third *Maupin* prong (independent and adequate state procedural rule) saves Ahmed's ineffective assistance of appellate counsel claim from procedural default, there is no cause for the Court to labor over *Maupin*'s fourth prong (cause and prejudice).

6.  He was denied his right to confront the witnesses against him by the admission of hearsay evidence;

7.  He was denied his right to be free of unreasonable searches and seizures;

8.  Prosecutorial misconduct infected his trial;

9.  He was saddled with ineffective counsel at trial;

10. Trial counsel failed to request instructions on voluntary manslaughter;

11. A police officer lied on the witness stand;

12. A "death qualified" jury denied him a fair trial;

13. There was excessive police presence in the courtroom during the trial.

*Id.* The Court will address Ahmed's ineffective assistance of appellate counsel claim by considering each proposed proposition of law argued to illustrate counsel's ineffectiveness, but first it is worthwhile to review the standard applicable to ineffective assistance of appellate counsel claims.

"[Appellate c]ounsel's failure to raise an issue on appeal amounts to ineffective assistance only if a reasonable probability exists that inclusion of the issue would have changed the result of the appeal." *Henness v. Bagley*, 644 F.3d 308, 317 (6th Cir. 2011), *citing Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008). "If a reasonable probability exists that the defendant would have prevailed had the claim been raised on appeal, the court still must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel." *Id. citing Wilson.* The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-752 (1983)(noting that "experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on

appeal and focusing on one central issue if possible, or at most on a few key issues"). Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003); *Williams v. Bagley,* 380 F.3d 932, 971 (6th Cir. 2004); *see Smith v. Murray*, 477 U.S. 527, 535-36 (1986). Failure to raise an issue can, however, amount to constitutionally ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004), *citing Joshua v. Dewitt,* 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); and *Mapes v. Coyle,* 171 F.3d 408, 427-29 (6th Cir. 1999).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000), *citing Strickland v. Washington*, 466 U.S. 668, 687 (1984), and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). "Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland*, 356 F.3d at 699, *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir. 2001). "'Counsel's performance is strongly presumed to be effective.'" *McFarland,* 356 F.3d at 710, *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000), *citing Strickland*, 466 U.S. at 690. To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that counsel ignored issues that were "clearly stronger" than those presented on appeal. *Webb v. Mitchell,* 586 F.3d 383, 399 (6th Cir. 2009); *Smith v. Robbins*, 528 U.S. 259, 288 (2000), *quoting Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986). With these precepts in mind, the Court will consider each of Ahmed's alleged instances of ineffective assistance of counsel. The Court also notes that the last four of the allegations, numbers ten through thirteen, were not included

as issues Ahmed believed his appellate attorneys should have raised as error on direct appeal in his application to reopen his direct appeal in the state court. (See Appendix, Vol. 5 at 72-81.) They are, therefore, procedurally defaulted. Had they been properly preserved by presentation to the state court in Ahmed's application, however, they would not have changed the outcome of his appeal, as discussed, *infra*.

### 1. Denied counsel of choice

The first of the proposed propositions of law that Ahmed claims his appellate counsel should have raised on direct appeal corresponds with his first ground for relief in his habeas petition. Although Ahmed's first ground for relief has been found by the Court to be procedurally defaulted without excuse, the Court also noted in its discussion of that ground that even if it had been preserved, the claim would fail. It follows that Ahmed's appellate counsel cannot have been ineffective for failing to raise a losing claim on direct appeal.

### 2. Denied right to speedy trial

Ahmed's second proposed proposition of law corresponds to his nineteenth ground for relief in his habeas petition, where he claims to have been deprived of his right to a speedy trial. He argues his appellate attorney should have raised that claim on direct appeal in the state court.

In doing so, Ahmed refers the Court to his nineteenth ground for relief where he goes into great detail describing the various continuances that were requested, agreed to, rescinded, or granted. (Petition, Doc. No. 35 at PageID 247, 371-78.) He acknowledges that the United States Supreme Court has articulated a non-exhaustive list of four factors to be considered in determining whether a particular defendant has been deprived of his right to a speedy trial. *Id*. at 372. Those factors are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to

the defendant." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "The length of delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id*. at 530. A delay of one year is presumptively prejudicial and triggers consideration of the remaining *Barker* factors. *United States v. Ferreira*, 665 F.3d 701, 705 (6th Cir. 2011), *citing United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006); *United States v. Bass*, 460 F.3d 830, 836 (6th Cir. 2006). Presumptive prejudice, however, cannot carry a Sixth Amendment claim without regard to the other *Barker* criteria. *Doggett v. United States*, 505 U.S. 647, 655-56 (1992). In *Barker*, the Supreme Court noted that the more-than-five-year delay between the defendant's arrest and trial was "extraordinary," and that of the various reasons for the delay, only a relatively small portion of it could be attributed to a "strong excuse," that being the illness of the person in charge of the investigation of the offenses. *Id*. at 533-34.

Ahmed was arrested on September 11, 1999, and voir dire began in his trial on January 16, 2001, a little over sixteen months after his arrest. On November 29, 1999, a motion for a continuance was made by Ahmed's counsel, but Ahmed refused to sign the entry. (Appendix, Vol. 1 at 148-49.) Nevertheless, upon defense counsel's statement that trial on the original date of December 7 would be impracticable, the court granted a continuance until January 3, 2000. *Id*. at 149. Defense counsel received upwards of 560 pages of discovery material approximately ten days before the trial was to begin, and requested another continuance on December 23, 1999. *Id*. at 166. In addition, counsel indicated they needed more time to conduct DNA testing. *Id*. The trial was then reset to February 15, 2000. *Id*. at 179. In a *pro se* filing, Ahmed urged the trial court not to grant any further continuances "with out [sic] the accountability of past performance of 5 months

and setting reasonable accountability and monitoring standards." *Id*. at 194. The defense's DNA testing was not completed by February 14, and on that date another continuance until July 10 was granted at defense counsel's request and after the court had determined that counsel were competently and effectively representing Ahmed. *Id*. at 201-2, 204. By June 14, 2000, however the defense's DNA testing was still not completed, and upon counsel's request, another continuance was granted and the trial was reset for January 15, 2001.[11] *Id*. at 297. In September 2000, Ahmed filed a *pro se* document alleging he had not been advised of how to preserve his right to a speedy trial, citing Ohio R. Crim. P. 12(G).[12] *Id*. at 353. The trial court construed the document as a motion to dismiss his case under the state speedy trial statute, and it was overruled. *Id*. at 357. On January 2, 2001, Defense counsel once again requested a continuance. (Appendix, Vol. 2 at 2-3.) The State opposed further delay in bringing Ahmed to trial, *id*. at 13-14, as did Ahmed in several *pro se* filings, *id*. at 16-25. The trial court denied defense counsel's request for another continuance. *Id*. at 34. Ahmed's trial began on January 16, 2001, as scheduled.

The delay between Ahmed's arrest and the start of his trial was approximately sixteen months, giving rise to presumptive prejudice and triggering examination of the remaining *Barker* factors. The second *Barker* factor looks to the reason for the delay. "Governmental delays motivated by bad faith, harassment, or attempts to seek a tactical advantage weigh heavily against the government, while neutral reasons such as negligence are weighted less heavily, and valid

---

[11] January 15, 2001, was a federal holiday, Dr. Martin Luther King, Jr.'s Birthday, so the trial date was at some point corrected to reflect a January 16 start date.

[12] At the time the document was filed, that rule read as follows:

> **(G)     Effect of failure to raise defenses or objections**
>
>> Failure by the defendant to raise defenses or objections or to make requests that must be made prior to trial, at the time set by the court . . ., or prior to any extension

reasons for a delay weigh in favor of the government." *Robinson*, 455 F.3d at 607. "In contrast, delay caused by the defense weighs against the defendant." *Vermont v. Brillion*, 556 U.S. 81, 89 (2009). As is noted above, none of the continuances was requested by the prosecution, so the delays were not attributable to the prosecutor. Instead, each continuance was requested by defense counsel, although Ahmed himself sometimes indicated he was opposed to them. However, because "the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation," delay caused by the defendant's counsel is also charged against the defendant, whether counsel is retained or appointed. *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). "Once a lawyer has undertaken the representation of an accused, the duties and obligations are the same whether the lawyer is privately retained, appointed, or serving in a legal aid or defender program." *Polk County v. Dodson*, 454 U.S. 312, 318 (1981), *citing* ABA Standards for Criminal Justice 4-3.9 (2d ed. 1980). Furthermore, the Supreme Court has rejected the notion that an attorney appointed to represent a defendant should be considered a state actor for purposes of determining who bears responsibility for a delay when a violation of the Speedy Trial Clause has been alleged. *Vermont*, 556 U.S. at 89-90..

None of defense counsel's requests for continuances was unreasonable. Approximately one month of delay was requested and granted because defense counsel stated it was impracticable to defend a defendant charged with four aggravated murders and facing the death penalty three months after the crimes. That is indubitably an accurate assessment and implies conscientiousness rather than needless delay. One year of the delays can be attributed to the time necessary for the defense to complete DNA testing. One day of the delay was attributable to the federal holiday marking the

---

of time made by the court, shall constitute waiver of the defenses or objections, but

birth of Dr. Martin Luther King, Jr.  Although Ahmed at times expressed opposition to the continuances, none of counsel's requests were unreasonable and nothing in the record suggests that counsel had any nefarious or ulterior motive in requesting them.  Even if the reasons given by counsel had not fully explained why any particular continuance was required, Ahmed himself caused his attorneys to expend significant pre-trial time on collateral matters, such as Ahmed's repeated attempts to substitute counsel, which were sometimes effective; his lawsuits naming everyone involved in his legal matters (including those whose connection was solely tangential) as either defendants or witnesses; his seeking to have the trial judge removed from his case; his constant complaining about having been deprived of access to his own money; and his insistence that extraordinary measures be taken to assure the confidentiality of his conversations with counsel at the jail.  "Just as a State's 'deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [State],' so too should a defendant's deliberate attempt to disrupt proceedings be weighted heavily against the defendant."  *Vermont*, 556 U.S. at 93, *quoting Barker*, 407 U.S. at 531.  Thus, any delay unaccounted for by counsel's need to adequately prepare for trial would be taxed to Ahmed's contumacy and his attempts to derail his trial.  The second *Barker* factor weighs heavily against Ahmed.

As noted above, Ahmed did object to his attorneys' request for continuances at times.  Thus, that *Barker* factor weighs in his favor.

In *Barker*, the Supreme Court recognized the difficulty of demonstrating prejudice from delay between the time of arrest or indictment and trial as follows:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.  This

the court for good cause shown may grant relief from the waiver.

Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

We have discussed previously the societal disadvantages of lengthy pretrial incarceration, but obviously the disadvantages for the accused who cannot obtain his release are even more serious. The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent.

*Barker*, 407 U.S. at 532-33.

Ahmed makes the following argument respecting the prejudice he suffered as a result of the

sixteen-month delay between his arrest and the start of his trial:

Ahmed was prejudiced by the delays because:

If the trial had proceeded on 12/7/1999 as scheduled[,] the outcome of the trial would clearly have been in favor of this defendant. In fact[,] proper action by defense counsel should have been to ask for dismissal for failure to provide discovery as almost nothing was provided/discovered by prosecution before 12/7/1999. Now it is clear that continuances have clearly benefitted to state [sic] at the detrement [sic] of defense. (Apx. Vol. 2, p. 248).

(Traverse, Doc. No. 71 at PageID 1846.) When the Court turns to the referenced page in the

Appendix, however, no such language appears on that page or any page near it. The cited page in

the Appendix consists of a single-page *pro se* filing in which Ahmed sought to have his attorneys removed "for fabricated defense and not for truth as contained in discovery." (Appendix, Vol. 2 at 248.) It contains no discussion of Ahmed's speedy trial right or an alleged violation thereof, nor does it address the supposed consequences of the delay between his arrest and the beginning of his trial. In any case, the excerpt above appears to be nothing more than Ahmed's own supposition that his trial would have resulted in an acquittal if it had proceeded on the original trial date of December 7, 1999. Such unsupported conjecture from a petitioner carries no weight in habeas corpus.

To sum up, the delay between Ahmed's arrest and the start of his trial, the first of the *Barker* factors, gives rise to presumptive prejudice warranting an examination of the remaining three *Barker* factors. The delays were requested by defense counsel so that they could prepare for trial and to allow time for DNA analysis to be completed, both legitimate and non-dilatory reasons for seeking continuances. Even if that were not the case, Ahmed's obstructionist conduct during the sixteen-month delay would likely result in the second *Barker* factor weighing against Ahmed. The third *Barker* factor weighs lightly in Ahmed's favor as he did express opposition to some of the requests for continuances. Finally, Ahmed failed to demonstrate, as opposed to alleging, prejudice from the delays.

On the whole, then, Ahmed has not shown that he was denied his Sixth Amendment right to a speedy trial. Consequently, his appellate counsel cannot have been ineffective for failing to raise that claim as error on direct appeal in the Ohio Supreme Court. Accordingly, his second sub-claim in his fifth ground for relief should be denied.

### 3. He was denied his right to self representation

Ahmed has presented this sub-claim as a claim itself in his third ground for relief, *supra*. The Court recommended denial of Ahmed's third ground for relief in its entirety after addressing *de novo* that part of the claim which concerned the guilt phase of the trial, and finding meritless that part relating to the mitigation phase of the trial. Again, Ahmed's appellate counsel were not ineffective for failing to raise claims error on direct appeal claims that were sure to fail.

**4.      The trial judge was biased against Ahmed**

Ahmed raised this sub-claim as a claim itself in his eighth ground for relief. In order to determine whether Ahmed's appellate counsel were ineffective for failing to raise as error on direct appeal his claim that the trial judge was biased against him, it is necessary for this Court to determine whether there was a reasonable probability that the claim would have succeeded had it been raised. *See Goff v. Bagley*, 601 F.3d 445, 466 (6th Cir. 2010). The answer to that question is "no."

Ahmed alleges the trial judge's bias was evident from the fact that she consistently attempted to silence him and prevent him from making arguments in pretrial hearings, and that she was named a witness in his divorce case and so should have recused herself from his criminal trial. The fact of the matter is Ahmed continuously attempted to argue as if he were a *pro se* defendant in the pretrial hearings, and Judge Sargus was exceptionally generous in allowing Ahmed time to make his points. (Hearing of Nov. 9, 2000, Trial Tr., Vol. 3 at 3-53; Hearing of Jan. 2, 2001, Trial Tr., Vol. 3 at 3-19; Hearing of Jan. 8, 2001, Trial Tr., Vol. 3 at 4-74.) Ahmed acknowledges that Judge Sargus stated she had never been declared a witness in his divorce case by his counsel, only by Ahmed himself, but he does not point to anything in the record suggesting that was not a true statement or that it was an inadequate response to his argument that she was indeed a witness in the divorce proceeding. In

addition, what Ahmed characterizes as his "polite" attempt to explain his dissatisfaction with his appointed counsel which drew Judge Sargus' allegedly uncalled-for ire included :

1. His accusations that his attorneys would only do certain work on his case to "eat up" all Ahmed's money (Hearing of Nov. 9, 1999, Trial Tr. Vol. 3 at 17);

2. His own opinion that attorney Hershey did not have a clue how to conduct an investigation, *id*. at 24;

3. Calling an explanation his counsel provided to him regarding DNA analysis "bullshit," *id*. at 33;

4. Allegations that the judge was biased against him because there were, in his estimation, excess security officers present at the view of the scene of the murders (Hearing of Jan. 8, 2001, Trial Tr., Vol. 4 at 20);

5. Personal attacks on trial counsel's intelligence, *id*. at 22;

6. Accusations that his counsel had a blatant disregard for professional responsibility and that they were in collusion with the prosecutors and police to hide evidence, *id*.;

7. An accusation that the judge was hiding motions in a bid to deprive him of his constitutional rights with full knowledge and cooperation of his counsel, *id*. at 23;

8. Acknowledgement that he told one of his trial counsel he was the "stupid most guy who I ever seen representing any defendant," *id* at 30;

9. Calling the proceedings "a travesty," *id*. at 36;

10. Calling attorney Hershey a liar, *id*. at 37;

11. Accusing the trial judge of foisting appointed counsel on him to serve the interests of the court and prosecution rather than himself, *id*. at 39;

12. Impugning the goodness of attorney Hershey's heart, *id*. at 42;

13.     Alleging that his counsel conspired with the prosecution to suppress evidence, *id*. at 43;

14.     Accusing attorney Hershey of relaying whatever Ahmed told him to the prosecution, *id*. at 44-45;

15.     Accusing his counsel of violating his civil rights and their own professional ethics; *id*. at 46; and

16.     Accusing his counsel of "covering up" the fact that they had not worked on his case, *id*. at 47.

Judge Sargus' refusal to permit Ahmed limitless opportunities to complain about his attorneys, his treatment at the jail, and the bias he perceived on the judge's part toward him was understandable and completely appropriate to maintain some semblance of order in the court in the face of Ahmed's obstreperous behavior. That being the case, Ahmed's appellate counsel were not derelict in failing to raise a losing judicial bias claim as error on direct appeal.

**5.      He was denied a right to a public trial**

Ahmed alleges his appellate counsel were ineffective for failing to raise as error on appeal a claim that he was denied his right to a public trial. The basis for Ahmed's claim is the trial court's closure of the courtroom for a pretrial hearing on "several missives describing difficulties he has in his dealings with his own attorneys." (Hearing of November 9, 2000, Trial Tr., Vol. 3 at 3.) Ahmed also speculates that hearings held on January 8 and 11, 2001, and February 2, 2001, were either held in the jail and not accessible by the public, or that unnamed attorneys were kept from attending. (Petition, Doc. No. 35 at PageID 379.) Nothing on the pages of the transcripts of those hearings, however, indicates that those hearings took place away from the courthouse or that any person who was interested in the proceedings was kept from attending any of those hearings, and they will not be discussed further.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend. VI; *see also In re Oliver*, 333 U.S. 257, 278 (1948) (holding the right to a public trial binds the states through the Due Process Clause of the Fourteenth Amendment). The right extends beyond the offering of actual proof at trial, although it "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller v. Georgia*, 467 U.S. 39, 45-46 (1984), *citing Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 511-12 (1984).

The Supreme Court has summarized the benefits flowing from the guarantee as being to (1) ensure a fair trial, (2) ensure that the judge and prosecutor carry out their duties responsibly, (3) encourage witnesses to come forward, and (4) discourage perjury. *Waller*, 467 U.S. at 46. To close a courtroom, a party must "advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48.

Here, the record does not reveal any request by either party for closure of the courtroom, and the trial court made none of the findings required by *Waller*. In fact, there was no discussion at all about any interest likely to be prejudiced, the breadth of the closure, or alternatives to complete closure of the courtroom. Instead, the trial judge simply stated, "Because this is a private hearing, I'm going to ask that all spectators leave." (Trial Tr., Vol. 3, Hearing of November 9, 2000, at 4.) Neither party objected. Initially, then, it would appear that the trial court failed to take the necessary steps prior to closing the courtroom.

That is not the end of this Court's evaluation of Ahmed's claim, however. Ahmed argues that the denial of his right to a public trial is a structural defect, for which no prejudice need be shown and to which harmless error analysis does not apply. For support he cites footnote 9 in *Waller* in which the Court cites various circuit courts of appeals' opinions, and another footnote in a dissent by Brennan, J. in an earlier Supreme Court case. 467 U.S. at 49. Of course, the term "structural error" did not become part of the legal parlance until after *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991) (holding some constitutional errors defy analysis by "harmless-error" standards), and *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993) (coining the term "structural error"). In *Waller*, the Court observed that "[t]he parties do not question the consistent view of the lower federal courts that the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee," expressing agreement with that view, but rejecting the notion that Waller was therefore entitled to a new trial. 467 U.S. at 49-50. Although this Court does not read the quoted portion of *Waller* as an actual holding, the Supreme Court has since characterized it as the case in which it found denial of a public trial to be structural error subject to automatic reversal. *United States v. Marcus*, 560 U.S. 258, 263 (2010); *Neder v.United States*, 527 U.S. 1, 8 (1999); *Johnson v. United States*, 520 U.S. 461, 468-69 (1997).

The subject of the hearing that was closed to the public was Ahmed's numerous complaints about his appointed counsel, his allegations of their incompetence, his feelings of religious persecution by his attorneys and the jail staff, his suspicion about the investigator hired by his counsel, his disappointment that his trial was continued allegedly without his knowledge, his frustration at not having been successful at retaining private counsel, and his counsel's defenses to Ahmed's allegations against them, all of which either have no basis in fact or are tangential or

collateral to a fair trial. (Trial Tr., Vol. 3, Hearing of November 9, 2000, at 1-56.) No witnesses were called, and neither Ahmed nor his counsel were under oath. Why the trial judge felt it necessary to close the courtroom is anyone's guess. Whatever the reason, closure of the courtroom during the November 9 hearing, even if inappropriate, does not require a reversal of Ahmed's convictions or death sentence.

*Waller* itself demonstrates that point. The hearing at issue in *Waller* was one on a motion to suppress evidence. The Supreme Court observed that "the remedy should be appropriate to the violation. If, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant and not in the public interest." *Waller*, 467 U.S. at 49. The *Waller* Court ordered the case remanded to the state court for a determination of what portions of a new suppression hearing had to be closed and what portions must be open to the public, concluding that a "new trial need be held only if a new, public suppression hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties." *Id.*

Let us not forget that Ahmed's claim here is not that he was denied a public trial. That is the subject of his twentieth ground for relief. Here, his claim is that his appellate attorneys were ineffective for failing to raise as error on direct appeal the closing of the courtroom to the public. Recall, too, that counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir. 2001). Even assuming that appellate counsel should have raised the public trial claim on direct appeal, a new hearing on Ahmed's complaints about his attorneys and his general

situation could not possibly change the position of the parties in any material way, so there would be no need for either a new hearing or a new trial. "A new hearing would be an empty formality; a new trial would be a 'windfall.'" *State v. Bethel*, 110 Ohio St. 3d 416, 429 (2006), *quoting Waller*, 467 U.S. at 49. Even if Ahmed's appellate counsel had included the instant sub-claim in his appellate brief, therefore, the result of the appeal would not have been different. Accordingly, Ahmed's claim of appellate counsel ineffectiveness based upon their failure to raise the public trial claim on direct appeal should be denied.

### 6. He was denied his right to confront the witnesses against him by the admission of hearsay evidence.

In his sixth proposed proposition of law Ahmed alleges that an MCI WorldCom employee inappropriately testified about a business record, namely a report tracking the use of Ahmed's company-issued identification badge, even though she allegedly was not qualified to authenticate the document, and that allowing her testimony amounted to the admission of hearsay and violated his right to confront the witnesses against him. (Petition, Doc. No. 35 at PageID 248; Traverse, Doc. No. 71 at PageID 1726-27.[13]) "Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004), *citing Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). Had appellate counsel raised the confrontation clause/hearsay issue on direct appeal in the Ohio Supreme Court, the court likely would have overruled Ahmed's proposition of law as waived.

---

[13] Nowhere does Ahmed give the slightest hint as to where in the ten-volume transcript of his trial the Court might find the employee's offending testimony.

In Ohio parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, as set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus. Ahmed does not allege that he lodged any objections during the MCI WorldCom employee's testimony, and this Court finds he did not. The only objection raised during her testimony at all was one raised by the defense based on the relevance of the information sought (Trial Tr., Vol. 7 at 382), not the Confrontation Clause or hearsay as he alleged in his application to reopen his direct appeal (Appendix, Vol. 5 at 76-77). Thus, the state supreme court undoubtedly would have found against Ahmed had his appellate counsel raised the confrontation clause/hearsay issue on direct appeal. In addition, even if Ahmed were able to surmount that obstacle, Ahmed failed to identify, much less demonstrate, any prejudice suffered as a result of the admission of the MCI WorldCom employee's testimony. Indeed, his own counsel believed it to be irrelevant. He does not allege that her testimony about the identification badge or the report tracking its use was in any way inaccurate or false, or that either the identification badge or tracking report was inauthentic. In addition, defense counsel highlighted in cross-examination the possibility of someone other than Ahmed using the identification card and weaknesses in MCI's security procedures relating to identification badges and their tracking of the badges. (Trial Tr., Vol 7 at 376-71.) Because Ahmed has not shown that there is even a slight probability that inclusion of the confrontation clause/hearsay issue would have changed the result of his direct appeal, the instant sub-claim should be denied.

**7.    Ahmed was denied his right to be free of unreasonable searches and seizures.**

Ahmed alleges his appellate counsel provided ineffective assistance when they failed to raise as error on direct appeal a claim that the warrantless search of the crime scene violated his right to

be free from unreasonable searches and seizures. (Petition, Doc. No. 35 at PageID 249.) For counsel's representation to be found deficient, Ahmed must demonstrate that "there is a reasonable probability that the inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004), *citing Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). Ahmed has done no such thing.

The Sixth Circuit has summarized the relevant law as follows:

> The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, *against unreasonable searches* and seizures, shall not be violated, and [that] no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV (emphasis added). The Fourth Amendment's protections hinge on the occurrence of a "search," a legal term of art whose history is riddled with complexity. *See Kyllo v. United States*, 533 U.S. 27, 32 (2001) (discussing "when a search is not a search"). A search is defined in terms of a person's "reasonable expectation of privacy" and is analyzed under a two-part test first penned in *Katz v. United States*, 389 U.S. 347[, 361] (1967) [(Harlan, J., concurring)]: (1) 'has the individual manifested a subjective expectation of privacy in the object of the challenged search?" and (2) "is society willing to recognize that expectation as reasonable?" *California v. Ciraolo*, 476 U.S. 207, 211 (1986).
>
> The second prong of the *Katz* test generally addresses two considerations. The first focuses on "what a person had an expectation of privacy *in*, for example, a home, office, phone booth or airplane." *Dow Chemical Co. v. United States*, 749 F.2d 307, 312 (6th Cir. 1984), *aff'd*, 476 U.S. 227 (1986) (emphasis in original); *see also Oliver v. United States*, 466 U.S. 170, 178 (1984) (noting "our societal understanding that certain areas deserve the most scrupulous protection from government invasion"); *United States v. White*, 401 U.S. 745[, 786] (1971) (Harlan, J., dissenting) (assessing "the individual's sense of security"); Wayne R. LaFave, 1 *Search and Seizure: A Treatise on the Fourth Amendment* § 2.1(d) (4th ed.2004). This inquiry centers on "whether the human relationships that normally exist at the place inspected are based on intimacy, confidentiality, trust or solitude and hence give rise to a 'reasonable' expectation of privacy." *Dow Chemical Co.*, 749 F.2d at 312.

