# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**NAWAZ AHMED,**

        **Petitioner,**

        **v.**

**MARK C. HOUK,**

        **Respondent.**

**Case No. 2:07-cv-658**
**JUDGE WATSON**
**Magistrate Judge Merz**

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. § 2254. This matter is before the Court upon the Magistrate Judge's Report and Recommendations ("R&R"), ECF No. 88, in which the Magistrate Judge recommended denying relief on all of Petitioner's habeas claims. This matter is also before the Court on Petitioner's Corrected Objections to the R&R, ECF No. 150, the Warden's response, ECF No. 151, and Petitioner's Reply, ECF No. 155.

As required by 28 U.S.C. § 636(b) and Federal Rules of Civil Procedure Rule 72(b), the Undersigned has made a *de novo* review of the record in this case. Upon said review, the Court finds all of Petitioner's objections to the R&R to be without merit. The Court **OVERRULES** Petitioner's objections and **ADOPTS** the R&R. While reaching the same conclusions as the Magistrate Judge, the Court adds the following analysis.

## I.     Factual and Procedural History

In 2001, a jury convicted Petitioner of four counts of Aggravated Murder and sentenced him to death in Belmont County, Ohio, for the murders of his wife Lubaina Bhatti Ahmed, Lubaina's father Abdul Bhatti, Lubaina's sister Ruhie Ahmed, and Ruhie Ahmed's two-year old daughter, Nasira Ahmed.  The Ohio Supreme Court set forth the facts of this case as follows:

> In October 1998, Lubaina hired an attorney to end her marriage with [Ahmed] and to secure custody of their two children, Tariq and Ahsan. According to Lubaina's divorce attorney, [Ahmed] did not want a divorce, and consequently, it was a hostile divorce proceeding. In early February 1999, shortly after the complaint for divorce had been filed, Lubaina was awarded temporary custody of the children and exclusive use of the marital residence. Later that month, the divorce court issued a restraining order to prevent [Ahmed] from coming near Lubaina or making harassing phone calls to her.

> [Ahmed] had accused Lubaina, a physician, of having an affair with another physician, and claimed that their oldest son, Tariq, was not his. A subsequent paternity test showed that claim to be false. According to Lubaina's divorce attorney, Grace Hoffman, Lubaina had been afraid of [Ahmed] and she had called Hoffman three or four times a week, "scared [and] frustrated * * *. It just kept escalating." Lubaina had also confided to Hoffman that [Ahmed] had forced her to have sex with him during the marriage.

> Tahira Kahn, one of Lubaina's sisters, corroborated that Lubaina had feared [Ahmed]. She also testified that Lubaina had told her that [Ahmed] had raped her repeatedly.

> The owner of the rental home where Lubaina resided testified that Lubaina had called him in February 1999 and asked him to change the locks on the house. He stated that Lubaina had been very upset and had asked that he change them within the hour.

> In March 1999, Lubaina complained to police that [Ahmed] was

harassing her by telephone, but after the officer explained that the matter could be handled through criminal or civil proceedings, she decided to handle it through the ongoing divorce proceedings. The final divorce hearing was scheduled for Monday, September 13, 1999, and Lubaina had arranged for her sister Ruhie to fly in from California the Friday before to testify at the hearing.

On Friday, September 10, 1999, [Ahmed] called Lubaina's office several times. But Lubaina had instructed the medical assistants at her office to reject any phone calls from him. Then, at approximately 4:00 p.m. that day, Lubaina took [Ahmed's] call. [Ahmed] who worked and lived in Columbus, wanted Lubaina to bring the children to him for the weekend two hours earlier than planned. [Ahmed] claimed that he was planning a surprise birthday party for their youngest son. Lubaina, however, refused to change her plans and told [Ahmed] that he was using the birthday party as an excuse to inconvenience her.

Rafi Ahmed, husband of Ruhie and father of two-year-old Nasira, testified that Ruhie and Nasira had been scheduled to arrive in Columbus from California at 10:34 p.m. on Friday, September 10. Ruhie had planned to call Rafi that night when she arrived at Lubaina's home near St. Clairsville. However, since he had not heard from Ruhie, Rafi began calling Lubaina's home at 1:21 a.m., Saturday, September 11. Rafi called 20 to 25 times, but he got only Lubaina's answering machine. At approximately 3:00 a.m., he called the Belmont County Sheriff's Office.

A parking receipt found in Lubaina's van indicated that the van had entered a Columbus airport parking lot at 9:30 p.m. and exited at 11:14 p.m. on September 10, 1999.

Around 3:45 a.m. on September 11, in response to Rafi Ahmed's call, a sheriff's detective went to Lubaina's home and knocked on the doors and rang the doorbell. She got no answer. The detective also looked in the windows, but nothing at the home appeared to be disturbed.

Later that day, Belmont County Sheriff's Department Detective Steve Forro was assigned to investigate the missing persons. He recognized Lubaina's name because he was the officer who had talked to her regarding [Ahmed's] harassing phone calls. Forro called [Ahmed's] home to see if he had any information. [Ahmed] did not answer, so

Forro called Columbus police to have them check [Ahmed's] apartment. They did and found that he was not home.

Forro went to Lubaina's home at 2:18 p.m. As he walked around the outside of the house, he noticed a flicker of a car taillight through a garage window. Using a flashlight, he looked through the window and saw a van with its hatch open and luggage inside. He then saw the body of a man on the floor covered with blood.

Forro called for backup. Deputy Dan Showalter responded and entered through a side door, which he had found unlocked. He searched the house and found three more bodies on the basement floor.

Detective Bart Giesey found [Ahmed's] MCI WorldCom employee badge on the basement floor near the bodies. Records from [Ahmed's] employer, MCI WorldCom in Hilliard, Ohio, revealed that [Ahmed's] badge was last used at 7:19 p.m. on September 10, 1999.

Through several inquiries, police learned that [Ahmed] was scheduled to depart from JFK [International Airport in New York] for Lahore, Pakistan, that evening. Earlier that day, [Ahmed], through a travel agent, had booked a flight leaving for Pakistan that same evening. [Ahmed] arrived at the agent's home with both of his sons and asked if he could leave them with the agent, saying that his wife would pick them up soon. [Ahmed] wrote on the back of his and Lubaina's marriage certificate, which he gave to the agent, that he was leaving his sons to be handed over to his wife. [Ahmed] also signed his car over to the agent. The agent then drove [Ahmed] to JFK to catch his flight to Pakistan.

At 8:10 p.m., Robert Nanni, a police officer stationed at JFK, learned that [Ahmed] was a murder suspect and that he had checked in for a flight scheduled to leave for Pakistan at 8:55 p.m. [Ahmed] was located and arrested. Nanni noticed a large laceration on [Ahmed's] right thumb. Nanni read [Ahmed] his rights and called airport paramedics to attend to [Ahmed's] thumb. Among the items confiscated from [Ahmed] was an attaché case containing 15 traveler's checks totaling $7,500, his will, and $6,954.34 in cash.

On October 7, 1999, a grand jury indicted [Ahmed] on three counts of

aggravated murder for purposely and with prior calculation and design killing Lubaina, Ruhie, and Abdul, pursuant to R.C. 2903.01(A), and one count for the aggravated murder of Nasira, pursuant to R.C. 2903.01(C) (victim younger than 13). All four aggravated murder counts carried a death-penalty specification alleging a course of conduct involving the killing of two or more persons. R.C. 2929.04(A)(5). The aggravated murder count for Nasira carried an additional death-penalty specification alleging that the victim was younger than 13 years at the time of the murder. R.C. 2929.04(A)(9).

At trial, Dr. Manuel Villaverde, the Belmont County Coroner, testified that he had been called to the crime scene on September 11, 1999. All four victims appeared to have died from blood loss from slashes on their necks. Based on the condition of the bodies, he determined that the victims had been killed at approximately 3:00 a.m. that day, with two to four hours variation either way.

A deputy coroner for Franklin County performed autopsies on all four victims and concluded that each victim had died from skull fractures and a large cut on the neck.

Diane Larson, a forensic scientist at the DNA-serology section of the Bureau of Criminal Identification and Investigation ("BCI"), concluded that the DNA of blood found in the kitchen of Lubaina's home matched [Ahmed's] DNA profile. The probability of someone else in the Caucasian population having that same DNA profile is 1 in 7.6 quadrillion, and in the African-American population, the probability is 1 in 65 quadrillion.

*State v. Ahmed*, 103 Ohio St. 3d 27, 27-30 (2004).

On January 25, 2001, Petitioner was found guilty of the aggravated murders of Lubaina Bhatti Ahmed, Abdul Bhatti, Ruhie Ahmed, and Nasira Ahmed, as well as the death penalty specifications. ECF No. 92-4, at PAGEID # 9185-9190. Following a mitigation hearing, the jury recommended a sentence of death on each of the four aggravated murder counts. ECF No. 92-5, at

PAGEID # 9477-78.  After independently weighing the aggravating circumstances and mitigating factors, the trial court imposed a sentence of death. *Id*. at PAGEID # 9550-51.

On direct appeal, the Ohio Supreme Court affirmed Petitioner's convictions and sentence and overruled each of Petitioner's nineteen propositions of law. *State v. Ahmed*, 103 Ohio St. 3d 27 (2004).  Subsequently, the Ohio Supreme Court denied Petitioner's application to reopen his direct appeal, along with a motion to amend the application, because Petitioner failed to comply with the 90-day filing deadline.  The trial court denied Petitioner's petition for post-conviction relief, ECF 90-10, at PAGEID # 5648-5675, and the court of appeals affirmed the trial court's denial of the post-conviction petition.  *State v. Ahmed*, No. 05-BE-15, 2006 WL 3849862 (Ohio App. 7th Dist. Dec. 28, 2006).

## II.    Standards of Review

This Court reviews *de novo* those portions of the R&R to which the parties objected.  *See*, *e.g., Chinn v. Warden*, 3:02-cv-512, 2020 WL 2781522, *5 (S.D. Ohio May 29, 2020); *Lardie v. Birkett*, 221 F. Supp. 2d 806, 807 (E.D. Mich. 2002).  In that regard, Fed. R. Civ. P. 72(b)(3) provides:

> The district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

Because this is a habeas corpus case, provisions of the Antiterrorism and
Effective Death Penalty Act ("AEDPA") that became effective prior to the filing of
the instant Petition, apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336
(1997). The AEDPA limits the circumstances under which a federal court may
grant a writ of habeas corpus with respect to any claim that was adjudicated on
the merits in a state court proceeding. Specifically, the AEDPA directs us not to
grant a writ unless the state court adjudication "resulted in a decision that was
contrary to, or involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United States," 28
U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding," 28 U.S.C.
§ 2254(d)(2). Section 2254(d)(1) circumscribes a federal court's review of
claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's
review of claimed factual errors.

Under § 2254(d)(1), "[a] state court's adjudication of a claim is 'contrary to'
clearly established federal law 'if the state court arrives at a conclusion opposite
to that reached by the Supreme Court on a question of law, or if the state court
decides a case differently than the Supreme Court on a set of materially
indistinguishable facts.'" *Stojetz v. Ishee*, 892 F.3d 175, 192 (6th Cir. 2018)
(quoting *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014)). A state court
decision involves an "unreasonable application" of Supreme Court precedent if

the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case. *Id.* (citing *Henley v. Bell*, 487 F.3d 379, 384 (6th Cir. 2007)). A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001). Rather, for purposes of 2254(d)(1), "clearly established federal law includes only the holdings of the Supreme Court, excluding any dicta; and, an application of these holdings is 'unreasonable' only if the petitioner shows that the state court's ruling 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Stojetz*, 892 F.3d at 192-193 (quoting *White v. Woodall*, 572 U.S. 415 (2014)).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a petitioner bears the burden of rebutting the presumption of correctness by

clear and convincing evidence. Last, our review is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170 (2011).

A state prisoner who seeks a writ of habeas corpus in federal court does not have an automatic right to appeal a district court's adverse decision unless the court issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c). When a claim has been denied on the merits, a COA may be issued only if the petitioner "has made a substantial showing of the denial of a constitutional right." *Id.* To make such a showing, a petitioner must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Recently, the Sixth Circuit vacated a COA and dismissed an appeal, on the basis that a district court did not appropriately apply the correct standard for granting a COA. *Moody v. United States*, 958 F.3d 485 (6th Cir. 2020). In *Moody*, the Sixth Circuit cautioned that "a court should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect," and, "[t]o put it simply, a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable*." *Id.* at 488 (emphasis in original).

### III.  Petitioner's Claims

On July 11, 2007, after exhausting his state court remedies, Petitioner filed motions to proceed in forma pauperis and for the appointment of counsel.  ECF No. 1.  On May 14, 2008, Petitioner filed the instant Petition for a Writ of Habeas Corpus, raising twenty-seven claims for relief.  Petition, ECF No. 35.  In the R&R, the Magistrate Judge considered each of Petitioner's claims for relief and found none of them—nor any combination of them—to be meritorious.  The Magistrate Judge recommended the Petition be denied and that Ahmed be denied a COA.