> . . .
>
> Other relevant factors to apply in *Katz*'s [sic] second prong include . . . "the uses to which the individual has put a location." *Oliver*, 466 U.S. at 178.

*Widgren v. Maple Grove Twp.*, 429 F.3d 575, 578-80 (6th Cir. 2005) (parallel citations omitted).

Ahmed's argument, both here and in his Twenty-second Ground for Relief where he argues the failure to obtain a search warrant as a free-standing claim, is sufficiently nebulous that the Court cannot discern the basis upon which he claims to have had a reasonable expectation of privacy in Lubaina's residence. He refers to Lubaina's residence as "the home/crime scene" (Petition, Doc. No. 35 at PageID 249-50) but it was not his home because he moved from that house and had taken an apartment in Columbus.[14] (Trial Tr., Vol. 7 at 58-59.) Furthermore, the court hearing the divorce case between Ahmed and Lubaina had awarded Lubaina exclusive use of the home and its contents months before the murders. *Id*. at 166. Lubaina also had had her landlord install new locks on the doors of the residence and change the code on the electric garage door opener. *Id*. at 164-67. These facts do not square with Ahmed's implicit argument that he had a reasonable expectation of privacy in Lubaina's residence. Accordingly, any motion to suppress the evidence collected at Lubaina's home would have had an infinitesimal chance of succeeding, and no ineffectiveness on Ahmed's appellate counsel's part results from their failure to raise the issue as error on direct appeal. Ahmed's seventh sub-claim should be denied.

### 8. Prosecutorial misconduct infected Ahmed's trial.

Here, Ahmed alleges that his appellate counsel should have presented his prosecutorial misconduct claim to the Ohio Supreme Court on direct appeal. (Petition, Doc. No. 35 at PageID

250.) He refers the Court to his ninth ground for relief, *infra*, in support of his claim. The Court has considered each of his arguments under that ground for relief and found that none is meritorious. Consequently, Ahmed's appellate counsel cannot have been ineffective for failing to raise doomed propositions of law on direct appeal. His eighth ineffective assistance of appellate counsel sub-claim should be denied.

> **9. Ahmed was saddled with ineffective assistance of counsel at trial.**

Ahmed refers the Court to his fourth ground for relief, *supra*, rather than argue the ineffectiveness of his trial counsel anew here in order to demonstrate his appellate counsel's deficient performance. (Petition, Doc. No. 35 at PageID 250.) The Court determined that Ahmed's fourth ground for relief was meritless, and it follows that his appellate counsel cannot have been ineffective for failing to raise losing propositions of law on direct appeal in the Ohio Supreme Court. Ahmed's ninth ineffective assistance of appellate counsel sub-claim should therefore be denied.

> **10. Trial counsel failed to request instructions on voluntary manslaughter.**

Ahmed argues his appellate counsel provided ineffective assistance by failing to raise trial counsel's ineffectiveness on direct appeal, alleging that trial counsel should have requested that the jury be instructed on the offense of voluntary manslaughter as an alternative to the aggravated murder offenses charged in the indictment. (Petition, Doc. No. 35 at PageID 250-252.) As has been noted above, Ahmed never presented this claim to the state court as an example of his appellate counsel's ineffectiveness in his application to reopen his direct appeal. To the extent Ahmed argues his appellate counsel's ineffectiveness for failing to raise as error trial counsel's failure to request voluntary manslaughter instructions, therefore, the instant claim is procedurally defaulted.

---

[14] A warrant was obtained prior to the search of Ahmed's apartment in Columbus. (Trial Tr., Vol. 4 at 110-13;

Even if he had preserved that part of his ineffective assistance of appellate counsel claim, however, it would fail. Ahmed raised the underlying lesser-included offense claim as trial court error in his sixteenth ground for relief, *infra*. For all of the reasons discussed there, had appellate counsel raised the claim as error on direct appeal, the Ohio Supreme Court would have found it to be unavailing. Consequently, Ahmed's appellate counsel were not ineffective when they omitted the lesser-included offense claim from the appellate brief on direct appeal.

### 11. A police officer lied on the witness stand.

Here, Ahmed contends his appellate counsel were ineffective when they failed to raise as error on direct appeal a claim alleging that police officer Nanni testified falsely that Ahmed, while in New York, told the officer that he had come from St. Clairsville and had asked for an attorney. (Petition, Doc. No. 35 at PageID 252-53.) This sub-claim is in the same procedural posture as the one just preceding it, and is also procedurally defaulted.

Had he properly preserved the instant sub-claim for habeas review, however, it would have been unavailing. Ahmed argues as follows:

> Nanni further testified that after Miranda [sic] warnings were given by him, questioning stopped. However, Nanni's signed contradicts his assertion that "questioning stopped." [Sic.] Ahmed protested to h is [sic] counsel when he heard this false testimony. Attorney Olivitto [sic] questioned Nanni about his own signed statements and Nanni disowned his own signed statement. Olivitto [sic] said to the Trial Judge "we/should [sic] settle this outside the jury." According to Ahmed, the transcript is cleaned out [sic] as it only says that Hershey cross-examined Nanni.

*Id*. at PageID 253. There are no citations to the record where the Court might find the statements and events to which Ahmed refers. It is not the Court's duty to search the record to find support for

---

Vol. 7 at 221-22; Vol. 8 at 503.)

a habeas petitioner's allegations. Ahmed has failed to make out a coherent claim to which this Court can respond. Consequently, Ahmed's appellate counsel's representation cannot be found to have been deficient.

### 12. A "death qualified" jury denied Ahmed a fair trial.

Next, Ahmed purports to claim that his appellate counsel were ineffective for failing to raise as error on direct appeal a claim that a "death qualified" jury is an anathema to a fair trial, a familiar claim in death penalty cases. (Petition, Doc. No. 35 at PageID 253.) His argument, however, contends that one prospective juror, Rosemary Busack, whose attitude toward the death penalty Ahmed does not reveal, was excused from the jury by the prosecutor's peremptory challenge, and that the jury was consequently not representative of the community and biased toward a death sentence. *Id*. Ahmed provides a reference to the trial transcript, but that page contains defense counsel Olivito's oral motion that the court dismiss the entire jury panel because the venire did not represent a fair racial cross-section of the community. (Trial Tr., Vol. 6 at 482.) No mention of prospective juror Busack is made on that page or the several pages preceding it, nor is there any mention of a "death qualified" jury impinging on Ahmed's right to a fair trial. Thus, Ahmed purports to raise one claim, argues another, and directs the Court to a page in the transcript that has nothing to do with either. Furthermore, none of the claims were presented to the state court as instances of trial counsel's ineffectiveness that should have been brought to the state court's attention on direct appeal. (*See* Application to Reopen Direct Appeal, Appendix, Vol. 5 at 72-81.) Had he done so, however, the claim would have been rejected.

Assuming Ahmed means what he says when he claims that death qualifying the jury deprived him of a constitutionally guaranteed fair trial, that proposition, had appellate counsel raised the issue

on direct appeal, would have been denied on the authority of *Lockhart v. McCree*, 476 U.S. 162 (1986), where the Supreme Court held that "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." *Id.* at 173. As for Ahmed's argument that the excusal of prospective juror Busack resulted in a jury that was "unrepresentative of community, and biased toward death" (Petition, Doc. No. 35 at PageID 253), he has provided no indication of how or why that result follows from Busack's excusal. What was Busack's attitude toward the death penalty? Is Ahmed arguing that the jury was constitutionally required to be representative of the community's attitude toward the death penalty, assuming a "community's attitude" can even be determined? Was Busack African-American? Is Ahmed arguing that she was challenged and excused on the basis of her race? Her gender? After she was excused, what was the composition of the jury with regard to whatever characteristic or attitude Busack possessed that Ahmed appears to argue was underrepresented in the other jurors? The Court simply cannot fill in all the blanks missing from Ahmed's argument. Accordingly, if Ahmed is contending that the excusal of prospective juror Busack skewed the jury toward death in some manner or rendered the jury unrepresentative of the community, and had his appellate counsel presented the claim in the cursory manner in which it was presented here, the state court would unquestionably have denied it as lacking in any foundation. Finally, piecing together what it can from Ahmed's reference to a page in the trial transcript in his argument, it appears to this Court that defense counsel objected to the jury venire as being unrepresentative of a proper cross-section of the population of Belmont County. (Trial Tr., Vol. 6 at 482.) Defense counsel did not elaborate on how that was so, identify upon what basis he made that claim, or cite any law from which this Court could better determine the nature of the objection. *Id.* Ahmed provides no clarification in his argument. Thus, it cannot be determined whether appellate

counsel was or was not ineffective for omitting any argument having to do with defense counsel's overruled objection on the referenced page in the trial transcript.

Ahmed's contention consists of mere fragments of an argument and an unsupported ones at that. Accordingly, his twelfth ineffective assistance of appellate counsel sub-claim should be denied.

### 13. There was excessive police presence in the courtroom during the trial.

In his final sub-claim of his fifth ground for relief, Ahmed alleges his appellate counsel were ineffective when they failed to raise as error on direct appeal the excessive police presence in the courtroom during his trial. (Petition, Doc. No. 35 at PageID 254-55.) Again, this sub-claim was not included in Ahmed's application to reopen his direct appeal as an example of appellate counsel's ineffectiveness, and is consequently procedurally defaulted, nor would it have succeeded had Ahmed properly preserved the claim in the state court.

Ahmed argues that the excessive law enforcement presence in the courtroom and at the jury view violated his rights under *Holbrook v. Flynn*, 475 U.S. 560 (1986). In that case, the United States Supreme Court held that the "conspicuous, or at least noticeable," presence of guards in the courtroom during trial was *not* an inherently prejudicial practice that was only permissible if it was justified by an essential state interest specific to the particular defendant. *Id*. at 568-69. The Court stated:

> All a . . . court may do . . . is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over.

*Id*. at 572.

Ahmed alleges there were five uniformed law enforcement officers in the courtroom during his trial.  (Petition, Doc. No. 35 at PageID 254.)  He further alleges there were guards outside the courtroom dressed and armed as "special duty task force" members, that the courthouse parking lot was closed and the jurors were made to park a mile distant from the courthouse then taken to the court by Sheriff's Office employees.  *Id.*  Along the one-mile route to the courthouse, Ahmed claims there were concrete barriers with access to the road only to "approved vehicles."  *Id.* at 255.  He alleges those measures were unilaterally put in place by the Sheriff's Office, and that they served no purpose other than to inspire prejudice in the jurors and demolish the presumption of innocence to which he was entitled.  *Id.*  He also claims that there were approximately thirty members of the Belmont County Sheriff's Office at the jury view "outfitted in tactical gear and carrying automatic weapons."  *Id.* at 254.

There is not one citation to the record in Ahmed's argument on this issue in his petition or traverse.  Ahmed refers to his twenty-first ground for relief as additional support for his claim of appellate counsel ineffectiveness, but there he makes no record references in his petition, and only one reference to the record in his traverse.  (Doc. No. 71 at PageID 1853.)  In the pages referenced, the only discussion even fancifully relevant to the instant claim is defense counsel's objection that Ahmed was forced to have a large heavy coat that did not belong to him draped over his upper body while at the jury view.  (Trial Tr., Vol. 8 at 615.)  Defense counsel objected, stating that if Ahmed had stayed in the presence of the jurors, they would have seen that he was handcuffed because Ahmed did not have his arms in the arms of the coat.  *Id.*  The shackling issue is not mentioned in Ahmed's argument here, where he instead contends his appellate counsel were ineffective for failing to raise as error on direct appeal the allegedly excessive law enforcement presence at his trial.

Ahmed has failed to point to evidence in the record supporting his allegations that there was an excessive police presence in the courtroom, that the entrance to the courtroom was guarded by "special task force" members, that the courthouse parking lot was closed or the reason for that closure, that the jurors were forced to park a mile away from the courthouse, that they were transported to the courthouse by Sheriff's Office personnel, or that there were approximately thirty officers in "tactical gear" at the jury view. There is no evidence in the record that the road between the courthouse was blocked to all but "authorized vehicles," or that even if the road had been blocked, that it had anything to do with Ahmed's trial.

Aside from the discussion about the heavy coat and Ahmed's having been handcuffed at the jury view of the crime scene, which is not at issue in the instant ground for relief, as noted above, Ahmed has not directed this Court's attention to any objections trial counsel made to any of the allegedly excessive security measures he describes. Thus, had appellate counsel raised the issue as error on direct appeal, it is beyond doubtful that the Ohio Supreme Court would have found any part of the claim preserved for appeal. Instead, the state court would most likely have denied the proposition of law as waived due to the absence of a contemporaneous objection. Accordingly, Ahmed's appellate counsel were not ineffective for omitting the excessive law enforcement presence claim on direct appeal.

This Court has considered *de novo* each alleged error Ahmed contends effective appellate counsel should have raised as error on direct appeal to the Ohio Supreme Court. Had they been presented, none would have resulted in a change in the outcome of Ahmed's direct appeal. Most of the proposed propositions of law have been found to be losing claims, and no ineffectiveness can be found where appellate counsel fails to present a losing claim to an appellate court. Four of the sub-

claims are procedurally defaulted as they were not included as proposed propositions of law in his application to reopen his direct appeal. Ahmed also failed to support two of those proposed propositions of law, the eleventh and thirteenth, by providing citations to the record or any other evidence tending to prove those alleged errors.

To sum up, then, the Court has found that Ahmed's first, second, third, fourth, fifth, sixth, seventh, eighth, and ninth ineffective assistance of appellate counsel sub-claims be denied at meritless because the claims underlying those sub-claims are themselves without merit, and appellate counsel cannot be ineffective for failing to raise losing claims. The remaining four sub-claims, the tenth, eleventh, twelfth, and thirteenth, are procedurally defaulted as having never been presented to the state court. Accordingly, Ahmed's fifth ground for relief should be denied.

**Sixth Ground for Relief**

In his sixth ground for relief, Ahmed contends the trial court failed to hold a competency hearing, thereby violating his ambiguously referenced "rights under the federal constitution." (Petition, Doc. No. 35 at PageID 255-64.) He does not mention the Ohio Supreme Court's decision on the claim in his petition, calling into question whether he has even stated a claim cognizable in habeas corpus. Respondent concedes that Ahmed preserved his claim for habeas review and argues there is nothing unreasonable about the Ohio Supreme Court's merits decision overruling Ahmed's proposition of law. (ROW, Doc. No. 61 at PageID 995-99.) In his traverse Ahmed argues that that state supreme court rejected his claim on its merits (Traverse, Doc. No. 71 at PageID 1731), and also, contradictorily, that the state court "never considered whether the claim violated the United

States Constitution,"[15] *id.* at PageID 1738.  Therefore, he argues, the "unreasonable application" prong of 28 U.S.C. § 2254(d)(1) does not apply and this Court need only determine whether the state court's decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States."  *Id.* at PageID 1738-39.

The Supreme Court's observation that § 2254(d), in its entirety, expressly "applies only to claims 'adjudicated on the merits in State court proceedings,'" *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct. 1388, 1401 (2011), renders Ahmed's argument nonsensical.  If the state court did not address the claim on the merits, as Ahmed argues in one part of his traverse (Doc. No. 71 at PageID 1738), then no part of § 2254(d) applies to the claim here.  Conversely, if the state court did address the merits, as Ahmed concedes on a different page of his traverse, *id* at PageID 1731, then this Court must consider his claim under § 2254(d) as a whole.

Since the parties agree that Ahmed did present his claim to the state court, the first question this Court must resolve is whether that court addressed the merits of Ahmed's federal claim.  A factual background will facilitate a discussion of that question.

Between the prosecution's guilt phase case-in-chief and the defense's, Ahmed filed a *pro se* motion for an evaluation of his competence to stand trial.  (Appendix, Vol. 2 at 272; Trial Tr., Vol. 8 at 669.)  Ahmed complained that he was experiencing extreme pain in his brain and head, frequent blackouts, and episodes of vertigo.  (Appendix, Vol. 2 at 272.)  He attributed those symptoms to "some neurological or organic defect in the brain and other systems," and claimed that he could not concentrate, hold his head steady, or maintain his balance.  *Id.*  Ahmed stated that he was

---

[15] It has not been made clear to this Court how a *claim* itself can violate the United States Constitution.  Certainly a claim typically alleges a violation of the constitution, but it is not the claim doing the actual violating, rather it merely describes the alleged violation.

experiencing extreme emotional stress and depression, and finally stated that he could not understand or help his attorneys in his defense. *Id*. The trial court noted that Ahmed had drafted motions and documents throughout his trial that were worthy of any attorney's hand, and that they were well drafted and in compliance with the relevant rules. (Trial Tr., Vol. 8 at 669.) Although Ahmed had refused medical treatment in the jail previously, *id*., the trial judge determined that he should be examined to make sure he was "doing okay" prior to moving him to the medical wing of the jail. *Id*. at 671. Ahmed refused to allow any doctor but his own private physician, whose practice was two hours distant from the jail, to examine him. *Id*. at 673-79. Even so, the court permitted Ahmed to testify, out of the jury's presence, in order to demonstrate his entitlement to a competency hearing. *Id*. at 682-90. In addition, three jail personnel testified as to their observations of Ahmed's demeanor and appearance since his incarceration, none of whom corroborated Ahmed's account of his symptoms. *Id*. at 692-715. The trial court found Ahmed had not demonstrated entitlement to a competency hearing, giving several reasons, among them that Ahmed had prepared his motion for a hearing that morning, and it contained correct legal terms and reflected service. *Id*. at 715. During his testimony, Ahmed was able to distinguish between a psychologist retained for the purpose of mitigation, and one retained for the purpose of determining a defendant's competence to stand trial, *id*, a distinction requiring some degree of sophistication and competence to discern. Throughout his trial, the court observed, Ahmed has delivered numerous soliloquies on his rights and drafted many documents phrased as an attorney would phrase them. *Id*. at 716. Ahmed demonstrated an impressive knowledge of the rules of criminal procedure, and had never complained of inadequate medical care or unprofessional medical personnel in the jail prior to the day he submitted his motion for a hearing. *Id*. As the court explained its reasons for denying Ahmed a

competency hearing, Ahmed stated that he prepared the motion submitted that morning just "as he began to succumb to the pain and the emotional distress" he described in the motion. *Id*. at 716-17. The court concluded the discussion. *Id*. at 717.

Ahmed argues that the Ohio Supreme Court's decision on direct appeal was limited to a determination of his claim under state law even though he presented his federal claim as well. (Traverse, Doc. No. 71 at PageID 1738.) The first indication that the state court addressed Ahmed's federal claim alleging he was denied a competency hearing, however, is that the state court cited one of its own cases that in turn cited both *Drope v. Missouri*, 420 U.S. 162 (1975), and *Pate v. Robinson*, 383 U.S. 375 (1966). *State v. Ahmed*, 103 Ohio St. 3d 27, 2004-Ohio-4190 at ¶ 64 (2004), *citing State v. Berry*, 72 Ohio St. 3d 354, 359 (1995). The court also applied the standard entitling a defendant to a competency hearing that was set forth in those Supreme Court cases, stating that "[t]he right to a hearing 'rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence,' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial." *Ahmed*, 103 Ohio St. 3d at 37, 2004-Ohio-4190 at ¶ 64, *quoting Berry*, 72 Ohio St. 3d at 359, *citing Drope*, 420 U.S. 162, and *Pate*, 383 U.S. 375. The Ohio Supreme Court observed that over the course of the trial, neither of Ahmed's attorneys suggested he was incompetent to stand trial, *Ahmed*, 103 Ohio St. 3d at 38, 2004-Ohio-4190 at ¶ 67, a factor that is one the Supreme Court has stated should "unquestionably . . . be considered" in determining entitlement to a competency hearing, *Drope*, 420 U.S. at 906 and n.13. The state supreme court also concluded that "[n]either [Ahmed's] behavior at trial nor any testimony presented on his behalf provided 'good cause' to hold a hearing on his competency or 'sufficient indicia of incompetence,'" and acknowledged that "deference on such issues should be granted to

those 'who see and hear what goes on in the courtroom." *Ahmed*, 103 Ohio St. 3d at 38, 2004-Ohio-4190 at ¶ 68. The state court concluded that "[n]either appellant's behavior at trial nor any testimony presented on his behalf provided . . . 'sufficient indicia of incompetence'" to warrant a hearing. *Id.*

The Sixth Circuit Court of Appeals has summarized the law governing habeas corpus claims such as the instant claim as follows:

> The due-process right to a fair trial is violated by a court's failure to hold a proper competency hearing where there is substantial evidence that a defendant is incompetent. *Pate v. Robinson*, 383 U.S. 375, 385-86 (1966). To be adjudged competent, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." *Dusky v. U[nited] S[tates]*, 362 U.S. 402 (1960)(per curiam). Finally, as we noted long ago in *Williams v. Bordenkircher*, 696 F.2d 464, 466 (6th Cir. 1983), "the [*Pate*] Court did not prescribe a general standard for determining whether the trial court should resort to evidentiary proceedings." We stated the test as requiring us to determine "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Id*. at 467.

*Filiaggi v. Bagley*, 445 F.3d 851, 858 (6th Cir. 2006).

A mere allegation of incompetence is not enough to require a full-blown hearing on the issue, however. In a footnote in *Drope*, the Supreme Court recognized that motions for a competence hearing have often been made for the purpose of delay, and that the vast majority of such hearings result in a finding of competence, not incompetence. 420 U.S. at 177 n.13. In addition, in *Drope*, which was in the Court on direct appeal, the Court relied on "hindsight" and "later events" in concluding that the defendant should have been provided a competency hearing, something this Court may not do in habeas corpus. *Id*. at 177; *Pinholster*, 131 S. Ct. 1388; 28 U.S.C. § 2254(d).

Ahmed now characterizes his participation in his trial as "irrational interference with his appointed counsel's efforts" (Traverse, Doc. No. 71 at PageID 1739). The Ohio Supreme Court noted, as did the trial court, that Ahmed prepared his motion for a competency evaluation himself using correct legal terms. *Ahmed*, 103 Ohio St. 3d at 38, 2004-Ohio-4190 at ¶ 66. Ahmed also points to his frequent "accusations against everyone involved in the case" and Dr. Smalldon's diagnosis of a delusional disorder, persecutory type as indicia of his incompetence (Traverse, Doc. No. 71 at PageID 1739), but does not explain how the Ohio Supreme Court's finding that "mental illness" does not equate to legal incompetency is unreasonable.

In short, Ahmed restates the arguments he made in the state court, and devotes little argument to the real task at hand, which is to demonstrate how the Ohio Supreme Court's decision rejecting his claim is contrary to federal law as determined by the United States Supreme Court. Recall that to be "contrary to" federal law, a decision must be more than erroneous or incorrect, it must be objectively unreasonable. *Williams v. Taylor*, 529 U.S. 362, 410 (2000). In addition, the AEDPA imposes a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997). The Ohio Supreme Court's decision rejecting Ahmed's claim does not come close to being objectively unreasonable. Accordingly, Ahmed's sixth ground for relief should be denied.

**Seventh Ground for Relief**

In his seventh ground for relief, Ahmed contends the trial court's denial of his counsel's request for a continuance on the eve of trial was an abuse of discretion, and induced counsel's ineffectiveness. (Petition, Doc. No. 35 at PageID 265.) As in the sixth ground for relief, Ahmed

does not even mention the Ohio Supreme Court's decision on the claim, let alone allege it is contrary to federal law or based upon an unreasonable determination of the facts. Instead, he copies the claim virtually verbatim as it was presented to the state court[16] as if *this* court were considering the claim on direct appeal, which it is not. Consequently, he has failed to make out a claim cognizable in habeas corpus. Respondent overlooks Ahmed's failure, acknowledges that the claim is preserved for habeas corpus review, and argues that the Ohio Supreme Court's decision is neither contrary to nor an unreasonable application of federal law. (Return of Writ, Doc. No. 61 at PageID 999-1004.) Ahmed again argues that parts of 28 U.S.C. § 2254(d)(1) do apply to his claim and other parts do not, and contends that he has established the denial of a continuance resulted in state-induced ineffective assistance of trial counsel as well as deprived him of his right to present a defense. (Traverse, Doc, No. 71 at PageID 1746-47.)

The Ohio Supreme Court thoroughly considered the claim Ahmed presented there and rejected it, reasoning as follows:

> On the day before voir dire began, appellant provided defense counsel a list of approximately 60 potential witnesses that he wanted contacted and interviewed to aid in his defense. The list of names provided no addresses or phone numbers, but only a general description of the area where the potential witnesses might be located, i.e., Pakistan, Washington D.C., Pittsburgh, New York. Defense counsel requested a continuance in order to find and interview these potential witnesses. The state objected, and the trial court denied the continuance, stating: "I believe that if we were to work with this list, we might never have a trial. And so balancing the need to have an efficient administration of justice and the tardy

---

[16] The Court notes that most, not all, of the references to the standard of review applicable to an Ohio state court direct appeal have been cut from the argument presented in the petition, and that typographical errors are different in each version of the claim, but that substantively there is no difference between the claim as it was presented in the state court and as it has been presented here. This short-cut and off-point practice of law (if it can be called that) is especially troubling in a capital case.

presentation of the list, the court overrules the motion for a continuance."

We have recognized that "'[t]he grant or denial of a continuance is a matter [that] is entrusted to the broad, sound discretion of the trial judge. An appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.'" _State v. Jones_ (2001), 91 Ohio St. 3d 335, 342, 744 N.E.2d 1163, quoting _State v. Unger_ (1981), 67 Ohio St. 2d 65, 67, 21 O.O.3d 41, 43, 423 N.E.2d 1078, 1080. In evaluating a motion for a continuance, "[s]everal factors can be considered: the length of delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors." _State v. Landrum_, 53 Ohio St. 3d at 115, 559 N.E.2d 710.