On September 4, 2019, Petitioner filed Corrected Objections to the R&R, ECF No. 150, wherein he challenges the Magistrate Judge's R&R as to eight claims only.  Specifically, Petitioner objects to the Magistrate Judge's resolution of his first, second, third, fifth, eighth, thirteenth, nineteenth, and twenty-seventh claims for relief.  For the reasons that follow, the Court **OVERRULES** each of Petitioner's objections.  The Court finds the Magistrate Judge's R&R to be thorough, well-supported, and correct.  The Court further finds that Petitioner's objections fail to raise factual or legal arguments that have not been fully addressed by the R&R.

### First Claim for Relief:  Denial of Counsel of Choice

In his first claim for relief, Petitioner argues he was denied his "fundamental right to his own funds to employ counsel of choice, plan his defense and employ experts of his choosing."  Petition, ECF No. 35 at PAGEID

# 173.  Specifically, Petitioner contends he was denied his right to counsel of choice when the trial judge restrained his assets without the legal authority to do so and required him to proceed to trial with appointed counsel.  Corrected Obj., ECF No. 150 at PAGEID # 10402.  According to Petitioner, "[n]ot being indigent, petitioner's equal protection and due process rights were violated when the criminal trial judge, domestic relations court judge and probate judge of Belmont County, Ohio coordinated their actions with the prosecutor's office, sheriff's office, the Belmont County public defender and the appointed conservator Edward Susteric by intentionally engaging in conduct designed to frustrate petitioner's efforts to obtain counsel of choice."  Petition, ECF No. 35, at PAGEID # 173.

Petitioner and his wife, Lubaina Bhatti Ahmed, were involved in divorce proceedings at the time of her death, and Petitioner's first claim for relief arises from a series of orders issued in domestic relations and probate court, as well as his criminal case, regarding the expenditure and conservation of his funds.  The Magistrate Judge recommended that Petitioner's first claim for relief be dismissed as both procedurally defaulted and without merit, R&R, ECF No. 88, at PAGEID # 2131-6, and Petitioner objects to both determinations.

The Magistrate Judge engaged in a thorough and well-reasoned analysis of Petitioner's first claim for relief that spans thirty-two pages of the R&R.  In large part, Petitioner's Corrected Objections merely rehash the same issues

addressed by the R&R, without offering targeted discussion of why the Magistrate Judge's determinations are wrong. For the following reasons, this Court **OVERRULES** Petitioner's Corrected Objections and **ADOPTS** the R&R. Although the Court has adopted the R&R, the Court will address, generally, Petitioner's main objections.

### A. Procedural Default

The Magistrate Judge concluded that Petitioner failed to raise his denial of counsel of choice claim during his direct appeal as of right to the Ohio Supreme Court and failed to offer cause and prejudice to excuse that default. The Magistrate Judge rejected Petitioner's argument that he presented this claim to the Ohio Supreme Court by way of his *pro se* motion to reconsider, or by way of a *pro se* motion to disqualify the Ohio Public Defender and to strike the brief filed by the Ohio Public Defender. The Magistrate Judge determined those *pro se* filings did not preserve the issue, because Ohio law did not permit hybrid representation. Finally, the Magistrate Judge found that Petitioner's attempt to raise a claim of ineffective assistance of appellate counsel for failing to raise the denial of counsel of choice claim did not preserve for habeas review the underlying claim of denial of counsel of choice.

In his Corrected Objections, Petitioner argues this Court should reject the Magistrate Judge's determination that he procedurally defaulted his counsel of choice claim. First, Petitioner argues he presented the substance of this claim as

part of his second and thirteenth propositions of law on direct appeal.  Corrected

Obj., ECF No. 150 at PAGEID # 10432-34.  Next, Petitioner asserts that Ohio's

rule against hybrid representation had not been firmly and routinely established

at the time he filed his *pro se* motions for reconsideration and to strike, and,

therefore, those *pro se* filings presented the issue to the Ohio Supreme Court.

Finally, Petitioner argues that even if the Magistrate Judge correctly determined

he failed to present this claim to the Ohio Supreme Court, the ineffective

assistance of appellate counsel excuses the default.  The Court will address

Petitioner's arguments in turn.

First, Petitioner argues the "content" of his counsel of choice claim was

presented to the Ohio Supreme Court on direct appeal as part of Propositions of

Law Nos. 2 and 13.  According to Petitioner:

> In his brief to the Ohio Supreme Court, filed by his appointed counsel,
> Ahmed argued in Proposition of Law No. 2 that the trial court refused
> to remove appointed counsel and that Ahmed had been forced to
> proceed to trial with appointed counsel he did not want.  The brief
> urged among many factors that those appointed lawyers had a conflict
> of interest because, "As they were selected by the court, they served
> the court's and prosecution's interests rather than his."  Doc. 90-3,
> OSC brief, PageID # 3569.  During its resolution of the merits of this
> claim, the Ohio Supreme Court recognized that "Although appellant
> sought to hire attorneys of his own choosing, he was never able to do
> so."  Doc. 90-5. OSC Opinion, PageID # 4152.  The court also noted
> that Ahmed told the trial court he had hired Attorney Carpino to
> represent him but that the trial court found that Carpino "could not
> serve as Ahmed's counsel because he was not certified to act as
> counsel in capital cases."  *Id.*  Privately retained counsel do not have
> to be death penalty certified to represent defendants charged with
> capital offenses.  Rules for Appointment of Counsel in Capital Cases,

R. 2.01 (formerly R. 20).

In Proposition of Law No. 13, Ahmed argued that he had been denied the right to represent himself.  Doc. 90-4, OSC brief, PageID # 3706.  He also reported that he had been denied his right to counsel of choice.  *Id.*  During its resolution of the merits of Proposition of Law No. 13, the Ohio Supreme Court cited in its decision that Ahmed had signed an entry in the trial court and wrote on the entry:  "I have not been allowed the rights under the Constitution and as given in Constitution and Crim. R. 10 and 44 to continuance and representation by selection counsel. . . . ."  Doc. 90-5, OSC opinion, PageID # 4160.

Neither of these propositions of law is captioned as a claim of denial of counsel of choice but each references that denial and relies on the Sixth and Fourteenth Amendments.  In *Carter v. Bell*, 218 F.3d 581 (6th Cir. 2000), the court said, "We do not require word-for-word replication of the state claim in the habeas petition . . . only that the petitioner 'fairly present' . . . his federal constitutional claims."  *Id.* at 606-607.

Corrected Obj., ECF No. 150, at PAGEID # 10432-33.

The Court has carefully reviewed Propositions of Law 2 and 13, as set forth in Ahmed's state appellate brief, and concludes Petitioner did not present his denial of counsel of choice claim within those propositions of law.  Petitioner admits that "neither of these propositions of law is captioned as a claim of denial of counsel of choice."  Corrected Obj., ECF No. 150 at PAGEID # 10433.  This Court agrees but also finds that no reasonable read of those claims can support Petitioner's argument that his counsel of choice claim was raised within the body of those propositions of law.  Petitioner's second proposition of law on direct appeal was titled:

A DEFENDANT IS DENIED HIS RIGHTS TO COUNSEL, A FAIR TRIAL, AND DUE PROCESS WHEN HE IS FORCED TO

PROCEED TO TRIAL WITH COUNSEL THAT HAS A CONFLICT
OF INTEREST.  SIMILARLY, FORCING A DEFENDANT TO TRIAL
WHERE THERE HAS BEEN A BREAKDOWN IN THE ATTORNEY-
CLIENT RELATIONSHIP DEPRIVES THE DEFENDANT OF
THOSE SAME RIGHTS.  U.S. CONST. AMENDS. VI AND XIV,
OHIO CONST. ART. I, §§ 2, 9, 20.

ECF No. 90-3 at PAGEID # 3567-77.  In that proposition, Petitioner argued his

court-appointed counsel "were burdened with a conflict of interest" and there was

"a complete breakdown of the attorney-client relationship."  *Id.*  Petitioner cited

several instances during the pendency of his case in the trial court wherein

Ahmed claimed trial counsel were not working on his case, failed to meet with

him, failed to review evidence, withheld discovery, and did not consult him about

continuances, and Petitioner "did not trust them."  *Id.* at PAGEID # 3568.

Specifically, Petitioner accused Attorney Hershey of "directing racial and religious

remarks at him," as well as being in collusion with the prosecution and the police.

*Id.*  Petitioner "believed counsel were involved in a conspiracy to suppress

evidence favorable to him."  *Id.* at PAGEID # 3569.  Attorney Hershey refused to

see Ahmed alone and contended that "Ahmed distorted and twisted what counsel

said and that an atmosphere of distrust had been created."  *Id.*  Ultimately,

Petitioner filed a civil rights lawsuit against his counsel while they were

representing him.

In the "law" section of this proposition of law, Petitioner argued that a

conflict of interest occurred because Ahmed had filed the civil lawsuit against

counsel, and "[a] defendant's federal lawsuit against counsel suggests divided

loyalties and gives the attorney a personal interest in the way he conducts the

defense." *Id.* at PAGEID # 3570. The appellate brief alleged "[o]nce Ahmed

sued counsel, counsel's and Ahmed's interests diverged." *Id.* at PAGEID # 3571.

There is only one reference to "new counsel" in this section of Petitioner's merit

brief, and that reference acknowledges the fact that the trial court would have

permitted new counsel. Specifically, Petitioner argued, "[w]hile the trial court told

Ahmed it would permit substitution of counsel, the court made clear that it would

not provide any extensions or continuances to new counsel." *Id.* at PAGEID

# 3576. At the end of that sentence is a footnote acknowledging "[t]he trial court

subsequently withdrew its comments regarding a potential continuance. (See

entry at docket no. 210)." ECF No. 90-3 at PAGEID # 3576. Petitioner does not

allege anywhere in the more than ten pages of briefing dedicated to his second

proposition of law that he was denied counsel of his choosing or that the trial

court—or anyone for that matter—withheld his funds in a manner that prevented

him from hiring new counsel. There is no reasonable argument to be made that

Petitioner fairly presented the factual premise of his denial of counsel of choice

claim as part of his second proposition of law on direct appeal.

Petitioner's thirteenth proposition of law on direct appeal was titled as

follows:

WHERE A DEFENDANT MAKES A KNOWING AND INTELLIGENT WAIVER OF HIS RIGHT TO COUNSEL AND ELECTS TO PROCEED PRO SE, THE TRIAL COURT'S FAILURE TO HONOR THAT ELECTION DEPRIVES THE DEFENDANT OF HIS RIGHTS TO CONDUCT HIS OWN DEFENSE AND TO DUE PROCESS. U.S. CONST. AMEND. VI AND XIV; OHIO CONST. ART. I §§ 10, AND 16.

ECF No. 90-4 at PAGEID # 3706-08.  This proposition of law, in both its heading and argument, sets forth a claim alleging the denial of Petitioner's right to self representation, which is the subject of Petitioner's third ground for relief in these habeas proceedings.  Although a claim challenging the denial of counsel of choice and a claim asserting the denial of the right to self represent both invoke the Sixth Amendment, the claims are nonetheless factually and legally distinct.  A criminal defendant's decision to represent himself, once knowingly and intelligently made, is a relinquishment of the right to counsel.  *See Hill v. Curtin*, 792 F.3d 670, 678 (6th Cir. 2015) (noting that "a self-representation request" is "in effect, a waiver of the right to counsel").  As such, Petitioner's thirteenth proposition of law, asserting the denial of his right to represent himself, did not fairly present the factual or legal basis of his claim challenging the denial of his right to counsel of choice.

The concept of procedural default requires a person convicted of a crime in a state court to present a particular claim to the highest court of the state so the state has a fair chance to correct any errors made in the course of the trial or the appeal, before a federal court intervenes in the state criminal process.  Fair

presentment requires the petitioner to present the same claim under the same legal theory to the state courts before raising it on federal habeas review. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000) (finding federal courts do not have jurisdiction to entertain a claim in a federal habeas petition that was not fairly presented to the state court, and "[a] claim may only be considered fairly presented if the petitioner asserted both the factual and legal basis for his claim to the state courts"). This Court agrees with and adopts the Magistrate Judge's conclusion that Petitioner failed to present his counsel of choice claim to the state courts.