Appellant asserts that the denial of the continuance resulted in ineffective assistance of counsel. However, the trial court's denial of a continuance did not result in ineffective assistance or reflect an abuse of discretion. The motion was made at the beginning of voir dire, and the list of names of potential witnesses was just that, a list of names. No phone number s or addresses were provided, only general locations. Moreover, defense counsel Olivito noted when requesting the continuance that when he and Hershey were appointed, more than six months earlier, "we began making inquiry of the defendant as to witnesses that could assist us in either phase of this case."

At a January 8, 2001[,] hearing, approximately one week before voir dire began, appellant claimed that he had given names of potential witnesses to counsel but that counsel had never contacted them. Olivito responded that the list that appellant had given him did not include telephone numbers and was largely made up of people in Pakistan who did not speak English. Appellant then asserted that no one had contacted other potential witnesses who live in the United States and Canada and that "most of that information is available with the sheriff's office, because they confiscated all my phone books * * *." But nothing in the record, beyond appellant's assertions, indicates that appellant had previously relayed that information to counsel. Furthermore, defense counsel noted that none of the witnesses that appellant had named lived in Belmont County.

Hershey stated that he had contacted appellant's brother in Toronto, Canada, but [that the brother] had been uncooperative and had hung up on him. Moreover, appellant's own failure to communicate specific information about potential witnesses to his attorneys

contributed to the last-minute request for a continuance at the outset of voir dire. Appellant could have easily told counsel earlier that contact information for potential witnesses was in his address books that were in the custody of the sheriff's office. Also militating against the requested continuance was the fact that no time period was specified as to the proposed length of the continuance. In addition, the list of potential witnesses contained people who lived in Pakistan, whose testimony could be secured only with difficulty, which suggests that the delay would be significant. Nor did appellant proffer any summary of what the testimony of these witnesses would have been, and thus there is no basis for us to judge the importance of obtaining the continuance. By failing to proffer a description of the testimony, appellant has not preserved the issue. See, e.g., _State v. Davie_ (1997), 80 Ohio St. 3d 311, 327, 686 N.E.2d 245; _State v. Twyford_ (2002), 94 Ohio St. 3d 340, 353, 763 N.E.2d 122.

The inconvenience that would have resulted if a continuance had been granted also supports the trial court's denial of appellant's requested continuance. The venire had been summoned, and an open-ended continuance could have delayed the beginning of trial in the hope that some witnesses could be located, to the inconvenience of all involved with the trial.

Since the trial court's denial of the requested continuance did not amount to an abuse of discretion, we reject appellant's tenth proposition.

_Ahmed_, 103 Ohio St. 3d at 34-35, 2004-Ohio-4190 at ¶¶ 43-50.

The Sixth Circuit Court of Appeals has summarized the law governing Ahmed's claim as follows:

A trial court's denial of a continuance rises to the level of a constitutional violation only where there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" _Morris v. Slappy_, 461 U.S., 11-12 (1983) (quoting _Ungar v. Sarafite,_ 376 U.S. 575, 589 (1964)); _United States v. Moreno_, 933 F.2d 362, 371 (6th Cir. 1991). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." _Ungar_, 376 U.S. at 589. To obtain habeas relief, it is not sufficient for the

> petitioner to show that the trial court arbitrarily denied the
> continuance request; he "must also show that the denial of a
> continuance actually prejudiced his . . . defense." *Burton v. Renico*,
> 391 F.3d 764, 772 (6th Cir. 2004). "Actual prejudice may be
> demonstrated by showing that additional time would have made
> relevant witnesses available or otherwise [would have benefited] the
> defense." *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003).

*Beuke v. Houk*, 537 F.3d 618, 641 (6th Cir. 2008) (parallel citations omitted).

Aside from Ahmed's failure to state a claim cognizable in habeas corpus, there was no evidence before the trial court or the Ohio Supreme Court, nor is there evidence before this Court, that demonstrates he was actually prejudiced by the trial court's denial of his motion for a continuance on the first morning of his trial. The Ohio Supreme Court brought that to Ahmed's attention in stating its observation that he failed to proffer a summary of what any of the sixty belatedly provided witnesses would have testified to had they been located and called to testify at trial.[17] *Ahmed*, 103 Ohio St. 3d at 35, 2004-Ohio-4190 at ¶ 48. In fact, that court found that by failing to do so, Ahmed had not preserved the issue for appellate review, which implies procedural default of the claim although Respondent does not so argue.

Ahmed does not direct this Court's attention to anywhere in the record where it might find the names of any witnesses who would have been available at trial and willing to testify, nor has he indicated what testimony they could have given that would have been beneficial to the defense. *See Powell*, *supra*. Even ignoring the Ohio Supreme Court's finding that Ahmed had not preserved his

---

[17] The state court's observation might be read as a hint that the claim should properly have been raised in post-conviction since it is the type that of necessity would require resort to evidence outside the trial record, but that course of action was not pursued by Ahmed's post-conviction counsel. Even if Ahmed now argued that under *Martinez v. Ryan*, ___ U.S. ___, 132 S.Ct. 1309 (2012), any procedural default is excused, his claim would fail since there is no "substantial claim of ineffective assistance at trial." *Id.* at 1320. Although Ahmed argues that the trial court's denial of his motion for a continuance amounted to state-induced ineffective assistance, in reality if there was any ineffectiveness, it was induced by Ahmed himself since he was at all times possessed of the list of potential witnesses but did not provide it to his attorneys until the morning of the first day of his trial.

claim by proffering the testimonies of some or all of the sixty persons in the list of potential witnesses, it remains that *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S.Ct. 1388, 1398 (2011), limits the evidence this Court may consider when reviewing a state court's merits decision in habeas corpus to what was before the state court, which in Ahmed's case does not include evidence necessary to demonstrate prejudice from the denial of the motion for a continuance.

Ahmed has not shown that the Ohio Supreme Court's decision was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court or based on an unreasonable determination of the facts in light of the evidence before the state court at the time the court rendered its decision overruling his proposition of law. Accordingly, he has not demonstrated entitlement to habeas corpus relief, and his seventh ground for relief should be denied.

**Eighth Ground for Relief**

In his eighth ground for relief, Ahmed contends the trial judge was biased against him throughout his trial. (Petition, Doc. No. 35 at PageID 273-77.) Respondent argues the claim is both procedurally defaulted and meritless. (ROW, Doc. No. 61 at PageID 1004-6.) Ahmed refers the Court to a memorandum in opposition to Respondent's motion to dismiss procedurally defaulted claims wherein he argues that he preserved the instant claim by (1) raising it in his affidavit of prejudice in the Ohio Supreme Court, (2) raising it as error in his *pro se* post-conviction petition which the state trial court refused to consider, and (3) identifying it as a proposition of law his appellate counsel should have raised on direct appeal, in other words, a claim underlying his application to reopen his direct appeal. (Traverse, Doc. No. 71 at PageID 1750; Memorandum, Doc. No. 44 at PageID 666-67.) Ahmed does not contend that he raised the claim on direct appeal.

As for Ahmed's first allegation, that he preserved his claim by presenting it to the Ohio Supreme Court in an affidavit of prejudice in case "01-AP-01" (Memorandum, Doc. No. 44 at PageID 667), he provides no record reference where this Court might locate that document, and searches of the Ohio Supreme Court's website and an electronic database for an Ohio Supreme Court case possessing that number returned no results. Even assuming the process suggested by Ahmed were a valid method of preserving his claim for federal habeas corpus review, with no way to verify that the claim was included in the document Ahmed references, and no way to determine whether and how the Ohio Supreme Court ruled on the issue, this Court cannot assume it was presented to the state court and adjudicated on its merits there. Thus, Ahmed's claim that he preserved his claim of judicial bias by filing an affidavit of prejudice with the Ohio Supreme Court is unavailing.

Next, Ahmed argues he preserved the claim by including it in a *pro se* post-conviction petition filed in the state court. (Memorandum, Doc. No. 44 at PageID 667.) Ahmed references "02/20/03, Petitioner's Additional Post Conviction Petition Grounds for Relief, Filed Pro Se, pp. 198-200" in his memorandum. That reference does not communicate to this Court where the document can be found in the Appendix in these habeas proceedings. Although the Court is not required to search the record for support for any party's allegations, the Court did notice that Ahmed filed a *pro se* post-conviction petition on October 3, 2002 (if the Court reads the file stamp correctly), but no claim of judicial bias appears in that document. (Appendix, Vol. 7 at 310-316.) The document is incomplete, however, ending in mid-sentence. *Id*. On October 11, 2002, it appears that Ahmed amended his *pro se* post-conviction petition, but no claim of judicial bias appears therein, either. (Appendix, Vol. 8 at 6-9.) Curiously, that document, too, is incomplete, ending as

did the initial *pro se* petition in mid-sentence. *Id.* The Court has gone beyond the call of duty in attempting to find in the record the document in which Ahmed claims to have preserved the instant ground for relief, to no avail. Consequently, there is no indication that Ahmed presented his claim of judicial bias to the state courts in post-conviction.

Finally, Ahmed argues that he preserved his claim of judicial bias by presenting it as a claim underlying his ineffective assistance of appellate counsel claim in his application to reopen his direct appeal in the Ohio Supreme Court. (Memorandum, Doc. No. 44 at PageID 667.) That argument has been rejected in this Court's discussion of Ahmed's fifth argument against the procedural default of his first ground for relief, *supra*. There is no reason to repeat the discussion here. An ineffective assistance of appellate counsel claim does not preserve the underlying claims Ahmed argued competent appellate counsel would have raised on direct appeal. Accordingly, whether or not Ahmed included the judicial bias claim as one his appellate counsel should have presented in direct appeal, it is not preserved for habeas corpus review.

To summarize the procedural arguments Ahmed has made, none of the three mechanisms through which Ahmed claims to have preserved the instant ground for relief actually accomplished that task. The claim is consequently procedurally defaulted. Were the Court to construe Ahmed's argument that he preserved his claim by raising it as a claim underlying his ineffective assistance of appellate counsel claim as one alleging cause and prejudice sufficient to excuse the procedural default (an argument Ahmed has not made), his claim of judicial bias would still fail because appellate counsel were not ineffective, *see* Fifth Ground for Relief, Fourth Sub-Claim, *supra*.

Ahmed's eighth ground for relief is procedurally defaulted without excuse and should be denied for that reason.

**Ninth Ground for Relief**

In his ninth ground for relief, Ahmed contends prosecutorial misconduct throughout his trial rendered the trial unfair and his sentence unreliable. (Petition, Doc. No. 35 at PageID 277-98.) Respondent argues that "a number" of the sub-claims were found by the Ohio Supreme Court to have been waived for lack of a contemporaneous objection at trial, and that those sub-claims are consequently procedurally defaulted. (ROW, Doc. No. 61 at PageID 1007.) Respondent goes on to argue that none of the instances misled the jury or prejudiced Ahmed and that the ground for relief is therefore meritless. *Id*. at 1011-18.

Ahmed's entire response to Respondent's procedural default defense is, "This claim of prosecutorial misconduct was raised in the Ohio Supreme court in *State v. Ahmed*, 103 Ohio St. 3d 27; [sic] 2004-Ohio-4190; [sic] 813 N.E.2d 637."[18] (Traverse, Doc. No. 71 at PageID 1754-55.) But finding that a petitioner presented a claim in the state court does not end this Court's analysis of a procedural default question: it matters what the state court did with the claim. As noted above, if the state court relied upon an independent and adequate state procedural ground to deny the claim, it is procedurally defaulted in a subsequent federal habeas corpus proceeding unless the petitioner can show cause for the default and resulting prejudice. *See Maupin*, 785 F.2d at 138. Ahmed does not address that part of the question. As far as arguing the issue actually before *this* Court, Ahmed merely states, "This claim is a constitutional violation of Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)." (Traverse, Doc. No. 71 at PageID 1772.) No further elaboration is provided.

---

[18] No reference to the specific proposition of law in Ahmed's appellate brief, or page number in the Ohio Supreme Court's decision where its discussion of the issue might be found has been provided.

The page in *Donnelly* to which Ahmed refers in his traverse contains a discussion of the differing standards applicable to a claim of denial of a specific provision of the Bill of Rights, and a claim in which it is argued that the alleged error or errors "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. This Court finds no holding in the cited page at all, much less one to which the Ohio Supreme Court's decision on the matter might be contrary. Ahmed's practice of copying his state court appellate brief arguments into his petition and then into his traverse misses the point of these proceedings. Federal habeas corpus is not a "do over" of state appellate processes. The only questions before this Court are whether the claims have been preserved for habeas review; whether unpreserved claims are excused from procedural default; and whether the last state court to address the issues raised made a decision or decisions contrary to federal law as determined by the holdings of the United States Supreme Court, or that were based upon an unreasonable determination of the facts given the evidence before that court. It is a rare set of circumstances that provides this Court with the opportunity to address a petitioner's claims *de novo*, in which case it would make sense to make the arguments that Ahmed has made in his petition and traverse. But making arguments in habeas corpus that are identical to those made in the state court is almost always a losing strategy since the issue here is different than the one there.

Ahmed does not explain how the Ohio Supreme Court's decision rejecting his claim of prosecutorial misconduct is contrary to or an unreasonable application of federal law, or how it is based on an unreasonable determination of the facts based on the evidence before the state court. He merely states that "this claim" is a constitutional violation of *Donnelly*, *supra*, which does not even make sense, for how can "this claim," crafted by Ahmed, violate his federal constitutional right to a

110

fair trial?  In spite of these weaknesses in Ahmed's presentation of his claim, this Court will address them as best it can, and will address each sub-claim in order.

First, Ahmed claims the prosecutors engaged in misconduct when they mentioned the death sentence in the guilt phase of his trial, thereby denying him his right to a fair trial.  (Petition, Doc. No. 35 at PageID 277-80.)  The Ohio Supreme Court concluded that Ahmed had waived all but plain error because he did not contemporaneously object to the prosecutor's statements, then found that the remarks did not amount to plain error.  *Ahmed*, 103 Ohio St. 3d at 47, 2004-Ohio-4190 at ¶120.  Ahmed does not dispute the state court's findings, and offers no excuse for or resulting prejudice from the default.  Ohio's contemporaneous objection rule is an adequate and independent state ground of decision.  *Wogenstahl v. Mitchell,* 668 F.3d 307, 335 (6th Cir. 2012), *citing Keith v. Mitchell,* 455 F.3d 662, 673 (6th Cir. 2006); *Nields v. Bradshaw,* 482 F.3d 442, 451 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell,* 320 F.3d 604, 635 (6th Cir. 2003), *citing Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell,* 209 F.3d 854, 867 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982); *see also, Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson,* 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010).  Consequently, Ahmed's first prosecutorial misconduct sub-claim is procedurally defaulted and should be denied for that reason.[19]

Second, Ahmed argues that the prosecutor improperly referred to evidence in his opening statement that he never produced during the trial, denying Ahmed his right to a fair trial.  (Petition, Doc. No. 31 at PageID 280-82.)  Respondent does not contend the sub-claim is procedurally

_____

[19] The state court also briefly mentioned that the trial court had instructed the jurors that the opening statements and closing arguments of the attorneys in the case were not evidence, insinuating that it would not have found the prosecutor's comments to have been reversible error even if Ahmed had preserved the claim with a contemporaneous objection.

defaulted, and it is not. When the claim was presented to the Ohio Supreme Court, it was rejected as follows:

> Appellant next complains that the prosecutor referred to evidence not presented at trial. Before trial, the prosecutor informed the court that it would not call a police officer who had taken a domestic-violence report from Lubaina in 1994. But then in his opening statement, the prosecutor stated: "Like many women in her situation, she filed reports with the authorities, but never followed through." Appellant claims that the prosecutor promised one thing to the parties and the court but then submitted evidence through the "back door" by vouching to the jury that it existed.
>
> Appellant is incorrect. The prosecution never stated that it would not present any evidence of domestic-violence reports, only that it would not present the 1994 report. The prosecution did present evidence that Lubaina had complained of telephone harassment when Deputy Steve Forro testified that he had responded to a March 1999 complaint by Lubaina. He also testified that Lubaina had decided to handle the problem through her divorce proceedings.

*Ahmed*, 103 Ohio St. 3d at 47-48. Ahmed does not contend that the state court's factual determination is objectively unreasonable in light of the evidence presented in the state court proceedings, and this Court is obligated to presume the state court's factual findings are correct in the absence of clear and convincing evidence to the contrary. *Miller-El v. Cockrell*, 537 U.S. 322, 330, 340 (2003); 28 U.S.C. § 2254(e)(1). Accordingly, Ahmed has not demonstrated entitlement habeas relief on the instant sub-claim, and it should be denied.

In his third prosecutorial misconduct sub-claim, Ahmed argues that the prosecutor violated Ohio R. Crim. P. 16(B) when he failed to disclose Ahmed's own statement to police that he had come to New York from St. Clairsville, Ohio, on the night he was arrested. (Petition, Doc. No. 35 at PageID 282-83.) Federal habeas corpus is available only to correct federal constitutional violations. *Wilson v. Corcoran*, 562 U.S. ___, ___, 131 S.Ct. 13, 16 (2010); 28 U.S.C. § 2254(a). "[I]t is not

the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States," *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, Ahmed has not stated a claim cognizable in habeas corpus and his third sub-claim should be denied on that basis.

Moreover, although the instant sub-claim was presented to the state supreme court on appeal, that court found that Ahmed had waived the claim because he had failed to lodge a contemporaneous objection at trial. *Ahmed*, 103 Ohio St. 3d at 48, 2004-Ohio-4190 at ¶¶ 123-24. The state supreme court also mentioned in the alternative, that even if Ahmed had objected in a timely manner to the alleged misconduct, the outcome of his trial would not have been impacted. *Id*. Ahmed does not dispute either of the state court's conclusions in his petition or traverse, preferring instead to stick with the same arguments he made in the state court.

Tellingly, Ahmed does not deny having made the statement in question to the police officer. He merely argues that having knowledge of his own statement "would have been of benefit to Ahmed, and Ahmed was thereby prejudiced" by the prosecutor's having failed to disclose to him a statement he does not deny making. Presumably, Ahmed is aware of the things he says, and this Court is unwilling to follow him down the rabbit hole of illogic into which he appears to be descending. Ahmed also attempts to demonstrate prejudice from the alleged misconduct by stating that his comment to the officer "placed him at the locale of the murders." But "[v]irtually all evidence is prejudicial or it isn't material." *Old Chief v. United States*, 519 U.S. 172, 193 (1997) (O'Connor, J., dissenting), *quoting Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 618 (5th Cir. 1977). Weak and unsupported allegations that certain material would have been beneficial to

Ahmed and that his own comment prejudiced him would fall short of the standard set by the AEDPA for demonstrating constitutional error, even if the instant sub-claim presented a preserved issue cognizable in habeas corpus.

Ahmed's third prosecutorial misconduct sub-claim should be denied because it is not cognizable in habeas corpus and it is also procedurally defaulted. Even if the claim were presented as a federal constitutional violation and properly preserved, however, it would still fail since Ahmed has not demonstrated actual prejudice from the alleged misconduct sufficient to warrant habeas corpus relief.

In his fourth and fifth prosecutorial sub-claims, Ahmed contends that "[d]uring its case-in-chief, the prosecution improperly elicited testimony regarding Dr. Bhatti's fear of Ahmed and the reasons for that fear," and that "[d]uring its case-in-chief, the prosecution improperly elicited evidence of other bad acts, including the highly inflammatory accusation that Ahmed previously raped Dr. Bhatti." (Petition, Doc. No. 35 at PageID 283.) Those two sentences are the sum total of Ahmed's arguments in both his petition and his traverse. (Petition, Doc. No. 35 at PageID 283; Traverse, Doc. No. 71 at PageID 1759.)

Respondent does not advance a procedural default defense, and simply states that the sub-claims are meritless as discussed "in other [unidentified] sections" of the return of writ (ROW, Doc. No. 61 at PageID 1015), which is over one hundred pages in length. Fortunately, the state court's decision provided this Court with a clue as to which "other sections" Respondent might be referring when it held as follows: "Appellant also claims that the prosecutor improperly elicited testimony that Lubaina had feared appellant and that appellant had raped her. However, as discussed earlier regarding appellant's third and fourth propositions of law, that testimony was either proper or did

not affect the outcome of appellant's trial." *Ahmed*, 103 Ohio St. 3d at 48, 2004-Ohio-4190 at ¶ 125. In those propositions of law, where Ahmed claimed the challenged evidence was inadmissible hearsay and other acts evidence, the state supreme court found that testimony as to Lubaina's "then existing state of mind, emotion, sensation, or physical condition" was properly admissible under a hearsay exception. *Id*. at 39 ¶ 74. Testimony regarding Ahmed's rape of Lubaina was found by the state court to have been first elicited by defense counsel and was invited error. *Id*. at ¶ 75. In addition, the court observed that no objection to the testimony alleged to have been hearsay and inadmissible other acts evidence had been raised, so all but plain error, of which it found none, was waived. *Id*. at 39-40 ¶ 76.

Respondent could have, but has not, made a colorable claim of procedural default concerning Ahmed's fourth and fifth prosecutorial misconduct sub-claims. As it happens, Ahmed presented claims to this court that evidence of Lubaina's fear and his rape of her was admitted at his trial in violation of the hearsay and other acts evidentiary rules in his eleventh and twelfth grounds for relief, *infra*, and those claims are found to be both procedurally defaulted and meritless. Accordingly, to the extent the complained-of testimony was elicited by the prosecutor, no misconduct occurred. Thus, Ahmed's fourth and fifth prosecutorial misconduct sub-claims should be denied as meritless.

Sixth, Ahmed alleges the prosecutors engaged in misconduct during the guilt-phase closing argument by vouching for their witnesses, making derogatory comments about defense counsel, and speculating about the evidence. (Petition, Doc. No. 35 at PageID 283-87.) Although Respondent does not mention this sub-claim under his sub-heading "Procedural Posture" (ROW, Doc. No. 61 at PageID 1007), he does argue that it is "waived" for lack of contemporaneous objections to the

comments in his discussion of the merits of the sub-claim, *id.* at PageID 1015. The Court construes that argument as an argument that the claim is procedurally defaulted for habeas corpus purposes. In typical fashion, Ahmed does not specifically address Respondent's argument that his sub-claim is procedurally defaulted other than to state that his overarching claim of prosecutorial misconduct was presented to the state court. (Traverse, Doc. No. 71 at PageID 1754-55.)

Ahmed is correct, however, when he states that he presented the instant sub-claim to the Ohio Supreme Court on direct appeal. (Appendix, Vol. 3 at 325-28.) What he fails to acknowledge is that the state supreme court denied the claim because he did not lodge a contemporaneous objection to the comments about which he complained.[20] *Ahmed*, 103 Ohio St. 3d at 48, 2004-Ohio-4190 at ¶ 126. Ahmed offers no argument suggesting the state court's decision was in any way erroneous, nor does he argue cause for the default or prejudice therefrom. Since the state court relied on an independent and adequate state procedural ground in disposing of Ahmed's claim, *see Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012), *citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982), and Ahmed has offered no excuse for the default, this Court is precluded from addressing the merits of the sub-claim. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991), *citing Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Ulster County Court v. Allen*, 442 U.S. 140, 148 (1979). Consequently, Ahmed's sixth prosecutorial misconduct sub-claim should be denied as procedurally defaulted.

In his seventh prosecutorial misconduct sub-claim, Ahmed contends that the prosecutor who cross-examined Ahmed's psychological expert, Dr. Smalldon, during the penalty phase of his trial exceeded the bounds of permissible cross-examination. (Petition, Doc. No. 35 at PageID 287.) In particular, he argues that the prosecutor's questioning Dr. Smalldon as to whether Ahmed had expressed remorse for the murders, his referring to Dr. Smalldon as a magician, his attempt to discredit Dr. Smalldon by insinuating that Dr. Smalldon advertised his services exclusively to defense lawyers, and his criticism of Dr. Smalldon's failure to submit a written report were improper. *Id*. at 287-89. Respondent does not advance a procedural default defense and instead argues that the claim was appropriately found to be meritless by the Ohio Supreme Court. (ROW, Doc. No. 61 at PageID 1015.) The Ohio Supreme Court found the prosecutor's tactics to be proper cross-examination "designed to detect bias in Smalldon and thereby discredit his findings of mitigating evidence in favor of [Ahmed]." *Ahmed*, 103 Ohio St. 3d at 48, 2004-Ohio-4190 at ¶ 127. Ahmed does not explain how that decision by the state court is contrary to or an unreasonable application of federal law as determined by the United States Supreme Court or is based upon an unreasonable determination of the facts in light of the evidence before the court, other than to simply assert that it is so. (Traverse, Doc. No. 71 at PageID 1772.) That being the case, he has not demonstrated entitlement to habeas corpus relief and his seventh prosecutorial misconduct sub-claim should be denied.

In his eighth sub-claim, Ahmed contends the prosecutor denigrated defense counsel in his penalty-phase closing argument. (Petition, Doc. No. 35 at PageID 290.) Respondent does not argue

---

[20] In the alternative, the state court found that the prosecutor's challenged statements did not determine the outcome of Ahmed's trial. Ahmed does not explain how that alternative finding contradicts the federal constitution.

that the sub-claim is procedurally defaulted, but instead that it is without merit. (ROW, Doc. No. 61 at PageID 1007, 1016.)

The challenged comments imply that defense counsel had fewer or less rigid rules to follow during trial than the prosecution. The prosecutor also stated that if he had invoked the Bible in his argument, the trial judge would have put a stop to it at once. He urged the jurors not to abandon their common sense just because defense counsel had quoted from the Bible in his closing argument.

The Ohio Supreme Court found as follows:

> These comments were made in reply to the defense's closing argument employing biblical references such as God did not sentence Cain to death for killing Abel, Christ pronounced that "we should turn the other cheek," and Christ sought mercy for his killers. While the prosecutor's remarks were theatrical, they were provoked by defense counsel's argument. In any event, none of these comments affected appellant's substantial rights.