Next, Petitioner takes issue with the Magistrate Judge's determination that Ohio's rule against hybrid representation was firmly and routinely established at the time he filed his *pro se* motions for reconsideration and to strike, and, therefore, those *pro se* filings did not sufficiently present the issue to the Ohio Supreme Court. Petitioner takes further issue with the Magistrate Judge's finding that the state courts presumably denied those *pro se* pleadings on procedural grounds. The Magistrate Judge determined:

> Ahmed argues that the state supreme court's summary denial of his *pro se* motion for reconsideration constituted a decision on the merits in this post-*Harrington v. Richter* world. 131 S.Ct. 770 (2011). But while *Harrington* does not require written opinions from the state courts, it does hold that the presumption that state court summary dispositions are merits decisions may be overcome "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785, *citing Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). As has been discussed above, there are at least two

procedurally based explanations for the Ohio court's denial of Ahmed's motion for reconsideration that are more likely than a merits decision: (1) it is unlikely the state court would have addressed the merits of Ahmed's *pro se* motion since he was at all times represented by counsel and therefore not entitled to hybrid representation, and (2) the state procedural rule allowing motions for reconsideration does not contemplate new claims being presented to the state court in such filings. Therefore, this Court does not presume that the Ohio Supreme Court denied Ahmed's *pro se* motion for reconsideration on its merits, and instead concludes it was denied on both of the procedural grounds discussed. It also appears that the rule against hybrid representation is firmly established and regularly followed in the Ohio courts. *See State v. Martin*, 103 Ohio St. 3d 385, 2004-Ohio5471 (2004) (paragraph one of the syllabus); *State v. Ferguson*, 108 Ohio St. 3d 451, 466, 2006-Ohio-1502 at ¶ 97 (2006); *State v. Tenace*, 109 Ohio St. 3d 451, 452-53, 2006-Ohio-2987 at ¶ 10 (2006); *State v. Martin*, 103 Ohio St. 3d 385, 391, 2004-Ohio-5471 at ¶ 32 (2004); *State v. Taylor*, 98 Ohio St. 3d 27, 34, 2002-Ohio-7017 at ¶ 43 (2002); *State v. Cassano*, 96 Ohio St. 3d 94, 100, 2002-Ohio-3751 at ¶ 37 (2002); *State v. Keenan*, 81 Ohio St. 3d 133, 138 (1998); *State v. Landrum*, 53 Ohio St. 3d 107, 119 (1990); *State v. Thompson*, 33 Ohio St. 3d 1, 6-7 (1987); *State v. Packer*, 188 Ohio App. 3d 162, 168-69, 2010-Ohio-2627 at ¶ 20 (Ohio App. 6th Dist. 2010); *State v. Pilgrim*, 184 Ohio App. 3d 675, 2009-Ohio-5357 (Ohio App. 10th Dist. 2009) (paragraph five of the syllabus); *State v. Litten*, 174 Ohio App. 3d 743, 747, 2008- Ohio-313 at & 19 (Ohio App. 8th Dist. 2008); *State v. Beaver*, 119 Ohio App. 3d 385, 401-2 (Ohio App. 11th Dist. 1997); *State v. Day*, 72 Ohio App. 3d 82, 86 (Ohio App. 4th Dist. 1991); *State v. Carter*, 53 Ohio App. 2d 125, 129 (Ohio App. 4th Dist. 1977).

R&R, ECF No. 88, at PAGEID # 12-13. The Magistrate Judge's determination is

consistent with the decisions of other federal habeas courts that have addressed

this issue. *See, e.g.*, *Whatley v. Warden*, No: 2:16-cv-676, 2017 WL 1196168

(S.D. Ohio Mar. 31, 2017) ("Other courts which have considered this question

have concluded that Ohio's judicially-created rule against hybrid representation is

an adequate and independent state ground which supports the state courts'

refusal to consider, on their merits, claims raised by a criminal defendant which have not been advanced by that defendant's counsel."); *Rojas v. Warden*, 2015 WL 631183, *6 (N.D. Ohio Feb. 12, 2015) (finding the petitioner defaulted claims he sought to raise *pro se* on direct appeal while represented by counsel because "[t]he Ohio Supreme Court has held that '[a] defendant has no right to a 'hybrid' form of representation'" and "the State of Ohio regularly enforces its prohibition against Petitioners raising claims on appeal while being represented by counsel."); *Ysreal v. Warden*, 2014 WL 7185264, *9 (S.D. Ohio Dec. 16, 2014) ("Ohio's rule against hybrid representation is an adequate and independent state ground sufficient to foreclose habeas review"); *Storks v. Sheldon,* No. 3:12–cv–191, 2013 WL 3992592, at *35 (N.D. Ohio Aug.5, 2013) (same). *See also Wallace v. Sexton,* No. 13–5331, 2014 WL 2782009, at *8 (6th Cir. 2014) (finding procedural default of a claim based on the petitioner's presentation of the claim in a supplemental *pro se* brief prohibited under Tennessee procedural rule barring defendants from filing *pro se* briefs while simultaneously represented by counsel); *Hill v. Carlton*, 399 F. App'x 38, 42-45 (6th Cir. 2010) (finding a failure to fairly present federal habeas corpus claim when Tennessee petitioner violated similar state procedural rule against hybrid representation). Moreover, the Magistrate Judge correctly determined that a rule can be firmly established and regularly followed despite the fact that "a particular trial court and court of appeals might have disregarded or, in their discretion decided not to enforce the

rule in a few cases[.]" R&R, ECF No. 88, at PAGEID # 2145. *See Ysreal v. Warden*, 2014 WL 7185264, *9 (S.D. Ohio Dec. 16, 2014) ("To be considered regularly followed, a procedural rule need not be applied in every relevant case, but rather "[i]n the vast majority of cases.") (*quoting Dugger v. Adams,* 489 U.S. 401, 410 n. 6 (1989)).

In an effort to save his first claim for relief from procedural default, Petitioner argues the ineffective assistance of appellate counsel for failing to raise this claim on direct appeal establishes cause and prejudice to excuse the default. Alternatively, Petitioner claims the fundamental miscarriage of justice exception should apply. Petitioner is wrong on both accounts. Petitioner cannot establish a claim of appellate counsel ineffectiveness for failing to raise the denial of counsel of choice claim on direct appeal, because ultimately the denial of counsel of choice claim lacks merit, and appellate counsel were therefore not ineffective for failing to raise it. Furthermore, "[t]he narrow exception for fundamental miscarriage of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense." *Rogers v. Skipper*, No. 19-1426, 2020 WL 4219683, *3 (6th Cir. July 23, 2020) (*citing Schlup v. Delo*, 513 U.S. 298 (1995)). Petitioner has not presented any evidence of actual innocence.

## B. Merits Discussion

The Magistrate Judge determined that even if Petitioner had preserved his

denial of counsel of choice claim for habeas review, the claim lacks merit. The Magistrate Judge found no evidence of any conspiracy to deny Petitioner use of his funds to hire counsel. According to the Magistrate Judge, "Ahmed provides a lengthy chronology of his attempts to hire counsel, but fails to expose any collaboration, nefarious or otherwise, between the various courts he names, the prosecutor's office, the public defender, or conservator intended to deny him his right to counsel of his choice." R&R, ECF No. 88, at PAGEID # 2150. The Magistrate Judge noted that "[w]hat Ahmed thinks, or suspects, or claims is not evidence upon which this Court may rely in evaluating his counsel-of-choice ground for relief." R&R, ECF No. 88, at PAGEID # 2162.

The Magistrate Judge concluded, and Petitioner appears to agree, that the appropriate standard for reviewing Petitioner's counsel of choice claim was set forth in *Wheat v. United States*, 486 U.S. 153 (1988), which requires Petitioner to demonstrate both that he was denied the right to hire counsel of choice and that the fairness of his trial was compromised as a result. In *Wheat*, the Supreme Court determined that "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* at 158-59. The Court noted the right to counsel of choice is not absolute:

> The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects.  Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court.  Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant.  Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the Government.

*Id.* at 158-59.  Subsequently, in 2006, the Supreme Court decided *United States v. Gonzalez-Lopez*, 545 U.S. 140, 148 (2006), finding "[w]here the right to be assisted by counsel of one's choice is wrongly denied, . . . it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation."  *Id.* at 148.  *Gonzalez-Lopez* was decided a year after Petitioner's convictions became final, *see Ahmed v. Ohio*, 544 U.S. 952 (2005) (denying certiorari) and *Ahmed v. Ohio*, 545 U.S. 1124 (2005), and is not retroactively applicable to Petitioner's case.  *Rodriguez v. Montgomery*, 594 F.3d 548, 549 (7th Cir. 2010); *Rodriguez v. Chandler*, 492 F.3d 863, 866 (7th Cir. 2007); *Peters v. Bell*, No. 1:06-cv-880, 2007 WL 3348011, at *1 (W.D. Mich. Nov. 8, 2007).

Because Petitioner's claim is procedurally defaulted, the state courts were not given an opportunity to consider the circumstances leading to Petitioner's funds being subject to oversight.  Petitioner contends the domestic relations court improperly restrained his funds, and the probate court permitted funds to be attached to protect a future judgment in the wrongful death action pursued by Lubaina Bhatti's estate and also established a conservatorship over his funds.

Corrected Obj., ECF No. 150, at PAGEID # 10408. Regardless of the various orders pertaining to Petitioner's finances, one thing is clear: Petitioner's funds were always available for Petitioner to use to hire his own counsel.

Petitioner himself acknowledges "[a]n agreement was reached, whereby twenty thousand dollars would be attached *subject to Ahmed's need to use the money to pay for representation in his criminal trial at which time there would be a hearing on the matter*." ECF No. 150, at PAGEID # 10408 (emphasis added). Petitioner further acknowledges that the orders to which he complains were lifted nearly a year before his trial, alleging in his Corrected Objections that his funds were unavailable "from September 13, 1999 to March 9, 2000," well ahead of his January, 2001 trial. *Id.* at 10427. During a February 7, 2000, status conference, the trial court made clear to Petitioner "if you are laboring under an illusion that I am somehow strapping you from hiring someone, you're mistaken," and the court noted it had "waited for four months for someone to appear in this case." ECF No. 92-1, at PAGEID # 7408-09. In a March 29, 2000, docket entry, the trial court stated "defendant is permitted and encouraged to utilize funds for retention of counsel." ECF No, 90-1, at PAGEID # 2575.

The trial court's willingness to accommodate rather than hinder Petitioner's quest for private counsel was apparent during an April 27, 2000, on-the-record discussion between the trial court and Attorney Harry Reinhart. ECF No. 92-1, at PAGEID # 7432-39. During that hearing, Attorney Reinhart expressed concerns

that Ahmed did not have enough money to hire private counsel and also fund

other aspects of his defense. The trial court was willing to permit Petitioner to

use his owns funds to hand select counsel, while still availing himself of court

resources:

> MR. REINHART: Judge, I've been contacted by Mr. Ahmed who has indicated to me he's interested in retaining me in this matter and I told him that I would explore this both with him and with the other interested parties in this, but I told him that I had to get a few questions answered before I could even consider agreeing to represent him.
>
> He does not have, based on his representations to me, he does not have nearly sufficient funds to properly fund the defense of a capital case. He has – he has enough money that I would consider accepting that on a flat rate basis for legal services for attorneys fees, but that's not the end of the story in this case. I mean, there are costs and expenses in these cases that can be substantial, and I would not be doing him a favor, and I would be doing a disservice to the court and everybody else in this if I agree to enter into the case under circumstances where essentially my professional services are almost guaranteed to be constituted [sic] ineffective assistance of counsel.
>
> So I told him the first question I need to get answered, at least preliminary, would be whether or not the court would entertain an arrangement whereby he is declared marginally indigent, as that phrase is used by the State Public Defender's Office, which means he's got some money, but not enough money, and essentially the State is going to pick up the tab for necessary defense services such mitigation and investigation and, potentially, expert witness fees.
>
> THE COURT: If he has exhausted his asserts and I have his statement to that effect and the conservator's statement to that effect, I will – the County will pick up necessary defense services of a reasonable amount. By that I mean, if this – should he select an investigator that charges $150.00 an hour, that's not reasonable and the County will not pick up the tab for that. But if the fees are consistent with fees charged by other persons performing those services, the County will be reasonable about it.
>
> MR. REINHART: Assuming we got to that point, what I would do is submit a proposed litigation budget to you so you could look at it in advance, and I do that to [sic] both good business practice as a

courtesy to the court and as protection of myself.

THE COURT: So we know what's going on down the road, I think that's a good idea.

. . .

MR. REINHART: So he's a little bit weak even on the flat rate, but I told him I would consider taking it on a flat rate, but if there's not going to be a problem with actually getting the funds from wherever they are right now, you know, to me, and since the court has, as I understand it, some of the accounts are tied up by order of this court, some of the accounts are tied up by order of the other Common Pleas Court judge, and maybe even the Probate Court, can you tell me – can you tell me how difficult it's going to be to actually get access to the funds?

THE COURT: I don't have anything tied up in – I get letters from – he believes I have money tied up. I'm not a judge in any case but this case, and there is a conservatorship downstairs where I have advised them to hold on to $10,000 to pay the Belmont County Public Defender. The Belmont County Public Defender can submit a bill for their services rendered if they stay in this case.

If you told me today that you were taking this case, and you needed that money for your retainer, I would vacate my order. Now, that's the extent of the funds to which I have access. Now, he has, you know, it's a mystery to me, he's told me he only has $15,000 and he's sworn to that, so it's obvious that everybody's records are different.

…

MR. REINHART: I have no problems at all, Judge, with making an in camera disclosure to you about what resources this individual has and he proposes to use to retain me because there is no reason why the court should be asked to authorize a kind of hybrid representation if you know counsel is getting on the sly $500.00, if he had that much money he could pay for his entire defense himself. . . . I don't think I – in fact, I think I have a responsibility to be forthcoming to the court in that regard. But as I understand what you're telling me, if I show you a signed fee contract where I have agreed contractually to represent him –

THE COURT: If I see the check going to you, the money that we have set aside for attorney fees should go to you. I don't have a

problem with that.  I would love to see the case move and I have put off appointing another public defender because I've been told for a month that the hiring of an attorney is about to happen and if – should it happen, no one would be more pleased than me.