*Ahmed*, 103 Ohio St. 3d at 49, 2004-Ohio-4190 at ¶ 133. Ahmed does not address the Ohio Supreme Court's findings, and instead presents exactly the same arguments to this Court that he presented to the Ohio Supreme Court on direct appeal. As such, he has failed to demonstrate that the state supreme court's decision was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court or that it was based on an unreasonable determination of the facts in light of the evidence before the court and is not entitled to habeas corpus relief. Ahmed's eighth prosecutorial misconduct sub-claim should be denied.

In his ninth sub-claim, Ahmed contends the prosecutor's argument concerning the relative weight in pounds to be given the aggravating circumstances and mitigating factors constituted misconduct. (Petition, Doc. No. 35 at PageID 290-93.) Respondent acknowledges the claim is

preserved for habeas review and relies heavily on the Ohio Supreme Court's decision on the claim.[21]

(ROW, Doc. No. 61 at PageID 1017.)

The Ohio Supreme Court rejected Ahmed's claim, reasoning as follows:

> Appellant next complains about the prosecutor's speculating on how many "pounds" of weight should be accorded to the aggravating circumstances and the mitigating factors. Appellant's objection on this point was correctly overruled by the trial court, as we have noted that "[a] prosecutor can freely argue the weight to be given to potentially mitigating factors." *State v. Loza* (1994), 71 Ohio St. 3d 61, 82, 641 N.E.2d 1082. In addition, the question "What's the weight you give to four innocent lives taken the way they were taken?" does not necessarily suggest, as appellant submits, that the prosecutor was inviting the jury to weigh the nature and circumstances of the offenses as aggravating circumstances, which would violate our holding in *State v. Wogenstahl* (1996), 75 Ohio St. 3d 344, 662 N.E.2d 311, paragraph two of the syllabus, "Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Hill* (1996), 75 Ohio St. 3d 195, 204, 661 N.E.2d 1068, citing *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 647.

*Ahmed*, 103 Ohio St. 3d at 49, 2004-Ohio-4190 at ¶ 134. Ahmed's argument that this "claim" violates the federal law established in *Donnelly v. Christoforo*, 416 U.S. 637 (1974), does not explain how that is so, and after rereading *Donnelly*, this Court is unable to fill in the blanks of Ahmed's argument, even if it were proper to do so.

Ahmed has not demonstrated that the Ohio Supreme Court's decision is either contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, or based upon an unreasonable determination of the facts in light of the evidence before the state court. Accordingly, his ninth prosecutorial misconduct sub-claim should be denied.

---

[21] Indeed, Respondent has copied parts of the Ohio Supreme Court's decision into his argument without bothering to cite the court's opinion.

In his tenth sub-claim, Ahmed contends the prosecutor improperly indicated that if he were given a death sentence, it would be highly unlikely that he would ever be executed, thereby lessening the jury's responsibility for imposing the death sentence. (Petition, Doc. No. 35 at PageID 293-94.) Respondent has not advanced a procedural default defense, and again copies the Ohio Supreme Court's decision without quotation or citation, adding no original argument. (ROW, Doc. No. 61 at PageID 1017.) The state supreme court held that "the defense objected, and the trial court sustained the objection and instructed the jury to disregard the comment," *Ahmed*, 103 Ohio St. 3d at 50, 2004-Ohio-4190 at ¶ 135. Ahmed does not challenge the state court's reasoning, preferring instead to simply repeat the arguments he put before the state court as if this Court were answering the same question. He does contend that the situation called for more than an instruction to the jury to disregard the comment, but provides no authority for that proposition. (Traverse, Doc. No. 71 at PageID 1771.) As before, Ahmed's stating that "the claim" violates *Donnelly* does not come close to meeting his burden of demonstrating that the Ohio Supreme Court's decision is contrary to federal law or based on an unreasonable determination of the facts. Consequently, this sub-claim, too, should be denied.

In his eleventh prosecutorial misconduct sub-claim, Ahmed contends that the prosecutor engaged in misconduct by attacking Ahmed's character in his penalty-phase closing argument. (Petition, Doc. No. 35 at PageID 294.) Respondent concedes the claim is preserved for habeas corpus review, but argues it is nonetheless meritless. (ROW, Doc. No. 61 at PageID 1017.) The Ohio Supreme Court denied Ahmed's claim on direct appeal, characterizing the prosecutor's argument that Ahmed might be "just a bad person who does bad, evil things" as fair argument against the psychological evidence Ahmed presented in the penalty hearing. *Ahmed*, 103 Ohio St.

3d at 50, 2004-Ohio-4190 at ¶ 136.  Ahmed does not address the state supreme court's decision and instead argues here what he argued in that court, tacking on the statement that "[T]his claim is a constitutional violation of *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)."  (Traverse, Doc. No. 71 at PageID 1772.)  Ahmed's burden of demonstrating that the state court's decision is contrary to federal law or based upon an unreasonable determination of the facts is not met by that single sentence, and his eleventh sub-claim should also be denied.

In his twelfth sub-claim, Ahmed contends that the prosecutor's comments about Dr. Smalldon's mitigation testimony went beyond appropriate argument.  (Petition, Doc. No. 35 at PageID 294-97.)  Respondent counters that the sub-claim is procedurally defaulted.  (ROW, Doc. No. 61 at PageID 1007.)

Ahmed presented the instant sub-claim to the Ohio Supreme Court on direct appeal as part of his fifth proposition of law.  (Appendix, Vol. 3 at 336-38.)  The state court found all but plain error waived, as Ahmed did not object to the prosecutor's comments on Dr. Smalldon's testimony during closing argument.  *Ahmed*, 103 Ohio St. 3d at 50, 2004-Ohio-4190 at ¶ 138.  The court found no plain error, and distinguished the case Ahmed relied on there (and upon which he continues to rely here), *Gall v. Parker*, 231 F.3d 265 (6th Cir. 2000),[22] stating that:

> In *Gall*, the court found the comments by the prosecutor to be an attack on the legitimacy of the defense of insanity, a defense that had been enacted by the legislature.  In this case, the prosecutor merely questioned Smalldon's expert opinion and did not attack the legitimacy of a mental disease or defect as a mitigating factor.

---

[22] *See Parker v. Matthews*, 132 S.Ct. 2148, 2155-56 (2012), however, in which the Supreme Court strongly criticizes the Sixth Circuit's continuing reliance on *Gall* since it was decided under pre-AEDPA law and relied on its own circuit precedent rather than "firmly established federal law as determined by the United States Supreme Court," as required by the AEDPA.

*Ahmed*, 103 Ohio St. 3d at 50, 2004-Ohio-4190 at ¶ 138. Ahmed does not contend that the state court's distinguishing *Gall* from his case, or the court's finding that there was no plain error is contrary to federal law or based upon an unreasonable determination of the facts. His statement that "this claim" is a constitutional violation of *Donnelly*, *supra*, fails to meet his burden under the AEDPA. Consequently, Ahmed's twelfth prosecutorial misconduct sub-claim should be denied.

Finally, Ahmed contends that the cumulative effect of the instances of prosecutorial misconduct that were preserved at trial by objections amounts to a constitutional violation of his Eighth and Fourteenth Amendment rights. (Petition, Doc. No. 35 at 297-98.) Respondent does not address this sub-claim in his return of writ. The Ohio Supreme Court examined all the instances of alleged prosecutorial misconduct and concluded that any effect they had, individually or cumulatively, did not warrant a reversal of Ahmed's convictions or death sentence. *Ahmed*, 103 Ohio St. 3d at 50, 2004-Ohio-4190 at ¶ 139. In both his petition and his traverse, Ahmed merely copied his arguments from his appellate brief to the state supreme court without even bothering to correct the terminology (he refers to "this proposition of law" rather than the correct term "ground for relief" (Appendix, Vol. 3 at 338; Petition, Doc. No. 35 at PageID 297; Traverse, Doc. No. 71 at PageID 1770)) or typographical errors (he states that "[m]ore definition guidance" beyond curative instructions was required when his objections were sustained (Appendix, Vol. 3 at 338; Petition, Doc. No. 35 at PageID 298[23])). He does not argue that the state supreme court's decision was contrary to federal law or based upon an unreasonable determination of the facts, but of course, he states "this claim is a constitutional violation of *Donnelly*," as before.

---

[23] In his traverse, Ahmed changed the term to "definitional guidance." (Doc. No. 71 at PageID 1771.)

Ahmed has failed to demonstrate entitlement to the writ of habeas corpus on prosecutorial misconduct grounds. His arguments on each sub-claim can be summarized as a repetition of the same arguments he made to the Ohio Supreme Court on direct appeal, which widely misses the issue before *this* Court, which is whether the state court's decision was contrary to or an unreasonable application of federal law as determined by the holdings of the United States Supreme Court, or was based upon an unreasonable determination of the facts in light of the evidence before the state court. Individually and cumulatively, his alleged instances of misconduct did not so infect his whole trial so as to deprive him of due process of law.

In summary, Ahmed's first, sixth, and twelfth prosecutorial misconduct sub-claims should be denied as procedurally defaulted. His third sub-claim should be denied on the ground that it does not state a claim cognizable in federal habeas corpus. His second, fourth, fifth, seventh, eighth, ninth, tenth, and eleventh sub-claims are meritless individually and collectively, so they, too, should be denied. Accordingly, the entirety of Ahmed's ninth ground for relief should be denied for the reasons stated.

**Tenth Ground for Relief**

In his tenth ground for relief, Ahmed contends New York Port Authority officer Robert Nanni's testimony that Ahmed had requested an attorney upon being apprehended at John F. Kennedy airport in New York was erroneously admitted, and that it violated his right to due process. (Petition, Doc. No. 35 at PageID 298-304.) Respondent argues that the trial court's instruction to the jurors to disregard that part of Nanni's testimony cured any resulting prejudicial error. (ROW,

Doc. No. 61 at PageID 1018-20.) Ahmed claims the instruction was "hopelessly inadequate, since the jury had already heard the constitutional violation." (Traverse, Doc. No. 71 at PageID 1773.)

During Ahmed's trial, Nanni testified twice to Ahmed's having requested his attorney upon his arrest. (Trial Tr., Vol. 8 at 470, 476.) At the conclusion of Nanni's direct examination, and at the prosecutor's request, a break was taken. During that break, the prosecutor acknowledged having inadvertently elicited Nanni's testimony that Ahmed had requested an attorney. *Id*. at 492. Defense counsel indicated that a corrective instruction was in order. *Id*. at 493. The prosecutor and defense counsel both had input into the instruction that was to be given. *Id*. When the jury returned, the trial court gave the following instruction, which encompasses the suggestions made by the prosecutor and defense counsel:

> A few moments ago, the witness stated that during police interrogation, the defendant requested the right to counsel. You are instructed to disregard the defendant's request to speak to counsel. Each of us has an absolute right to have counsel present during any police interrogation. You are to infer nothing from his having requested the right to speak to counsel.

(Trial Tr., Vol. 8 at 494.)

Ahmed presented the issue to the state supreme court on direct appeal as his eighth proposition of law. (Appendix, Vol. 3 at 380-86.) That court rejected Ahmed's claim, finding that although Nanni's testimony was clearly improper, Ahmed never objected to it; any prejudice was cured by the trial court's instruction to disregard the testimony, which the jury was presumed to have followed; and the trial court did not err in failing to *sua sponte* order a mistrial. *Ahmed*, 103 Ohio St. 3d at 41-42, 2004-Ohio-4190 at ¶¶ 89-93.

Although the state court first noted that Ahmed had not objected to the improper testimony, it was essentially an aside made as part of the court's description of how the error was presented to the

court by the prosecutor and the agreement by the parties that a curative instruction should be given. Thus, the court's comment does not affect reliance on an independent and adequate state procedural rule, that there be a contemporaneous objection when error occurs, so as to raise the specter of procedural default, and Respondent wisely does not claim that it does.

Ahmed argues that the instruction given was woefully inadequate to vindicate his constitutional right to due process, in essence, a "you can't unring the bell" argument. (Petition, Doc. No. 35 at PageID 301, 303.) As appealing as that argument might be, it is not the law. The United States Supreme Court has recognized the value of curative instructions as described in *Richardson v. Marsh*, 481 U.S. 200 (1987), which reads as follows:

> [There is an] almost invariable assumption of the law that jurors follow their instructions, *Francis v. Franklin*, 471 U.S. 307, 325 [sic] n.9 (1985), which we have applied in many varying contexts. For example, in *Harris v. New York*, 401 U.S. 222 (1971), we held that statements elicited from a defendant in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), can be introduced to impeach that defendant's credibility, even though they are inadmissible as evidence of his guilt, so long as the jury is instructed accordingly. Similarly, in *Spencer v. Texas*, 385 U.S. 554 (1967), we held that evidence of the defendant's prior criminal convictions could be introduced for the purpose of sentence enhancement, so long as the jury was instructed it could not be used for purposes of determining guilt. Accord, *Marshall v. Lonberger*, 459 U.S. 422, 438-439, n. 6 (1983). See also *Tennessee v. Street*, 471 U.S. 409, 414-416 (1985) (instruction to consider accomplice's incriminating confession only for purpose of assessing truthfulness of defendant's claim that his own confession was coerced); *Watkins v. Sowders*, 449 U.S. 341, 347 (1981) (instruction not to consider erroneously admitted eyewitness identification evidence); *Walder v. United States*, 347 U.S. 62 (1954) (instruction to consider unlawfully seized physical evidence only in assessing defendant's credibility). . . .

*Richardson*, 481 U.S. at 206-7 (parallel citations omitted). The Court acknowledged that there are some contexts in which the jury either will not or cannot follow an instruction, and gave the example

of a case where a "facially incriminating confession of a nontestifying codefendant is introduced at [a] joint trial." *Id*. at 207, *citing Bruton v. United States*, 391 U.S. 123, 135-36 (1968). The Court distinguished *Bruton* in *Richardson*, however, explaining that in *Bruton* the codefendant's confession expressly implicated the defendant, whereas in *Richardson*, the codefendant's confession was not facially incriminating and only became so when viewed in context with evidence introduced later in the trial. *Richardson*, 418 U.S. at 208. The Court put it succinctly when it wrote:

> [W]ith regard to . . . an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget.

*Id*. In Ahmed's case, the testimony at issue did not expressly implicate him, and it would require the jury to infer that he would not have asked for his lawyer unless he was guilty for it to become incriminatory, thus making it more likely that the jury obeyed the instructions to disregard the inadvertently elicited testimony.

In a case even more analogous to Ahmed's, the Court observed that:

> We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, *Richardson, v. Marsh*, 481 U.S. 200, 208 (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant, *Bruton v. United States*, 391 U.S. 123, 136 (1968). We have no reason to believe that the jury in this case was incapable of obeying the curative instructions. And far from being "devastating," the fact of Miller's postarrest silence was at most "insolubly ambiguous." *Doyle v. Ohio*, 426 U.S. 610, 617 (1976). Miller argues that the curative instructions should have been more specific. But Miller's trial counsel bore primary responsibility for ensuring that the error was cured in the manner most advantageous to his client. Once it became apparent that the judge

> was not going to grant a mistrial, it was the duty of counsel to
> determine what strategy was in his client's best interest.

*Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (parallel citations omitted).  In Ahmed's trial, his

attorneys never moved for a mistrial, but they did agree that a curative instruction was warranted and

they participated in formulating the instruction given after the prosecutor raised the issue.  As the

Supreme Court indicated, the manner in which such errors are handled is a matter of trial strategy.

Although at the end of his argument on the instant ground for relief, Ahmed alleges that his

trial counsel were ineffective for failing to move for a mistrial after Nanni's testimony, he never

challenged his attorneys' decision to forego a motion for a mistrial in the state court, nor did he file a

timely application to reopen his direct appeal on the ground that his appellate counsel were

ineffective for not raising as error trial counsel's decision to forego a motion for mistrial in favor of

the curative instruction given.  In addition, in his fourth ground for relief in these proceedings, where

he alleged many instances of his trial counsel's ineffectiveness, this particular allegation is absent.

It is unclear for what purpose Ahmed includes the allegation about his trial counsel.  If there

were an argument or suspicion on his part that the claim were procedurally defaulted, this Court

could interpret the argument as one attempting to show cause and prejudice for the default, but that

is not the case here.  If Ahmed is attempting instead to raise his counsel's alleged ineffectiveness for

any other reason, it would be found to be procedurally defaulted for his having failed to raise it at all

in the state courts.

Ahmed also alleges that the trial court should have realized that the admission of Ahmed's

statement as testified to by Nanni so damaged his defense that a mistrial should have been declared

*sua sponte*.  That defense counsel never requested such relief and were unabashedly in favor of a

cautionary instruction instead militates against that argument. Finally, Ahmed contends that the prosecutor's elicitation of the improper testimony from Nanni constituted prosecutorial misconduct. Ahmed did not raise that argument as a sub-claim in his ninth ground for relief which is devoted to prosecutorial misconduct, and the prosecutor repeatedly characterized the elicitation of the testimony as inadvertent and unintentional. (Trial Tr., Vol. 8 at 492-93.) Should any doubt remain about the prosecutor's lack of intent in bringing out the testimony regarding Ahmed's request for a lawyer, it is resolved by the prosecutor's having brought the issue to the court's attention in the first place. With no objection or request from defense counsel following the testimony, the prosecutor could quite easily have let the matter go and the curative instruction might never have been given to the jury. Instead, he drew the court's and defense counsel's focused attention to the matter and left the remedy up to defense counsel. *Id*. Rather than misconduct, the prosecutor honored his role as an officer of the court by bringing the improper testimony up and assisting the court, with defense counsel, in composing a curative instruction.

In summary, Ahmed as not demonstrated that the Ohio Supreme Court's resolution of his claim that Officer Nanni's improper testimony warranted a mistrial was in any way contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. Accordingly, he is not entitled to habeas corpus relief, and his tenth ground for relief should be denied for that reason.


**Eleventh Ground for Relief**

128

In his eleventh ground for relief, Ahmed contends that the admission of hearsay evidence concerning Lubaina's fear of Ahmed and the reasons for that fear denied him a fair trial, due process, and a reliable determination of his guilt and appropriate sentence. (Petition, Doc. No. 35 at PageID 304-09.) Respondent asserts that the claim is procedurally defaulted, and that it alleges a violation of state evidentiary law and is therefore not cognizable in habeas corpus. (ROW, Doc. No. 61 at PageID 1201.) In his traverse, Ahmed refers the Court to his previously filed memorandum in opposition to Respondent's motion to dismiss procedurally defaulted claims. (Doc. No. 71 at PageID 1779.) There, Ahmed argues that some of the hearsay statements were determined by the state supreme court to have been properly admitted, and he argues to the extent the state court addressed the merits of his claim, it is not procedurally defaulted. (Memorandum, Doc. No. 44 at PageID 678-79.) Other hearsay statements were admitted but any error was deemed waived for lack of a contemporaneous objection. *Id.* Ahmed also argues that any procedural default of any part of his eleventh ground for relief is excused by his trial counsel's ineffectiveness. *Id.*

When presented with the claim, the Ohio Supreme Court found as follows:

> In his third proposition of law, appellant argues that the admission of hearsay evidence regarding Lubaina's fear of appellant and the reasons for her fear deprived him of a fair trial.
>
> Grace Hoffman, Lubaina's divorce attorney, testified that Lubaina had been afraid of appellant. On cross-examination, defense counsel elicited from Hoffman that Lubaina had described appellant as controlling and manipulative and that Lubaina had told her that appellant had been violent during the marriage, including "forced sex" and "some striking." On redirect, Hoffman again stated that Lubaina had been afraid of appellant during the divorce proceedings.

Tahira Khan, Lubaina's sister, also testified that Lubaina had been afraid of appellant. The second time this was elicited from Khan, the defense objected and the court essentially advised the prosecutor to limit his questions to adducing testimony that Lubaina had feared appellant and not the reasons behind the fear.

Khan also testified that when she had asked Lubaina why, with all the problems in the marriage, she and appellant had had a second child, Lubaina had told her, "He raped me." The defense did not object to this testimony.

In *State v. Apanovich* (1987), 33 Ohio St. 3d 19, 21-22, this court held that evidence that a victim had a fearful state of mind was admissible as a hearsay exception under Evid.R. 803(3), as a statement of "then existing state of mind, emotion, sensation, or physical condition." However, the reasons or basis behind the victim's fearful state of mind would not be admissible under this exception. This court has followed the reasoning in *Apanovich* in subsequent cases. . . . With regard to testimony of fear elicited in this case, the trial court properly allowed the testimony. No testimony was admitted over objection as to the basis of the victim's fear.

With regard to the testimony that appellant had "forced sex" on Lubaina, defense counsel elicited this statement on cross-examination. Any error in admitting this testimony and Khan's subsequent testimony that appellant had raped Lubaina was invited error, since the defense first elicited the testimony. . . . The defense opened the door to Khan's remark about rape based on its cross-examination of Hoffman. . . .

Moreover, since no objection was raised, appellant has waived all but plain error. *State v. Slagle* (1992), 65 Ohio St. 3d 597, 604, 605 N.E.2d 916. In view of the strong and compelling evidence of appellant's guilt, any error was not plain error affecting the outcome of his trial. . . . Accordingly, we overrule appellant's third proposition.

*Ahmed*, 103 Ohio St. 3d at 38-40, 2004-Ohio-4190 at ¶¶ 70-76 (some citations omitted).

The Court agrees with Respondent that the claim presented by Ahmed concerns a matter of state evidentiary law and does not implicate the federal constitution. When Ahmed presented his hearsay claim to the Ohio Supreme Court, he never once mentioned the Confrontation Clause, and only indirectly referenced it in the heading of his third proposition of law in his appellate brief by stating he was denied his rights "AS GUARANTEED BY U.S. CONST. AMENDS. V, VI, VIII AND XIV" as well as the Ohio Constitution. (Appendix, Vol. 3 at 298.) In his argument, he relied upon state law and evidentiary rules, acknowledging that the testimony presented on Lubaina's fear of Ahmed was admissible under the state evidentiary rules, but arguing that admission of the testimony about the reasons for her fear (abuse, rape) constituted prejudicial other acts evidence and was therefore inadmissible under Ohio R. Evid. 803(3). *Id*. at 302. He cited no federal authority. In his conclusion, he referenced the Due Process Clause of the Fourteenth Amendment, but no other provision of the federal constitution. *Id*. at 305. The Ohio Supreme Court apparently read the claimed error as implicating only state law as well, since it relied exclusively on its own cases and the state evidentiary rules in rejecting Ahmed's claim. *Ahmed*, 103 Ohio St. 3d at 38-40, 2004-Ohio-4190 at ¶¶ 70-76, *citing State v. Apanovitch*, 33 Ohio St. 3d 19, 21-22 (1987); *State v. Simko*, 71 Ohio St. 3d 483, 491 (1994); *State v. Frazier*, 73 Ohio St. 3d 323, 338 (1995); *State v. Awkal*, 76 Ohio St. 3d 324, 331 (1996), *State v. Reynolds*, 80 Ohio St. 3d 670, 677-78 (1998); *State v. LaMar*, 95 Ohio St. 3d 181, 2002-Ohio-2128 at ¶ 102 (2002); *State v. Davie*, 80 Ohio St. 3d 311, 322 (1997); *State v. Slagle*, 65 Ohio St. 3d 597, 604 (1992); *State v. Long*, 53 Ohio St. 2d 91 (1978); Ohio R. Evid. 803(3).

Merely using talismanic constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue. *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir.

2006).  "A lawyer need not develop a constitutional argument at length, but he must make one; the words 'due process' are not an argument." *Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995). Thus, Ahmed failed to present his federal claim to the state court for adjudication.

Since Ahmed merely cut and pasted the arguments made in that court into his petition in these proceedings, he has not presented an issue arising out of the federal constitution here, either. The United States Supreme Court has "stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" *Estelle v. McGuire*, 502 U.S. 62, 67 (1991), *quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Landrum v. Mitchell*, 625 F.3d 905, 913 (2010).  Even if his current claim were to be generously read as raising a federal claim in these proceedings, the federal claim was not presented to the state court, and it would be procedurally defaulted for habeas corpus purposes.  For these reasons, Ahmed's eleventh ground for relief should be denied.

Perhaps taking a clue from Respondent's argument against an imagined Confrontation Clause claim, Ahmed contends in his traverse that "[t]his claim is contra *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).  Once again, the Court is puzzled by Ahmed's statement that a *claim* violates federal law (Traverse, Doc. No. 61 at PageID 1784), because his burden under the AEDPA is to demonstrate that *the Ohio Supreme Court's decision* on the matter is contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, or is based on an unreasonable determination of the facts in light of the evidence before the state court at the time the decision was rendered.  Ahmed makes no allegations that the Ohio Supreme Court's decision is in any way defective.  That makes two reasons why Ahmed's eleventh ground for relief fails to state a claim cognizable in habeas corpus.

132

Finally, even if the Court were to indulge Ahmed to the point of assuming he raised a Confrontation Clause claim by simply stating his claim was contrary to the holding of *Roberts*, it would be meritless. "'Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment.'" *Broom v. Mitchell*, 441 F.3d 392, 406 (6th Cir. 2006), *quoting McAdoo v. Elo,* 365 F.3d 487, 494 (6th Cir. 2004), *citing Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). "Generally, state court evidentiary rulings cannot rise to the level of due process violations unless they offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Broom,* 441 F.3d at 406 (internal quotation marks omitted), *citing Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir.2000), *quoting Montana v. Egelhoff,* 518 U.S. 37, 43 (1996).

In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court identified two separate restrictions imposed by the Confrontation Clause on the range of admissible hearsay: (1) "the Sixth Amendment establishes a rule of necessity," which means that "the prosecution must either produce, or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant"; and (2) once the witness' unavailability has been demonstrated, the out-of-court statements must possess "indicia of reliability." *Id*. at 65-66. Because of the similar values intended to be protected by the hearsay rules and the Confrontation Clause, reliability may be found where the evidence falls within a "firmly rooted hearsay exception." *Id*. at 66. In other cases, the evidence may be admitted if it possesses "particularized guarantees of trustworthiness." *Id*.