ECF No. 92-1, at PAGEID # 7434-38.  Additionally, during a January 2, 2001, hearing, Judge Sargus noted that she was "mindful of the great role played by one in his selection of counsel" and reiterated that she had agreed to "not only turn over all funds which were retained by the court, but we would supplement those funds for you so that you could have a defense."  ECF No. 92-1, at PAGEID # 7574.  During a January 8, 2001, hearing, the trial court remarked "we have all advised every attorney who expressed an interest in the case that any funds that we had would be released."  ECF No. 92-1, at PAGEID # 7627.  Those on-the-record discussions completely negate the allegations contained in Petitioner's First Claim for Relief.

The state-court record reflects that Ahmed was at all times represented by appointed counsel, beginning at his arraignment, and for nearly sixteen months, Ahmed unsuccessfully attempted to hire private counsel.  The Magistrate Judge found no evidence that any of the attorneys Petitioner sought to hire declined representation because the trial court refused to release funds.  In so finding, the Magistrate Judge engaged in a detailed thirteen-page recitation of Petitioner's attempts to obtain private counsel, as well as the trial court's willingness to release funds to counsel if counsel entered an appearance in the case.  That

discussion, ECF No. 88, at PAGEID # 2150-63, is adopted by the Court. As revealed by that discussion, there is little evidence to suggest Petitioner's inability to hire private counsel had anything to do with the trial court's orders. To the contrary, much evidence suggests Petitioner was unable to hire counsel because of his own terms and conditions regarding new counsel's representation. The record establishes that Petitioner sought to hire an impressive list of criminal defense attorneys. That list includes Dennis McNamara, Sam Shamansky and William Meeks, Harry Reinhart, Brian Rigg and Donald Schumacher, Terry Sherman and Debra Gorrell, Robert Suhr, and Richard Cline and David Young. No agreements were reached with any of these attorneys in large part because Petitioner refused to waive his speedy trial rights to allow new counsel a reasonable time to prepare to defend this quadruple homicide death penalty case. The record reflects the trial judge attempted to facilitate Petitioner's hiring of counsel by agreeing to permit reasonable continuances to accommodate defense preparation, by agreeing to release the funds that had been earmarked for reimbursement of appointed counsel, and by agreeing to authorize additional county funds to pay for reasonably necessary defense services if Petitioner depleted his own funds. *See, e.g.*, ECF No. 92-1, at PAGEID # 7434-38. The Magistrate Judge concluded:

> Although attorney McNamara mentioned that it would take time for Ahmed's funds to be released, he also stated that he could not take Ahmed's case because he did not have time to prepare for

Ahmed's trial, and Ahmed refused to waive his speedy trial right. Attorneys Shamansky, Meeks, and Thomas were apparently willing to take Ahmed's case and sent him forms to complete that would give them access to Ahmed's account with T. Rowe Price, apparently one of the accounts not in the control of the conservator. The record does not indicate what became of those forms, whether Ahmed executed them or not, but because Ahmed had not provided the court with a financial statement from which the court could determine his indigency status, Ahmed was prohibited by a court order from using any of his money for any purpose. Thus, it was Ahmed's failure to cooperate with the court's assessment of his ability to pay for his own counsel that prevented Shamansky, *et. al.* from receiving payment from Ahmed's funds. When attorney Reinhart discussed taking Ahmed's case with Judge Sargus, she assured him there was no barrier to his receiving payment from Ahmed's funds, and this Court has not found within the record any explanation as to why Reinhart ultimately decided not to take Ahmed's case. Although attorneys Rigg and Schumacher initially declined to represent Ahmed in part because of the financial restrictions, they later expressed an interest in taking his case. When they informed Ahmed that he would need to waive his right to a speedy trial if they decided to represent him, he refused to sign either a waiver or the retainer agreement they had presented to him. Ahmed, then, was the one to reject representation by Rigg and Schumacher.

The only evidence that attorneys Sherman and Gorrell were interested in representing Ahmed is their retainer agreement, signed by both of them, but not by Ahmed. The Court cannot presume anything from that document other than that an agreement was not reached. The reasons for that outcome are unknown. Attorney Suhr was apparently under the impression that Ahmed did not have counsel at the time he expressed an interest in representing him, and when he found out otherwise, he determined that having a conversation with Ahmed, who was represented by appointed counsel, would be "premature." That does not establish that Suhr was worried about the availability of Ahmed's funds to pay him should he become Ahmed's lawyer. If this Court were to assume anything about the failure of attorneys Cline and Young to represent Ahmed, it would be that Ahmed altered the "Scope of Work" portion of the retainer agreement to terms that would be unacceptable to most, if not all, attorneys. There is nothing in the record suggesting that they were afraid they would not be paid if they took Ahmed's case. And as for Carpino, it is evident that Ahmed himself had doubts about Carpino's

ability to competently represent him, and those doubts were warranted, as evidenced by Carpino's filings and conduct in Ahmed's case, by Carpino's conduct in other cases around that same time, and by his mental illness suspension from the practice of law a couple of years later. None of these attorneys ever filed a notice of appearance in Ahmed's case, which the trial court had repeatedly stated was necessary before Ahmed's funds would be released. Under the circumstances present in Ahmed's case, it was not unreasonable for Judge Sargus to require such a filing before disbursing Ahmed's funds to any attorney.

R&R, ECF No. 88, at PAGEID 2159-61. It is relevant to note that although Petitioner claimed he had hired Attorney Carpino as his private counsel, it is clear Carpino wanted to be paid by the court and was hesitant to take on the full role as Petitioner's only trial counsel. This is evidenced by Carpino's requests to be permitted to assist Attorneys Olivito and Hershey, or to appear as "a friend of the court." ECF No. 92-1, at PAGEID # 7575. Carpino inquired as to whether "Belmont County would pay the difference" if Petitioner ran out of funds to pay him. The trial court denied this request, because Attorney Carpino was not certified to serve as appointed counsel in death penalty cases. *Id.* at 7697-7702.

This Court agrees with the recommendation of the Magistrate Judge. Petitioner has presented no evidence of a conspiracy to deny him counsel of choice or any attempt to impede the expenditure of his funds to hire counsel. A much more likely explanation for Petitioner's failure to obtain his own counsel was offered during Petitioner's sentencing hearing, wherein appointed counsel Olivito remarked "no other counsel from any other part of the State of Ohio

wished to become involved in this case after they found out exactly what they had to deal with." ECF No. 92-5, at PAGEID 9548. Petitioner's First Claim for Relief lacks merit.

Having determined Petitioner's First Claim for Relief should be denied as both procedurally defaulted and without merit, the Court must determine whether a COA should issue as to this claim. To warrant a COA, a petitioner must make a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(2*); see also Barefoot v. Estelle*, 463 U.S. 880, 893 (1983); *Lyons v. Ohio Adult Parole Authority*, 105 F.3d 1063, 1073 (6th Cir. 1997). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy 28 U.S.C. § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Recently, in *Moody v. United States*, 958 F.3d 485 (6th Cir. 2020), the Sixth Circuit dismissed an appeal and expressly cautioned against issuing a COA in cases where alternate grounds for denying relief exist, finding "a claim does not merit a certificate unless *every independent reason to deny the claim is reasonably debatable*." *Id.* at 488 (emphasis in original). Here, two independent grounds exist to dismiss Petitioner's first ground for relief, and this Court cannot conclude that reasonable jurists would find the Court's resolution of this claim on either basis to be debatable or wrong. The Court denies Petitioner a COA as to

his first claim for relief.

**Second Claim for Relief:  Conflict/Breakdown in Attorney-Client Relationship**

In his second claim for relief, Petitioner argues he was denied his rights to counsel, a fair trial, and due process when he was forced to proceed to trial with appointed counsel who had a conflict of interest and when there was a complete breakdown in the attorney-client relationship.  Petition, ECF No. 35 at PAGEID # 198.  The record reflects that in the time leading up to and during his trial, Petitioner aired a near constant stream of perceived grievances regarding his court-appointed counsel.  Petitioner's complaints were the subject of several hearings before the trial court, as well as a civil rights lawsuit filed by Petitioner. The Magistrate Judge recommended denying relief on this claim, and Petitioner objects to that recommendation.

The Magistrate Judge determined that Petitioner's second claim for relief was properly before the court, having been raised on direct appeal before the Ohio Supreme Court as Petitioner's second proposition of law.  In rejecting the merits of this claim on direct appeal, the Ohio Supreme Court held:

> In his second proposition of law, appellant asserts that the trial court erred in failing to remove defense counsel, since a conflict of interest occurred when he filed a lawsuit against counsel in federal court. Alternatively, appellant contends that there was a total breakdown of the attorney-client relationship that required counsel's removal. Appellant submits that the trial court's inquiry into the difficulties between him and counsel was insufficient.

Appellant complained about his counsel on numerous occasions. Appellant was first represented by appointed public defenders at his arraignment. Appellant claimed that counsel had not met with him or answered his questions, but counsel disputed appellant's allegations. Due to conflicts with appellant, both attorneys later withdrew, and by June 2000, the trial court had appointed attorneys Peter Olivito and Adrian Hershey to represent appellant. Although appellant sought to hire attorneys of his own choosing, he was never able to do so.

Soon after Olivito and Hershey were appointed, appellant began complaining that their representation was ineffective. At a September 6, 2000 hearing, appellant claimed that counsel had neither met nor consulted with him prior to seeking a continuance. At a November 9, 2000 hearing, appellant complained that Hershey had laughed at and humiliated him in front of a detective, had made racial slurs, and had been hostile toward him. Hershey disputed appellant's complaints, and the court advised appellant to let his counsel help him.

At a January 2, 2001 hearing, appellant told the court that he had hired attorney Joseph Carpino to represent him and that he had filed a civil rights lawsuit against Olivito and Hershey in federal court and wanted to discharge them.

On January 8, 2001, the trial court held a hearing on appellant's motion to discharge counsel. Appellant indicated again that he was suing counsel in federal court. He also claimed that he had given his attorneys a list of witnesses, but that in 16 months, neither his first attorneys nor his new attorneys had contacted them and that his new attorneys had "refused to contact them." Olivito explained that many of the witnesses that appellant had named were in Pakistan and that appellant had not provided phone numbers to contact them. Both attorneys told the trial court of their efforts to obtain witnesses and comply with requests by appellant. The trial court concluded that counsel was representing appellant diligently and therefore overruled appellant's motion to discharge them.

Also at the January 8, 2001 hearing, the court found that Carpino could not serve as appellant's counsel because he was not certified to act as counsel in capital cases. The court overruled Carpino's motion to become appellant's trial counsel.

Appellant reiterated his dissatisfaction with counsel at a January 11, 2001 suppression hearing. He also complained about counsel at the outset of voir dire, as well as at the mitigation and sentencing hearings.

Appellant relies on *Smith v. Lockhart* (C.A.8, 1991), 923 F.2d 1314, 1321, citing *Douglas v. United States* (D.C.App.1985), 488 A.2d 121, 136, in claiming that his federal lawsuit against appointed counsel reflected a conflict between his interests and counsel's. Appellant contends that once he raised the issue of a conflict of interest, the trial court was required to allow him to demonstrate that the conflict "impermissibly imperil[ed] his right to a fair trial." *See Cuyler v. Sullivan* (1980), 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333.

There are strong indications that appellant filed his federal lawsuit simply to get his court-appointed attorneys discharged. Prior to trial, the trial court held hearings regarding appellant's complaints about counsel on November 9, 2000, and January 8, 2001. Upon considering the statements of appellant and counsel, the trial court found no reason to replace counsel. At the conclusion of the November 9 hearing, the trial court urged appellant to let his counsel help him. At the conclusion of the January 8 hearing, the court stated: "The court is comfortable that counsel has represented Mr. Ahmed * * * diligently; that the difficulties which have arisen in this case stem from what Mr. Ahmed himself pinpointed when he said that he does not understand. And the allegations do not have firm footing in law or in fact. The motion to discharge is overruled." Nor did the trial court find any conflict of interest that adversely affected counsel's performance. *See Mickens v. Taylor* (2002), 535 U.S. 162, 171–172, 122 S.Ct. 1237, 152 L.Ed.2d 291. Under these circumstances, we will defer to the trial judge, "who see[s] and hear[s] what goes on in the courtroom." *State v. Cowans* (1999), 87 Ohio St.3d 68, 84, 717 N.E.2d 298.

We further note that courts "must be wary of defendants who employ complaints about counsel as dilatory tactics or for another invidious motive." *Smith v. Lockhart,* 923 F.2d at 1321, fn. 11, citing *United States v. Welty* (C.A.3, 1982), 674 F.2d 185, 193–194.

Appellant continually complained about counsel. The trial court took appellant's complaints seriously and listened to all sides before it

determined that his complaints were not valid and that counsel should remain as appellant's attorneys. The federal lawsuit appears to have been filed in an attempt to create a conflict so that his counsel would be removed from the case, not a genuine grievance causing a true conflict of interest. Moreover, after the trial court conducted thorough inquiries into the difficulties between appellant and counsel, it found that appellant's complaints against counsel were not substantiated. Nothing offered by appellant compels us to disturb that ruling. *See State v. Deal* (1969), 17 Ohio St.2d 17.