Although *Roberts* has been overruled by *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court has since held that while *Crawford* announced a new procedural rule, it was not a

"'watershed rule of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton v. Bockting*, 549 U.S. 406, 418 (2007), *quoting Saffle v. Parks*, 494 U.S. 484, 495 (1990), *citing Teague v. Lane*, 489 U.S. 288, 311 (1989). Consequently, *Crawford* may not be applied retroactively in a collateral proceeding, and *Roberts* would govern a Confrontation Clause claim in Ahmed's case, had he made such a claim. This Court need not delve too deeply into analysis of the testimonies Ahmed might have challenged on Confrontation Clause grounds, however, because had he done so, each part of his claim would have been found to be procedurally defaulted.

Turning to the particulars of Ahmed's case, as the Ohio court noted, some of the complained-of testimony was brought out by the defense in cross-examination of the State's witnesses. For instance, Grace Hoffman testified during cross-examination that Lubaina had complained to her about violence in the marriage, that Ahmed had dragged her by her hair and forced sex on her. (Trial Tr., Vol. 7 at 93.) In Ohio, a party cannot take advantage of an error he invited or induced and the Ohio Supreme Court enforced the rule in Ahmed's case. *Ahmed*, 103 Ohio St. 3d at 39, 2004-Ohio-4190 at ¶ 75. The Court's research reveals that the doctrine of invited error is, and was at the time of Ahmed's trial and direct appeal, firmly established and regularly followed, even in death penalty cases. *State v. Cassano*, 96 Ohio St. 3d 94, 105, 2002-Ohio-3751 at ¶64 (2002); *State v. Murphy*, 91 Ohio St. 3d 516, 535 (2001); *State v. Bey*, 85 Ohio St. 3d 487, 492-93 (1999); *State v. Keenan*, 81 Ohio St. 3d 133, 144 (1998); *State v. Seiber*, 56 Ohio St. 3d 4, 17 (1990) (all death penalty cases); *see also*, *State ex rel. Beaver v. Konteh*, 83 Ohio St. 3d 519, 520-21 (1998); *State ex rel. Fowler v. Smith*, 68 Ohio St. 3d 357, 359 (1994); *Lester v. Leuck*, 142 Ohio St. 91 (1943) (paragraph one of the syllabus). As the state doctrine amounts to an independent and adequate state

procedural rule upon which the state court relied in rejecting Ahmed's claim, his habeas claim here (had it been pled) would be procedurally defaulted for that reason. *See Maupin*, *supra*.

Ahmed offers his trial counsel's ineffectiveness in an effort to excuse the default (Memorandum, Doc. No. 44 at PageID 678-79), but the state supreme court determined that Hoffman's testimony did not affect the outcome of his trial or deprive him of a fair trial. *Ahmed*, 103 Ohio St. 3d at 53, 2004-Ohio-4190 at ¶ 154. "[C]onstitutional error is cause for federal habeas relief only if it has 'a substantial and injurious effect or influence in determining the jury's verdict.'" *Hill v. Hofbauer*, 337 F.3d 706, 718 (2003) *quoting Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The state court's finding that Ahmed suffered no significant prejudice from Hoffman's cross-examination testimony eviscerates his statement that his counsel were ineffective for eliciting the challenged testimony. In addition, ineffective assistance of counsel cannot serve as cause for a procedural default unless the ineffectiveness claim itself has been preserved for habeas review as well. *Edwards v.Carpenter*, 529 U.S. 446, 453-54 (2000). Ahmed did not preserve that claim of attorney ineffectiveness. Thus, to the extent Ahmed might have contended Grace Hoffman's testimony elicited on cross-examination by defense counsel violated the Confrontation Clause, his eleventh ground for relief would be procedurally defaulted without excuse.

Furthermore, the Sixth Circuit Court of Appeals has held that "[w]hen a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error." *Fields v. Bagley*, 275 F.3d 478, 486 (6th Cir. 2001). The Sixth Circuit has also indicated that when a party elicits unfavorable evidence against himself during cross-examination of an opponent's witness, it is only the evidence from any subsequent redirect examination that would be subject to Confrontation Clause analysis, as the cross-examination testimony is invited error. *United States v. Cromer*, 389

135

F.3d 662, 678-79 and n.11 (6th Cir. 2004), *citing Harvis v. Roadway Exp., Inc*., 923 F.2d 59, 60 (6th Cir. 1991). The most damaging testimony Hoffman gave on redirect examination was that Lubaina called her three or four times a week expressing frustration and fright. (Trial Tr., Vol. 7 at 107.)

As for Lubaina's sister Tahira Kahn's testimony that Lubaina had told her Ahmed had raped her repeatedly (Trial Tr., Vol. 7 at 147-48), defense counsel did not object to that testimony, as the Ohio Supreme Court observed. *Ahmed*, 103 Ohio St. 3d at 39-40, 2004-Ohio-4190 at ¶ 76. As has been noted above, Ohio's rule requiring a contemporaneous objection has been found to be an independent and adequate state procedural ground which, if relied upon by the state court, precludes federal habeas corpus review of the merits of a claim. Ahmed has offered his trial counsel's ineffectiveness as cause for the procedural default of this part of his claim. For the same reasons discussed in relation to Grace Hoffman's testimony above, Ahmed's argument that his trial counsel's ineffectiveness excuses his procedural default in this instance fails. Consequently, to the extent Ahmed might have argued Tahira's testimony violated his right to confront the witnesses against him, this Court would recommend that his eleventh ground for relief be denied as procedurally defaulted.

Likewise, Ahmed never objected to any part of Lubaina's psychotherapist Ronni Rittenhouse's testimony regarding Lubaina's depression and its source, which she testified was Ahmed's abusive and controlling manner. (Trial Tr., Vol. 7 at 112-121.) The Ohio Supreme Court did not explicitly rule on Rittenhouse's testimony, although it did note that after having opened the door to further testimony on Ahmed's abuse and rape of Lubaina by bringing it out in Hoffman's cross-examination, additional testimony from later witnesses was invited error. *Ahmed*, 103 Ohio St. 3d at 39, 2004-Ohio-4190 at ¶ 75. Consequently, that part of Ahmed's claim relating to

Rittenhouse's testimony is also procedurally defaulted for the reasons given in this Court's discussion of Hoffman's testimony, *supra*. Furthermore, after Hoffman's testimony that Lubaina had confided in her that Ahmed had forced sex on her, Rittenhouse's testimony that Lubaina was depressed because she was in an abusive marriage was merely cumulative of Hoffman's testimony. In addition, on cross-examination Rittenhouse testified that as Lubaina's counselor, it would have been inappropriate for her to investigate the accuracy of Lubaina's allegations of abuse and manipulation, mitigating much of any prejudice that might have flowed from her direct testimony. (Trial Tr., vol. 7 at 114, 116, 121.) Moreover, defense counsel never objected to any part of Rittenhouse's testimony. For all of these reasons, had Ahmed contended that Rittenhouse's testimony violated his right to confront the witnesses against him, this Court's recommendation would be that the claim be denied as procedurally defaulted.

In summary, Ahmed does not state a claim cognizable in habeas corpus in his eleventh ground for relief. Instead, his claim relates to state case and evidentiary law. In addition, Ahmed does not argue that the Ohio Supreme Court's decision denying his claim is contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, or that it is based upon an unreasonable determination of the facts in light of the evidence before the state court. Even if his claim were construed as one raising an issue of federal constitutional law, however, he has procedurally defaulted the claim by not presenting the federal claim first to the state court. (Recall that in rote fashion Ahmed referred to the Sixth Amendment in the heading of his hearsay claim in the state court, but never mentioned the Confrontation Clause, never cited any federal cases discussing the Confrontation Clause, and never made any Confrontation Clause-like arguments there.) Finally, had Ahmed argued the Confrontation Clause in his eleventh ground for

relief, his claim would be procedurally defaulted without excuse on the basis that it was invited error, or because he failed to lodge a contemporaneous objection to the complained-of testimony. For these reasons, Ahmed's eleventh ground for relief should be denied as procedurally defaulted.

**Twelfth Ground for Relief**

In his twelfth ground for relief, Ahmed contends that prejudicial and irrelevant other acts evidence was admitted at trial, and that the trial court's failure to give limiting instructions deprived him of a fair trial and due process of law.  (Petition, Doc. No. 35 at PageID 311.)  Respondent argues the claim is procedurally defaulted due to the state supreme court's direct appeal denial of the claim on procedural grounds, specifically because defense counsel did not object to the evidence.  (ROW, Doc. No. 61 at PageID 1025.)  Respondent also states that the claim concerns solely a matter of state law not cognizable in federal habeas corpus, and that the state court's plain error review of Ahmed's allegations is neither contrary to nor an unreasonable application of federal law.  *Id*. at 1026-30.

Rather than include his arguments against procedural default in his traverse, Ahmed refers the Court to his memorandum in opposition to Respondent's motion to dismiss procedurally defaulted claims.  (Doc. No. 44.)  There, he acknowledges that the Ohio Supreme Court denied his other acts claim on procedural grounds, but argues that his having raised his trial counsel's ineffectiveness based on their failure to object to the other acts evidence excuses the default. (Memorandum, Doc. No. 44 at 35-36.)  Ahmed also acknowledges that the Ohio Supreme Court concluded that trial counsel's performance was not deficient and that Ahmed was not prejudiced by his counsel's failure to object.  *Id*.  Here, he does not contend that that decision is contrary to federal

law or based upon an unreasonable determination of the facts in light of the evidence before the state court, nor is trial counsel's failure to object to the other acts evidence discussed in Ahmed's fourth ground for relief, where he contends counsel were ineffective for numerous reasons. Since the state court's decision finding no attorney ineffectiveness is unchallenged, this Court may not evaluate that decision under the AEDPA, and consequently cannot accept Ahmed's suggestion in his memorandum that trial counsel's ineffectiveness serve as cause for the default of his twelfth ground for relief. The claim is therefore procedurally defaulted without excuse and should be denied on that ground.

There are other reasons that Ahmed's claim could be denied even if it had been preserved for habeas corpus review. Ahmed has failed to state a claim cognizable in habeas corpus because, once again, he has merely cut and pasted the arguments he made in his state court appellate brief into his petition and traverse. The arguments there, as has been noted, relate to some impropriety Ahmed perceived relating to the Ohio evidence rule on "other acts" evidence, an issue wholly within the state court's purview, and wholly outside this Court's. Such allegations are "no part of a federal court's habeas review of a state conviction." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). "Federal habeas corpus relief does not lie for errors of state law." *Id.*, quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (internal quotation marks omitted). Rather than examining the state court's decision on a matter of state law, this Court must answer the question whether the admission of the challenged evidence violated Ahmed's federal constitutional rights. *Estelle*, 502 U.S. at 68. And as for that question, Ahmed makes one statement: "This claim is contra *Huddleston v. United States*, 485 U.S. 681 (1988)." (Traverse, Doc. No. 71 at PageID 1794.) That case, however, is fundamentally and quite obviously distinguishable from Ahmed's

case in the following ways: (1) *Huddleston* was a case that came to the Supreme Court on direct appeal, not an action brought under 28 U.S.C. § 2254, so the stringent standard set forth in that statute and applicable to Ahmed's case was not applicable in *Huddleston*; (2) in *Huddleston*, the Supreme Court did not mention the constitution or due process even one time, and decided the case based entirely on Fed. R. Evid. 404, and; (3)the holding of *Huddleston*, that a district court does not have to make a preliminary finding that the government has proved the "other act" by a preponderance of the evidence before it submits the evidence to the jury under Fed. R. Evid. 404, has no relevance to Ahmed's case at all.

Ahmed's twelfth ground for relief is procedurally defaulted without excuse and should be denied for that reason. Even if he had properly preserved the claim, however, it would fail as it does not present an issue cognizable in federal habeas corpus.

### Thirteenth Ground for Relief

In his thirteenth ground for relief, Ahmed contends that a videotape and numerous crime scene and autopsy photographs admitted at trial created an unacceptable risk of prejudice to him and violated his right to a fair trial, citing the Fourteenth Amendment. (Petition, Doc. No. 35 at PageID 323-24.) Respondent argues the claim is not cognizable in habeas corpus as it concerns only a matter of state law. (ROW, Doc. No. 61 at PageID 1030-31.) In the alternative, Respondent relies heavily on the Ohio Supreme Court's decision,[24] stating it is neither contrary to nor an unreasonable application of federal law. *Id.* at PageID 1034. After himself repeating roughly twelve pages of

---

[24] Respondent goes so far as to recite verbatim five paragraphs of the state court's seven-paragraph discussion of the claim not once, but TWICE in his five-page argument! Such repetition is unnecessary.

argument from his state court appellate brief and habeas petition, Ahmed asserts that the admission of the photographs violated *Darden v. Wainwright,* 477 U.S. 168 (1986), and *Payne v. Tennessee*, 501 U.S. 808 (1991).

There is no question that Ahmed presented the instant claim to the Ohio Supreme Court on direct appeal since the claim asserted here was cut and pasted from his state appellate brief into his petition and then into his traverse. The state supreme court addressed the merits of Ahmed's claim. *Ahmed*, 103 Ohio St. 3d at 42-43, 2004-Ohio-4190 at ¶¶ 94-100. Thus, the claim is preserved for habeas corpus review.

In presenting his claim to the state supreme court, Ahmed relied primarily on two of that court's decisions in which the court decided claims involving the admission of allegedly gruesome photographs under Ohio R. Evid. 403; *see State v. Morales*, 32 Ohio St. 3d 252, 257-59 (1987); *State v. Maurer*, 15 Ohio St. 3d 239, 264-66 (1984). (Appendix, Vol. 3 at 413-14.) He also argued to the state court, however, that "the prosecution's use of 'unduly prejudicial' [photographic] evidence in a capital case violates the defendant's right to due process," *citing Payne v. Tennessee*, 501 U.S. 808, 825 (1991). *Payne* in turn cites *Darden v. Wainwright* 477 U.S. 168, 179-83 (1986), where the Court noted that the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief should evidence that is so "unduly prejudicial that it renders the trial fundamentally unfair" be introduced at trial, and no specific provision of the Bill of Rights is implicated. (Appendix, Vol. 3 at 414, 423, 425.) Contrary to Respondent's assertion, therefore, Ahmed did present his federal claim to the state court on direct appeal.

The Ohio Supreme Court, on the other hand, did not acknowledge that Ahmed had included his federal claim in his proposition of law before that court, nor did it rely on any federal law or use

any language in its opinion that might suggest it had considered Ahmed's due process arguments. The court found most of the photographs and slides and the crime-scene videotape admitted were relevant to prove the killer's intent, illustrate witnesses' testimonies, or give the jury an "appreciation of the nature and circumstances of the crimes." *Ahmed*, 103 Ohio St. 3d at 42-43, 2004-Ohio-4190 at ¶¶ 94-100. The court relied exclusively on state law, and couched its decision in terminology nearly identical to that found in Ohio R. Evid. 403. *Id.* Furthermore, all the state court cases upon which the Ohio Supreme Court relied in Ahmed's case applied state law to the claims there as well. Given these circumstances, this Court concludes that the Ohio Supreme Court did not address the federal claim Ahmed presented in his direct appeal.

If a state court does not rule on a federal claim before it, federal review of that claim is *de novo* rather than deferential. *Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008), *citing Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007), *citing Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (stating that when "there are no results, let alone reasoning, to which this court can defer . . ., any attempt to determine whether the state court decision was contrary to, or involved an unreasonable application of clearly established federal law . . . would be futile"); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003), *citing Wiggins v. Smith*, 539 U.S. 510 (2003). Thus, this Court addresses Ahmed's federal due process claim relating to the photographs, etc., *de novo*.

Before proceeding to do so, however, the Court acknowledges that the Supreme Court has held that a state court's decision on a claim unaccompanied by an explanation or reasoning is still an adjudication on the merits subject to 28 U.S.C. § 2254(d)(1). *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 784 (2011). It is not only an explanation or reasoning that is missing from the

state court's discussion of Ahmed's claim, but the decision on the federal claim itself. Thus, *Harrington* does not constrict this Court's *de novo* consideration of Ahmed's claim.

Ahmed contends that because there were multiple crime-scene photographs and autopsy slides and one videotape, the sheer quantity and graphic nature of the images of the victims introduced at his trial denied him due process of law under *Payne v. Tennessee*, 501 U.S. 808 (1991). That case, however, was decided under the Eighth Amendment, and Ahmed makes no Eighth Amendment claim in his thirteenth ground for relief.

The Ohio Supreme Court concisely described the materials Ahmed argues were so unduly prejudicial that their admission rendered his trial fundamentally unfair as follows:

> Eight crime scene photos were admitted over appellant's objections, and they are gruesome. State's Exhibit 6 depicts the body of Abdul Bhatti on the garage floor. State's Exhibit 15 shows the doorway area between the basement and garage where the bodies of Ruhie and Abdul can partially be seen. State's Exhibit 16 depicts the bodies of Lubaina, Ruhie, and Nasira on the basement floor . . . . State's Exhibits 17, 18, 19, and 20 are individual close-up photos of the heads of the four murder victims. State's Exhibit 21 is a crime-scene videotape, and portions of it are repetitive of the crime-scene photos. . . .
>
> Appellant also claims that he was prejudiced by the admission of the autopsy slides of the four victims. . . .
>
> Many of the autopsy slides are gruesome.

*Ahmed*, 103 Ohio St. 3d at 42-43. Ahmed does not challenge the Ohio Supreme Court's description of the content of the photographs, slides, and videotape.

The Supreme Court has held that "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial . . ., [b]ut it has never been thought that such cases establish

this Court as a rulemaking organ for the promulgation of state rules of criminal procedure." *Estelle v. McGuire*, 502 U.S. 62, 70 (1991), *quoting Spencer v. Texas*, 385 U.S. 554, 563-64 (1967) (internal quotation marks omitted). The Court has repeatedly stated that "federal habeas corpus relief does not lie for errors of state law." *Estelle*, 502 U.S. at 67, *citing Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). In *Estelle*, the Court also reemphasized "that it is not the province of a federal habeas court to reexamine state-court determinations on state law questions." 502 U.S. at 67-68. "[A]bsent a specific constitutional violation, federal habeas review of [state] trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), *quoting Donnelly v. DeChristforo*, 416 U.S. 637, 643 (1974). The *Estelle* Court also acknowledged that the Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." 502 U.S. at 73, *quoting Dowling v. United States*, 493 U.S. 342, 352 (1990). In addition, the Court has repeatedly observed that "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Medina v. California*, 505 U.S. 437, 443 (1992); *Estelle*, 502 U.S. at 73; *Dowling*, 493 U.S. at 352. In the context of an allegedly erroneous jury instruction, the Court has stated:

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process", *Cupp v. Naughten*, 414 U.S. [141,] . . .147 [(1973)], not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned,'" *id.*, at 146.

*Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

The Sixth Circuit Court of Appeals has rejected claims that the admission of gruesome or repetitive evidence is a violation of a defendant's right to due process on numerous occasions. *Franklin v. Bradshaw*, 695 F.3d 439, 456-57 (6th Cir. 2012) (rejecting claim that autopsy photographs of charred, disfigured, and gory remains of victims denied petitioner the fundamental right to a fair trial); *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (holding admittedly gruesome photographs of victim's severed head, severed breast, and torso depicting pre- and post-mortem injuries demonstrated defendant's intent to kill and mutilate, and that court's limiting instruction was sufficient to guarantee fundamentally fair trial); *Cooey v. Coyle*, 289 F.3d 882, 893-94 (6th Cir. 2002) (finding gruesome and duplicative photographs were highly probative and did not "raise the spectre of fundamental fairness such as to violate federal due process of law"). Many other circuit courts of appeals have done so as well. *Lyons v. Brady*, 666 F.3d 51, 54-56 (1st Cir. 2012); *Wilson v. Sirmons*, 536 F.3d 1064, 1114-16 (10th Cir. 2008); *Rousan v. Roper*, 436 F.3d 951, 958-59 (8th Cir. 2006); *Woods v. Johnson*, 75 F.3d 1017, 1038-39 (5th Cir. 1996); *Gomez v. Ahitow*, 29 F.3d 1128, 1139-40 (7th Cir. 1994); *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982).

Ahmed contends that the admission of State's Exhibits 6, 15-20, 25 (crime scene photographs); 21 (crime scene videotape), and 163-66 (autopsy slides) deprived him of a fundamentally fair trial. Although the crime scene photographs and videotape are gruesome, State's Exhibits 6 (depicting Ahmed Bhatti's body), State's Exhibit 15 (depicting Ruhie's body), State's Exhibits 16 and 25 (depicting Lubaina's, Ruhie's, and Nasira's bodies) (Appendix, Vol. 12 at 114, 137-38, 147) are no more gruesome than photographs introduced by the defense, which also portray all three bodies, and in fact appear to be if not identical, then nearly so to some of the challenged photographs (Defense Exhibits 10, 18, Appendix, Vol. 13 at 11, 19). The close-up photographs of

the heads of the four victims are quite gruesome (State's Exhibits 17-20; Appendix, Vol. 12 at 139-42). All of the photographs Ahmed argues denied him a fundamentally fair trial were used at trial to identify the victims and to establish the state of the crime scene at the time it was discovered. (Trial Tr., Vol. 7 at 218-20, 239-47.) In addition, the photographs show the positions of the victims' bodies relative to each other, and establish the nature and extent of the injuries to them. *Id.*

As for the crime scene videotape, it too is gruesome in parts. (State's Exhibit 21, Appendix, Vol. 12, following index, immediately before page 1.) It was offered by the State for the purpose of more fully illustrating the bodies' spatial relationship to each other and various other objects of evidentiary value, such as Ahmed Bhatti's eyeglasses on the garage floor, blood droplets throughout the scene and in the kitchen of the house, and bloody footprints found at the scene and their location relative to the bodies and other evidence. *Id.* The videotape does not linger unnecessarily over the bodies, the copious quantities of the victims' blood, or the slashed throats of the four victims. *Id.* The videotape, too, was used in conjunction with testimony from the detective who was one of the first to enter the crime scene. (Trial Tr., Vol. 7 at 247-52.)

When presented with a claim that photographs of the victims were unduly prejudicial and violated the defendant's right to due process in *Gonzalez v. DeTella*, 127 F.3d 619 (7th Cir. 1997), the Seventh Circuit Court of Appeals stated as follows:

> Evidence wrongly admitted does not support a writ of habeas corpus unless[,] all things considered[,] the trial posed an unacceptably great risk of convicting an innocent person, and the judicial process therefore denied the accused due process of law. . . . [T]he admission of "gruesome" photos of the decedent in a murder case does not justify collateral relief, even when the evidence is cumulative and likely designed more to inflame the jury than to supply an essential underpinning of the prosecution's case.

146

> Photographs of the decedent's body are relevant. They tend to show that the crime charged by the indictment took place. Graphic depictions of multiple bullet wounds also may be relevant: they can (and here did) support the prosecution's other evidence about how the crime occurred. Cruz testified that Gonzalez emptied a clip of ammunition into the drug dealers; the photographs corroborated this testimony by showing multiple bullet wounds in the victims' bodies. Although these facts were adduced in a more sedate fashion through the testimony of a pathologist, no rule of law, and certainly no rule of *constitutional* law, limits the prosecutor to one piece of evidence in support of each element of the offense. This is so even when the element is uncontested – indeed, even when the defendant offers to admit the element (as Gonzalez did not). See *Old Chief v. United States*, 519 U.S. 172, [186-89] (1997). The Court recognized in *Old Chief* that limiting the proofs to clinically abstract propositions may prevent the jurors from acquiring an accurate picture of events, and that disappointing their expectations about what evidence would normally be available to establish a proposition may lead them to draw inaccurate inferences about what actually happened (based on conjectures about why evidence is being hidden from their view.)

*Gonzalez*, 127 F.3d at 621 (parallel citation omitted). In Ahmed's case, the prosecution showed admirable restraint in presenting only eight crime scene photographs that show the victims' bodies, especially since there were four victims. The videotape, a little more than five minutes in length altogether, did not dwell on the gruesome features of the crime scene, and included substantial footage of other, less gruesome evidence, as well. The outcome of Ahmed's trial and mitigation hearing were not likely to have been different had the photographs and videotape been excluded.

Finally, Ahmed also claims the autopsy photographs were so gruesome as to deprive him of a fundamentally fair trial. The exhibits to which Ahmed directs the Court are photographs of photographic slide carousels apparently containing the slides of the autopsies. The Court cannot see the content of the slides themselves, and no photographic reproductions of their images has been submitted in these proceedings. Therefore, the Court is unable to determine whether the slide images are so gruesome that they denied Ahmed's right to due process of law. It is noted, however,

that contrary to Ahmed's assertion that Dr. Keith Norton, the forensic pathologist who conducted all four autopsies, testified without the aid of photographic assistance (Petition, Doc. No. 35 at PageID 327-30), Dr. Norton relied extensively on the autopsy slides during his testimony to aid the jurors' understanding of his description of the victims' wounds and cause of death. (Trial Tr., Vol. 8 at 617-656.) That fact alone is sufficient to defeat Ahmed's claim that he was denied a fundamentally fair trial due to the autopsy slides having been admitted into evidence.

Ahmed has not demonstrated that the admission of the several photographs, the crime scene videotape, and the autopsy slides were so egregiously gruesome, repetitive, or cumulative that the fairness of his trial was compromised. His thirteenth ground for relief should accordingly be denied.

**Fourteenth Ground for Relief**

In his fourteenth ground for relief, Ahmed alleges that the instructions given to the jury on "reasonable doubt" in both phases of his trial were flawed and had the effect of allowing him to be convicted on a standard of proof below "beyond a reasonable doubt" and sentenced to death in violation of the Due Process Clause. (Petition, Doc. No. 35 at PageID 340.) Respondent acknowledges the claim is preserved for habeas corpus review, but argues that Ohio's "reasonable doubt" instruction has long passed constitutional muster, and that the Ohio Supreme Court's decision rejecting Ahmed's claim is neither contrary to nor an unreasonable application of federal law. (ROW, Doc. No. 61 at PageID 1034-35.) In his traverse, Ahmed states that "[t]his claim is contra *Cage v. Louisiana*, 498 U.S. 39, 41 (1990), which the Court takes to mean that Ahmed

believes the Ohio Supreme Court's decision on his claim contradicts the cited case. (Traverse, Doc. No. 71 at PageID 1815.)