Appellant argues alternatively that even if there was no conflict of interest, there was at least a total breakdown in the attorney-client relationship that necessitated counsel's removal. The trial court, however, addressed appellant's complaints concerning counsel's representation of him at two hearings as stated above. Upon considering appellant's motion for a new trial and his complaints about counsel and claims of counsel's ineffectiveness throughout trial, the trial court held that "[h]ours of testimony [concerning appellant's disagreements with counsel] established that the grounds alleged were not cogent or reliable." In addition, the record reflects many instances where appellant continued to confer with counsel throughout the proceedings, thus belying his claim that there was a total breakdown in the attorney-client relationship.

Since appellant did not substantiate his claims of a conflict of interest and of a total breakdown of the attorney-client relationship, we overrule his second proposition.

*State v. Ahmed*, 103 Ohio St. 3d 27 (2004).  Because the Ohio Supreme Court considered and rejected this claim on the merits, this Court's review is limited by the AEDPA.

The Magistrate Judge criticized Petitioner for "repeating verbatim the arguments he presented in the state court" and not attempting "in any serious manner" to satisfy the requirements of the AEDPA.  R&R, ECF No, 88, at PAGEID # 2167.  The Magistrate Judge observed:

The issue before the habeas court is not the same as the issue presented to the state court. The question before the state court was whether there was a conflict of interest or a total breakdown of communication between Ahmed and his trial counsel requiring reversal of his convictions. Here, the question is whether the state court's decision that there was not a conflict is either contrary to or an unreasonable application of federal law as determined by the United States Supreme Court, or whether the state court's decision was based upon an unreasonable determination of the facts, given the evidence before that court at the time of Ahmed's trial, starkly different inquiries than the one before the state court in the first instance. Basically cutting and pasting the claim as it was presented to the state court into a habeas petition is consequently ill advised as it does not address the question this Court must consider in habeas review.

R&R, ECF No. 88, at PAGEID # 2166-67.

As noted by the Magistrate Judge, "a claim that counsel labored under a conflict of interest is at base a claim of ineffective assistance of counsel governed by *Strickland v. Washington*, 466 U.S. 668 (1984)." R&R, ECF No. 88, at PAGEID # 2168. Under *Strickland*, the Court must ask whether counsel's performance "fell below an objective standard of reasonableness" and whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The standard for reviewing claims of ineffective assistance of counsel on habeas review is highly deferential:

The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court.

> Under [the] AEDPA, though, it is a necessary premise that the two questions are different. . . .  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Applying that deferential standard, the Magistrate Judge concluded that Petitioner fell short of demonstrating that the state court's decision was contrary to federal law or was based on an unreasonable determination of the facts.  In reaching that conclusion, the Magistrate Judge opined:

> Ahmed's claim as it was presented in the state court and in this Court is filled with statements that begin with "Ahmed accused . . .," "Ahmed claimed . . .," "Ahmed asserted . . .," "Ahmed believed . . .," and the like (Appendix, Vol. 3 at 287-97; Petition, Doc. No. 35 at PageID 199-207), but the Court notes that Ahmed's belief or claim or assertion of something does not establish it as fact upon which the state court may act, or this Court rely.
>
> That Ahmed lodged numerous and far-fetched accusations against his trial counsel reflects more on his own inability to cooperate with counsel than on counsel's ability to represent him adequately. Ahmed's filing of the lawsuit against his trial counsel in federal court was determined by the state court to likely have been for the very purpose of creating a conflict of interest in hopes of having them removed from his case, and Ahmed does not explain how that determination was unreasonable under federal law or based upon an unreasonable determination of the facts as they existed at the time of the state court's decision.

R&R, ECF No. 88, at PAGEID # 2169.

In his Corrected Objections, Petitioner seeks to introduce a new factual basis for his second ground for relief.  Petitioner argues "[e]very lawyer appointed to represent Ahmed had at least a financial conflict that weighed against pursuing

Ahmed's right to hire counsel of his own choosing."  ECF No. 150, at PAGEID

# 10455.  According to Petitioner:

> Ahmed's appointed counsel were conflicted due to the financial detriment they faced if they pursued their own replacement with counsel of Ahmed's choice.  In addition, they were conflicted because they believed that their replacement was likely, and thus were not [ ] actively pursuing Ahmed's other trial interests.  Moreover, by accepting appointment in the face of Ahmed's clear and repeated statements that he did not want appointed counsel, they entered the case, not as his agents, but as state actors working in opposition to his desire to hire his own counsel and to insist[] on his speedy trial rights.  The fact that Ahmed filed a lawsuit alleging that the appointed lawyers were violating his civil rights was to be expected under the circumstances.  Ahmed had nowhere to turn except to another court.  Judge Sargus, although she was fully aware that Ahmed was not indigent, withheld and controlled his funds despite his multiple attempts to access and use them to hire counsel.  His lawyers were not representing his interest in hiring other counsel.

Corrected Obj., ECF No. 150, at PAGEID 10456.  The Court notes that this new

argument was not set forth in the Petition as part of the second claim for relief,

was not included on direct appeal as part of Petitioner's second proposition of

law, and was not addressed by the Magistrate Judge in connection with this

claim for relief in the R&R.  On direct appeal, the factual basis underlying his

conflict of interest claim was that Petitioner did not trust his appointed counsel

and felt they were not working on his case.  Petitioner alleged that counsel failed

to meet with him, withheld discovery, failed to review evidence, and did not

consult him about continuances.

Respondent characterizes Petitioner's new argument regarding a financial

conflict of interest as an attempt "to transform his conflict of interest claim into the choice of counsel claim that he did not fairly present to the Ohio Supreme Court." Response, ECF No. 151, at PAGEID # 10516.  This Court is inclined to agree. To the extent Petitioner argues his appointed counsel operated under a financial conflict of interest with an agenda to maintain their appointment, this factual basis is procedurally defaulted because it was not presented to the state courts. Furthermore, Petitioner's argument is conclusory, speculative and not supported by facts of record.  Petitioner points to nothing in the record to support his broad assertion that his counsel labored under a constitutionally infirm conflict of interest simply because they did not want their "employment as court appointed counsel" to be terminated by the trial court.  Corrected Obj, ECF No. 150 at PAGEID # 10402.  In fact, the state-court record contradicts Petitioner's claim. During a January 8, 2001 hearing, Attorney Hershey stated:

> MR. HERSHEY:  Early in this case, it occurred to Mr. Olivito and I that Mr. Ahmed did have a right to hire his own attorney.  I redrafted his pro se motions, obtained his signature which he at first refused to sign, filed them in Judge Solovan's court, filed them in this court, filed them in the juvenile court and obtained clear court orders his money was to be released.  He immediately appealed Judge Solovan for doing that, became extremely angry at me and informed Mr. Olivito and I that we had absolutely no business interfering in his affairs in these other matters.  And from that point on, it's been up to Mr. Ahmed.  We have had nothing more to do with the issue.

ECF No. 92-1, at PAGEID # 7628.

With respect to the conflict of interest allegations Petitioner actually

presented to the state court, the Ohio Supreme Court found Petitioner's arguments unpersuasive. The Ohio Supreme Court determined that the trial court carefully considered Petitioner's complaints regarding counsel and found them to be unfounded. Petitioner has not established that this determination was unreasonable under federal law or based on an unreasonable determination of the facts. As such, the Court **OVERRULES** Petitioner's Corrected Objections, ECF No. 150, **ADOPTS** the R&R of the Magistrate Judge, ECF No. 88, and hereby **DENIES** Petitioner's second claim for relief. The Court also declines to issue a COA, because reasonable jurists would not find the Court's resolution of this claim debatable or wrong. Petitioner's Second Claim for Relief is not deserving of further review on appeal.

### Third Claim for Relief: Denial of the Right to Self-Representation

In his Third Claim for Relief, Petitioner argues he was denied his Sixth and Fourteenth Amendment rights to represent himself at trial. Petition, ECF No. 35-1, at PAGEID # 214. As an initial matter, the Court notes that in this claim, Petitioner asserts the trial court violated his right to self-representation not only during the penalty phase of his trial but during the pre-trial proceedings and guilt phase as well. Petition, ECF No. 35-1, at PAGEID # 214. In the R&R, the Magistrate Judge observed that on direct appeal to the Ohio Supreme Court, Petitioner's allegations regarding the denial of his right to self-representation concerned only the penalty phase. Petitioner never presented the state courts

with any arguments or claims asserting the denial of his right to self-representation in connection with the pre-trial proceedings or the guilt phase of his trial. The Magistrate Judge opined:

> Respondent acknowledges the claim has been properly preserved for habeas corpus review, but argues it is nevertheless meritless. (ROW, Doc. No. 61 at PageID 977-980.) . . . .
>
> Respondent is only partially correct in stating that Ahmed raised the instant claim on direct appeal in the state court. There, Ahmed's claim that he was denied his right to proceed *pro se* was explicitly limited to the mitigation phase of his trial (Appendix, Vol. 3 at 426-28), whereas here, the claim has expanded to include both phases of the trial (Petition, Doc. No. 35 at PageID 214-17). Although a colorable argument could be made that Ahmed procedurally defaulted the part of the instant claim relating to the guilt phase of his trial, Respondent has not suggested that any part of Ahmed's claim has been defaulted.
>
> Generally, procedural default is an affirmative defense that must be asserted by a respondent at the earliest opportunity or it will be waived. *Trest v. Cain*, 522 U.S. 87, 89 (1997). While a federal court is not required to *sua sponte* invoke procedural default when a respondent has failed to do so, there is no prohibition against doing so, either. *Id.* at 89-90; *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004); *Elzy v. United States*, 205 F.3d 882, 886 (6th Cir. 2000). This Court has been reluctant to raise the defense *sua sponte* except in cases where an expressly defederalized claim was presented to the state courts. *See Sheppard v. Bagley*, 604 F.Supp.2d 1003, 1008-1013 (S.D. Ohio 2009). That is not the situation here, and because of the seriousness of the penalty Ahmed faces, the Court will exercise its discretion not to raise the procedural defense *sua sponte*.
>
> Where a respondent does not advance a procedural default defense respecting a habeas claim never presented to the state court, a federal court has an opportunity to address the claim *de novo*. "If deference to the state court is inapplicable . . ., we 'exercise our independent judgment' and review the claim *de novo*." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *quoting Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir. 2002). Accordingly, to the extent Ahmed

argues that he was denied his right to represent himself in the guilt phase of his capital trial, this Court will address his claim *de novo.* That part of his claim relating to the mitigation phase of his trial, of course, will be considered under the familiar standard set forth in the AEDPA.

R&R, ECF No. 88, at PAGEID # 2171-72.  Accordingly, the Magistrate Judge

reviewed the portion of Petitioner's third ground for relief asserting the denial of

his right to self representation during the pre-trial proceedings and guilt phase *de*

*novo* and the allegations concerning the mitigation phase through the deferential

lens required by the AEDPA.

The right to self-representation is firmly rooted in the Sixth and Fourteenth

Amendments to the United States Constitution:

> It is undeniable that, in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly.  To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal.  The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'

*Faretta v. California*, 422 U.S. 806, 834 (1975) (citing *Illinois v. Allen*, 397 U.S.

337, 250-51 (1970)).  Although the right to self representation exists where a

defendant has voluntarily and intelligently elected to do so, the right is not

absolute.  As the Magistrate Judge noted:

> Criminal defendants may not use the courtroom to engage in "deliberate disruption . . . [or] serious and obstructionist misconduct," *id.* at 834 n.46, and must be "able and willing abide [sic] by the rules of procedure and courtroom protocol," *McKaskle v. Wiggins*, 465 U.S. 168, 173 (1984). "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 162 (2000), *see also Sell v. United States*, 539 U.S. 166, 180 (2003) (observing that "the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one"). Furthermore, any waiver of the right to counsel, for that is what the decision to represent one's self is, must be knowing, intelligent, and unequivocal. *Faretta*, 422 U.S. at 835. When the right to proceed *pro se* is properly invoked and a trial court denies the request, the denial is *per se* reversible error. *McKaskle*, 465 U.S. at 177 n.6.

R&R, ECF No. 88, at PAGEID # 2178-79.

In rejecting the pre-trial and guilt phase portion of Petitioner's third ground

for relief, the Magistrate Judge concluded that Petitioner had not attempted to

represent himself but had instead vacillated between wanting appointed counsel

discharged and replaced and seeking hybrid representation.  With respect to the

pre-trial proceedings, Petitioner asserts that his intent to waive his right to

counsel was evident during a January 2, 2001, hearing.  In the R&R, the

Magistrate Judge determined that no such request was made:

> [Petitioner] cites to pages eight through eighteen of the transcript of a January 2, 2001, hearing as supporting his claim, but those pages reveal that what Ahmed was actually seeking is discharge of his appointed counsel, Hershey and Olivito, because he had retained

private counsel, Carpino. (Trial Tr., Vol. 3 at 8-18.) Carpino incongruously stated that he wanted to be appointed as a third counsel in addition to Hershey and Olivito and that he wanted to be appointed as a friend of the court. *Id.* at 8. Ahmed suggested that he could represent himself *pro se* as well as having Carpino retained as his counsel, in other words, he requested hybrid representation, which the court denied. *Id.* at 11-12. Requesting hybrid representation is not the same as requesting to represent one's self, and Ahmed's argument that he requested *pro se* status within the pages of the transcripts he cited is disingenuous.