The Ohio Supreme Court summarily rejected Ahmed's claim stating as follows:

> In his 18th proposition of law, appellant contends that the trial court erred in instruction the jury on reasonable doubt based on the statutory definition in R.C. 2901.05. We have repeatedly rejected the same argument, and do so again for the same reasons. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, paragraph eight of the syllabus; *State v. Jones* (2000), 90 Ohio St.3d 403, 417.

*Ahmed*, 103 Ohio St. 3d at 43, 2004-Ohio-4190 at ¶ 101 (parallel citations omitted). In *Jenkins*, the Ohio Supreme Court found Ohio's statutory instruction on reasonable doubt was substantially similar to the instruction upheld by the United States Supreme Court in *Holland v. United States*, 348 U.S. 121, 140 (1954). *Jenkins*, 15 Ohio St. 3d at 211.

Ahmed's claim is a familiar one in capital habeas corpus cases. It has been repeatedly rejected by the Sixth Circuit Court of Appeals. *White v. Mitchell*, 431 F.3d 517, 533-34 (6th Cir. 2005); *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 436-37 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854, 883-84 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000); *Thomas v. Arn*, 704 F.2d 865, 867-69 (6th Cir. 1983).

Ahmed argues that his conviction and death sentence must be reversed "where the instruction on reasonable doubt could have led jurors to find guilt 'based on a degree of proof below that required by the Due Process Clause.' *Cage v. Louisiana*, 498 U.S. 39, 41 (1990)." (Traverse, Doc. No. 71 at PageID 1809. He fails to acknowledge, however, that the Supreme Court backed away from that language the very next term stating

> We acknowledge that language in the later cases of *Cage v. Louisiana*, 498 U.S. 39 (1990), and *Yates v. Evatt*, 500 U.S. 391

149

(1991), might be read as endorsing a different standard of review for jury instructions. See *Cage*, *supra*, 498 U.S., at 41 ("In construing the instruction, we consider how reasonable jurors could have understood the charge as a whole"); *Yates*, *supra*, 500 U.S., at 401 ("We think a reasonable juror would have understood the [instruction] to mean . . . "). In *Boyde* [*v. California*, 494 U.S. 370 (1990)], however, we made it a point to settle on a single standard of review for jury instructions – the "reasonable likelihood" standard – after considering the many different phrasings that had previously been used by this Court. 494 U.S., at 379-380 (considering and rejecting standards that required examination of either what a reasonable juror "could" have done or "would" have done). So that we may once again speak with one voice on this issue, we now disapprove the standard of review language in *Cage* and *Yates*, and reaffirm the standard set out in *Boyde*.

*Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991) (parallel citations omitted). Thus, the standard under which Ahmed has encouraged this Court to consider his claim has been explicitly disavowed by the Supreme Court. The proper inquiry is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction or a sentence of death based upon proof insufficient to meet the beyond a reasonable doubt standard. *United States v. West*, 28 F.3d 748, 750 (8th Cir. 1994). Furthermore, that inquiry must be conducted with regard to the overall charge and the entire trial record. *See Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) (observing that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge; *Victor v. Nebraska*, 511 U.S. 1, 16 (1994) (stating that "the [challenged] language cannot be sequestered from its surroundings.").

The Supreme Court has stated that

The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be

used in advising the jury of the government's burden of proof. Rather, "taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury."

*Victor,* 511 U.S. at 5 (citations omitted), *quoting Holland v. United States*, 348 U.S. 121, 140 (1954)

The Court in *Victor* recognized that the only case in which it had ever found a definition of reasonable doubt violated the Due Process Clause was *Cage*, *supra*, and reiterated that that case was decided using an improper standard. 511 U.S. at 5-6.

The instructions Ahmed claims violated his right to due process were given at trial as follows:

> The Defendant is presumed innocent until his guilt is established beyond a reasonable doubt. Defendant must be acquitted of an offense unless the State produces evidence that convinces you beyond a reasonable doubt of every essential element of the offense.
>
> Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.
>
> If after a full and impartial consideration of all the evidence, you are firmly convinced of the truth of the charge, the State has proved its case beyond a reasonable doubt. If you are not firmly convinced of the truth of the charge, you must find the Defendant not guilty.

(Trial Tr., Vol. 8, Appendix at 1-2.)

> In order for you to decide that the sentence of death shall be imposed upon the Defendant, the State of Ohio has the burden to prove, to each member of this jury, beyond a reasonable doubt that the aggravating circumstance or circumstances of which Defendant was found guilty is sufficient to outweigh the factors in mitigation of imposing the death sentence. . . .

151

> Reasonable doubt is present when, after carefully considering and comparing all of the evidence, you cannot say that you are firmly convinced the aggravating circumstance or circumstances outweighs the factors in mitigation. Reasonable doubt is present when you are not firmly convinced that death is the appropriate punishment.
>
> Reasonable doubt is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely upon it and act upon it in the most important of his or her own affairs.

(Trial Tr., Vol. 9, Appendix at 2.) Ahmed contends three phrases in the instructions deprived him of due process: (1) "firmly convinced"; (2) "moral evidence"; and (3) "willing to act." (Petition, Doc. No. 35 at PageID 341-42.)

Ahmed argues that the "firmly convinced" language is derived from the "clear and convincing" standard of proof rather than the "reasonable doubt" standard. *Id*. at PageID 344. That argument has been rejected by the Sixth Circuit Court of Appeals. *Coleman v. Mitchell*, 268 F.3d 417, 437 (6th Cir. 2001).

Next, he argues that the phrasing of the "moral evidence" language in the alternative rather than in the conjunctive denied him his right to due process. (Petition, Doc. No. 35 at PageID 344-46.) As he acknowledges, the Supreme Court has rejected a due process challenge to an instruction that defined "reasonable doubt" in part by stating, "It is not a mere possible doubt because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt." *Victor v. Nebraska*, 511 U.S. 1, 7-8 (1994). Nevertheless, Ahmed contends that the substitution of the word "or" in place of the word "and" in that sentence freed the jury to convict him "based on considerations of subjective morality, rather than evidentiary proof required by [the]

152

Due Process Clause." (Petition, Doc. No. 35 at PageID 346.) In *Victor*, however, the court noted that "[m]oral evidence, in this sentence, can only mean empirical evidence offered to prove such matters – the proof introduced at trial." *Victor*, 511 U.S. at 13. It is doubtful that changing "and" to "or" in the sentence would wreak such a fundamental change in the meaning of the phrase. After all, the definition of the term is not determined by the preceding conjunction. Thus, the instruction in Ahmed's case may be read as, "Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on 'empirical evidence offered to prove such matters' is open to some possible or imaginary doubt." That substitution does not transform the instruction into a signal that "subjective morality" is a proper guide for the jury to determine a defendant's guilt or sentence, as Ahmed argues is so.

Finally, Ahmed contends that the "willing to act" language in the jury instructions deprived him of his right to due process. (Petition, Doc. No. 35 at PageID 342-44.) He cites several federal circuit court opinions and one Supreme Court case in which the phrase "willing to act" was disapproved. *Id.* In the Supreme Court case, however, it was determined that the jury instructions as a whole were "not of the type that could mislead the jury into finding no reasonable doubt when in fact there was some." *Holland v. United States*, 348 U.S. 121, 140 (1954). The Court concluded that, "taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." *Id.* As has been pointed out by the Fourth Circuit Court of Appeals,

> [S]ome sixty-seven years prior to *Holland*, in *Hopt v. Utah*, 120 U.S. 430 (1887), the Supreme Court unequivocally upheld the following jury instruction, which is materially indistinguishable from the "willing to act" language challenged by Waine: "[I]f, after such impartial comparison and consideration of all the evidence, you can truthfully say that you have an abiding conviction of the defendant's guilt, such as you would be willing to act upon in the more weighty

153

and important matters relating to your own affairs, you have no
reasonable doubt." *Id*. at 439.

*Waine v. Sacchet*, 356 F.3d 510, 516 (4th Cir. 2004).

In sum, Ahmed has pointed to no clearly established federal law with which the Ohio
Supreme Court's decision conflicts.  Rather, the state court's decision is in line with the Supreme
Court decisions addressing similar arguments about "reasonable doubt" jury instructions, and circuit
court interpretations of those precedents.  Accordingly, he has not demonstrated entitlement to
habeas corpus relief, and his fourteenth ground for relief should be denied.


**Fifteenth Ground for Relief**

Next, Ahmed contends that the trial court's sentencing-phase instruction to consider only as
much evidence as was relevant to the aggravating circumstances from the guilt phase of the trial
when determining the appropriate sentence for Ahmed violated his Eighth and Fourteenth
Amendment rights.  (Petition, Doc. No. 35 at PageID 347-353.)  Respondent argues that the claim is
procedurally defaulted and concerns only state evidentiary law and is therefore not cognizable in
federal habeas corpus.  (ROW, Doc. No. 61 at PageID 1036.)  Ahmed disputes that the claim is
procedurally defaulted, referring the Court to his memorandum opposing Respondent's motion to
dismiss procedurally defaulted claims (Doc. No. 44), repeats the arguments made in his petition,
then makes brief argument addressing the issues raised by Respondent in his return of writ.
(Traverse, Doc. No. 71 at PageID 1815-22.)

The claim was presented to the Ohio Supreme Court on direct appeal.[25]  In response, the state court observed that Ahmed had not raised the issue before the trial court, so all but plain error was waived.  *Ahmed*, 103 Ohio St. 3d at 45.  The court went on to determine that no plain error occurred, and it overruled his proposition of law.[26]  *Id*.  As has been noted above, Ohio's contemporaneous objection rule is an adequate and independent state ground which, if enforced by the state court as it was in Ahmed's case, is sufficient to preclude federal habeas corpus review.

Ahmed asserts that his claim is saved from procedural default because he identified it as an example of his trial counsel's ineffectiveness on direct appeal, an assertion that is borne out by his appellate brief.  (Appendix, Vol. 3 at 365-66.)  Since his ineffective assistance of trial counsel claim presented in these habeas proceedings fails, however (*see* Fourth Ground for Relief, *supra*), Ahmed's counsel's performance cannot serve as cause to excuse a procedural default.  Consequently, Ahmed's fifteenth ground for relief is procedurally defaulted without excuse and should be denied for that reason.

Even if that were not the case, the same argument Ahmed makes has been rejected by the Sixth Circuit Court of Appeals.  *Buell v. Mitchell*, 274 F.3d 337, 354 (6th Cir. 2001).  In addition, the evidence of which Ahmed complains was relevant to the aggravating circumstances.  For instance, although the homicides themselves are not aggravating circumstances, the fact that there were four victims is an aggravating circumstance that Ahmed was charged with and convicted of.  *See* Ohio

---

[25]  Indeed, much of what was argued in Ahmed's appellate brief there is (unsurprisingly) imported into his petition and traverse here.

[26]  Ahmed characterizes the Ohio Supreme Court's plain-error review as a holding on the merits (Memorandum Contra Warden's Motion to Dismiss Procedurally Defaulted Claims, Doc. No. 44 at PageID 680).  A state appellate court's review for plain error has long been recognized as enforcement, not waiver, of a procedural default. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell*, 538 F.3d 478, 511 (6th Cir. 2008);

Rev. Code § 2929.04(A)(5). The crime scene photographs and coroner's slides were relevant to that same aggravating circumstance and also to one relating to Nasira's murder, that being the killing of a person under thirteen years of age. *See* Ohio Rev. Code § 2929.04(A)(9). The prosecution is also permitted to demonstrate that there is no mitigatory value in the "nature and circumstances of the offenses," and the challenged evidence is also relevant to that argument.

Moreover, the opinion of a state court on plain error review is still entitled to AEDPA deference if the federal court reaches the merits of a claim despite the unexcused procedural default. *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009). The state court's plain error review concluded that "evidence of the nature and circumstances of the aggravating circumstances is also relevant at the penalty phase[, and m]ost of the evidence admitted in the guilt phase was also admissible during the penalty phase." *Ahmed*, 103 Ohio St. 3d at 45, 2004-Ohio-4190 at ¶ 111. Ahmed argues that the admission of the guilt phase evidence into the penalty phase was tantamount to permitting the jury to consider non-statutory aggravating circumstances in violation of *Stringer v. Black*, 503 U.S. 222, 237 (1992), and *Sochor v. Florida*, 504 U.S. 527, 532 (1992). Even assuming that some of the evidence admitted in the mitigation phase was irrelevant, and assuming the jury considered that evidence, and assuming that Ahmed was prejudiced by that, he still fails to acknowledge the curative effect of the state court's independent weighing of the aggravating circumstances and mitigating factors which it did without mentioning the evidence about which Ahmed complains. *Clemons v. Mississippi*, 494 U.S. 738, 745 (1990); *Ahmed*, 103 Ohio St. 3d at 55-58, 2004-Ohio-4190 at ¶¶ 167-86. Thus, even if Ahmed had preserved his claim for habeas corpus review, it would fail.

*Lundgren v. Mitchell*, 440 F.3d 574, 765 (6th Cir. 2006); *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005; *Hinkle*

Ahmed's fifteenth ground for relief is procedurally defaulted without excuse and should be denied for that reason.

**Sixteenth Ground for Relief**

In his sixteenth ground for relief, Ahmed makes the following disjointed and artless argument:

> The prosecutor claimed that the facts showed that Ahmed committed "honor killings" which by its [sic] nature involve provocation occurring due to perceived infidelity and an "enraged" relative, who was dishonored. Before the final jury instructions in the trial phase, Attorney Olivito went to the prosecutor and the trial judge to request such jury instructions. Thereafter, Olivito told Ahmed: "They say that voluntary manslaughter is not the lesser included offense to aggravated murder and that only murder is the lesser included offense of aggravated murder, so the jury instructions will only include murder as the lesser included offense." [Citation to record absent.] This is not an accurate statement of Ohio law. As such, the defense attorneys themselves failed to ensure that correct law was being used and applied and failed to make a proper record insisting that correct jury instructions be given. Moreover, the trial judge had an independent duty to instruct the jury on the voluntary manslaughter [sic].
>
> Here, prosecution witnesses testified that the divorce was contested and the situation kept escalating. That Dr. Bhatti was adamant that she have full custody of the children [sic]. There was an accusation that Dr. Bhatti had an affair. There was evidence that both Ahmed and his wife were taking major depression and extreme stress medications during the pendency of [the] divorce.
>
> The Coroner testified and wrote on the death certificates that there was a marital dispute leading to [the] deaths of four people. The Prosecutor claimed "her family members came to her aid" (Tr.779) so he killed her and any representative of the family that he could get his hands on. Petitioner's blood found in the kitchen, swollen hands[,] scratch on his forearm and injured thumb are consistent with

*v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

> defensive wounds from family members who came to her aid.
> Petitioner was prejudiced by trial counsel's failure to understand the
> law and argue the available evidence already presented by the
> Prosecution which supported a charge on voluntary manslaughter.

(Petition, Doc. No. 35 at PageID 355-56.)

Respondent argues the claim is procedurally defaulted since it was not presented to the state

supreme court on direct appeal, and that it is also meritless. (ROW, Doc. No. 61 at PageID 1039.)

In his traverse, Ahmed refers the Court to his memorandum opposing Respondent's motion to

dismiss procedurally defaulted claims. (Doc. No. 71 at PageID 1822.) There, he contends that

including the instant claim as one underlying his ineffective assistance of appellate counsel claim

preserved it for habeas corpus review (Doc. No. 44 at PageID 681), an assertion that has been

repeatedly rejected, *supra*.

It is difficult to know where to begin. First, Ahmed's claim purports to challenge the trial

court's refusal to give an instruction on voluntary manslaughter as an inferior offense to the charged

offenses of aggravated murder, but the last sentence of his argument sounds more like a claim of

counsel's ineffectiveness. Whichever theory he intended to pursue in the instant claim, neither was

first presented to the state court on direct appeal. Failure to raise a constitutional issue at all on

direct appeal is procedurally defaulted for habeas corpus purposes and subject to the cause and

prejudice standard of *Wainwright v. Murray*, 477 U.S. 478, 485 (1986). *Mapes v. Coyle*, 171 F.3d

408, 413 (6th Cir. 1999); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d

94, 97 (6th Cir. 1985).

Second, Ahmed has not even suggested that the failure of the court to give the desired instruction amounted to a violation of any of his constitutional rights.[27] He merely states in conclusory fashion that the information given to him by Olivito "is not an accurate statement of Ohio law," without any indication of how Olivito's remarks differed from Ohio law, or even what the law is in Ohio regarding instruction on inferior offenses. Ahmed, however, mentions no federal law at all, not even the talismanic phrase "due process," as is evident from the quotation from his petition, above. Thus, he has failed to allege a violation of his federal constitutional rights which short circuits this Court's ability to address his claim.

Third, Ahmed's claim is so poorly constructed that it would be difficult for the Court to make the (il)logical leaps Ahmed attempts in his argument with any grace at all. He rattles off a laundry list of evidentiary facts and unfounded accusations, apparently expecting the Court to connect the far-flung, widely disbursed, dots of his argument. He has fallen far short of his burden to demonstrate entitlement to habeas corpus relief, even if he had preserved his claim.

In *Beck v. Alabama*, 447 U.S. 625 (1980), the Supreme Court held that a death sentence may not be constitutionally imposed when the jury was not permitted to consider a lesser-included non-capital offense and when the evidence would have supported acquittal on the capital offense and conviction on the lesser-included offense. *Id*. at 627, 638. The *Beck* Court reasoned that

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

---

[27] Ahmed takes a hint from Respondent's supposition in the Return of Writ, suggesting that Ahmed might be attempting to make a claim under *Beck v. Alabama*, 447 U.S. 625 (1980), and cites federal law relevant to the instant claim (*Beck*) for the first time in his traverse. (Doc. No. 71 at PageID 1824.)

159

*Id*. at 637. Ahmed's jury, however, was provided with the "third option" of convicting him of three non-capital offenses of murder rather than the charged offenses of aggravated murder. (Guilt Phase Jury Instructions, appended to Trial Tr., Vol. 8 at 7, 10, and 13.) On Count Four, however, the jury was not instructed on any lesser-included offense. That count related to the murder of the child, Nasira, and will be addressed momentarily.

In a case presenting a claim not dissimilar to Ahmed's here, the Supreme Court expounded upon the requirement set forth in *Beck*. In *Schad v. Arizona*, 501 U.S. 624 (1991), the Court considered a petitioner's claim that "he was entitled to a jury instruction on the offense of robbery, which he characterizes as a lesser included offense of robbery[-]murder." *Id*. at 645. Schad was charged with a capital offense, and his jury was instructed on the non-capital offense of second-degree murder as well. *Id*. at 629. Essentially Schad argued for an expansion of *Beck*'s holding, contending that "the jury in a capital case be instructed on *every* lesser included noncapital offense supported by the evidence, and that robbery was such an offense in this case." *Id*. at 646 (emphasis added). The Court rejected Schad's argument, explaining that

> The argument is unavailing, because the fact that the jury's "third option" was second-degree murder rather than robbery does not diminish the reliability of the jury's capital murder verdict. To accept the contention advanced by petitioner . . ., we would have to assume that a jury unconvinced that petitioner was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital murder rather than second-degree murder as its means of keeping him off the streets. Because we can see no basis to assume such irrationality, we are satisfied that the second-degree murder instruction in this case sufficed to ensure the verdict's reliability.

*Id*. at 647-48.  Thus, Ahmed's argument that his jury should have been instructed on voluntary manslaughter in addition to murder and aggravated murder on Counts One, Two, and Three of the indictment is in flat contradiction to well-established federal law as determined by the United States Supreme Court.

Turning to his claim as it relates to Count Four of the indictment, the Sixth Circuit Court of Appeals has recognized that "a claim regarding the failure to instruct on a lesser-included offense might be cognizable in habeas where 'a fundamental miscarriage of justice is found to have resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law,'" and the district court in *Hendrickson* suggests the same is true when the omitted instruction is one on an inferior offense rather than a lesser-included offense.  *Hendrickson v. Warden*, No. 2:10-cv-1084, 2012 WL 113435 at *7-8 (S.D.Ohio Jan. 13, 2012), *quoting Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990); *State v. Shane*, 63 Ohio St. 3d 630, 632 (1992).  Such an occurrence would be most unusual and would include a situation in which "the failure to give such an instruction likely resulted in the conviction of an innocent person."  *Hendrickson*, 2012 WL 113435 at *8, *quoting Mason v. Brunsman*, No. 1:07-cv-1020, 2009 WL 2169035 at *22 (S.D. Ohio July 16, 2009), *citing Bagby*, 894 F.2d at 795.

Ohio's statute setting out the offense of voluntary manslaughter reads as follows:

> No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation *occasioned by the victim* that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.

Ohio Rev. Code § 2903.03(A) (emphasis added).  It is true, as Ahmed argues, that his divorce was not amicable.  It may be true that Lubaina desired full custody of the two children of the marriage.

161

There is no proof that Lubaina was having an affair, as Ahmed claimed. Both Ahmed and Lubaina may have been taking medication for their respective psychological problems. There is no doubt that divorce is a stressful event in anyone's life. Ahmed also provides a contorted reading of the coroner's notation on the death certificates that there was a marital dispute that led to the deaths of four people into what seems to be a claim that Ahmed committed the murders as a result of Lubaina's family members coming to her aid during a marital argument. He audaciously suggests that his own minor injuries suffered while murdering four people were defensive wounds inflicted upon him when he tried to defend himself against an elderly man, a woman, and a two-year-old child "coming to the aid" of Lubaina. He utterly fails to show that there was *any* evidence that *any* of the victims, much less Nasira, provoked him into such a sudden passion or fit of rage that was reasonably sufficient to incite him into using deadly force against a two-year-old child. He does not contend that the failure of the court to include the instruction on voluntary manslaughter effected a fundamental miscarriage of justice.

The Court has exceeded its duty in parsing Ahmed's convoluted argument in his sixteenth ground for relief. Having found that his jury was instructed on a lesser-included offense on three of the four counts of aggravated murder, and that the evidence produced at trial did not establish his entitlement to an instruction on any lesser-included offense on the fourth count of aggravated murder, even if the claim were preserved, Ahmed would not have been entitled to habeas corpus relief on the instant ground for relief.

Ahmed's sixteenth ground for relief is procedurally defaulted without excuse, and should be denied for that reason. For all of the reasons discussed above, Ahmed's claim would still fail even if he had properly preserved it for habeas corpus review.

**Seventeenth Ground for Relief**

In his seventeenth ground for relief, Ahmed contends that neither the jurors nor the trial judge followed the applicable law when determining his sentence. (Petition, Doc. No. 35 at PageID 356-64.) Respondent argues the claim is both procedurally defaulted and without merit. (ROW, Doc. No. 61 at PageID 1040-41.)

Ahmed counters that he presented the matter to the state trial court as his sixth claim for relief in his post-conviction petition. (Traverse, Doc. No. 71 at PageID 1826.) That claim for relief, however, addresses only that part of Ahmed's habeas claim that relates to the alleged juror misconduct, and says nothing about the alleged impropriety of the trial court's sentencing opinion. (Appendix, Vol. 6 at 207-8.) Thus, to the extent Ahmed challenges the constitutionality of the trial court's sentencing opinion, his claim is procedurally defaulted. He offers no cause for the default nor prejudice therefrom so habeas review of that part of Ahmed's seventeenth ground for relief is precluded.

When the claim of juror misconduct was presented to the state court, Ahmed supported his claim with an affidavit from Kathryn Sandford, an attorney on the staff of the Ohio Public Defender's Office. (Appendix, Vol. 6 at 207-8; Vol. 7 at 34-35.) Sandford's affidavit purports to recount conversations she had with three individuals who served as jurors in Ahmed's trial. Each of the jurors refused to sign affidavits. (Appendix, Vol. 7 at 34-35.) Thus, the post-conviction trial court was left with an advocate's affidavit containing nothing but hearsay from three jurors who explained their deliberative process when deciding Ahmed's sentence. The state court rejected Ahmed's claim on the ground that inquiry into the deliberative process is prohibited by Ohio R.

Evid. 606(B), (Appendix, Vol. 8 at 331) commonly referred to as the *aliunde* rule, which reads as follows:

> Inquiry into validity of verdict or indictment
>
> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes.

The trial court also rejected the claim because it was based solely on the hearsay contained in Sandford's affidavit. (Appendix, Vol. 8 at 331.) The state court of appeals affirmed on both grounds. *State v. Ahmed*, No. 05-BE-15, 2006-Ohio-7069 at ¶¶ 138-44, 2006 WL 3849862 (Ohio Ct. App. 7th Dist. Dec. 28, 2006).

Neither Ahmed's claim nor Sandford's post-conviction affidavit allege that the jury was influenced by any extraneous information. Instead, they credit the jurors with statements explaining how they weighed the evidence relating to the aggravating circumstances, what evidence caused the jurors to come to their decision that death was the appropriate sentence for Ahmed, what impact the evidence had on the jurors in the mitigation deliberations, and other conclusions one or more jurors came to in considering all the evidence before them in the penalty-phase deliberations. (Petition, Doc. No. 35 at PageID 356-58; Appendix, Vol. 7 at 34-35.)

The Sixth Circuit Court of Appeals has noted that a state court's enforcement of the *aliunde* rule was not an unreasonable application of constitutional law, especially when the supporting affidavit is "weak evidence of prejudice." *Hoffner v. Bradshaw*, 622 F.3d 487, 501 (2010). The court reasoned as follows:

> The affidavit does not allege that the jury was influenced by any "extraneous" information, and therefore the juror's testimony was properly excluded from consideration by the Ohio courts. This court has previously held that there is no "constitutional impediment to enforcing" Ohio's *aliunde* rule, and Hoffner has cited no authority to the contrary. *See Brown v. Bradshaw*, 531 F.3d 433, 438 (6th Cir. 2008); *see also Tanner v. United States*, 483 U.S. 107, 117-27 (1987) (chronicling the legal history of and policy underlying Federal Rule of Evidence 606(b)).

*Hoffner*, 622 F.3d at 501. Ahmed is in the same evidentiary boat as was Hoffner: weak evidence of the juror(s) deliberative process lacking any allegation that the jury was influenced by any extraneous information. Thus, the result should be the same in both cases.