R&R, ECF No. 88, at PAGEID # 2173. Regarding a September 6, 2000, hearing, the Magistrate Judge concluded that although Petitioner sought to submit his own motion addressing a litany of issues including, but not limited to, voir dire, the exclusion of photographs, and his request to view the crime scene before it was cleaned, Petitioner made no request to proceed *pro se*. *Id.* at PAGEID # 2174. As to the January 8, 2001, hearing, the Magistrate Judge opined that Petitioner had sought to discharge his court-appointed attorneys but did not request to proceed *pro se*.

In his Corrected Objections, Petitioner does not attempt to refute the Magistrate Judge's *de novo* findings regarding whether he sought to definitively assert his right to self representation at the pre-trial and guilt phases. Instead, Petitioner reiterates previous arguments and asserts that he attempted to proceed *pro se* by filing several *pro se* motions, wherein he "sought to represent himself in these motions for limited purposes in order to be able to hire his counsel of choice and to preserve objections his trial lawyers were not making."

Corrected Obj., ECF No. 150, at PAGEID # 10458-59. Petitioner contends that "[a]lthough he asked to be able to self-represent for these specific purposes, he still wanted to hire counsel of choice once he vindicated his right to counsel of choice and to a speedy trial by representing himself in the specified matters." *Id.* The Court finds that each of the additional instances highlighted by Petitioner in the Corrected Objections evidence an intention by Petitioner to engage in hybrid representation, not to knowingly, intelligently and unequivocally waive his right to counsel. *See, e.g.*, Hearing of January 2, 2001, ECF No. 92-1, at PAGEID # 7577-78. Because there is no constitutional right to hybrid representation, Petitioner cannot establish that he is entitled to relief on this part of his third ground for relief. *See McKaskle v. Wiggins*, 465 U.S. 168 (1984) ("*Faretta* does not require a trial judge to permit 'hybrid' representation" and "[a] defendant does not have a constitutional right to choreograph special appearances by counsel"); *United States v. Cromer*, 389 F.3d 662, 682-83 (6th Cir. 2004) ("Because the assertion of the right to self-representation necessarily involves a waiver of the constitutional right to counsel, and given the importance of the right to counsel, we think the wisest course is to require a clear and unequivocal assertion of a defendant's right to self-representation before his right to counsel may be deemed waived."); *Cassano v. Bradshaw*, 1:03 CV 1206, 2018 WL 3455531, at *25 (N.D. Ohio July 18, 2018) ("The Ohio Supreme Court, therefore, reasonably found that Cassano's initial demands regarding representation 'focused

on hybrid representation,' to which he had no constitutional right"); *Rojas v. Warden*, No. 3:13cv2521, 2015 WL 631183, *7 (N.D. Ohio Feb. 12, 2015) ("A defendant has a constitutional right to be represented by counsel or to represent himself during his criminal proceedings, but not both." (citing *United States v. Mosley*, 810 F.2d 93, 98 (6th Cir. 1987))); *Randolph v. Cain*, 412 F. App'x 654 (5th Cir. 2010) ("Requests that vacillate between self-representation and representation by counsel are equivocal.").

With respect to the mitigation phase of trial, the Magistrate Judge summarized Petitioner's attempt to represent himself as follows:

> At the outset of the mitigation phase of Ahmed's trial, he repeatedly requested to waive his right to appointed counsel and to represent himself for the remainder of his trial. (Trial Tr., Vol. 9 at 10, 33, 34, 35.) The trial judge advised him that he would be required to follow the same procedural rules as attorneys, that she would not grant a continuance, and that he would not have a lot of time to talk with the mitigation witnesses. *Id.* at 11. She also warned Ahmed that he does not possess the same knowledge as do his attorneys respecting the available penalties, the mitigating factors, the aggravating circumstances, or the weighing process. *Id.* at 12. She reminded Ahmed that he had already been found in contempt of court several times during his trial, and she cautioned that if he engaged in disorderly or contemptuous conduct, she would remove him from his own case. *Id.* at 11. As the judge reviewed the proposed jury instructions with Ahmed, he rustled papers, and interrupted the judge to question whether the court composed the proposed instructions or if the prosecutor had done so. *Id.* at 23-25. The trial court advised him that he cannot question the court and that if it was his intent to represent himself and thwart the rules of procedure, she would not permit him to proceed *pro se*. *Id.* at 25. Ahmed then asked about the author of the jury instructions again, to which the court responded that if Ahmed were to ask another question contrary to the rules, she would hold him in contempt of court. *Id.* Ahmed continued to interrupt the

judge and objected to Hershey and Olivito's continued presence in the courtroom since he had decided to represent himself. *Id.* at 29, 33. The judge asked Ahmed again if he wanted his appointed counsel discharged and to represent himself, to which Ahmed responded by repeating his persistent complaint of having been denied his right to hire counsel of his choice. *Id.* at 34. The court then overruled Ahmed's motion, stating it was false and that the issue of Ahmed's dissatisfaction with his appointed counsel had been dealt with previously. *Id.* at 35. The court continued to explain self-representation to Ahmed, however, and responded to his complaint about Hershey and Olivito remaining in the courtroom by saying that they would be there for Ahmed to consult should he wish to do so. *Id.* at 33, 36-37. Finally, the trial court indicated to Ahmed that if he wanted to proceed *pro se*, he had to sign a form acknowledging his rights by a time certain that day. *Id.* at 37. That time came and went without Ahmed's signing the form acknowledging his rights. *Id.* at 38. Instead, Ahmed composed a written addendum to the form contending he was denied his constitutional rights to a continuance and to self-representation without the presence of his previously appointed counsel. *Id.* at 38, 41. When the trial court questioned Ahmed as to whether he agreed that he was advised of his rights to self-representation, Ahmed argued that advisement means nothing when the rights are not given. *Id.* The court found that Ahmed had not effectively signed the acknowledgement of rights form and overruled his motion to proceed *pro se. Id.* at 43

R&R, ECF No. 88, at PAGEID # 2176-77.  *See also* Trans., ECF No. 92-5, at

PAGEID # 9298-9331.

The Magistrate Judge concluded that this claim was raised on direct

appeal to the Ohio Supreme Court as Petitioner's thirteenth proposition of law,

and the Ohio Supreme Court rejected the claim on the merits.  Specifically, the

Ohio Supreme Court determined:

In his 13th proposition of law, appellant submits that the trial court deprived him of due process and the right to conduct his own defense when the court declined to accept his waiver of counsel at the

beginning of the penalty phase. Appellant contends that *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, guarantees him the right to waive assistance of counsel and proceed *pro se.*

If a trial court denies the right of self-representation, when properly invoked, the denial is per se reversible error. State v. Reed (1996), 74 Ohio St.3d 534, 535, 660 N.E.2d 456, citing McKaskle v. Wiggins (1984), 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122. However, in this case, the right of self-representation was not properly invoked. See State v. Vrabel, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 49–53.

At the beginning of the penalty phase, appellant gave the trial court a *pro se* motion "to exercise his right to self representation under the circumstances and thus hereby discharge the appointed counsels." The court explained to appellant the right that he was waiving and what representing himself would entail. The court then gave appellant a docket entry to sign that stated: "Being fully advised of my rights, I hereby elect to represent myself." Appellant signed the form but also wrote on the docket entry: "I have not been allowed the rights under Constitution and as given in Constitution and Crim.R. 10 and 44 to continuance and representation by selection counsel and even to represent myself alone without the presence of court appointed counsels to whom I have sued in the civil case C2–001–0013 in Federal Court. There has been no defense, no defense witnesses and almost no investigation to justify 16 months of delay or period before trial and—."

The trial court then addressed appellant and repeatedly asked him whether he understood his rights and wanted to waive them. Appellant did not give a clear answer. The court then held: "When I read the comments that you have written on the docket entry, I find that you have failed to effectively sign the entry that was prepared by the court; that the soliloquy [sic] has failed and that you have not, in fact, elected to undertake self representation. We will proceed. Counsel will represent you."

The trial court correctly found that appellant did not unequivocally and explicitly invoke his right to self-representation. See State v. Cassano, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 37–38. "The constitutional right of self-representation is waived if it is not timely and unequivocally asserted." Jackson v. Ylst (C.A.9, 1990),

921 F.2d 882, 888; see, also, United States v. Frazier–El (C.A.4, 2000), 204 F.3d 553, 558 (assertion of the right of self-representation "must be * * * clear and unequivocal").

Given these circumstances, appellant's 13th proposition is not well taken.

*State v. Ahmed*, 103 Ohio St. 3d 27, 44-45 (2004).

The Magistrate Judge concluded that the decision of the Ohio Supreme Court that Petitioner did not unequivocally invoke his right to self-representation during the penalty phase was entitled to deference under the AEDPA. Additionally, the Magistrate Judge determined that Petitioner's unwillingness to adhere to the rules of court and to conduct himself within the parameters of courtroom protocols constituted an additional reason to deny his request to self represent. The Magistrate Judge opined:

Ahmed also argues that the trial court improperly required his waiver to be in writing. (Traverse, Doc. No. 71 at PageID 1701.) But what the trial court did is not the primary focus of this Court. Instead, it is how the Ohio Supreme Court decided the constitutional propriety of the trial court's handling of the matter that is at issue. *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). That court merely concluded that the trial court correctly found Ahmed had not equivocally and explicitly invoked his right to represent himself in the mitigation phase of his trial. *Ahmed*, 103 Ohio St. 3d at 45, 2004-Ohio-4190 at ¶ 107. Significantly, the state supreme court acknowledged that Ahmed actually signed the written request to proceed *pro se*, *Ahmed*, 103 Ohio St. 3d at 44, 2004-Ohio-4190 at ¶ 105, contrary to the trial court's statement on the record that he had not (Trial Tr., Vol. 9 at 38).

In habeas corpus, the petitioner's burden "must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S.Ct. 770, 784 (2011). Both the trial court and the Ohio Supreme Court concluded that Ahmed had not

effectively invoked his right to self representation, presumably because of his handwritten addendum to the form provided to Ahmed by the trial court. This Court need not agree with the state court on that question to deny Ahmed's claim for habeas corpus relief, however. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S.Ct. at 786, *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). This Court does not disagree with the state court's decision, but even if it were to do so, Ahmed has not demonstrated that only an unreasonable jurist would agree with the decision. In addition, another basis for denying Ahmed's request to proceed *pro se*, perhaps even stronger than the first, is apparent in the record.

As noted above, a defendant wishing to represent himself may not use the right for the purpose of disrupting the proceedings, and must be willing to follow courtroom procedure and protocol. *Faretta*, 422 U.S. at 834 n.46; *United States v. Lopez-Osuna*, 232 F.3d 657, 665 (9th Cir. 2000) (holding defendant's request to represent himself may be denied when he is unable or unwilling to adhere to rules of procedure and courtroom protocol); *United States v. Frazier-El*, 204 F.3d 553, 559 (4th Cir. 2000) (stating that "the *Faretta* right to self-representation is not absolute, and the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"); *United States v. Brock*, 159 F.3d 1077, 1079 (7th Cir. 1998) (finding that "when a defendant's obstreperous behavior is so disruptive that the trial cannot move forward, it is within the trial judge's discretion to require the defendant to be represented by counsel"). Ahmed had already been cited for contempt of court before he requested to proceed *pro se* in the mitigation phase of his trial. In numerous hearings, Ahmed repeatedly interrupted the trial judge, answered questions directed to others, refused to move on in his argument when instructed to do so by the court, and used contemptuous language directed at his attorneys and the court (Hearing of January 2, 2001, Trial Tr., Vol. 3 at 18, 19; Hearing of January 8, 2001, Trial Tr., Vol. 4 at 11, 20, 27, 30-31, 33, 37, 42, 43, 45, 46, 48, 49, 52, 54, 57, 59, 73-74; Hearing of January 11, 2001, id. at 86, 87; Hearing of February 1, 2001, Trial

Tr., Vol. 9 at 11), demonstrating a persistent inability or unwillingness to adhere to the rules of procedure and courtroom protocol. As the trial judge observed, she had been "heroically patient" with Ahmed and his numerous and repeated complaints about them, providing him with multiple opportunities at hearings to air his grievances about his appointed attorneys, his treatment at the jail, and the trial judge herself. (Hearing of January 11, 2001, Trial Tr., Vol. 4 at 85.) Still, she found it necessary to hold Ahmed in contempt of court. (Hearing of February 1, 2001, Trial Tr., Vol. 9 at 11.) In addition, in presenting his request to proceed *pro se*, Ahmed again breached protocol by arguing about the judge's decision that appointed counsel would become stand-by counsel should Ahmed represent himself, challenging the judge on the origin of the proposed jury instructions to the point of being threatened with being held in contempt of court again, interrupting the judge, and arguing with the judge about the difference between being advised of his rights and being given his rights. (Hearing of February 1, 2001, Trial Tr., Vol. 9 at 12, 25, 33, 36, 38-39.) Thus, even if the state court's finding that Ahmed had not effectively invoked his right to self representation were objectively unreasonable, Ahmed's demonstrated unwillingness to adhere to the rules of court and to conduct himself within the parameters of courtroom protocol would provide a solid ground upon which to deny his right to represent himself in the mitigation phase of his trial.

R&R, ECF No. 88, at PAGEID # 2179-80.