Although Ahmed declares that his ground for relief "does not involve the *Clemons* [*v. Mississippi*, 494 U.S. 738 (1990)] doctrine," he does not explain why be believes that to be so, and this Court imagines no reason why it should be so. *Clemons* held that errors by the sentencing court in weighing aggravating circumstances and mitigating factors can be cured by independent reweighing in the state appellate court. *Id.* at 745-50. The Ohio Supreme Court performed a thorough review and reweighing of the valid aggravating circumstances and mitigating factors for each victim and determined that the death sentence was appropriate for each of Ahmed's four aggravated murder convictions. *Ahmed*, 103 Ohio St. 3d at 55-58, 2004-Ohio-4190 at ¶¶ 167-86. Pursuant to *Clemons*, even if this Court agreed that error occurred at the trial court level in Ahmed's sentencing procedure, the Ohio Supreme Court's reweighing cured the error.

That part of Ahmed's claim in which he alleges the trial court's sentencing opinion was fatally flawed under the federal constitution has been procedurally defaulted without excuse and it should consequently be denied. In addition, he has failed to demonstrate that the state court's denial of his claim that the jurors in his case engaged in misconduct is contrary to or an unreasonable application of federal law or based upon an unreasonable determination of the facts. Therefore, he is not entitled to habeas corpus relief, and his seventeenth ground for relief should be denied.

**Eighteenth Ground for Relief**

In his eighteenth ground for relief, Ahmed contends that the trial court's allowance of the alternate jurors to be present in the deliberation room without participating in the actual deliberations violated an Ohio Rule of Criminal Procedure, and his rights to a fair trial, a reliable sentence, a jury trial, equal protection, due process, and to be free from cruel and unusual punishment. (Petition, Doc. No. 35 at PageID 364-71.) Respondent argues that the claim is procedurally defaulted because, although Ahmed properly raised it on direct appeal, the Ohio Supreme Court rejected the claim due to Ahmed's failure to object to the alternates' presence in the jury room at the time, and its finding that no plain error occurred. (ROW, Doc. No. 61 at PageID 1041-44.) In his traverse, Ahmed refers the Court to his memorandum in opposition to Respondent's motion to dismiss procedurally defaulted claims, where he argues that his having raised trial counsel's ineffectiveness for failing to object to the alternate jurors' presence in the deliberations preserved the instant claim for habeas review. (Traverse, Doc. No. 71 at PageID 1833; Doc No. 44 at PageID 681-82.)

Ahmed correctly states that he raised the instant ground for relief on direct appeal to the Ohio Supreme Court as his sixteenth proposition of law. (Appendix, Vol. 3 at 442-48.) Respondent is correct in arguing that the state supreme court found Ahmed had failed to object to the alternates' presence in deliberations, thereby waiving all but plain error. *Ahmed*, 103 Ohio St. 3d at 46-47, 2004-Ohio-4190 at ¶¶ 115-18. Since Ahmed's ineffective assistance of trial counsel claim fails here as it did in the state supreme court, it cannot serve as cause to excuse Ahmed's procedural default of his alternate jurors ground for relief. *See* Fourth Ground for Relief, *supra*; *Ahmed*, 103 Ohio St. 3d at 54-55, 2004-Ohio-4190 at ¶ 164.

Furthermore, the state court concluded that Ahmed had suffered no prejudice from the alternates' presence in deliberations or from his trial counsel's failure to object to that arrangement. *Id*. at 46-47, 54-55, 2004-Ohio-4190 at ¶¶ 115-18, 164. Ahmed acknowledges that his burden with regard to any prejudice from the alleged error is to show that it had "'a substantial and injurious effect or influence in determining the jury's verdict,'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), *quoting Kotteakos v. United States*, 328 U.S. 750, 776 (1946), but the only "argument" he makes, if it can be called that, is his bare assertion that "[t]he mere fact that alternate jurors remained in the room, upon the Trial Court's instruction, in both phases, cannot but have a substantial and injurious effect on influencing the 12 jurors in their decision." (Traverse, Doc. No. 71 at PageID 1840.) Such a declaration does not satisfy Ahmed's burden to show that he was prejudiced by the alternates' presence in the jury room during deliberations, or from his trial counsel's failure to object to their presence in deliberations.

As noted above, Ohio's rule that contemporaneous objections are required to preserve a claim of error for appeal is a firmly established and regularly followed rule. It was applicable in

Ahmed's case, and the Ohio Supreme Court enforced the rule. Ahmed has not demonstrated cause for the default or prejudice therefrom, so his eighteenth ground for relief is not preserved for habeas corpus review, and it should be denied for that reason.

Were it preserved, however, it would still fail. In his traverse, Ahmed asserts that the Ohio Supreme Court's decision is contrary to *United States v. Olano*, 507 U.S. 725 (1993).[28] (Traverse, Doc. No. 71 at PageID 1840.) *Olano*, however, is a case that went to the United States Supreme Court on direct appeal from a federal conviction in which the Court considered whether the presence of non-participating alternate jurors in deliberations was plain error under Fed. R. Crim. P. 24(c) and 52(b). 507 U.S. at 727, 737. (The Court concluded it was not. *Id*.) The Court noted that the question before it was not whether the alternates' presence in the deliberations violated the Sixth Amendment or Due Process Clause, and instead concerned the federal rules cited. *Id*. at 739. Therefore, *Olano* does little to further Ahmed's claim of constitutional error from the alternates' presence in deliberations. Moreover, the Sixth Circuit has observed that even though *Olano* was not a habeas corpus case, the Court "clearly held that the mere presence of alternate jurors in jury deliberations does not affect a defendant's substantial rights" in the context of plain error analysis. *Roberts v. Carter*, 337 F.3d 609, 616 (6th Cir. 2003). It is highly unlikely that analysis under the more stringent standard of the AEDPA would result in a Supreme Court ruling more favorable to Ahmed.

Aside from the state procedural rule and cases from the Ohio state courts, Ahmed relies quite heavily on a Fourth Circuit Court of Appeals case, *United States v. Virginia Erection Corp.*, 335 F.2d 868, 870 (4th Cir. 1964), *citing Patton v. United States*, 281 U.S. 276 (1930), *abrogated by*

*Williams v. Florida*, 399 U.S. 78 (1970); a case from the Tenth Circuit Court of Appeals, *United States v. Beasley*, 464 F.2d 468 (10th Cir. 1972); a case from the Superior Court of Pennsylvania, *Commonwealth v. Krick*, 164 Pa.Super. 516, 67 A.2d 746 (Pa. 1949); a case from the Supreme Court of North Carolina, *State v. Bindyke*, 288 N.C. 608, 220 S.E.2d 521 (N.C. 1975); a case from the Supreme Judicial Court of Massachusetts, *Commonwealth v. Smith*, 403 Mass. 489, 531 N.E.2d 556 (Mass. 1988); and a case from the Supreme Court of Washington, *State v. Cuzick*, 85 Wash.2d 146, 530 P.2d 288 (Wash. 1975). (Petition, Doc. No. 35 at PageID 366-370.)

In at least three of those cases, the courts were interpreting state statutes or constitutions, which have no relevance to Ahmed's habeas corpus claim about the alternate jurors. *See Smith*, 403 Mass. at 491-97; *Bindyke*, 288 N.C. at 621-27; *Krick*, Pa.Super. at 520-21. In *Beasley*, the court relied upon a federal rule of criminal procedure in granting a mistrial because of an alternate's presence in deliberations. 464 F.2d at 469. Although that court cited *Duncan v. Louisiana*, 391 U.S. 145 (1968), and *Williams v. Florida*, 399 U.S. 78 (1970), in its analysis, it did so for the purpose of directing the reader's attention to the Supreme Court's discussion of the history and nature of jury trials, and not for any specific holding relevant to the alternate juror issue. In addition, the *Beasley* court was guided by two cases interpreting federal rules and statutes respecting alternate jurors, and *Virginia Erection Corp.*, which this Court addresses in the next paragraph. In *Cuzick*, the state court first addressed the relevant state statute, but then appears to recognize that, at least as far as the privacy of the jury's deliberations goes, it is a matter of "constitutional statute," 85 Wash.2d at 149, which this Court reads as a typographical error most probably meant to state that the issue is one of constitutional stature.

---

[28] Curiously, Ahmed never mentions the *Olano* case in his discussion of his eighteenth ground for relief in his

Ahmed also relies on *Virginia Erection Corp.*, 335 F.2d 868 (4th Cir. 1964). He cites that case for the proposition that "[c]riminal defendants are entitled to a jury of twelve persons, no more and no less." The case does include that statement, and it cites *Patton v. United States*, 281 U.S. 276 (1930) as support for that proposition, as Ahmed acknowledges. What apparently escaped Ahmed's notice, however, is that the Fourth Circuit Court of Appeals has overruled that specific holding in *Virginia Erection Corp.* in *United States v. Curbelo*, 343 F.3d 273, 279 (4th Cir. 2003), following the Supreme Court's abrogation of *Patton* in *Williams v. Florida*, 399 U.S. 78, 86 (1970). This is another risk habeas petitioner's counsel takes in simply cutting and pasting another lawyer's work from the state appellate brief into the federal habeas petition without checking the accuracy of previous counsel's work or the validity of the cases upon which that lawyer relied. Not only does the bulk of the argument miss the point relevant in habeas corpus, the law upon which the appellate counsel relied may be, as here, overruled or abrogated.

Furthermore, none of the cases cited by Ahmed are ones that came to the respective courts by way of a petition for a writ of habeas corpus. Therefore, none of those appellants faced the strenuous hurdles Ahmed faces under the AEDPA. Citing state and federal appellate court rulings on direct appeal in a habeas corpus petition benefits the habeas petitioner little since the question is whether the state court holdings *in the petitioner's case* are contrary to or an unreasonable application of *clearly established federal law* as determined by the *United States Supreme Court*, or based upon an unreasonable determination of the facts in light of the evidence before the state court at the time it rendered its opinion. As the Supreme Court has repeatedly stated, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application

---

petition.

of clearly established federal law was objectively unreasonable" rather than simply erroneous or incorrect. *Williams v. Taylor*, 529 U.S. 362 at 410-11. Citing state cases interpreting state rules and statutes, or citing federal cases in which the federal rules or statutes are discussed is not helpful to a petitioner bringing suit under 28 U.S.C. § 2254. The closest Ahmed comes to making a cogent argument in his eighteenth ground for relief is to note that *Virginia Erection Corp.* cites *Patton*, the proposition for which it was cited having been abrogated by *Williams v. Florida* some forty years ago!

Finally, although Ahmed does not cite any Sixth Circuit law in his argument, this Court observes that in *Manning v. Huffman*, 269 F.3d 720 (6ᵗʰ Cir. 2001), the court of appeals determined that the habeas petitioner's evidence that an alternate juror had *actually participated* in the deliberations was sufficient to demonstrate prejudice. *Id.* at 726. Recall, however, that the court noted in *Roberts* that the Supreme Court had found no diminution of a defendant's substantial rights when the alternate jurors were merely present but did not take part in the deliberations. 337 F.3d at 615, *citing Olano*, 507 U.S. 725. Thus, nothing in the Sixth Circuit's consideration of alternate juror claims alleging error of a constitutional dimension would have helped Ahmed meet his burden under the AEDPA even if his eighteenth ground for relief had been preserved.[29]

---

[29] The record in Ahmed's case is completely devoid of any evidence that the alternate jurors participated in any way in the deliberations during either phase of his trial. Since he vigorously asserts that alternates are extraneous to the jury during deliberations (Petition, Doc. No. 35 at PageID 366-69), he could have, but did not, raise the instant claim in his post-conviction proceedings, supporting the claim with affidavits from the alternates and/or jurors indicating what part, if any, the alternates took in the deliberations. On this record, however, no evidence exists suggesting the alternates participated in the deliberations at all, and they were explicitly instructed not to do so. (Trial Tr., Vol. 8 at 841; Vol. 9 at 188.) The jury is presumed to have followed the instructions. *Weeks v. Angelone,* 528 U.S. 225, 234 (2000), *citing Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Ahmed's eighteenth ground for relief is procedurally defaulted and should be denied for that reason. Even if he had preserved the claim, however, it would be unavailing, and his request for habeas corpus relief would be denied.

## Nineteenth Ground for Relief

In his nineteenth ground for relief, Ahmed contends that the prosecutor, his trial counsel, and the trial court all violated his right to a speedy trial. (Petition, Doc. No. 35 at PageID 371-78.) Respondent argues the claim is procedurally defaulted and that the applicable four-factored test articulated by the Supreme Court militates against relief on the claim. (ROW, Doc. No. 61 at PageID 1044-46.) Ahmed essentially admits that the claim is procedurally defaulted, but directs the Court to his fifth ground for relief where he argued that his appellate counsel's ineffectiveness serves as cause for his default of the instant claim. (Traverse, Doc. No. 71 at PageID 1840.) In addressing that ground for relief, this Court concluded that the state court's denial of Ahmed's application to reopen his direct appeal because it was untimely did not result in a procedural default of Ahmed's ineffective assistance of appellate counsel claim asserted in the application. When the state court applied the timeliness rule in Ahmed's case, it was not an independent and adequate state procedural ground upon which this Court may base a procedural default since it was not firmly established and regularly followed in the state courts at that time.

In addressing the fifth ground for relief, this Court considered the merits of Ahmed's speedy trial claim to the extent necessary to determine whether appellate counsel were ineffective for failing to raise the matter as error on direct appeal. The Court concluded that the claim, had it been presented to the state court, would have been rejected as meritless, which in turn means Ahmed's

appellate counsel were not ineffective for omitting the speedy trial claim from the direct appeal. Since appellate counsel were not ineffective, their performance cannot serve as cause to excuse Ahmed's procedural default of the instant ground for relief. Consequently, Ahmed's speedy trial claim is procedurally defaulted without excuse and should be denied for that reason.

**Twentieth Ground for Relief**

In his twentieth ground for relief, Ahmed contends he was deprived of his right to a public trial when the trial court ordered spectators out of the courtroom prior to a hearing on November 9, 2000. (Petition, Doc. No. 35 at PageID 378-80.) Ahmed also speculates that hearings held on January 8 and 11, 2001, and February 2, 2001, were either held in the jail and not accessible by the public, or that unidentified "attorneys interested in the case" were kept from attending one of those hearings. *Id.* at PageID 389. With the exception of the November 9 hearing, none of the pages of transcript from those hearings indicates they took place away from the courthouse or that any person who was interested in the proceedings was kept from attending, and they will not be discussed further.

Respondent argues that the claim is procedurally defaulted because it was never raised as error on direct appeal in the state court, and because Ahmed's application to reopen his direct appeal was dismissed because it was untimely, resulting in the procedural default here. (ROW, Doc. No. 61 at PageID 1046-48.) No default results, however, if the procedural rule relied on by the state court was not firmly established and regularly followed at the time it was applied to the petitioner's case, however.

Ahmed responds that "NONE OF PETITIONERS [sic] CLAIMS RAISED IN AN APPLICATION TO REOPEN UNDER OHIO S. CT. PRAC. R. XI, § 6 ARE DEFAULTED" in his memorandum opposing Respondent's motion to dismiss procedurally defaulted claims. (Doc. No. 44 at PageID 655.) The only claim capable of being raised in an application to reopen under the rule Ahmed cites, however, is an ineffective assistance of appellate counsel claim. The underlying claims identified in the application are not saved from procedural default simply by being mentioned as errors that should have been raised by appellate counsel. Therefore, the fact that Ahmed included his public trial claim as a proposition of law his appellate counsel should have raised on direct appeal does not preserve the public trial claim for habeas corpus purposes.

Recall, however, that this Court has concluded that the timeliness rule pertaining to applications to reopen direct appeals, on which the state court relied in dismissing Ahmed's application, was not a rule that was firmly established and regularly followed at the time it was applied in Ahmed's case. (*See* Fifth Ground for Relief, *supra*.) Consequently, this Court has addressed Ahmed's ineffective assistance of appellate counsel claim *de novo*, and determined that no ineffectiveness resulted from appellate counsel's failure to include the public trial claim as a proposition of law in Ahmed's direct appeal because the outcome of Ahmed's appeal would not have been different had the claim been presented. *Id*. In other words, Ahmed's public trial claim would not have been a successful claim even if it had been presented to the state court on direct appeal. For the reasons stated in the Court's discussion of Ahmed's fifth sub-claim of his fifth ground for relief, *supra*, and because there was no ineffectiveness on the part of Ahmed's appellate counsel to excuse the default of his public trial claim, Ahmed's twentieth ground for relief should be denied as procedurally defaulted.

**Twenty-First Ground for Relief**

In his twenty-first ground for relief, Ahmed contends he was denied a fair trial due to "the government[-]sponsored practice of excessive courtroom security." (Petition, Doc. No. 35 at PageID 381-383.) He also alleges, as he did in his fifth ground for relief, thirteenth sub-claim, *supra*, that streets were blocked and jurors were transported by law enforcement vehicles to and from the courthouse during his trial, that there were police posted outside the courtroom door attired in "full armed special duty" gear, and that photographs of him in shackles and a jail uniform were frequently published on television, in newspapers, and on the internet. *Id*. The last of those allegations has no relevance to Ahmed's claim that there was excessive police presence during his trial, so it will not be considered further.

Respondent argues the claim is procedurally defaulted (ROW, Doc. No. 61 at PageID 1048-49), to which Ahmed counters that he preserved the claim by including it as one underlying his ineffective assistance of appellate counsel claim in a *pro se* application to reopen his direct appeal filed in the Ohio Supreme Court (Traverse, Doc. No. 71 at PageID 1851-52). As has been noted above numerous times, even if the Ohio Supreme Court had considered the merits of Ahmed's *pro se* application, that would not preserve for habeas corpus review the claims identified as ones Ahmed believed his appellate counsel should have but did not raise on direct appeal in the state court. Although Ahmed argues in his fifth ground for relief that his appellate counsel were ineffective for failing to raise as error on direct appeal the excessive police presence claim, he does not contend here that his appellate counsel's ineffectiveness is cause for the procedural default of this ground. Regardless, this Court recommends denial of Ahmed's ineffective assistance of

appellate counsel claim, *supra*, having found no ineffectiveness on counsel's part in the omission of the excessive police presence proposition of law on direct appeal. Consequently, appellate counsel's performance cannot serve as cause to excuse Ahmed's procedural default of the claim here. Furthermore, Ahmed supposes prejudice without demonstrating any such result from the police presence in the courtroom.

Ahmed's twenty-first ground for relief is procedurally defaulted without excuse, and should be denied for that reason. Even if it had been properly preserved for habeas corpus review, however, it would fail, as discussed in Ahmed's thirteenth sub-claim of his fifth ground for relief, *supra*.

**Twenty-Second Ground for Relief**

In his twenty-second ground for relief, Ahmed contends the police were constitutionally required to obtain a search warrant prior to searching the "home/crime scene." (Petition, Doc. No. 35 at PageID 383-84.) Respondent argues the claim is both procedurally defaulted as having never been presented to the state courts, and meritless since Ahmed has utterly failed to specify precisely what evidence he believes was seized without a warrant. (ROW, Doc. No. 61 at PageID 1050-51.) Ahmed again suggests that this claim was preserved by his including it as a claim underlying his ineffective assistance of appellate counsel claim presented to the state court through his *pro se* application to reopen his direct appeal. And once again, the Court notes that claims underlying an ineffective assistance of appellate counsel claim in an application to reopen a direct appeal are not preserved for habeas corpus review. Only the ineffective assistance claim itself can be preserved via an application to reopen. Ahmed offers no cause nor does he demonstrate prejudice therefrom to excuse his procedural default of his claim. Assuming Ahmed intended to offer his appellate

counsel's ineffectiveness as cause for the default by raising counsel's ineffectiveness in his fifth ground for relief, *supra*, he has still omitted a demonstration of prejudice. Accordingly, his twenty-second ground for relief should be denied as procedurally defaulted without excuse.

Even if it had been preserved, however, his claim would be unavailing, as discussed in the Court's analysis of Ahmed's seventh sub-claim in his fifth ground for relief, *supra*.

**Twenty-Third Ground for Relief**

In his twenty-third ground for relief, Ahmed contends the venires from which the grand jurors and petit jurors were drawn were not representative of a fair cross section of the community. (Petition Doc, No. 35 at PageID 385-86.) Respondent counters that to the extent Ahmed challenges the makeup of the petit jury venire, the claim is both procedurally defaulted and meritless. (ROW, Doc. No. 61 at PageID 1051-53.) Respondent does not address the procedural posture of Ahmed's claim pertaining to the venire from which the grand jurors were drawn in the return of writ, but argues in a motion to dismiss procedurally defaulted claims that that part of the instant claim was never presented to the state court. (Motion to Dismiss, Doc. No. 39 at PageID 634-35.) Ahmed directs the court to the procedural arguments he made in his first ground for relief and indicates that the explanations as to why the petit jury venire portion of this ground is not procedurally defaulted can be found there. (Traverse, Doc. No. 71 at PageID 1857.) He also suggests that his *pro se* post-conviction petition included that part of the instant claim directed toward the venire from which the grand jurors were drawn, and that it was thereby preserved for habeas corpus review. *Id.* at 1857-58.

Ahmed did not mention the grand jury venire when he presented his petit jury venire claim to the state court through counsel. (Appendix, Vol. 8 at 114-18.) He claims to have raised the grand

jury venire issue in a *pro se* petition for post-conviction relief, but provides no citation to the record to aid this Court's consideration of that part of the instant claim. (Traverse, Doc. No. 71 at PageID 1857-58.) In any event, Ohio does not permit hybrid representation where a defendant or petitioner for post-conviction relief is represented by counsel. *State v. Keenan*, 81 Ohio St. 3d 133, 138 (1998), *citing McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984), and *State v. Thompson*, 33 Ohio St. 3d 1, 6 (1987). Thus, Ahmed's *pro se* petition was not properly filed in the state court as he was at all times represented by counsel. Having never been properly presented to the state court, that portion of the instant ground in which he contends the grand jury venire was not representative of the community is procedurally defaulted and should be denied for that reason.

Ahmed did present the petit jury venire issue to the state court as his seventeenth claim for relief in his post-conviction petition. (Appendix, Vol. 8 at 116-17.) The post-conviction trial court denied the claim as barred by the doctrine of *res judicata*, *id*. at 343-46, and the state court of appeals affirmed on the same ground, *State v. Ahmed*, No. 05-BE-15, 2006-Ohio-7069 at ¶¶156-61, 2006 WL 3849862 at *20-21 (Ohio App. 7th Dist. Dec. 28, 2006). The Ohio Supreme Court declined further review. *State v. Ahmed*, 113 Ohio St. 3d 1513, 2007-Ohio-2208 (2007). As noted above, Ahmed references the procedural arguments he made in his first ground for relief, *supra*, in disputing that the instant claim is procedurally defaulted. Each of the several explanations Ahmed offered there were rejected when considered in his first ground for relief, and they are no more persuasive here. Ahmed offers no cause or prejudice that could excuse his procedural default of the instant ground. That being the case, to the extent he alleges the venire from which his petit jury was drawn did not represent the racial composition of the community, his claim is procedurally defaulted and should be denied for that reason.

In the state appellate court, Ahmed also argued that the claim was not barred by *res judicata* because even though the makeup of the jury venire was known at the time of trial and direct appeal, the statistical information regarding the racial composition of the community was not part of the record and therefore the claim could not be considered by the trial court or the appellate court. (Appendix, Vol. 9 at 128.) The state appellate court acknowledged Ahmed's argument, but summarily rejected it, simply stating that the claim could have been raised on direct appeal and that since it was not, it was barred by the doctrine of *res judicata* in post-conviction. *Ahmed*, 2006-Ohio-7069 at ¶¶157-58. In fact, nothing stood in the way of Ahmed's trial counsel obtaining the statistical data to support the objection defense counsel made to the trial court concerning the racial makeup of the jury venire. (Trial Tr., Vol. 6 at 482.) Because that evidence was available for inclusion in the trial record, Ahmed's claim challenging the racial composition of the petit jury venire could have been brought at trial or on direct appeal, and since it was not, it was barred from consideration in post-conviction by the doctrine of *res judicata*. The Sixth Circuit has found the *res judicata* rule to be an independent and adequate state procedural rule, application of and state court reliance on which precludes federal habeas corpus review. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003); *Coleman v. Mitchell*, 268 F.3d 417, 427 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994).

Rather than demonstrating to this Court how the state appellate court's decision was contrary to or an unreasonable application of federal law, Ahmed chooses to repeat the arguments he made to the state court, as if this Court could simply come to its own conclusion about the issue without the

constraints mandated by the AEDPA.  But even if he had preserved the instant claim, however, it would not bring him the relief he seeks in habeas corpus.

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection."  *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  "Those on the venire must be 'indifferently chosen,' to secure the defendant's right under the Fourteenth Amendment to 'protection of life and liberty against race or color prejudice.'"  *Id*. at 86-87, *quoting Strauder v. West Virginia*, 100 U.S. 303, 309 (1879), *abrogated on other grounds by Taylor v. Louisiana*, 419 U.S. 522, 536 n.19 (1975).  "The burden is, of course, on the petitioner[] to prove the existence of purposeful discrimination."  *Whitus v. Georgia*, 385 U.S. 545, 550 (1967), *citing Tarrance v. Florida*, 188 U.S. 519 (1903).  The Supreme Court has described a defendant's burden as follows:

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979).  The following paragraphs are Ahmed's attempt to meet the burden he would have had he preserved his fair-cross section claim:

> Petitioner did not receive his Fourteenth Amendment rights to Due Process and Equal Protection because the venire from which his capital grand jury and capital petit jury was [sic] chosen was not representative of the community.  Taylor v. Louisiana, 419 U.S. 522, 538 (1975).  Petitioner's jury was not.