This Court agrees with the findings of the Magistrate Judge. The decision of the state courts on this issue is entitled to deference. Furthermore, Ahmed's disruptive behavior was an additional reason to deny his request to represent himself. A review of the hearing discussing his request demonstrates his inability to accept the rules of court. It is also apparent from that hearing that Petitioner sought to represent himself in part just so he could call his appointed counsel as witnesses and subject them to cross-examination. Petitioner's third claim for relief lacks merit, and this Court hereby **ADOPTS** the R&R, **OVERRULES**

Petitioner's Corrected Objections, and declines to issue a COA.  Reasonable jurists would not find the Court's resolution of Petitioner's third claim for relief to be debatable or wrong.

### Fifth Claim for Relief:  Ineffective Assistance of Appellate Counsel

In his fifth claim for relief, Petitioner argues he was "denied the effective assistance of appellate counsel when his lawyers failed to raise in his first appeal of right preserved, constitutional issues, apparent on the face of the record including the denial of the right to speedy trial, the right to self-representation, the right to counsel of choice, and trial before a biased or apparently biased judge." Corrected Obj., ECF No. 150 at PAGEID # 10403.  These claims were raised before the Ohio Supreme Court in Petitioner's application to reopen his direct appeal, however his application for reopening was dismissed as untimely because Petitioner's appointed counsel failed to comply with the 90-day filing deadline.  ECF No. 90-6, PAGEID # 4323.  The Magistrate Judge concluded that this procedural rule was not firmly established and regularly followed at the time it was enforced against Petitioner.  R&R, ECF No. 88, at PAGEID # 2189-2191. As such, the Magistrate Judge reviewed Petitioner's claims of ineffective assistance of appellate counsel *de novo* and determined that sub-claims one through nine lacked merit and sub-claims ten through thirteen were procedurally defaulted because they were not raised in the application to reopen.  *Id.* at PAGEID # 2191-2218.

In his Corrected Objections, Petitioner contends the Magistrate Judge was correct in the assessment of the procedural issues but incorrect in the *de novo* review of certain sub-parts of his fifth claim for relief.  Specifically, Petitioner objects to the Magistrate Judge's resolution of the sub-parts challenging appellate counsel's failure to raise the denial of counsel of choice (Corrected Obj., ECF No. 150, at PAGEID # 10470-76), the speedy trial violation (*Id.* at PAGEID # 10476-79), the denial of his right to self-representation (*Id.* at PAGEID # 10479-80), and his claim that the trial judge was biased (*Id.* at PAGEID # 10481-82).

It is well settled that appellate counsel's failure to raise an issue on direct appeal amounts to the ineffective assistance of counsel "only if a reasonable probability exists that the inclusion of the issue would have changed the result of the appeal." *Henness v. Bagley*, 644 F.3d 308, 317 (6th Cir. 2011) (citing *Wilson v. Parker*, 515 F.3d 682, 707 (6th Cir. 2008)).  "If a reasonable probability exists that the defendant would have prevailed had the claim been raised on appeal, the court still must consider whether the claim's merit was so compelling that the failure to raise it amounted to ineffective assistance of appellate counsel." *Id.*  In other sections of this Opinion and Order, the Court has considered and rejected each of the underlying claims that Petitioner argues appellate counsel should have raised.  Because none of the underlying claims have merit, Petitioner cannot prevail on his claim of ineffective assistance of appellate counsel for

failing to raise those issues on appeal. The Court **ADOPTS** the Magistrate Judge's R&R as it relates to Petitioner's fifth claim for relief, R&R ECF No. 88, at PAGEID # 2186-2218, and hereby **DISMISSES** this claim in its entirety. Furthermore, the Court finds that reasonable jurists would not disagree with the Court's resolution of the claim and concludes that no COA should issue.

### Eighth Claim for Relief: Biased Judge

In his Eighth Claim for Relief, Petitioner argues the trial judge was biased against him throughout his trial. Petition, ECF No. 35, at PAGEID # 273-77. Specifically, Petitioner contends he was "tried before a judge who took control of his funds through defunct divorce proceedings and continued to control his funds making him unable to hire his own counsel. The judge was intolerant of Petitioner's speaking style and accent and created the appearance (and belief in him) that she was biased against him by cutting him off, telling him to be quiet and to 'shut up.'" Corrected Obj., ECF No. 150 at PAGEID # 10403.

The Magistrate Judge concluded that Petitioner's Eighth Claim for Relief is procedurally defaulted and that the ineffective assistance of appellate counsel for failing to raise the claim on direct appeal could not serve as cause and prejudice to excuse that default. The Magistrate Judge concluded that because the underlying claim of judicial bias lacks merit, appellate counsel were not ineffective for failing to raise and preserve the claim on direct appeal. The Court **ADOPTS** the Magistrate Judge's discussion of both the procedural default of this

claim, R&R, ECF No. 88, at PAGEID # 2228-30, and what amounts to a merits discussion of the claim in connection with Petitioner's allegations of ineffective assistance of appellate counsel, *id.* at PAGEID # 2201-03. In sum, although Petitioner alleged bias and sought to disqualify the trial judge through various *pro se* documents and complaints, he failed to fairly present this claim to the state courts on appellate review.

The Court also finds that even if Petitioner had properly raised the claim on direct appeal, the claim is without merit. In connection with Ahmed's First Claim for Relief, this Court adopted the Magistrate Judge's determination that the trial judge did not deny Petitioner access to his funds or impede his ability to hire counsel of choice. Moreover, although Ahmed complains that the trial judge continuously attempted to silence him, the record reflects that Judge Sargus exuded patience in her handling of this case and liberally permitted Petitioner to be heard throughout the proceedings. Hundreds of pages of the transcript reveal the wide latitude Petitioner had to air his grievances regarding appointed counsel, his treatment at the jail, and his belief that jail officials were surveilling his meetings with counsel through ceiling tiles, baseboards, and air vents. *See*, *e.g.*, Hearing of Nov. 9, 2000, ECF No. 92-1, at PAGEID # 7498-7554; Hearing of Jan. 2, 2001, ECF No. 92-1, at PAGEID # 7568-87; Hearing of Jan. 8, 2001, ECF No. 92-1, at PAGEID # 7588-7705. With respect to the reasonable limits imposed by the trial court, the Magistrate Judge correctly concluded:

> Judge Sargus' refusal to permit Ahmed limitless opportunities to complain about his attorneys, his treatment at the jail, and the bias he perceived on the judge's part toward him was understandable and completely appropriate to maintain some semblance of order in the court in the face of Ahmed's obstreperous behavior.  That being the case, Ahmed's appellate counsel were not derelict in failing to raise a losing judicial bias claim as error on direct appeal.

R&R, ECF No. 88, at PAGEID # 2203.  The Magistrate Judge's recommendation is a fair and correct assessment of Petitioner's claim, and Petitioner has failed to raise any convincing arguments to the contrary in his objections.  The Court hereby **OVERRULES** Petitioner's objections and **DISMISSES** Petitioner's Eighth Claim for Relief as both procedurally defaulted and without merit.

The Magistrate Judge recommended against granting a COA on this issue. A district court "should not grant a certificate without some substantial reason to think that the denial of relief might be incorrect."  *Moody v. United States*, 958 F.3d 485 (6th Cir. 2020).  Here, two equally strong reasons exist to deny relief on this claim, as it is both defaulted and utterly lacking in merit.  A COA is not warranted.

### Thirteenth Claim for Relief:  Gruesome Photographs

In his Thirteenth Claim for Relief, Petitioner argues that the State "introduced particularly gory and gruesome photographs that were, at best, of cumulative probative value and were so likely to induce prejudice against the accused that he was denied Due Process of Law."  Corrected Obj., ECF No. 150 at PAGEID # 10403.  Specifically, Petitioner challenges the admission of a

videotape and numerous crime scene and autopsy photographs.  Petition, ECF
No. 35 at PAGEID # 323-24.

In the R&R, the Magistrate Judge determined that Petitioner properly
presented his gruesome photographs claim to the Ohio Supreme Court, but that
court "did not acknowledge that Ahmed had included his federal claim in his
proposition of law before that court, nor did it rely on any federal law or use any
language in its opinion that might suggest it had considered Ahmed's due
process arguments."  R&R, ECF No. 88 at PAGEID # 2264.  The Magistrate
Judge concluded that the Ohio Supreme Court relied exclusively on state law,
and specifically Ohio R. Evid. 403, in finding that "most of the photographs and
slides and the crime-scene videotape admitted were relevant to prove the killer's
intent, illustrate witnesses' testimonies, or give the jury an appreciation of the
nature and circumstances of the crimes."  *Id*.  Because the Ohio Supreme Court
did not address the federal claim Petitioner presented in his direct appeal, the
Magistrate Judge reviewed Petitioner's Thirteenth Claim for Relief *de novo*,
rather than deferentially.  *Id.*

The Magistrate Judge cited the Ohio Supreme Court's description of the
materials at issue, a description Petitioner does not challenge:

> Eight crime scene photos were admitted over appellant's objections,
> and they are gruesome.  State's Exhibit 6 depicts the body of Abdul
> Bhatti on the garage floor.  State's Exhibit 15 shows the doorway area
> between the basement and garage where the bodies of Ruhie and
> Abdul can partially be seen.  State's Exhibit 16 depicts the bodies of

Lubaina, Ruhie, and Nasira on the basement floor. . . .   State's Exhibits 17, 18, 19, and 20 are individual close-up photos of the heads of the four murder victims.   State's Exhibit 21 is a crime-scene videotape, and portions of it are repetitive of the crime-scene photos. . . .

Appellant also claims that he was prejudiced by the admission of the autopsy slides of the four victims. . . .

Many of the autopsy slides are gruesome.

*State v. Ahmed*, 103 Ohio St. 3d at 42-43.

In rejecting Petitioner's claim, the Magistrate Judge compiled and cited a laundry list of federal cases rejecting due process claims involving the admission of gruesome evidence:

The Sixth Circuit Court of Appeals has rejected claims that the admission of gruesome or repetitive evidence is a violation of a defendant's right to due process on numerous occasions. *Franklin v. Bradshaw,* 695 F.3d 439, 456–57 (6th Cir. 2012) (rejecting claim that autopsy photographs of charred, disfigured, and gory remains of victims denied petitioner the fundamental right to a fair trial); *Biros v. Bagley,* 422 F.3d 379, 391 (6th Cir. 2005) (holding admittedly gruesome photographs of victim's severed head, severed breast, and torso depicting pre-and post-mortem injuries demonstrated defendant's intent to kill and mutilate, and that court's limiting instruction was sufficient to guarantee fundamentally fair trial); *Cooey v. Coyle,* 289 F.3d 882, 893–94 (6th Cir. 2002) (finding gruesome and duplicative photographs were highly probative and did not "raise the spectre of fundamental fairness such as to violate federal due process of law"). Many other circuit courts of appeals have done so as well. *Lyons v. Brady,* 666 F.3d 51, 54–56 (1st Cir. 2012); *Wilson v. Sirmons,* 536 F.3d 1064, 1114–16 (10th Cir. 2008); *Rousan v. Roper,* 436 F.3d 951, 958–59 (8th Cir. 2006); *Woods v. Johnson,* 75 F.3d 1017, 1038–39 (5th Cir. 1996); *Gomez v. Ahitow,* 29 F.3d 1128, 1139–40 (7th Cir. 1994); Bat*chelor v. Cupp,* 693 F.2d 859, 865 (9th Cir. 982).

R&R, ECF No. 88 at PAGEID # 2267.  In the time since the Magistrate Judge

issued the R&R, the law has not become more favorable to Petitioner.

The Magistrate Judge determined that although the crime scene photographs and videotape were gruesome, many of the photographs were no more gruesome than photographs introduced by the defense, which also portrayed all three bodies, and "in fact appear to be if not identical, then nearly so to some of the challenged photographs (Defense Exhibits 10, 18, Appendix, Vol. 13 at 11, 19)." R&R, ECF No. 88, at PAGEID # 2267. The Magistrate Judge noted that while the close-up photographs of the heads of the four victims are quite gruesome, State's Exhibits 17–20; Appendix, Vol. 12 at 139–42, the photos "were used at trial to identify the victims and to establish the state of the crime scene at the time it was discovered. (Trial Tr., Vol. 7 at 218–20, 239–47.)." R&R, ECF No. 88, at PAGEID 2268. Additionally, the Magistrate Judge determined the photos "show the positions of the victims' bodies relative to each other, and establish the nature and extent of the injuries to them." *Id*. The Magistrate Judge concluded:

> As for the crime scene videotape, it too is gruesome in parts. (State's Exhibit 21, Appendix, Vol. 12, following index, immediately before page 1.) It was offered by the State for the purpose of more fully illustrating the bodies' spatial relationship to each other and various other objects of evidentiary value, such as Ahmed Bhatti's eyeglasses on the garage floor, blood droplets throughout the scene and in the kitchen of the house, and bloody footprints found at the scene and their location relative to the bodies and other evidence. *Id.* The videotape does not linger unnecessarily over the bodies, the copious quantities of the victims' blood, or the slashed throats of the four victims. *Id.* The videotape, too, was used in

conjunction with testimony from the detective who was one of the first
to enter the crime scene. (Trial Tr., Vol. 7 at 247–52.)

*Id.* at PAGEID # 2268.