> Although the population of Belmont County is overwhelmingly Caucasian, nonwhites comprise approximately five percent.  In a county of 69,451 residents, at least 3,472 persons are nonwhite.  Thus, approximately five percent of the venire should have been nonwhite.  For example, in a jury pool of approximately two hundred persons from Belmont County, at least ten of the prospective jurors

should be nonwhite. The under-representation of a cognizable group in a jury venire can constitute a denial of due process. Peters v. Kiff, 470 [sic] U.S. 493, 501 (1972). In Petitioner's case, only one person in the array was nonwhite. (Voir Dire, Vol. 2, p. 482) [sic]. Upon, information and belief, Petitioner asserts that all persons on the grand jury were white.

Petitioner lodged a pro se objection to the make up and constitution of the jury pool. This objection was based on the talk overheard by Petitioner among police that they would ensure [a] 100% white jury in this case. Petitioner was particularly concerned with the trial court's order (see Td# 128 dated 10-25-2000) "The Sheriff's Office is directed to serve jurors personally" because such an order gave the sheriff and his deputies discretion to personally observe prospective venire persons and simply do not serve those potential jurors who were not white. The group excluded by "sheriff's personal service" from which the venire was drawn was a distinctive group of non-white persons. The trial court's failure to ensure a fair cross-section of the community and then using the Sheriff for personal service upon prospective jurors when sufficient time for mail service was available from 10-25-00 to 1-16-01, was "systematic exclusion of the non-white group" in violation of Duren v. Missouri, 439 US [sic] 357 (1979).

(Petition, Doc. No. 35 at PageID 385-86.) As is apparent, Ahmed's argument fails to establish even one of the *Duren* requirements. "Non-whites" has never been recognized as a "distinctive group" in the community. In addition, Ahmed alleges that there was only one non-white person in "the array," citing a page in the transcript of voir dire. There, Ahmed's counsel moved to dismiss the jury panel because "this particular array" included only one person of non-Caucasian origin and consequently did not represent a proper cross-section of the community. (Trial Tr., Vol. 6 at 482.) The time for making that objection, however, was when the "array" was initially brought into the courtroom, not after counsel participated in choosing the jurors and alternates from the venire. Furthermore, Ahmed points to no evidence in the record supporting his claim that 5% of the Belmont County population is non-white, nor does he indicate how many individuals were in "the array" that contained only one

181

non-white person, making it impossible for this Court to determine the significance of that alleged fact. Consequently, Ahmed has not demonstrated that representation of non-whites in the venire from which his jury was selected was not fair and reasonable in relation to the number of such persons in the community. His allegations concerning his overhearing police discuss ensuring a jury of all white individuals is completely unsupported in the record, as is his questionable claim that police officers served only white individuals with jury summonses. Thus, Ahmed has not demonstrated that the exclusion of non-whites from the jury venire was systematic.

As for the venire from which Ahmed's grand jurors were drawn, he offers even less evidence of any impropriety. Frankly, "upon information and belief" of a petitioner is nothing like the evidence required to establish entitlement to a writ of habeas corpus on a fair cross section claim, but that is what Ahmed offers instead of actual evidence. Since that is all Ahmed provides to the Court about the racial makeup of the grand jury that returned an indictment against him or the venire from which it was drawn, that claim, too, would fail had it been preserved for habeas corpus review.

In summary, Ahmed has procedurally defaulted his claim that the venires from which his grand and petit juries were selected did not represent fair cross sections of the community, and his twenty-third ground for relief should be denied for that reason. Had he preserved the claims in the state court, however, they would fail anyway since Ahmed has offered no evidence to support the claim.

**Twenty-Fourth Ground for Relief**

In his twenty-fourth ground for relief, Ahmed contends that extensive pretrial publicity necessitated a change of venue which defense counsel requested but the trial court denied, and that

he was consequently deprived of a fair trial.  (Petition, Doc. No. 35 at PageID 386-91.)  Respondent acknowledges the matter is preserved for habeas corpus review, but argues that the Ohio Supreme Court's decision on the issue was neither contrary to nor an unreasonable application of federal law.  (ROW, Doc. No. 61 at PageID 1053-58.)  As expected, in his traverse, Ahmed repeats verbatim the arguments made in his petition which itself appears to be mostly copied from Ahmed's appellate brief on direct appeal in the state court.  He contends that "the [t]rial [c]ourt erred" in denying the motion for a change of venue due to pretrial publicity.  (Traverse, Doc. No. 71 at PageID 1864.)  The question before this Court, however, is not whether the trial court erred, but whether the Ohio Supreme Court's decision rejecting Ahmed's claim of error was contrary to or an unreasonable application of federal law as determined by the Supreme Court.  The closest Ahmed comes to even approaching that burden is to state without elaboration that "[t]his issue is contra Irvin v. Dowd, 366 U.S. 717 (1961)."  (Traverse, Doc. No. 71 at PageID 1864.)  Such skeletal relevant argument does not demonstrate entitlement to habeas corpus relief.  Nevertheless, Ahmed's claim is easily decided, and this Court will do so as if Ahmed had actually addressed the question before this Court rather than the one that was before the state court on direct appeal.

The Supreme Court has recognized that

> "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 [(1955)].  In the ultimate analysis, only the jury can strip a man of his liberty or his life.  In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne."  Co.Litt. 155b.  His verdict must be based upon the evidence developed at the trial.  *Cf. Thompson v. City of Louisville*, 362 U.S. 199 [(1960)].  This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies.  It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807).  "The theory of the law is that a juror who has formed an opinion cannot be impartial."  *Reynolds v. United States*, 98 U.S. 145, 155 [(1878)].

It is not required, however, that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.  *Spies v. People of State of Illinois*, 123 U.S. 131 [(1887)]; *Holt v. United States*, 218 U.S. 245 [(1910)]; *Reynolds v. United States, supra*.

*Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961) (parallel citations omitted).

When considering whether Ahmed's request for a change of venue was erroneously denied, the Ohio Supreme Court acknowledged that "there was extensive pretrial publicity about the murders in the local media."  *Ahmed*, 103 Ohio St. 3d at 33, 2004-Ohio-4190 at ¶ 39.  The court concluded, however, that "extensive, individual, sequestered voir dire of prospective jurors . . . helped insulate against any negative effect of the pretrial publicity."  *Id*.  In addition, the court noted that every person empaneled as a juror in Ahmed's case had confirmed during voir dire that they had not formed an opinion about Ahmed's guilt or innocence, and affirmed that they could put aside anything they had read or heard about the case and render a fair and impartial verdict based solely on the evidence presented in court.  *Id*. at 33-34, ¶ 41.  Finally, the court concluded that Ahmed had not shown that any of his jurors were biased.  *Id*. at 34, ¶ 41.  Thus, even though there was extensive pretrial publicity, Ahmed was unable to demonstrate any prejudice he suffered as a result of the publicity or the trial court's denial of his motion for a change of venue.

As mentioned above, Ahmed does not explain how the state court's decision is contrary to or an unreasonable application of federal law, but he does suggest that prejudice should be presumed, citing *Irvin*, *supra*, and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). The publicity in Ahmed's case does not even come close in volume or duration to that in either of those cases. In *Irvin*'s case, forty-six exhibits consisting of newspaper headlines, articles, cartoons, and pictures that had been printed about him in the six or seven months before his trial accused him of other crimes, stated he had confessed to twenty-four burglaries, characterized him as remorseless and without a conscience, reported that he had confessed to six murders, and stated that he had offered to plead guilty to the charged offense if he were promised a ninety-nine-year prison sentence. *Irvin*, 366 U.S. at 725-26. In *Sheppard*, newspaper and television coverage of the murder of Sheppard's wife and criticism of Sheppard, his attorney, and his family was constant prior to trial, and it only got worse when the trial commenced. *Sheppard*, 384 U.S. at 337-42. The small courtroom was set up to accommodate twenty representatives of newspapers and wire services. *Id.* at 343. Additional seating was reserved for television and radio stations, reporters from out-of-town newspapers, and reporters from magazines. *Id.* Arrangements were made so that news could be broadcast from the courthouse throughout the days during the trial. *Id.* Outside, news media were set up to take motion pictures of the participants in the trial, including the jurors, judge, counsel, and witnesses, and Sheppard was extensively photographed as he arrived at the courthouse. *Id.* at 344. The list of outrageous press access and involvement in Sheppard's case goes on and on, and the massive coverage of the trial and accommodation of the news media by the court continued throughout Sheppard's nine-week trial. *Id.* The Supreme Court described the scene in and around the courthouse as "bedlam" and "a carnival atmosphere." *Id.* at 355, 358.

Here, Ahmed offers that fourteen newspaper accounts[30] described the murders and his return to Ohio for prosecution, none of which appeared in print later than November 16, 1999, a mere two months after the murders. (Petition, Doc. No. 35 at PageID 387-90.) Apparently, no other articles appeared in the newspapers from November 17, 1999, until Ahmed's trial began on January 16, 2001, a period of fourteen months. The Supreme Court has indicated that a lapse of time and a diminishment of the "decibel level of media attention" lessens any prejudicial impact of news reports critical of a defendant or his alleged offenses. *Skilling v. United States*, 561 U.S. 358, 383 (2010). Although Ahmed's gap in news coverage was only one quarter of the four-year period of decreased coverage in *Skilling*, the level of media attention in his case was far, far less as well. Moreover, "pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976). Fourteen articles published more than a year before Ahmed's trial can hardly be described as "pervasive." Ahmed has not demonstrated that the articles gave rise to a presumption of prejudice as he claims.

The closest Ahmed comes to arguing that members of his jury were actually prejudiced by the pretrial publicity his case received is to contend that mere exposure to the newspaper articles compromised their impartiality, and that their subsequent assurances that they could render a fair verdict are not enough, without more, to dispel any doubts about their ability to be impartial. (Petition, Doc. No. 35 at PageID 390-91.) He correctly argues that in *Irvin v. Dowd*, *supra*, the Supreme Court found actual prejudice despite jurors' assurances that they could be impartial. (Petition, Doc. No. 35 at PageID 391.) In that case, however, it was established that the newspapers in which the prejudicial articles appeared were "'delivered regularly to 95% of the dwellings' in the

---

[30] Ahmed does not indicate where in the multi-box Appendix those articles might be found.

county where Irvin's trial was held, and that 'the pattern of deep and bitter prejudice' in the community 'was clearly reflected in the sum total of the *voir dire*.'" *Skilling*, 130 S.Ct. at 2922, *quoting Irvin*, 366 U.S. at 725-27. Furthermore, in Ahmed's case, as in *Skilling*, individual voir dire on the subject of pretrial publicity was granted, giving counsel and the judge a "face-to-face opportunity to gauge demeanor and credibility, [which, when] coupled with information from the questionnaires regarding jurors' backgrounds, opinions, and sources of news, gave the court a sturdy foundation to assess fitness for jury service." *Skilling*, 130 S.Ct. at 2923. Thus, the trial court did not simply take jurors at their word that they could be fair and impartial.

In short, this Court finds no constitutional infirmity in the Ohio Supreme Court's affirmance of the trial court's denial of Ahmed's motion for a change of venue based on what Ahmed characterizes as extensive pretrial publicity. Accordingly, Ahmed's twenty-fourth ground for relief should be denied.


**Twenty-Fifth Ground for Relief**

In his twenty-fifth ground for relief, Ahmed contends he was denied his right to contact Pakistan's consulate pursuant to the Vienna Convention on Consular Relations. (Petition, Doc. No. 35 at PageID 391-95.) Respondent does not advance a procedural default defense, arguing that the Ohio Supreme Court's decision denying Ahmed's claim on direct appeal was neither contrary to nor an unreasonable application of federal law. (ROW, Doc. No. 61 at PageID 1058-60.) Ahmed argues that since he was unaware of his rights under the Vienna Convention, he could not have waived them, as the state supreme court found, and that the state court's decision was therefore unreasonable. (Traverse, Doc. No. 71 at PageID 1868.) He contends the failure to advise him of his

rights under the Vienna Convention constitutes structural error which relieves him of the duty to show prejudice from the denial of his rights. *Id.*

When presented with the claim on direct appeal, the Ohio Supreme Court found as follows:

> In his 17th proposition of law, appellant argues that law enforcement officers' failure to advise him, a foreign citizen, of his right to contact his country's consulate pursuant to the Vienna Convention on Consular Relations ("VCCR") deprived him of due process.
>
> Appellant asserts that both New York and Belmont County law enforcement personnel were aware that he was a Pakistani citizen, since they had seized his Pakistani passport. Appellant contends that even though police officers knew that he was a Pakistani citizen, they failed to inform him of his absolute right to consular access under the VCCR.
>
> Appellant contends that he is a citizen of both Pakistan and the United States. Under Section 1448, Title 8, U.S. Code, however, the United States does not recognize the "other citizenship" of a person claiming dual citizenship once the person takes the oath to become a United States citizen. See *United States v. Shahani-Jahromi* (E.D. Va 2003), 286 F.Supp.2d 723, 726 [sic], fn.1.
>
> Moreover, as the court noted in *United States v. Matheson* (D.C.N.Y. 1975), 400 F.Supp. 1241, 1245: "[I]t is a recognized fact of international law that a dual national is never entitled to invoke the protection or assistance of one of the two countries while within the other country. See *Nishikawa v. [Dulles]*, 356 U.S. 129, 132 (1958); *Kawakita v. United States*, 343 U.S. 717, 733 (1952)."
>
> Additionally, we have decided that whatever individual rights the treaty may confer are waivable. *State v. Issa* (2001), 93 Ohio St. 3d 49, 54-56. As in *Issa*, appellant failed to raise this issue before the trial court and has therefore waived all but plain error. Plain error is absent, since it cannot be said that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Moreland* (1990), 50 Ohio St. 3d 58, 62. Appellant's 17th proposition is not well taken.

*Ahmed*, 103 Ohio St. 3d 27, 35-36, 2004-Ohio-4190 at ¶¶ 51-55.

Curiously, although Respondent chose to forego a colorable procedural default defense based on the state court's finding that Ahmed had waived all but plain error, that is the precise point upon which Ahmed focuses his argument in his traverse. He makes no argument at all pertaining to the state court's discussion of the merits of his Vienna Convention claim. Procedural default is an affirmative defense and must be pled by a respondent in his responsive pleading. *See Trest v. Cain*, 522 U.S. 87, 89 (1997). Respondent here having failed to plead the defense, there is no reason for Ahmed to defend against it, but that is exactly what he has done, even to the point of ignoring the state court's discussion of the merits of his claim. Ahmed takes no issue with the state court's decision that his Pakistani citizenship is given no purchase after his having taken the oath to become a United States citizen. Nor does he dispute that even if dual citizenship is recognized, one holding such citizenship can never "invoke the protection or assistance of one of the two countries while in the other country." *Ahmed*, 103 Ohio St. 3d at 36, 2004-Ohio-4190 at ¶ 54.

Furthermore, in this Court's order denying Ahmed's motion for an evidentiary hearing (Doc. No. 73), it was observed that

> [T]he Warden cites authority for the propositions that (1) the United States does not recognize the other citizenship of a person claiming dual citizenship once they have taken the oath of allegiance to the United States required for naturalization, and (2) under international law, a dual national cannot claim the protection of one of the two countries while present in the other. Petitioner makes no response to this argument; in neither the Petition nor his motion papers does he offer any proof that he had any rights under the Vienna Convention.

(Doc. No. 77 at PageID 1977.) Nothing filed since the Court's order has caused it to second guess its earlier synopsis of the parties' positions.

Finally, "[T]he Vienna Convention does not create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts can enforce." *United*

*States v. Emuegbunam,* 268 F.3d 377, 394 (6th Cir. 2001), *citing Federal Republic of Germany v. United States,* 526 U.S. 111, 111-12 (1999); *Breard v. Greene,* 523 U.S. 371, 377 (1998). "[T]he 'only remedies for failures of consular notification under the Vienna Convention are diplomatic, political, or exist between states under international law.'' *Emuegbunam,* 268 F.3d at 392, *citing United States v. Page*, 232 F.3d 536, 541 (2000), *quoting United States v. Li,* 206 F.3d 56, 63 (1st Cir. 2000).

For all of the reasons stated above, Ahmed has failed to demonstrate entitlement to habeas corpus relief due to the police officers' failure to inform him of his right under the Vienna Convention to contact the Pakistan Consulate upon his arrest. Accordingly, his twenty-fifth ground for relief should be denied.

**Twenty-Sixth Ground for Relief**

In his twenty-sixth ground for relief, Ahmed contends the Ohio death penalty statutory scheme is unconstitutional for a variety of reasons. (Petition, Doc. No. 35 at PageID 395-422.) Respondent notes that Ahmed raised the instant claim as his nineteenth proposition of law on direct appeal in the Ohio Supreme Court, and that that court summarily rejected Ahmed's arguments. (ROW, Doc. No. 61 at PageID 1061.) Respondent concedes the claim is preserved for habeas corpus review. *Id.* In his traverse, Ahmed unnecessarily repeats twenty-and-one-half pages of the argument from his petition, then alleges that Ohio's death penalty statutes violate several amendments to the United States Constitution as well as the Ohio Constitution and international law. (Traverse, Doc. No. 71 at PageID 1870-91.) Of course, only violations of the federal constitution, laws, or treaties of the United States are cognizable in habeas corpus, as Ahmed's counsel should be

well aware,[31] so this Court will not consider his argument that the Ohio Constitution is violated by the state's statutory scheme.

Ahmed first alleges that Ohio's death penalty scheme results in arbitrary and unequal punishment.  (Petition, Doc. No. 35 at PageID 1870.)  He argues, without citation to evidence in the record, that Ohio prosecutors possess "virtually uncontrolled indictment discretion" which "allows arbitrary and discriminatory imposition of the death penalty."  *Id*. at PageID 396.  Ahmed claims that "[w]hile African-Americans are less than twenty percent of Ohio's population, forty-nine percent . . . of Ohio's death row inmates are African-American."  *Id*. at PageID 397.  The same claim was advanced and rejected in *Coleman v. Mitchell*, 268 F.3d 417 (2001).  There, the Sixth Circuit Court of Appeals concluded as follows:

> Although the racial imbalance in the State of Ohio's capital sentencing system is glaringly extreme, it is no more so than the statistical disparities considered and rejected by the Supreme Court in *McCleskey* [*v. Kemp*, 481 U.S. 279 (1987)] as insufficient to "demonstrate a constitutionally significant risk of racial bias affecting the . . . capital sentencing process."  *McCleskey*, 481 U.S. at 313. And though the racial imbalance is, to say the least, extremely troubling, we find that the prosecutorial discretion under the Ohio death penalty scheme, and the disconcerting racial imbalances accompanying such discretion, nevertheless fall, under current Supreme Court law, within the "constitutionally permissible range of discretion in imposing the death penalty."  *Id*. at 305.

*Coleman*, 268 F.3d at 441-42 (parallel citations omitted).  Ahmed does not explain how the Ohio Supreme Court's denial of his proposition of law on direct appeal is contrary to or an unreasonable application of the federal law as summarized by the Sixth Circuit in *Coleman*.  In fact, he does not

---

[31] Most likely, the inclusion of allegations that the Ohio death penalty statutes violate the Ohio Constitution appear here as a consequence of habeas counsel's devotion to copying Ahmed's arguments from his appellate brief in the state court into his habeas petition and traverse, a practice that has been repeatedly and unfavorably commented upon, *supra*.

cite or even acknowledge *McCleskey* as the law governing his claim. For the reasons stated in *Coleman*, Ahmed's first sub-claim of his twenty-sixth ground for relief should be denied.

Next, Ahmed argues that Ohio's death penalty scheme consists of arbitrary and capricious procedures because the statutes do not require the state to prove the absence of any mitigating factors or that death is the only appropriate penalty. (Petition, Doc. No. 35 at PageID 398.) This same argument was rejected in *Buell v. Mitchell*, 274 F.3d 337, 367-68 (2001), which cited *Proffitt v. Florida*, 428 U.S. 242, 258 (1976), *Franklin v. Lynaugh*, 487 U.S. 164, 172-73 (1988), and *Zant v. Stephens*, 462 U.S. 862, 875 (1983). For the reasons expressed in *Buell*, Ahmed's second sub-claim of his twenty-sixth ground for relief should be denied.

Ahmed next contends that a capital case defendant who chooses to exercise his right to a jury trial faces an impermissibly greater risk of being sentenced to death than does a similarly situated defendant who elects to plead guilty or no contest. (Petition, Doc. No. 35 at PageID 400.) That argument, too, has been repeatedly rejected by the Sixth Circuit. *See*, *e.g.*, *Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (finding that Ohio's scheme does not impermissibly encourage guilty pleas); *Cooey v. Coyle*, 289 F.3d 882, 924-25 (6th Cir. 2002) (noting that petitioner offered no constitutional authority to support his claim that Ohio's statutory scheme impermissibly encouraged guilty pleas in capital cases). Accordingly, Ahmed's third sub-claim of his twenty-sixth ground for relief should be denied.

Ahmed argues next that Ohio's statutory requirement that the trier of fact be provided with any presentence investigation report or mental health evaluation requested by defense counsel in the penalty phase is unconstitutional. (Petition, Doc. No. 35 at PageID 401.) Although the provision of Ohio law Ahmed complains of has been described as "troubling," *Jamison v. Collins*, 100 F.Supp.2d

647, 764 (S.D. Ohio 2000), rejection of the same claim has been affirmed by the Sixth Circuit Court of Appeals in *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000). Ahmed's fourth sub-claim of his twenty-sixth ground for relief should be denied for the same reasons it was overruled in *Byrd*.

Next, Ahmed contends that Ohio's death penalty statutes are unconstitutional because the same underlying felony can elevate an offense from murder to aggravated murder, and also serves as an aggravating circumstance making the accused eligible to be sentenced to death. (Petition, Doc. No. 35 at PageID 401-4.) That argument was rejected in *Buell v. Mitchell*, 274 F.3d 337, 369-70 (2001), on the authority of *Lowenfield v. Phelps*, 484 U.S. 231, 241-46 (1988). Ahmed does not explain why he should be entitled to a different result on the same claim, so his fifth sub-claim of his twenty-sixth ground for relief should be denied.

Ahmed also alleges that certain language used in Ohio Rev. Code § 2929.03(D)(1) converts the "nature and circumstances of the aggravating circumstance" into an aggravating circumstance in the weighing process, and that it contradicts the language of Ohio Rev. Code § 2929.04(B), which identifies the "nature and circumstances of the offense" as evidence capable of mitigation only. (Petition, Doc. No. 35 at PageID 404-6.) When presented with the same argument in *Cooey v. Coyle*, 289 F.3d 882 (2002), the Sixth Circuit not only rejected the claim, but stated that it "cannot even imagine a constitutional violation here." *Id.* at 928. For the reasons stated in *Cooey*, Ahmed's sixth sub-claim of his twenty-sixth ground for relief should be denied.

In his seventh sub-claim, Ahmed challenges the constitutionality of Ohio's requirement that death sentences be reviewed by the appellate court for proportionality and appropriateness of the sentence. (Petition, Doc. No. 35 at PageID 406-08.) He contends that such review must compare the death sentence before the appellate court with cases other than ones in which the defendant was

sentenced to death. In other words, Ahmed argues that his death sentence should have been compared to cases in which defendants were capitally charged but sentenced to one of the life sentence options available in Ohio. As the Sixth Circuit stated in *Cooey*, *supra*,

> The Supreme Court held in *Pulley v. Harris*, 465 U.S. 37 (1984) that only one type of proportionality review is required – that in which the court makes sure that the sentence is proportional to the nature of the offense. Courts are *not* required to exercise another type of proportionality review, *i.e.*, comparing the sentence given in any particular case to the sentences given in other cases.

*Cooey*, 289 F.3d at 928 (parallel citations omitted). Thus, as in *Cooey*, Ahmed "does not allege any cognizable constitutional violation here." *Id.* Accordingly, his seventh sub-claim of his twenty-sixth ground for relief should be denied.

Ahmed next contends that the method of execution used in Ohio, lethal injection, constitutes cruel and unusual punishment contrary to the Eighth Amendment of the United States Constitution. (Petition, Doc. No. 35 at PageID 408-10.) On the authority of *Baze v. Rees*, 553 U.S. 35 (2008), the instant sub-claim should be denied.

Finally, Ahmed contends that Ohio's death penalty scheme violates the United Nations Charter, the Charter of the Organization of American States, the International Covenant on Civil and Political Rights, the International Convention on the Elimination of All forms of Racial Discrimination, the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, the Vienna Convention on the Law of Treaties, the Universal Declaration of Human Rights, the American Convention on Human Rights, the American Declaration of the Rights and Duties of Man, the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, the Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty, and the Second Optional Protocol to the

International Covenant on Civil and Political Rights. (Petition, Doc. No. 35 at PageID 410-22.) The Sixth Circuit has rejected similar claims by other death-sentenced individuals. *Buell v. Mitchell*, 274 F.3d 337, 370-76 (2001). Ahmed fares no better in the absence of a determination by the United States Supreme Court that establishes as a constitutional right the ideas Ahmed has advanced respecting international law and Ohio's death penalty scheme. Consequently, Ahmed's ninth sub-claim of his twenty-sixth ground for relief should be denied.

Having found each of Ahmed's claims that the Ohio death penalty scheme is unconstitutional to be unavailing, his twenty-sixth ground for relief should be denied.


## Twenty-Seventh Ground for Relief

In his final ground for relief, Ahmed argues that even if none of the preceding grounds justifies habeas corpus relief individually, they cumulate to warrant such relief. (Petition, Doc, No. 35 at 422-23.) Respondent contends the claim is procedurally defaulted as well as meritless. (ROW, Doc. No. 61 at PageID 1063-64.) Ahmed appears to contest Respondent's procedural default argument, at least to certain of his grounds for relief, but even if the claim were preserved for habeas review, the Sixth Circuit has recently observed that "'post-AEDPA, not even constitutional errors that would individually support habeas relief can be cumulated to support habeas relief.'" *Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012), *quoting Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010), and *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005). Thus, Ahmed's claim to the contrary fails, and his twenty-seventh ground for relief should be denied.


## CONCLUSION

The Court has considered each of Ahmed's twenty-seven grounds for relief and found none of them, nor any combination of them, meritorious. Accordingly, it is recommended that Ahmed's petition for a writ of habeas corpus be DENIED. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous.

June 16, 2014.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations not later than seventeen days after Respondent refiles the state court record in electronic format.

Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within seventeen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).