In the Corrected Objections, Petitioner rehashes previous arguments
concerning the gruesome nature of the photographs and argues it was error for
the trial court to re-admit certain photos during the sentencing phase. None of
his arguments merit further discussion by this Court, with the exception of the
autopsy photos. The Magistrate Judge noted in the R&R that the autopsy slides
were unavailable for review, and no photographic reproductions of those images
had been provided. Those images have since been provided to the Court. On
August 19, 2019, the Warden-Respondent manually filed one compact disc
containing the autopsy photos that were admitted at trial as State's Exhibits 163
through 166. ECF No. 143. State's Exhibit 163 is a slide containing thirteen
photographs taken as part of the autopsy of Abdul Bhatti. Exhibit 164 is a slide
containing seventeen photographs from the autopsy of Ruhie Ahmed. Exhibit
165 is a slide containing ten photographs from the autopsy of Nasira Ahmed.
Finally, Exhibit 166 is a slide containing fourteen photographs from the autopsy
of Lubaina Bhatti Ahmed.

The Court has reviewed each set of photographs and finds Petitioner's
objections lack merit. Dr. Keith Norton, the forensic pathologist who conducted
the four autopsies, testified regarding the extensive and numerous injuries

inflicted upon each of the four decedents.  Tr. Trans., ECF No. 92-4, at PAGEID # 8957-9009.  Dr. Norton testified the photographs were helpful to illustrate his findings.  *Id.* at PAGEID # 8966.  During his testimony, Dr. Norton utilized the photographs when describing the vast number of injuries as well as the nature and extent of the wounds.  The photographs illustrated the fatal wounds, the manner of death, and the presence of defensive wounds on all but Nasira.  Furthermore, the photographs were probative of Petitioner's intent.  For example, the photographs illustrated Dr. Norton's testimony that Lubaina Ahmed received what could be characterized as a disproportionate number of injuries in relation to the other deceased victims.  Additionally, the photographs illustrated the severity of her neck injury, which was described by Dr. Norton as a ten and one-half inch long, two and one-half inch deep incised wound or sharp-instrument wound, "which cut across the voice box, both jugular veins, both carotid arteries, and then there was a – actually a mark into the spinal column, the back bone from the front."  ECF No. 92-4 at PAGEID # 8986.  The photographs illustrated additional injuries to Lubaina Ahmed, including eleven defensive wounds and thirty-three scalp lacerations associated with blunt force trauma.  ECF No. 92-4, at PAGEID # 8990-97.  Likewise, the photographs illustrated Petitioner's intent and the nature of the injuries to Ruhie Ahmed, which included twenty-six scalp lacerations, at least seven of which were lethal, as well as a significant incised wound to the neck measuring seven and one-half inches long and one and one-

half inches deep, that injured the voice box, carotid artery and jugular vein.  ECF No. 92-4, at PAGEID # 8977-85.

In sum, the Court **ADOPTS** the R&R of the Magistrate Judge with respect to Petitioner's gruesome photographs claim.  Habeas relief is not available for a state court's evidentiary ruling unless the ruling was "so egregious that it resulted in a denial of fundamental fairness."  *Giles v. Schotten*, 449 F.3d 698, 704 (6th Cir. 2006); *see also Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  Here, Petitioner has not established that the trial court's evidentiary rulings with respect to the photographs or videotape were egregious, or even incorrect.  The photographs were probative of Petitioner's intent to kill and mutilate the four victims, and they illustrated the testimony of the pathologist regarding the nature and number of injuries.  Likewise, the crime scene photographs and videotape discussed in detail by the Magistrate Judge were indicative of the spacial relationship of the bodies at the crime scene, both in relation to each other and to other objects of evidentiary value, such as bloody footprints and blood droplets.  That evidence also helped to illustrate the testimony of the first officers on the scene.

The Court hereby **DENIES** Petitioner's Thirteenth Claim for Relief as without merit and further finds that this issue is not deserving of further attention on appeal.  The Court declines to issue a COA.

### Nineteenth Claim for Relief:  Speedy Trial

In his Nineteenth Claim for Relief, Petitioner argues the trial court,

prosecutor, and his trial counsel violated his right to a speedy trial.  Petition, ECF
No. 35 at PAGEID # 371-78.  According to Petitioner, he was "denied his right to
a speedy trial because the trial judge took control of his funds and made it
impossible for him to hire his counsel of choice and appointed counsel against
Petitioner's wishes who failed to investigate and conduct his defense as he
wished, who failed to safeguard his right to a speedy trial, and who failed to
pursue his right to counsel of choice."  Corrected Obj., ECF No. 150 at PAGEID
# 10404.

   The Magistrate Judge determined Petitioner procedurally defaulted his
Nineteenth Claim for Relief by failing to raise it on direct appeal and that the
ineffective assistance of appellate counsel could not serve as cause and
prejudice sufficient to excuse that default.  R&R, ECF No. 88, at PAGEID # 2295.
In so finding, the Magistrate Judge considered the merits of Petitioner's
underlying speedy trial claim to the extent necessary to determine whether
appellate counsel were ineffective for failing to raise the matter as error on direct
appeal.  The Magistrate Judge concluded the claim, had it been raised, was
meritless, which in turn means that appellate counsel were not ineffective for
omitting the claim on direct appeal.  R&R, ECF No. 88, at PAGEID # 2295.

   In considering the underlying merits of Petitioner's speedy trial claim as it
related to whether appellate counsel were ineffective for failing to raise the issue,
the Magistrate Judge applied the Supreme Court's flexible four-part balancing

test for examining whether a defendant's federal constitutional right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice occurred. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "No one factor is dispositive. Rather, they are related factors that must be considered together with any other relevant circumstances." *Brown v. Romanowski*, 845 F.3d 703, 712 (6th Cir. 2017) (citing *Barker*, 407 U.S. at 533). Furthermore, "[e]ven if all four *Barker* factors are satisfied, a court is not required to conclude that a defendant's speedy trial right has been violated." *Rice v. Warden*, 786 F. App'x 32, 35 (6th Cir. 2019).

Here, the Magistrate Judge noted that the length of delay in this case was approximately sixteen months, calculated from the date of Petitioner's September 11, 1999, arrest until voir dire began on January 16, 2001. A delay that approaches one year triggers a court's consideration of the rest of the *Barker* factors. With respect to the second factor, the Magistrate Judge determined that none of the continuances were requested by the prosecution. Instead, each continuance was requested by defense counsel, and "because 'the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation,' delay caused by the defendant's counsel is also charged against the defendant, whether counsel is retained or appointed." R&R, ECF No. 88, at PAGEID # 2197 (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991)).

Specifically, the Magistrate Judge concluded:

> None of defense counsel's requests for continuances was unreasonable.  Approximately one month of delay was requested and granted because defense counsel stated it was impracticable to defend a defendant charged with four aggravated murders and facing the death penalty three months after the crimes.  That is indubitably an accurate assessment and implies conscientiousness rather than needless delay.  One year of the delays can be attributed to the time necessary for the defense to complete DNA testing.  On day of the delay was attributable to the federal holiday marking the birth of Dr. Martin Luther King, Jr.  Although Ahmed at times expressed opposition to the continuances, none of counsel's requests were unreasonable and nothing in the record suggests that counsel had any nefarious or ulterior motive in requesting them.  Even if the reasons given by counsel had not fully explained why any particular continuance was required, Ahmed himself caused his attorneys to expend significant pre-trial time on collateral matters, such as Ahmed's repeated attempts to substitute counsel, which were sometimes effective; his lawsuits naming everyone involved in his legal matters (including those whose connection was solely tangential) as either defendants or witnesses; his seeking to have the trial judge removed from his case; his constant complaining about having been deprived of access to his own money; and his insistence that extraordinary measures be taken to assure the confidentiality of his conversations with counsel at the jail.  "Just as a State's 'deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the [State],' so too should a defendant's deliberate attempt to disrupt proceedings be weighed heavily against the defendant." *Vermont*, 556 U.S. at 93, *quoting Barker*, 407 U.S. at 531.  Thus, any delay unaccounted for by counsel's need to adequately prepare for trial would be taxed to Ahmed's contumacy and his attempts to derail his trial.  The second *Barker* factor weighs heavily against Ahmed.

R&R, ECF No. 88, at PAGEID # 2197-98.  With respect to the remaining factors,

the Magistrate Judge concluded the third factor weighed in favor of Petitioner,

because he objected to continuance requests.  As to the last factor—prejudice—

the Magistrate Judge noted "Ahmed failed to demonstrate, as opposed to alleging, prejudice from the delays."  *Id.* at PAGEID # 2200.

In his Corrected Objections, Petitioner argues that in the context of a speedy trial violation, the prejudice is "personal" and "not always readily identifiable."  Corrected Obj., ECF No. 150, at PAGEID # 10505. Specifically, Petitioner asserts he suffered oppressive pre-trial incarceration, was assaulted while in jail awaiting trial, was denied food at the conclusion of a religious fast, and lost his apartment while waiting in jail for sixteen months before trial.  *Id.* at PAGEID # 10507.  The Court does not find Petitioner's arguments persuasive.

The Supreme Court has identified three relevant forms of prejudice in speedy trial cases: (1) "oppressive pretrial incarceration"; (2) "anxiety and concern of the accused"; and (3) "'the possibility that [the accused's] defense will be impaired' by dimming memories and loss of exculpatory evidence." *Doggett v. United States,* 505 U.S. 647, 654 (1992) (quoting *Barker,* 407 U.S. at 532).  "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."  *Barker*, 407 U.S. at 532.  *See also United States v. Howard,* 218 F.3d 556, 564 (6th Cir. 2000) ("a defendant who cannot demonstrate how his defense was prejudiced with specificity will not make out a speedy trial claim no matter how great the ensuing delay.").  In the instant case, Petitioner does not allege the third form of prejudice and fails to assert how the pretrial delay impaired his defense or

resulted in the loss of exculpatory evidence.  Petitioner's claimed prejudice, particularly the loss of his apartment, is less than substantial.

Here, the reasons for the delay in trial were largely due to the conduct of Petitioner himself or Petitioner's counsel—not dilatory conduct by the state. Counsel sought reasonable continuance requests to prepare to defend a case of mass murder involving the death penalty.  While attempting to remain focused on the defense of Petitioner, counsel were continually forced to address peripheral matters including Petitioner's unfounded and hostile allegations towards them, Petitioner's attempts to sue them, Petitioner's constant complaints of conspiracies, and his overall disruption of the proceedings.  The Court finds Petitioner's pre-trial delay was not unreasonable, Petitioner did not suffer prejudice as a result, and the Court rejects any claim that Petitioner was denied his constitutional right to a speedy trial.

In sum, Petitioner procedurally defaulted his speedy trial claim by failing to raise it on direct appeal.  Petitioner cannot establish the ineffective assistance of appellate counsel as cause and prejudice to excuse that default because the claim would not have been successful on the merits had appellate counsel raised it.  The Court hereby **ADOPTS** the R&R of the Magistrate Judge, set forth at ECF No. 88 at PAGEID # 2194-2200, 2294-95, and **OVERRULES** Petitioner's objections.  The Court finds that reasonable jurists would not find the Court's resolution of Petitioner's Nineteenth Claim for relief to be debatable or wrong,

and Petitioner is not entitled to a COA.

**Twenty-Seventh Claim for Relief:  Cumulative Error**

In his Twenty-Seventh Claim for Relief, Petitioner argues "[t]he cumulative prejudice from the errors at his trial denied Petitioner a fair trial and Due Process of law."  Corrected Obj., ECF No. 150 at PAGEID # 10404.  The Magistrate Judge summarily denied this claim, finding cumulative error is not a basis for habeas corpus relief, even in a capital case.  R&R, ECF No. 88, at PAGEID # 2317.  The Magistrate Judge's decision is supported by binding Sixth Circuit precedent.  *See Webster v. Horton*, 795 F. App'x 322, 327-28 (6th Cir. 2019) ("Webster argued that the trial court's cumulative errors entitled him to habeas relief.  As stated by the district court, such claims of cumulated trial errors are not cognizable under § 2254.").  *See also Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012) ("'[P]ost-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief.'") (quoting *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010)); *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) ("Finally, Sheppard argues that the cumulative effect of these errors rendered his trial fundamentally unfair.  Post-AEDPA, that claim is not cognizable."); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) ("Because Moore can cite no Supreme Court precedent obligating the state court to consider the alleged trial errors cumulatively, we cannot grant relief on this ground."); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (death

penalty case noting "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").  Furthermore, there is no error to cumulate as each of Petitioner's claims for relief lack merit.  Petitioner's objection to the decision of the Magistrate Judge is **OVERRULED**, and because reasonable jurists would not find this decision debatable or wrong, the Court will not issue a COA as to Petitioner's Twenty-Seventh Claim for Relief.

## IV.    CONCLUSION

For the foregoing reasons, the Court **ADOPTS** and **AFFIRMS** the Magistrate Judge's R&R, ECF No. 88, and **OVERRULES** Petitioner's Corrected Objections, ECF No. 150.  The Court **DENIES** the petition for a writ of habeas corpus and **DISMISSES** this action **WITH PREJUDICE**.

Furthermore, the Court **DENIES** Petitioner a certificate of appealability and hereby **CERTIFIES** that any appeal in this matter would be objectively frivolous.

**IT IS SO ORDERED.**

s/Michael H. Watson
_____
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**